UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.
_____

)
KRISHNA MAHARAJ,                                        )
                         Petitioner,                   )
                                                       )
        v.                                             )
                                                       )
JULIE L. JONES, Secretary,                             )
Florida Department of Corrections;                     )
JOSE COLON, Warden, South Florida                      )
Reception Center; and                                  )
PAM BONDI, Florida Attorney General,                   )
                         Respondents.                  )
_____)

# SECOND PETITION FOR A WRIT OF HABEAS CORPUS BY A PRISONER IN STATE CUSTODY (28 U.S.C. §2254)

**BENEDICT P. KUEHNE**
**Miami Tower, Suite 3550**
**100 SE 2 Street**
**Miami, FL 33131**
**Tel: 305 789 5989**
**ben.kuehne@kuehnelaw.com**
**efiling@kuehnelaw.com**

**CLIVE A. STAFFORD SMITH**
**La State Bar No. 14,444**
**Reprieve PO Box 72054**
**London UK, EC3P 3BZ ENGLAND**
**Tel: +44 (0)20 7353 8140**
**clive@reprieve.org.uk**

# TABLE OF CONTENTS

**INTRODUCTION** ..................................................................................................................................... 1

**I.   PROCEDURAL BACKGROUND** ................................................................................................. 1

**II.   PRELIMINARY STATEMENT OF THE FACTS** ......................................................................... 3

**A.   The Actors** .................................................................................................................................... 5

**B.   What We Now Know: The Truth of what happened in this Case** .................................................. 10

**C.   The Case Presented To the Jury In 1987** ..................................................................................... 29

**1.   III. VERY SIGNIFICANT UNDERMINING OF THE STATE'S CASE IN 1997** .......................... 33

**1.   It was clear by 1997 that the Moo Youngs were deeply involved in criminal activity** .................... 34

**2.   The "proof" of motive, including highly prejudicial evidence presented by Eslee Carberry in the Caribbean Echo tabloid concerning Kris Maharaj, was emphatically dismantled in 1997.** ................. 39

**3.   Detective Buhrmaster's testimony that Kris Maharaj denied being in Room 1215 was shown to be false.** ...................................................................................................................................... 41

**4.   The prosecution's ballistics evidence was eviscerated even by 1997.** ............................................ 42

**5.   Tino Geddes's testimony was thoroughly disproven by 1997.** ...................................................... 54

**i.   Tino Geddes's story about the "Dry Run" at the Dupont Plaza (that never happened)** .................. 56

**(a)   Tino Geddes's eternally changing, and readily disprovable, story about the "Dry Run" at the Dupont Plaza** ..................................................................................................................................... 57

**(b)   Tino Geddes told so many lies about the gun he allegedly bought that it is hard to sort them all out   65**

**ii.   Tino Geddes's story about the Second Attempted Murder (The Marriage Day Massacre)** ......... 69

**iii.   Tino Geddes's Black-of-Night Midnight Murder Plot** ................................................................ 75

**iv.   Other readily exposed lies told by Tino Geddes** ......................................................................... 78

**6.   Other evidence of innocence from 1997: Prince Ellis and Eddie Dames.** ...................................... 82

**7.   Other evidence of innocence from 1997: Adam Hosein and Nigel Bowe.** ...................................... 83

**8.   The pervasive inconsistencies and perjury by "star witness" Neville Butler had been demonstrated by 1997** ...................................................................................................................... 86

**i.   Neville Butler is a serial perjurer – prior to the trial, during the trial, and since.** .......................... 87

**a.   It is conceded by the State that Neville Butler committed perjury in his original sworn statement   88**

**b.    While the details have never been released to the defense, it is abundantly clear that Neville Butler committed perjury with respect to the grand jury proceedings** ..................................................... **91**

**c.    It is conceded by the State that Neville Butler committed perjury – in a systematic way - during his first deposition.** ................................................................................................ **96**

**d.    The Butler polygraph test: a significant Brady violation** ...................................................... **103**

**(1)    The Butler polygraph test: the Brady element of the suppression of the test** .............................. **105**

**(2)    The Butler polygraph test: the Giglio and Perjury element of the suppression of the test** ........ **108**

**e.    The change between Neville Butler's first deposition and his second highlights the importance of the Brady material** .............................................................................................................. **110**

**ii.    The Brady material was vital to a central part of the story: Eddie Dames' involvement in setting up the Moo Young meeting** ........................................................................................... **111**

**a.    The fact that Eddie Dames made calls to the Moo Youngs to set up the meeting undermines entirely the prosecution theory against Mr. Maharaj** ............................................................... **112**

**b.    When, in his second deposition, Neville Butler said that Kris Maharaj was at the Dupont Plaza on October 15, this was consistent with Mr. Maharaj's version of events, and with the truth – that the Moo Youngs had produced a false letter of credit that morning to try to resolve their dire situation with the Cartel** ............................................................................................................. **114**

**c.    The fact that Eddie Dames was present in Room 1215 for a call with Derrick Moo Young at 9:47 a.m. was true, but irreconcilable with the prosecution theory that Mr. Maharaj was there from 8 a.m. till noon** .................................................................................................................... **118**

**d.    In 1997, it became clear that Neville Butler was closely involved in the crime in Room 1215, and that Eddie Dames actively helped to cover up the crime.** ............................................................ **121**

**iii.    Waiting in the car outside the Dupont Plaza for three hours while police swarmed the area: the Brady material here was strongly exculpatory** ...................................................................... **122**

**iv.    At the second Butler deposition, another key theory was how Mr. Maharaj was meant to extract money from the Moo Youngs** ............................................................................................ **125**

**v.    Neville Butler changed his story over and over again in order to make it consistent with the other evidence.** ................................................................................................................ **129**

**vi.    Why would Mr. Maharaj decide to hire Neville Butler, and then immediately commit a serious crime with him, when Butler had allegedly been involved in a fraud against him?** ............................. **131**

**vii.    Why would Mr. Maharaj plan to commit a murder in a hotel room rented to another unknown person who might walk in the door at any moment?** ............................................................... **134**

**viii.    The prosecution changed Neville Butler's testimony about the gun to make it consistent with the evidence purportedly linking Mr. Maharaj to the crime** ............................................................ **135**

**ix.    Neville Butler's testimony about the "silencer pillow" was clearly false and known by the prosecutors to be false** ......................................................................................................... **138**

**x.    Butler obviously lied when he said he had neither got a deal nor the expectation of a deal from the prosecution** ..................................................................................................................**146**

**xi.    As the cross-examination of Butler showed, defense counsel failed, woefully, to develop a sensible theory of what actually happened** ...................................................................................**148**

**IV.    THE TOTAL DESTRUCTION OF THE STATE'S CASE IN 2014 AND THE PROOF THAT THE CARTELS ACTUALLY COMMITTED THE CRIME** ..................................................................**150**

**1.    Brady material and newly discovered evidence concerning Jaime Vallejo Mejia proved that he was being investigated for membership in the Cartel conspiracy by State and Federal authorities from 1983 until his indictment in 1987, and was known to have been involved in the Moo Young murders** ...............................................................................................................................................**150**

**2.    Baruch Vega, a long time state and federal informant who told the government in 1986 that the Cartel did the Moo Young murders, filled in most of the missing blanks with respect to Kris Maharaj's actual innocence** ...........................................................................................................................**158**

**3.    "John Brown", a federal informant who had helped the US government put many narcotics conspirators in prison, provided a direct admission from Pablo Escobar that the Cartel committed the Moo Young murders, and identified Jaime Vallejo Mejia ("The Evil Dwarf") as a close confederate of Escobar's** ..................................................................................................................................**165**

**4.    Jorge Maya, an enforcer for the cartel conspiracy, testified that they committed the Moo Young murders and described how his brother Luiz paid Cuchilla ("The Blade") for masterminding the crime** .......................................................................................................................................................**168**

**5.    Jhon Jairo Velasquez Vasquez ("Popeye"), Pablo Escobar's chief sicario, confirmed that the Cartel was responsible for the Moo Young murders** ..................................................................**170**

**6.    The testimony of former DEA special agent Henry Cuervo provides a compelling overview, tying together the other evidence and identifying how a competent law enforcement officer would have followed up all the leads to prove who really committed these crimes** ............................................**173**

**7.    Through no fault of Mr. Maharaj, William Penn's former lawyer Brenton Ver Ploeg testified in 2014 that various exculpatory documents had accidentally been kept from Mr. Maharaj in 1997, further linking the Moo Youngs to the narcotics conspiracy** .....................................................**178**

**a.    The William Penn files: further proof that Adam Hosein was involved in the Cartel conspiracy and the homicides** .................................................................................................................................**180**

**b.    The William Penn files: Astill Jadusingh and how the Moo Youngs originally got into narcotics**   **181**

**c.    The William Penn Files and Richard Solomon** ..................................................................**181**

**d.    The William Penn Files revealed that the 23 year old Duane Moo Young faced a quarter million dollar Tax Lien** .........................................................................................................................................**183**

**8.    When Tino Geddes died, former members of the Jamaican Shower Posse revealed that the alibi witness who turned witness for the prosecution was himself deeply involved with narcotics** ............**184**

**9.    The additional evidence in 2014 of Neville Butler's penchant for perjury:  six other legal proceedings where he lied** ....................................................................................................................**186**

**10.    Icing on a very rich cake: Michael Flynn and evidence of Official Police Corruption in the Maharaj case**...................................................................................................................................**186**

**11.    Additional Allegations of Fact from 2014: the research that went into The Injustice System: A Murder In Miami and a Trial Gone Wrong** ......................................................................................**199**

**V.    2016 & FURTHER CLOSELY-RELATED PROOF THAT SHOWS BEYOND ANY SENSIBLE DOUBT THAT KRIS MAHARAJ IS INNOCENT** ................................................................**200**

**1.    Two more cartel members – both cooperating federal witnesses – state that the Cartel committed the murders** ..................................................................................................................................................**200**

**2.    Jaime Vallejo Mejia has made further incriminating statements (in the course of kidnapping Witness A) demonstrating that the Cartel conspiracy is still active and he is still a member**.............**202**

**3.    Any question on the admissibility of statements by cartel sicario Popeye has been cleared up.**.**205**

**4.    More cartel members willing to describe the Moo Young involvement in narcotics money laundering, and the Cartel's involvement in their murder** ........................................................................**207**

**VI.    2016 & THE NEED FOR LONG-DENIED DISCOVERY FROM THE FEDERAL DISTRICT COURT** ...........................................................................................................................................................**208**

**VII.    THERE CAN BE NO DEBATE OVER WHETHER KRIS MAHARAJ AND HIS PRO BONO COUNSEL HAVE ACTED WITH DUE DILIGENCE IN HIS CASE** ....................................**212**

**VIII.    PETITIONER KRIS MAHARAJ HAS EXHAUSTED HIS STATE REMEDIES WITH RESPECT TO EACH CLAIM PRESENTED** .......................................................................................**214**

**IX.    THE STATE COURT ADJUDICATION RESULTED IN A DECISION THAT WAS BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED IN THE STATE COURT PROCEEDING.** .........................................................................**216**

**1.    The Statements By People Involved In The Cartel Conspiracy Were Admissible As Co-Conspirator Statements** .......................................................................................................................................**216**

**i.    The parameters of the Co-Conspirator Statement rule were clearly met in this case**...................**217**

**ii.    Given that no fewer than six people involved in the Colombian conspiracy have provided a consistent version of events that tended to prove Mr. Maharaj totally innocent, a far more careful analysis is legally required**..........................................................................................................................**225**

**iii.    The state court mistook its function, which is merely to rule on admissibility and then assess the impact of any statement on the jurors**...................................................................................................**226**

**2.    The Statements by People Involved In the Cartel Conspiracy Were Admissible As Statements against Penal Interest** ...........................................................................................................................**228**

**3.    The Statements by People Involved In the Cartel Conspiracy Were Admissible As a Matter of Due Process** ...........................................................................................................................................**232**

**4.    The Statements by People Involved in the Cartel Conspiracy are Anyway Admissible in Support of the Procedural "Gateway" Issues before this Court**..........................................................................**236**

**i.   The Statements by People Involved in the Cartel Conspiracy are Admissible in Support of the Schlup Issue**..........................................................................................................................**237**

**ii.   The Statements by People Involved in the Cartel Conspiracy are Admissible in Support of the § 2244(b) Issue** ....................................................................................................................**238**

**X.   THE STATE COURT ADJUDICATION RESULTED IN A DECISION THAT WAS CONTRARY TO, OR INVOLVED AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED FEDERAL LAW, AS DETERMINED BY THE SUPREME COURT OF THE UNITED STATES** ....................................................................................................................**239**

**XI.   THIS PETITION CONTAINS ALLEGATIONS OF FACT UNDERLYING THE CLAIMS THAT, IF PROVEN AND VIEWED IN LIGHT OF THE EVIDENCE AS A WHOLE, WOULD BE SUFFICIENT TO ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THAT, BUT FOR CONSTITUTIONAL ERROR, NO REASONABLE FACTFINDER WOULD HAVE FOUND THE APPLICANT GUILTY OF THE UNDERLYING OFFENSE** ........................................................**244**

**XII.   THIS PETITION CONTAINS CLAIMS CONCERNING NEW RULES OF CONSTITUTIONAL LAW, MADE RETROACTIVE TO CASES ON COLLATERAL REVIEW BY THE SUPREME COURT, THAT WERE PREVIOUSLY UNAVAILABLE.**................................**247**

**XIII.   A NUMBER OF ISSUES WERE PRESENTED TO THE STATE COURT, AND THEREBY EXHAUSTED, BUT WERE NOT ADJUDICATED ON THE MERITS** ................................................**248**

**XIV.   REQUIRED INFORMATION - PROCEDURAL HISTORY** ................................................**250**

**XV.   GROUNDS FOR RELIEF** ..........................................................................................................**257**

**1.   UNDER ANY REASONABLE INTERPRETATION OF THE DEFINITION OF INNOCENCE, KRIS MAHARAJ IS INNOCENT OF THESE CRIMES AND THE CHARGES SHOULD BE DISMISSED** ........................................................................................................................**257**

**2.   MR. MAHARAJ WAS DENIED HIS CONSTITUTIONAL RIGHTS BECAUSE CRITICAL EXCULPATORY EVIDENCE WAS NOT PROVIDED TO THE DEFENSE AT THE TIME OF TRIAL** .................................................................................................................................**258**

**3.   MR. MAHARAJ WAS DENIED HIS CONSTITUTIONAL RIGHTS BECAUSE THE JURY HEARD SIGNIFICANT PERJURED TESTIMONY**.........................................................................**294**

**4.   MR. MAHARAJ WAS DENIED HIS CONSTITUTIONAL RIGHTS BECAUSE HE WAS PROVIDED WITH INEFFECTIVE ASSISTANCE OF COUNSEL** ................................................**297**

**5.   MR. MAHARAJ WAS INTENTIONALLY FRAMED BY MIAMI LAW ENFORCEMENT OFFICERS WHO WERE CORRUPT** ............................................................................................**304**

**6.   POST CONVICTION COUNSEL FOR MR. MAHARAJ WERE RENDERED INEFFECTIVE DURING HIS PREVIOUS CHALLENGES TO HIS CONVICTION BY THE LACK OF FUNDS AND RESOURCES PROVIDED FOR THE PRESENTATION OF HIS CASE** ...............................**305**

**7.   THE CUMULATION OF ERROR IN THE PROSECUTION OF MR. MAHARAJ VIOLATED HIS FUNDAMENTAL RIGHTS**..................................................................................................**305**

**PRAYER FOR RELIEF** ....................................................................................................................**308**

**CERTIFICATE OF SERVICE**.........................................................................................................**311**

## SECOND PETITION FOR A
## WRIT OF HABEAS CORPUS
## BY A PRISONER IN STATE CUSTODY

Petitioner KRISHNA MAHARAJ moves this Court to grant the writ of habeas corpus. The case was previously before this court in U.S.D.C. Case No. 02-22240-Civ-Huck (S.D. Fla.), and the Eleventh Circuit in Case No. 04-14669-B. Petitioner is indigent and incarcerated in the custody of the State of Florida. The Eleventh Circuit approved the filing of this second petition by order dated March 28, 2017, in Eleventh Circuit Case No. 17-10452-F.

## INTRODUCTION

Mr. Maharaj requests an evidentiary hearing. As is demonstrated in this comprehensive petition, a hearing is justified not only on the basis of the claims presented, but also on the procedural/substantive issue of actual innocence as a gateway to the constitutional issues that should result in *habeas corpus* relief.

## I.    PROCEDURAL BACKGROUND

In 1987, Krishna "Kris" Maharaj was convicted for the first degree murders of Derrick Moo Young and his son Duane. The murders occurred in Room 1215 of the Dupont Plaza Hotel in downtown Miami at noon on October 16, 1986. Mr. Maharaj was originally sentenced to death for the murder of Duane and life for the murder of Derrick. The Florida Supreme

Court affirmed his convictions and sentences on direct appeal. *Maharaj v. State*, 597 So. 2d 786, 791 (Fla. 1992) (*Maharaj I*), *cert. denied*, 506 U.S. 1072, 113 S. Ct. 1029 (1993). The initial summary denial of his state post-conviction challenge was reversed by the Florida Supreme Court. *Maharaj v. State*, 684 So. 2d 726 (Fla. 1996) (*Maharaj II*). His death sentence was vacated after a week-long evidentiary hearing in 1997. The decision was upheld by the Florida Supreme Court. *Maharaj v. State*, 718 So. 2d 944 (Fla. 2000), *cert. denied*, 121 S. Ct. 2563 (2001) (*Maharaj III*).

He was sentenced to life imprisonment at his 2002 resentencing hearing. He is not eligible for parole until he is 101 years old – effectively a death sentence.

His first application for habeas corpus relief was denied by this Court and the Eleventh Circuit. *Maharaj v. Moore*, 432 F.3d 1292 (11th Cir. 2006), *cert. denied*, 549 U.S. 1072 (2006).

In 2012, armed with additional newly discovered evidence, his *pro bono* counsel filed a successive Rule 3.850 petition (ROA vol. 10, 1735-1823 and ROA vol. 16, 3053-3099). An evidentiary hearing was held in November 2014 (ROA vols. 24-27, 4560-5104). The trial court denied relief by order dated January 9, 2015 (ROA vol. 27, 5105-5117).

Mr. Maharaj sought relief from the Florida Third District Court of Appeal. That court denied relief in a *per curiam* order. *Maharaj v. State*, 199 So. 3d 273 (Fla. 3DCA 2016). That court denied rehearing on September 1, 2016, and issued the mandate on September 19, 2016.[1]

Mr. Maharaj sought permission from the Eleventh Circuit Court of Appeals to seek habeas relief from this Court. On March 28, 2017, the Court granted the application. *In re Maharaj*, ___ F.3d ___, No. 17-10452-F, Slip Op. at 7 (11th Cir. March 28, 2017) ("at this preliminary stage, Mr. Maharaj has made a *prima facie* showing that his new evidence, when viewed in light of the evidence as a whole, would demonstrate that he could not have been found guilty of the Moo Young murders beyond a reasonable doubt because if a hit man for the cartel committed the murders, Mr. Maharaj did not.").

## II.    PRELIMINARY STATEMENT OF THE FACTS

Cocaine Cowboys and the Miami River Cops were the iconic Miami stories in the mid-1980s. Cocaine money entered the bloodstream of the city – Miami was even twinned with Pereira, Colombia, the hometown of Jaime Vallejo Mejia, one of the cocaine conspirators responsible for the murders in this case.

---

[1] Under Florida procedure, as the appeal was denied without written opinion, Mr. Maharaj was precluded from seeking review in the Florida Supreme Court. Thus, he is forced to seek relief in federal court.

Today, 30 years removed from that pernicious era, it is easy to forget that things worked differently in 1986. Kris Maharaj was framed for murder at the height of the city's cocaine dependency. Whether this addiction took the form of all out "corruption" – defined as cash or threats translated into criminal courtesies – or merely a willful bias in the criminal justice system, the influence of cocaine trafficking was a profound and lasting inhibition of justice.

The cocaine context of this case meant, from the start, that there was an alternative that should have been vigorously explored: in Miami in 1986, the odds were strong that cocaine would be behind murders such as those of the Moo Youngs. The information that has now come to light makes it practically impossible to say that Kris Maharaj is guilty – and more newly discovered exculpatory evidence continues to be uncovered through due diligence. Just as Colombia undergoes its own tortuous transformation, so those from Colombia who were responsible for these murders have gradually admitted to their role in the crime – perhaps their consciences pricked by the idea that Kris Maharaj, almost 78 years old and confined to a wheelchair, has spent 30 long years in prison for a crime they actually committed.

This is a complex case with what must have appeared originally to be a diverse cast of characters – but many of whom, it now transpires, were

members of the same conspiracy. It is also an extraordinary story, surely proof of the adage that truth is often stranger than fiction. The truth, in this case, is that Kris Maharaj did not commit the crime.

Evidence of Kris's innocence has emerged piecemeal since the trial, as rights of access changed, data came online, serendipity knocked and, ultimately, consciences floated to the surface. Cumulatively, virtually every chess piece in the prosecution of Kris Maharaj has been removed from play - all the way down to the pawns. Meanwhile, an entirely new explanation (the true one) has emerged.

### A. The Actors

This is a complex case. It is important to understand who the main actors are – for the most part they were, indeed, acting at the time of the trial, if they were invited to testify at all. They were, in 1986, as follows:

**Krishna "Kris" Maharaj** – was born in Trinidad in 1939. He is a British citizen. He was charged with the murders of Derrick and Duane Moo Young, and sentenced to death for the crime. He is indubitably innocent, and yet has spent more than 30 years in prison.

**Derrick and Duane Moo Young –** the victims who, as it now transpires, were working with the Colombian drug cartels, had stolen money from them, and tried to skim one percent off the top in their own drug money laundering.

They took out life insurance, frantic to find a solution after provoking the ire of their co-conspirators who learned of their misdeeds against the cartel.[2]

**Jaime Vallejo Mejia** – the cartel money man in Dupont Plaza Room 1214, opposite the scene of the murder. Ignored by the police investigation, despite being under investigation at the time for laundering $40 million to Switzerland for the cartels. Although he is now more than 80 years old, he remains in the money laundering world.

**Jhon Jhairo Velasquez Vasquez (*"Popeye"*)** – major assassin (*sicario*) for Pablo Escobar, recently released from lengthy prison term. He states that the cartel killed the Moo Youngs (the "Moos").

**Manuel Guillermo Zuluaga Salazar (*Cuchilla*, or "The Blade")** – cartel assassin (*sicario*) in charge of the Moo Young murders.

**Chino Cacho**, another assassin (*sicario*) involved with the Moo Young murders.

**"John Brown"** – the pseudonym[3] allowed by the state court for a federal informant, a former pilot for Pablo Escobar, who was threatened with the same fate as the Moo Youngs if he stole from the cartel leader.

---

[2] Without intending disrespect, but to avoid confusion, Derrick and Duane Moo Young are referred to by their first names.

[3] Mr. Brown testified under a pseudonym because he had been in the witness protection program, and has family in Colombia whose lives are at risk. He had previously never testified for the defense, but had testified for the

**Baruch Vega** – well-regarded state and federal informant, originally recruited by the CIA, who told his minders that he met Derrick Moo Young with Jaime Vallejo Mejia and that, later, Vallejo Mejia told him the cartel had murdered the Moo Youngs for stealing.

**Jorge Maya** – the cartel enforcer among the Maya brothers, who stated that Cuchilla coordinated the murder of the Moo Youngs, and was paid for this by Luiz Maya on the orders of Pablo Escobar.

**Jhon Henry "El Chino" Millan** – an assassin (*sicario*) for Pablo Escobar, active in 1986, who stated that the cartels killed the Moo Youngs.

**Juan "Juanito" Lopez** – cartel member who discussed the killing of the Moo Youngs with *El Chino*.

**Witness A** – Colombian witness who has conducted an extensive investigation into the case and uncovered significant evidence of Mr. Maharaj's innocence.[4]

**Witness B** – former accountant for Pablo Escobar in Miami who worked with the Moo Youngs in their narcotics money laundering, who worked

---

prosecution in fifteen federal trials, helping to convict a large number of cartel conspirators.

[4] Death threats have been leveled by cartel operatives against Witness A for the disclosures and actions taken by the witness. While it may become possible in due course for the name to be made public, for now the name is kept confidential. Under any reasonable agreement Petitioner will, naturally, disclose the name to Respondent.

closely with Jaime Vallejo Mejia (who acted essentially as treasurer), and who is willing to testify both to the Moo Youngs' involvement and their murder by the cartel.[5]

**Witness C** – a former associate of Jaime Vallejo Mejia who was working for the cartel, and who knew both why the Moo Youngs were killed and that the cartel carried it out. The Moo Youngs were, according to Witness C, responsible for some cartel money that went missing in Panama, and were killed because of that.[6]

**F. Nigel Bowe –** the Bahamian lawyer for Carlos Lehder and the Cartels, whose law office was used for registering *Cargil International (Bahamas)*, a Moo Young front corporation. He was under investigation and indictment on narcotics charges at the time of Mr. Maharaj's trial, was later extradited to the United States, and was convicted in federal court.

**Eddie Dames –** the Bahamian flight controller in whose name the murder room was booked, who set up his own alibi, choreographed the crime, and then coordinated the story of the State's star witness, Neville Butler.

---

[5] Witness B faces threats from the cartel as he lives in Colombia. Again, Petitioner intends to produce evidence as to his identity as soon and as fully as possible – with the witness' consent.

[6] Witness C faces threats from the cartel as he lives in Colombia. Again, Petitioner intends to produce evidence as to his identity as soon and as fully as possible – with the witness' consent.

**Neville Butler** – directly involved in the crime and designated by the conspirators to provide law enforcement with a narrative that kept his narcotics employers out of sight. He failed a polygraph test, changed his story in many regards to fit the physical evidence, and was allowed to walk free by the prosecution. Now he is shown to have been guilty of perjury in at least six separate legal proceedings in addition to this one.

**Mortimer "Tino" Geddes** – one of Kris Maharaj's several alibi witnesses who suddenly flipped, at the behest of his Jamaican *Shower Posse*[7] colleagues in the Garrison neighborhoods of Kingston, when facing life in prison for smuggling weapons.

**Adam Hosein** – an associate of the Moo Youngs whose own drug trafficking prompted the cartels to turn to him when trying to work through the Moo Youngs' staling efforts when the cartel sought the return of its stolen money. He took a gun to the Dupont on the day of the crime and has made statements admitting to his own involvement in the murders.

**Eslee Carberry** – a notorious publisher of a "gossip newspaper," the *Caribbean Echo*. He fabricated smears against Kris Maharaj at the behest of

_____

[7] The evidence concerning the Shower Posse only came to light after Geddes died, and in time for the 2014 evidentiary hearing. The Shower Posse was (and is) a notorious Jamaican drug cartel. Geddes' relationship with them is detailed below.

the Moo Youngs, who were trying to hide their various embezzling schemes. He was alleged to have committed a number of frauds, and was deported from the United States.

**Prince Ellis** – a Bahamian businessman used by Eddie Dames as a stooge to provide an alibi; now courageously speaking out about Kris Maharaj's innocence.

**Eric Hendon** – the then-defense lawyer on a fixed fee who failed to investigate the case prior to trial, failed to investigate and present what was a solid alibi, failed effectively to challenge the prosecution case, and failed to develop a coherent theory of the defense – albeit, he was hampered by the lack of disclosures made to him.

## B. **What We Now Know: The Truth of what happened in this Case**

Derrick and Duane Moo Young were murdered in Room 1215 of the Dupont Plaza Hotel in downtown Miami on October 16, 1986, at around noon. At his trial in 1987, Kris Maharaj could say what did *not* happen – he was innocent - but he could not say who actually killed the Moo Youngs. Today, thanks to painstaking work over 30 years, he can name the killers.[8]

---

[8] If the facts of this case read like an extreme version of a *Narcos* television drama, it is because truth is sometimes stranger than fiction. However, the difference is that Mr. Maharaj can now (belatedly, after 30 years on death row and in prison) prove that it is all true. It should be said that there remain a few

Kris Maharaj was born in Trinidad in 1939. He left as a young man to make his fortune in Britain; he became a self-made millionaire, mainly through the importation of fruit and vegetables. He lived a storied life – becoming the owner of the second largest string of race horses after the Queen, and driving a series of Rolls Royce cars. He also never bowed under the pressure of the Establishment: when the big banana companies tried to crush his little company, he took them and the government to court and won a famous victory for the small businesses of the day.

In the 1980s, he decided to invest in Florida real estate. With his wife Marita – who was originally from Portugal – Kris was attracted to the climate, and felt they might start spending half the year in the Sunshine State. Here, Kris made his first mistake: someone he had met briefly in London some years before, Derrick Moo Young, suggested that he become Mr. Maharaj's agent and oversee the investments when Kris was not there. All seemed to go well for some time and Kris, with his wife Marita, bought various houses, and even bought themselves a Florida home across the street from the Moo Youngs. However, everything began to unravel in 1985. Precisely how this happened

---

incomplete details (and, given some  people have now died, we may never know the complete truth) but, as a result of extensive investigation taking literally thousands of hours, the vast majority is now known.

has taken Mr. Maharaj – an innocent man – and his *pro bono* counsel a long time to piece together.

We now know that Derrick and Duane Moo Young were involved in serious money laundering for the Colombian cartels. We know this from a number of cartel sources; but the fact is also firmly corroborated by, first, a swath of documents in a briefcase found in Room 1215 (suppressed by the prosecution at trial), and second, by the investigation that was subsequently carried out by *William Penn Life Insurance*, when the Moo Young family sued on Derrick's and Duane's policies.

The Moo Youngs' first contact with the drug trade appears to have come on their home island of Jamaica, where their neighbors and close friends, the Jadusinghs, were heavily involved in drug trafficking (and would later be convicted in federal court). But Derrick and Duane subsequently became involved in laundering money for the Colombians – for the cartel then headed by Pablo Escobar himself.

According to Baruch Vega, an informant for federal and state law enforcement, Derrick was working with Jaime Vallejo Mejia, was a major Colombian money launderer who had installed himself in Room 1214 in the Dupont Plaza Hotel and was running various money laundering businesses, including a leather goods import business and his own life insurance company.

12

According to a Pablo Escobar confederate, former *sicario* Jhon Henry (*El Chino*) Millan, Derrick also went to visit Mr. Escobar in Colombia. Documents show Derrick and Duane flying around from Florida to Panama, trying to launder hundreds of millions of dollars in various Caribbean countries.

The documents reveal that Derrick and Duane were trying to skim one percent off the top of all the money they laundered. They had set up a number of scam companies, including *Cargil International* and *Amer International*. *Cargil*[9] was registered in the Bahamas at the office of F. Nigel Bowe, a notorious cartel lawyer who was, even then, under indictment and fighting extradition to the United States. *Cargil* was also registered in Panama.

According to a number of cartel personnel – including Mr. Vega, John Brown (a pilot for Escobar), Jorge Maya (an enforcer for Escobar in Miami), and Jhon Jhairo Velasquez Vasquez (known as *Popeye*, Escobar's senior hitman) – the cartel leaders came to suspect that Derrick and Duane were stealing from them.

The Moo Youngs were obviously concerned that their thefts had been discovered. In January 1986, Derrick took out a $1 million "key man" life

---

[9] *Cargil* seems to have been intentionally so named to provoke confusion with the multinational food company *Cargill.*

13

insurance policy. A few days later, he filed his annual tax return, declaring only his wife's income of $25,000 as a teacher, and announcing himself to be a disabled businessman. Likewise Duane, then only 22 years old, took out life insurance. The IRS later came after him for 1985 and 1986 tax liabilities of $250,000.[10]

On February 19, 1986, an incident took place 920 miles to the northwest: Barry Seal - a pilot and money launderer for the cartel, turned federal informant - was shot in Baton Rouge, Louisiana. As Pablo Escobar later told John Brown, he had Mr. Seal killed because he was "telling lies" about him to the federal government. While three people would later be convicted of the murder and sentenced to life in prison, the authorities never caught the mastermind of crime: Manuel Guillermo Zuluaga Salazar, known as *Cuchilla* ("The Blade"). It was *Cuchilla* who organized the murder of the Moo Youngs some eight months later.

The Moo Youngs may have been in trouble with the tax authorities, but their real concern was convincing the cartel that they were valuable launderers. In order to cover their debts, they began to steal from a number of

---

[10] The federal authorities have resisted, to date, state court subpoenas to disclose the relevant information they have on the Moo Youngs and other conspirators. Mr. Maharaj has diligently sought to get this material, and it should be ordered by this court. (See below)

people for whom Derrick had long acted as agent. First, there were various Trinidadians who had bank accounts in the United States. There were regulations that prohibited taking Trinidadian currency out of the country, but the better off were evading these laws, and Derrick was a signatory on their accounts. Knowing the account owners could not complain without incurring legal problems in Trinidad, Derrick and Duane began to cover their financial problems by embezzling tens of thousands of dollars from a number of these people. For example, on April 16, 1986, two women confronted Derrick, demanding to know what happened to their $54,000.

But this was not enough. Derrick and Duane next embezzled more than $443,000 from Kris Maharaj by essentially stealing his property – even Marita's car. When he worked out what was happening to him, in April 1986, Kris did what he always did – he sought legal redress. He demanded the money back and, on April 24, Duane gave him two checks (for $200,000 and $243,000), both of which bounced. Kris then sued in civil court. Two weeks later, an article appeared in the local paper discussing these events, and suggesting that the Moo Youngs were involved in a number of swindles.

By now, the Moo Youngs were in a dire situation and their frenetic travel schedule reflects their increasing desperation. They travelled to Los Angeles, trying to raise the money they needed to stave off their cartel creditors. On

May 1, 1986, they believed they had obtained the right to use $94 million in gems as collateral for their latest laundering scheme. They also obtained false letters of credit for $100 million. They were negotiating to obtain a controlling interest in a Panamanian bank to demonstrate their on-going value to the cartel. Meanwhile, their records reflect flights and telephone calls throughout the Caribbean – Costa Rica, Mexico, Panama, and elsewhere.

They also fought back against Kris Maharaj. They persuaded Eslee Carberry, the editor of the *Caribbean Echo* (a local gossip paper), to carry a number of false and defamatory articles about Mr. Maharaj.[11] Kris responded, once again, in typical style. He had money, and he knew he could make more money. So he set up a rival newspaper, the *Caribbean Times*. His paper never mentioned the Moo Youngs, and sought solely to respond to the *Echo* by raising press standards from the gutter. Here, because the pool of Caribbean journalists in South Florida was small, he made his second mistake: he hired one *Echo* journalist (Tino Geddes[12]), and attempted to lure another (Neville

---

[11] These would later be used by the prosecution to show a supposed motive on Mr. Maharaj's part to commit murder.

[12] Even though Geddes would turn on Mr. Maharaj before the trial (because of, we now know, his own drug connections), even he admitted that Mr. Maharaj would not reply in kind in the *Times*. (Tr. 2242) "The name, Mr. Carberry, never appeared on the pages of the *Caribbean Times*." (Tr. 2243) Mr. Maharaj did not want to sink to Mr. Carberry's level. (Tr. 2243)

Butler). He did not do the kind of background checks he should have on the two men.

Kris enjoyed a business challenge, and he immediately took to the work of media entrepreneur with the same hands-on approach he had always employed in his businesses. He would pick up the paper from the printers himself and deliver it to the distributors. Aware of the high crime in South Florida in the mid-1980s, he talked to a police officer friend, Lt. Bernie Buzzo, who advised him to buy a handgun, a 9mm Smith & Wesson. On July 27, 1986, he was stopped for speeding by the Florida Highway Patrol. He had promised a loan of $1,000 to a friend, Manuelos Stavros, who had to travel home in an emergency. He complained the same evening to Stavros that after the search of his car his handgun and several hundred dollars in cash were missing.[13]

Mr. Maharaj later complained about this to Lt. Buzzo, but police corruption was rife in South Florida at the time. The region was awash with narco-dollars and large numbers of police had recently been hired, with little vetting, to meet the law enforcement needs resulting from the influx of Cuban

---

[13] Clearly, then, Mr. Maharaj could not have used this gun three months later to commit a murder.

17

refugees. Fully one-tenth of the entire Miami Police Department was arrested or otherwise sanctioned in 1985 alone.

The Moo Youngs were frantically busy, albeit without notable success, in their laundering dealings over the next few weeks.

By October 1986, the Dupont Plaza hotel was infamous for its drug connections. To be sure, legitimate business people stayed there, but in mid-October 1986, the twelfth floor was reserved solely for use by the cartel. Resident in Room 1214 was Jaime Vallejo Mejia, a relative of Pablo Escobar's wife. Since 1983, he had been the focus of two money laundering investigations conducted by federal and state law enforcement.[14]

By now, Escobar's inner circle in Colombia had concluded that the Moo Youngs were stealing money. Because he was effectively their supervisor, they held Vallejo Mejia responsible for ensuring its return. The *modus operandi* of the cartels was well-known: they might well kill someone, but before that they would do everything to recoup "their" money. It is now clear in broad detail how they went about this.

The Maya brothers were also operating in Miami. The eldest, Luiz, was a money man who coordinated directly with Escobar. Jorge Maya was an

---

[14] These did not result in an indictment until September 3, 1987 (shortly before Kris Maharaj's trial), but various people, including Baruch Vega, were closely involved in the investigative developments.

enforcer who helped coordinate the work of such *sicarios* as *Cuchilla* and *El Chino*. After his homicidal success in Baton Rouge, *Cuchilla* came to Miami to deal with the Moo Youngs.

Mr. Maharaj, who knew nothing of the machinations of the cartel conspirators, was trying to build up his paper and broaden its appeal. Neville Butler, who had worked part time with Eslee Carberry and the *Caribbean Echo*, said he had a friend named Eddie Dames who could help with the distribution in the Bahamas, and that he would set up a meeting at the Dupont Plaza Hotel for 8 a.m. on Wednesday, October 15, 1986.

Unbeknownst to Mr. Maharaj, Mr. Dames was actually involved in the drug trade himself, using his role as a Bahamian Air Traffic controller to facilitate the transit of drugs from Colombia to the Bahamas, and then on to the United States (2014 Tr. 309). The years running up to the mid-1980s had been the height of Carlos Lehder's operation in *Norman's Cay*. Dames and cartel lawyer Nigel Bowe "were close associates" (2014 Tr. 310).

Eddie Dames had been trying to set up the meeting with the Moo Youngs at the behest of the cartel. Derrick's daughter Shaula Nagel told Detective Buhrmaster that she "remembered the names of Butler and Dames, only

because her father had mentioned that he received several messages from a Mr. Dames, who he did not know, and did not bother returning the calls."[15]

On October 15, Kris Maharaj called Neville Butler at 7:32 a.m. to confirm the meeting was taking place. (Tr. 3955) He was told it was, so he arrived at the hotel shortly after 8 a.m. to be met by Neville Butler, who apologized and said that Dames had not arrived the night before, and the meeting was postponed until the next day. This seemed strange to Mr. Maharaj – why had Butler not told him on the phone? - but he left to handle other work.

What was actually happening that morning, it is now known, was a meeting between the Moo Youngs and their cartel co-conspirators, where Derrick offered up a documentary letter of credit dated September 15, 1986.[16] As a result, the proceedings were suspended while the collateral was checked out. Had the letter of credit proved to be real, the Moo Youngs might have lived.  Vallejo Mejia sent it to his contacts (in New York) for confirmation, and later that day it was confirmed false.

---

[15] 1997 Exh. OC at 9. There is a notation to call a Bahamian number, "1-8096452744 - 45 - ED" next to the name of Neville Butler. (3.850 Clerk Tr. 2282)

[16] Mr. Maharaj should be clear: while he knows they tried to pass off a letter of credit, he is making the assumption (based on the fact that it was in the Moo Young briefcase, and that his counsel found it in the records of the State Attorney, *1997 Exhibit FAP)* that this was the letter that they tried to pass off. It was, when compared to other documents, clearly a forgery.

Kris Maharaj went about his business, oblivious to these developments. No doubt, meanwhile, when the unfortunate Derrick and Duane were told they must come back the next morning, they struggled with how they might get out of their predicament.

On Thursday, October 16, Mr. Maharaj called Butler at 7:19 a.m. to ensure that he would not be making another futile trip from Fort Lauderdale to Miami. He then drove to the hotel, arriving at 8 a.m. At around 8:30 a.m., Loretta Molaskey came to clean Room 1215 and saw a man fitting Kris Maharaj's description reading a *USA Today* paper. (1997 Exh. AJ-4)

He waited in Room 1215 for about an hour. Mr. Maharaj did not know that the Moo Youngs were meant to appear that morning, but they had delayed their arrival. Around 9 a.m., Mr. Maharaj left the room, rather frustrated that Dames had not shown up for the second day in a row. He called home collect at 9:06 a.m. expressing his frustration, and his intention to return for the other meetings he had in Fort Lauderdale.

At around 9:30 a.m., Dames came to the hotel and went to Room 1215. Mr. Maharaj was by then gone, so the two never met. Dames and Neville Butler called at 9:47 a.m. to ask where Derrick was, and the elder Moo Young said he had an international call to make (indeed this took place at 9:50 a.m.). Meanwhile, Adam Hosein was dispatched to ensure that Derrick and Duane

showed up. According to witness George Abchal, Hosein left the garage where they both worked, taking with him his 9 mm handgun.[17] Neville Butler later told Prince Ellis that Hosein, who he called "Hardman", came to Room 1215. (2014 Tr. 313)

Meanwhile, Dames left the hotel with Prince Ellis, on a spurious shopping trip where they bought nothing. Ellis later worked out that he had been duped into providing Dames with the alibi that he required.

The Moo Youngs arrived at the Dupont shortly after 11 a.m., and waited briefly in the lobby.

By now, Kris Maharaj was some 25 miles – a 40-minute drive at the best of times, but more during rush hour - north of the hotel, at the *Kenyon Press*, overseeing work on the *Caribbean Times*. He left there, with various colleagues, and arrived at the Disco Lounge just before noon, where Arthur

---

[17] Hosein had a history. He had faced serious trouble in the United Kingdom. In 1969, he was implicated in a notorious murder for which his two brothers, Arthur and Nizamodeen, were convicted – the kidnap of Muriel McKay, mistakenly seized because she was driving the Rolls Royce belonging to Rupert Murdoch's wife. Mrs. McKay was reputedly chopped up and fed to the Hosein pigs – although no trace of her was ever found. There was a phone message for Adam Hosein in Room 1215 on the morning of the Moo Young murders. He denied having any business dealings with Derrick or Duane – a patent falsehood. *Amer International* was one of the Moo Young laundering companies, where they were doing business with Adam Amer Hosein. Mr. Hosein made statements admitting to involvement in the homicides to Derek Jhagroo.

MacKenzie let them in for a drink. Shortly before 1:00 p.m., along with Gangabissoon Ramkissoon and George Bell, he inspected some premises at the Margate Shopping Center, where he was planning to relocate the paper. They went on from there to lunch at Tark's Restaurant where they were served by Ronald Kisch.[18]

Meanwhile, back at the hotel, the Moo Youngs had called up to Room 1215 and been told to come up: they had their meeting with Neville Butler, Adam Hosein, and the other cartel representatives. It is not clear that their deaths were pre-ordained at this point – presumably, it might depend on whether they could still make good their debt. Certainly, they had been told to bring what money they had. It appears that whatever they said was not enough. Derrick Moo Young appears to have tried to escape, but was shot with a pistol, using a green hotel pillow to muffle the sound. Duane Moo Young was shot in the upstairs bedroom.

---

[18] Later, Tino Geddes tried to say he confected the alibi, and that all this happened the day before (the 15th). Like all of Mr. Geddes' testimony, this is readily disprovable. All the alibi witnesses confirm that they never spoke to Geddes about the alibi. Further, Geddes said that Mr. Maharaj shaved off his mustache after the murders as part of a premeditated effort to avoid identification, and the prosecutor argued this in closing. (Tr. 4024-25) But all the alibi witnesses confirm that he had shaved his mustache off when they saw him – logically, if Geddes were telling the truth, that would have been on the 15th, the day before the murders.

At some point around noon, a security guard knocked on Room 1215. Jorge Aparicio, Head of Dupont Security, was responding to a report from a maid that there was blood on the carpet in the hallway. The door remained locked and someone with a "South American accent" said there was "no problem."[19] A short while later, another member of the hotel staff went into the room and discovered the bodies.

Neville Butler and the others responsible for the murders had left. However, Butler needed to get back in touch with Eddie Dames to ensure that they would get their stories straight. At some point, he managed to make contact with Dames and Prince Ellis, who described how Mr. Butler was slumped down in the car, "his shirt was torn, it had had blood on it and his watch – he had his watch in his hand or something like that, with one of the bands, I think, broken off." (2014 Tr. 296)

According to Butler, "*they* just went crazy and started shooting, and it was bullet[s] all over the place and I think there was some remark about the money, or two suitcases of money." (*Id*.) Dames talked to Butler about his

---

[19] Statement of Jorge Aparicio, at 4 (16 Oct. 1986, 21:00). By trial, this had metamorphosed into a British accent which was supposed to implicate Mr. Maharaj. This was simply untrue, and anyway, Mr. Maharaj has a Trinidadian accent, not a British accent, so the attempt to alter the evidence was pointless.

story, and told him to change his clothes before talking to the police. (2014 Tr. 301)

After this, Neville Butler called Det. Buhrmaster and agreed to a rendezvous where he gave his first – concededly perjured – statement in which he said Kris Maharaj did the crime, and kidnapped him as well. He then led Det. Buhrmaster to where Kris Maharaj was having dinner at Denny's with his wife and other friends - Mr. Maharaj was arrested. He has been in prison ever since – over 30 years.

Mr. Maharaj was questioned by the police and told them the whole story, as best he knew it.[20] Within days, a series of alibi witnesses had given sworn statements (none of which was presented at trial) placing Mr. Maharaj 25 miles away at the time of the murders.

Within days of the crime, Baruch Vega had spoken with Jaime Vallejo Mejia, who told him that the cartel had killed the Moo Youngs. He reported that to his state and federal minders, but then thought little more about it - it was just one more incident in the mayhem caused by the cartel in the mid-1980s. He later moved to Los Angeles and did not learn until 2014 (when contacted by a Miami reporter) that Kris Maharaj had been charged with, and

---

[20] Det. Buhrmaster later testified that Mr. Maharaj denied ever owning a pistol, and denied being in Room 1215 that day. Both of Det. Buhrmaster's assertions – crucial to the case – were proven false in 1997.

convicted of, the murders. He immediately came forward to volunteer what he knew about the involvement of four key figures in this case with the Colombian cartel: Derrick Moo Young, Vallejo Mejia, Adam Hosein, and Tino Geddes.

Vallejo Mejia was subsequently indicted on money laundering charges, and paid a cash bond of $600,000. He entered a guilty plea and later left the country, never to return. Once back in Colombia, he set up a company, *Proquim Ltda*, for processing the chemicals used in the production of narcotics.

Shortly after the murders, Luiz Maya was told to pay *Cuchilla* for taking care of the Moo Young murders. He did this and told his brother Jorge about it. *Cuchilla* spent his ill-gotten gains on a farm in Colombia, which was later seized under the narcotics forfeiture laws. Mr. Maharaj did not learn this until his *pro bono* lawyer went to Medellin and managed to convince Jorge Maya to speak about it.

Around Christmas 1986, John Brown met Pablo Escobar for the first time at the latter's farm in Colombia. Mr. Escobar warned Mr. Brown not to "tell lies" about him, or he would receive the same treatment as Barry Seal, and not to steal from him or he would be killed, just as were the Chinese in the hotel

(the Dupont) across from where Mr. Brown lived. Mr. Maharaj did not learn this until 2014.

In January 1988, very soon after Mr. Maharaj was sentenced to death, Adam Hosein traveled to Panama where he signed legal documents taking over control of Cargil International (Panama) Ltda., the primary Moo Young laundering front company. This only came to light in 2014. Hosein has long since left the United States and lives in Trinidad.

In 1992, F. Nigel Bowe, the Moo Youngs' associate and cartel lawyer, was finally extradited to the United States where he was convicted on racketeering charges.[21]

In 1993, *Cuchilla* was kidnapped by *Los Pepes* when they were trying to locate and kill Escobar. He either could not, or would not, reveal Escobar's whereabouts, and he then met his death in a particularly gruesome fashion – he was fed through a wood-chipping machine, much as in the horrific scene in the movie *Fargo*. His remains have never been found, but he has been declared legally dead and the fruits of his own grisly work have been forfeited to the Colombian government.

Tino Geddes had been one of the state's two primary witnesses. In late 2013, he passed away. At this point, his former confederates in the main

---

[21] *United States v. Bowe,* 221 F.3d 1183 (11th Cir. 2000).

Jamaican narcotics gang, the *Shower Posse*, agreed to share information concerning Geddes' long term involvement with the drug traffickers.

Jhon Jhairo Velasquez Vasquez (*Popeye*) had been part of the high-level discussions about the problem with the "Moos", and knew from his personal involvement that they had been murdered by the cartel. *Popeye* is now out of prison and continues in the (violent) distribution of narcotics.

Jhon Henry Millan (*El Chino*) discussed how the cartel committed the murder with his confederate Juan Lopez. Mr. Maharaj did not learn of this until November 2016.

Witnesses B and C expressed a preliminary willingness to come forward in May 2017, although both require certain assurances and may, or may not, be willing to testify. Witness B was the cartel accountant in Miami in the mid-1980s. He worked closely with Jaime Vallejo Mejia who was, by description, the cartel treasurer in South Florida at the time. Witness B was familiar at the time both with the laundering work being done by the Moo Youngs, and the fact that they were ultimately murdered by the cartel because they were deemed to be stealing money.

Witness C was a close associate of Jaime Vallejo Mejia who was aware of the Moo Youngs' work with money laundering and how money went missing from Panama for which they were held responsible.

In short, the cartel conspiracy has now been exposed and – while there are discovery obligations that remain unfulfilled by the government (see below) - it is already clear beyond any doubt that Mr. Maharaj is innocent. Kris Maharaj remains alive – but only just. He was 78 years old in January 2017, and is confined for the most part in a wheelchair in the South Florida Reception Center. With his *pro bono* counsel of 23 years, he continues to fight for his justice.

### C. The Case Presented To the Jury In 1987

All this – the truth – is very different from the story the jury was told in 1987. At trial, the jury listened to a prosecution case that faced only weak challenge from an anemic defense. In short, around noon on October 16, 1986, two men were found shot to death in Room 1215 of the Dupont Plaza Hotel in downtown Miami – Derrick Moo Young, and his son Duane. The room had been registered to a Bahamian by the name of Eddie Dames, who was supposedly a restaurateur in town to buy kitchen and music equipment. He was nowhere near the room at midday, as was confirmed by another Bahamian, Prince Ellis.  The Moo Youngs – father and son – were offered as honest businessmen who had had the misfortune to run into the corrupt and, in the end, homicidal Krishna Maharaj.

The basic elements of the case against Kris Maharaj were as follows:

29

One, Kris Maharaj was portrayed as the only person with a motive to kill Derrick and Duane Moo Young, his former business associates. This arose from a dispute over more than $400,000 that Kris said they had embezzled from him.

Two, the antagonism was illustrated by Eslee Carberry and the articles he published in the muck-raking *Caribbean Echo*; alleging that Kris Maharaj was a crook who was wanted in Great Britain by Scotland Yard, and that the Moo Youngs were honest small-time businessmen who had been defrauded by Kris.

Three, John Buhrmaster, the lead detective, testified that Kris Maharaj had denied ever being in Room 1215 of the Dupont Plaza Hotel. The evidence, he indicated, showed this to be a patent falsehood, since his fingerprints were found in the room.

Four, Det. Buhrmaster suggested that Kris Maharaj had denied ever owning a Smith & Wesson 9 mm pistol. A police officer testified that he had sold Kris that weapon, and the ballistics supposedly proved that such a gun had been used in the murders.

Five, according to state witness Tino Geddes, Kris Maharaj had involved him in three previous attempts on Derrick Moo Young's life and also asked

him to falsify an alibi. The fact that no alibi was presented at trial buttressed the notion that Geddes was telling the truth.

Six, Neville Butler was a supposedly credible eyewitness to the murders. He testified that he had set up a bogus meeting between Derrick and Eddie Dames, who was unknown to the Moo Youngs, on the pretext that they could do business together. This was, he said, actually Kris Maharaj's plan for getting them into the same room as him, so he could force them to sign checks refunding him over $400,000 that he insisted they had stolen. However, the meeting descended into violence, he said, whereupon Kris Maharaj shot Derrick, and then "executed" Duane. The trial judge heard that, according to the prosecutor, Butler had passed a polygraph.

There were other, incidental, witnesses whose testimonies did not directly implicate Kris in the murder, but added to the circumstantial evidence. For example, one of the hotel staff testified that she believed that Kris Maharaj had paid for Eddie Dames's room.[22] Another hotel employee testified that, at

---

[22] While this identification was presented at trial as being a positive one, it was never challenged either in a pre-trial hearing or at trial. Dupont Sales Representative Arlene Rivero was shown just one photo (of Mr. Maharaj) by Det. Buhrmaster, and even then made an equivocal identification. When asked whether she was positive when she made her identification, she said "I want to say positive, but it looked familiar to me, so that is why I ID'd it." (1987 Tr. 2722). In truth, she was mistaken, even according to Butler. Indeed, Butler himself admitted that he – not Kris Maharaj – paid for Eddie Dames's room. When Butler said he wanted a room for Dames, the woman gave him a card

the very time the murders must have been in progress, he had knocked on the door of Room 1215 and been told all was well by someone with a foreign accent.[23]

To be sure, there were significant reasons why the jury might have doubted the prosecution case, but they were given nothing to rely on by defense counsel, who was trying his first capital case.

The jury must surely have wondered why Kris Maharaj would commit a murder in a room registered to someone he had never met (Eddie Dames) who might reappear there at any moment. How could he depend on Dames to keep out of the way? And why would he "eliminate witnesses" but leave Butler alive?

Then, there were various bizarre developments that took place outside the jury's presence. Circuit Judge Howard Gross was arrested on the morning of the fourth day of trial – in the middle of Neville Butler's testimony. Judge Gross had been "stung" by the Florida Department of Law Enforcement

---

and told him to fill it out. (1987 Tr. 2769). He paid $55 in cash. (1987 Tr. 2770). The prosecution was then reduced to trying to say that perhaps Mr. Maharaj had booked the room before Butler paid for it. He did not.

[23] While it was intimated at trial that this was a "British" accent, consistent with Kris Maharaj's light Trinidadian lilt, a statement from this witness that was not provided to the defense at trial indicated that the witness believed it was a "Spanish" accent – consistent with what we now know about the involvement of the Colombian cartels in the murders.

(FDLE) taking a bribe from an agent posing as a Colombian drug dealer seeking bail to flee the country. At the time, Mr. Maharaj's defense counsel did not recall that his client had reported, months earlier, that Judge Gross had sent an intermediary to solicit a bribe from him to fix the case for $50,000.[24]

A second jurist, Circuit Judge Solomon, took over the trial. He, in turn, fell short of the standards expected of a judge: prior to hearing the evidence at the judicial sentencing phase, acting *ex parte*, he solicited a proposed order from the prosecutors imposing a sentence of death, which he then adopted verbatim.[25]

Next – in this strange, eventful history – Circuit Judge Glick, assigned to the case for the Rule 3.580 post-conviction proceeding, did not reveal that he had been the supervising Assistant State Attorney at the time of the prosecution, and again *ex parte* solicited an order denying Kris Maharaj's initial application without a hearing.[26]

## 1. III. VERY SIGNIFICANT UNDERMINING OF THE STATE'S CASE IN 1997

---

[24] The intermediary was, it transpired, a prosecutor with the Office of the State Attorney who was just going into private practice. The procedural posture of the Judge Gross issue is tortuous. Trial counsel advised Mr. Maharaj to waive his right to a mistrial, but had not at the time made the connection between the earlier bribery attempt reported by his client, and the judge now under arrest.

[25] This *ex parte* action ultimately resulted in the resentencing trial, where the jury recommended a life sentence. *See Maharaj III.*

[26] Again, this resulted in reversal for a full evidentiary hearing in *Maharaj II.*

By the time of the first Rule 3.850 motion heard in 1997, various newly discovered evidence had come to light through diligent investigative efforts.

### 1. It was clear by 1997 that the Moo Youngs were deeply involved in criminal activity.

It was revealed that the Moo Youngs were not the clean businessmen they were made out to be, and many people shared the supposed motive to kill them that had been attributed solely to Kris Maharaj. They had defrauded many people from Trinidad, and were involved in frauds involving not $400,000, but hundreds of millions of dollars.

Furthermore, in a development that the courts found interesting even in 1997, the Moo Youngs had taken out life insurance policies on themselves immediately before their deaths. This not only illustrated the reasonable fear they had of the Colombian cartel's wrath, but had a huge collateral impact. William Penn Life Insurance Company commissioned an expensive investigation into their activities that the company's lawyer would later testify clearly indicated their involvement in narcotics money laundering.

Mr. Maharaj demonstrated in 1997 that the only other person registered to a room on the twelfth floor of the Dupont Plaza Hotel – Room 1214, directly across the hall from the murder scene – was a man by the name of Jaime

Vallejo Mejia, from Pereira, Colombia.[27] It was clear from Det. Buhrmaster's interviews with various witnesses that the twelfth floor had been kept clear of prying eyes. It would later be clear that the cartel conspirators had done this. There was blood on the door of Vallejo Mejia's hotel room.

Meanwhile, the most alluring new evidence was the undisclosed material in the Moo Youngs' briefcase that had been hidden from the defense.[28] It revealed a broad range of financial transactions by the supposedly impoverished Moo Youngs, involving almost $100 million in gems, and proposed loans offered around the Caribbean amounting to $5 billion.[29]

The briefcase revealed:

_____

[27] Ironically, a member of the city commission had successfully pressed for Miami to be twinned with Pereira, which was known for little other than its links to the Colombian drug cartel.

[28] At the 1997 hearing, Det. Buhrmaster conceded he had reviewed the briefcase material "carefully". (1997 Rule 3.850 Tr. 800-01). There was unrebutted proof that Ron Petrillo (the defense investigator) had been told by Det. Buhrmaster that the briefcase and its contents had been returned to the victims' family, from which fact Mr. Petrillo understood it had no relevance. The federal court held that it had been established that the defense did not have access to this material at trial. *See Maharaj v. Moore*, Civ. No. 02-22240-HUCK/TURNOFF, 22 (S.D. Fla. Aug. 30, 2004) ("Since it appears that the police did have custody of the contents of the briefcase after a defense investigator specifically asked to look at it, the Petitioner has made a substantial showing of the deprivation of a constitutional right since it is possible that evidence adduced from the investigation of the contents could have, if admissible, bolstered the Petitioner's theory that he was set up by someone else who had a motive to murder the Moo Youngs").

[29] To set this in perspective, Mr. Maharaj showed that in the mid-1980s, the richest man in the world claimed to be worth roughly $5 billion.

- The Moo Youngs' passports (Pet. Exh. 297) showing that in the first nine months of 1986, the supposedly impoverished Derrick and Duane went to Europe (twice, staying upwards of two weeks), the Cayman Islands, Mexico, Panama (a total of six times), Puerto Rico (twice), Trinidad, as well as all over the United States. While traveling, they stayed at expensive hotels and ate in fancy restaurants. (1997 Rule 3.850 Clerk Tr. 2998-3059, Pet. Exh. 302, ROA vol. 29, 5413-5541).

- A draft letter from Derrick offering a $100 million loan. (1997 Rule 3.850 Clerk Tr. 2270, Pet. Exh.250 at 005966).

- A draft memo written by Derrick concerning a $250 million loan from Cargil International (Panama). (1997 Rule 3.850 Clerk Tr. 2274, Pet. Exh.250 at 005970).

- A draft of a letter to one Amer Edoo concerning a loan of $250 million to Trinidad. (1997 Rule 3.850 Clerk Tr. 2276, Pet. Exh. 250 at 005972).

- A June 27, 1986, letter from Roberto Alvarez of Alpine Inc., Puerto Rico, to Duane in Panama about $1 to $2 billion for loans to Trinidad. (1997 Rule 3.850 Clerk Tr. 4677, Pet. Exh. 353 at 010972).

- A May, 1986 telex from Derrick to Dr. Enrique Van Brown about placing the "other 3 billion" when the first deal is done. (1997 Rule 3.850 Clerk Tr. 4922, Pet. Exh.354 at 011205).

- The June 6, 1986, letter from Derrick, of Cargil International, to Dr. W.C. Bryant representing that Cargil has $5 billion for processing in Japanese Yen bonds. (1997 Rule 3.850 Clerk Tr. 4947, Pet. Exh. 355 at 011230).

There were also million-dollar life insurance policies taken out by

Derrick and Duane shortly before their deaths. The insurance company,

William Penn Life, ultimately disputed a claim brought under these policies

by the family. This litigation led to Brenton Ver Ploeg, then-counsel for

William Penn Life, to conduct a well-financed investigation, which further

revealed:

•      Duane Moo Young sent a letter as "S. Scott" on September 15, 1986 just one month before their deaths, on Cargil International Corp. SA stationery to Richard Hayes, Min. of Finance, Government of Barbados, Bridgetown, Barbados, offering a loan to the country of $1.5 billion. (1997 Pet. Exh. T).[30]

•      The Moo Youngs purported to have more than $134 million in gems. (1997 Pet. Exh. OL (2014 Pet. Exh.286), ROA vol. 28, 5154-5172).

•      The Moo Youngs purported to have various Letters of Credit from the International Bank of the South Pacific worth $100 million. (1997 Pet. Exh. FAP (2014 Pet. Exh.154), ROA vol. 27, 5141-5143).[31]

•      The Moo Youngs claimed to be purchasing a bank in Panama for several hundred million dollars. (1997 Pet. Exh. OCY (2014 Pet. Exh.353)).

A forensic accountant analyzed these and many more documents in

1997, concluding by affidavit that they reflected money laundering on a

massive scale – which, at the time, would most likely have been for the

---

[30] This is merely a small sample. There are many such letters offering sums ranging from $100 million to $5 billion to various governments around South America and the Caribbean. *See, e.g.*, 1997 Pet. Exhs. Y (2014 Exh.25); ROA vol. 27, 5139-5140; 1997 Pet. Exh. NN (2014 Exh. 34); and 2014 Pet. Exh. 421.

[31] In 2014, this would prove highly significant because Mr. Maharaj finally learned the relevance of these letters of credit. This also explained why Mr. Maharaj was originally told to come to the Dupont Plaza Hotel for his fictional meeting with Eddie Dames on October 15, 1986. According to the 2014 evidence, on October 15, the Moo Youngs tried to settle their debt with the cartel by bringing letters of credit. However, these were checked by Vallejo Mejia through New York contacts and determined to be fraudulent. Hence the second meeting was called for October 16, resulting in the cartel murders.

Colombian drug cartels. She also identified from the various documents the fact that the Moo Youngs were attempting to make loans of huge sums of money where they would themselves be skimming one percent off the top. For example, if they lent $100 million at six percent a year, they insisted on the payment of an additional one percent to themselves. This would have been a huge amount of money – one million dollars a year for the term of the loan. It would, if noticed by the cartel, have provided a hefty motive for murder, on top of whatever motive may have existed otherwise from their interactions with the other members of the narcotics conspiracy. However, since the defense was denied funds to present this evidence in 1997, it was never heard.

Meanwhile, though it seemed a strange coincidence that a Colombian – Jaime Vallejo Mejia – had been registered in Room 1214 (opposite the murder scene, with bloodstains on the door), Mr. Maharaj was not able to learn anything about Mejia.[32]

In the end, while it seemed intuitively obvious that there had to be a link in the case to drugs, critically, the government turned over none of the evidence proving its existence. The State parlayed this suppression to

---

[32] There was a vast amount of other evidence in 1997, much of which remained speculative until 2014. For example, the police had located a phone message for Room 1215 from one Adam Hosein, whose name had been linked to the murders. Hosein's role is discussed in more detail below.

successfully argue in 1997 that there was no hard evidence that the Moo Youngs' criminality was linked to drugs, thus Mr. Maharaj was returned to his prison cell.[33] The consequence has been that, notwithstanding repeated findings that his *pro bono* counsel acted with due diligence, the courts have continued to cite Mr. Maharaj's failure to prove a drug connection.

> **2. The "proof" of motive, including highly prejudicial evidence presented by Eslee Carberry in the Caribbean Echo tabloid concerning Kris Maharaj, was emphatically dismantled in 1997.**

At trial, the prosecution urged the jurors to rely on the newspapers printed by Eslee Carberry that contained a litany of bad acts attributed to Mr. Maharaj:

> Mr. Hendon told you don't waste your time reading these newspaper articles. Don't waste your time. Well, ladies and gentlemen, the best time that you will spend in that jury room deliberating is reading those articles because each and every one of those articles gives you the motive. (1987 Tr. 3912)

In closing, the prosecution spent pages of transcript going through each of the articles, and emphasizing how they were the most significant evidence in the case. (1997 Tr. 3912-23).

---

[33] See *Maharaj v. Moore*, Civ. No. 02-22240-HUCK/TURNOFF, 21 (S.D. Fla. Aug. 30, 2004) ("Petitioner has still not shown a firm link between the Moo Youngs and narcotics trafficking or money laundering, much less shown that such a link could demonstrate that someone else actually committed the murders.").

39

Mr. Maharaj proved in 1997 that essentially every allegation in the news articles was false.[34] The fact that the allegations were false undermines their relevance as well as emphasizes their patently prejudicial impact.

---

[34] For example, Carberry testified that Derrick Moo Young told him that a bribe of $160,000 was paid to a Mr. Persad to hush up *The Echo*. (1987 Tr. 2373). Derrick supposedly gave him a check to substantiate that. (1987 Tr. 2373). In fact, the check – a copy was in Det. Buhrmaster's hands all along – proves that Derrick Moo Young himself received the payment from Persad (1997 Rule 3.850 Clerk Tr. 5127) as part of a scam.

At trial, the jury heard that "Journalism has its Hazards", and Mr. Maharaj allegedly threatened to kill Carberry. (1987 Tr. 1653). Yet in his deposition, Carberry had made it clear that there was no threat to kill him, just his newspaper, by establishing a competitor, the *Caribbean Times*. (1987 Tr. 5842).

Carberry's story at trial was that "according to Detective Inspector Waldham of the Economic Crime Division, the entire Moo Young - Maharaj entourage is being investigated." (1987 Tr. 1622). Det. Waldman actually wrote that "it appears that [Derrick Moo Young] is attempting to utilize this agency to get back at [Mr. Maharaj] since their friendship is now dissolved." (1997 3.850 Clerk Tr. 2295).

Carberry's story was that "numerous persons, including Carl Tull a top Trinidad trades unionist, seem anxious to clarify many financial dealings involving Krishna Maharaj." (1987 Tr. 1622). Actually, the police had a check from Marita Maharaj to Carl Tull paying him the money that Derrick Moo Young had stolen from him. (1997 Rule 3.850 Clerk Tr. 1177). Mr. Maharaj sued (rather than killed) the Moo Youngs to recoup the money.

Carberry put forward highly prejudicial evidence that "a Scotland Yard spokesperson … claims that: 'While we need [Kris Maharaj] for questioning in connection with alleged criminal activities, it is far too costly for us to implement extradition proceedings so we will therefore bide our time.'" (1987 Tr. 1622). This was just false. (1997 Rule 3.850 Clerk Tr. 6835 supp.).

Indeed, even supposing that they were somehow deemed admissible at a retrial – which seems unlikely – it is hard to believe that the State would countenance calling Carberry as a witness a second time. The *Brady* material exposed at the 1997 hearing included a memo written to Sgt. Bohan and Sgt. Vivian, stating of this State witness:

> "This crooked, notorious thief and con and fraud artist from the island of Grenada came to the USA via Texas then he quickly opened up his paper then rob everyone and landed in Miami in 1982 about August or thereabouts. Then he started again he ripped off any and everybody and business and he moves about. He had a storefront office at 7911 Biscayne Boulevard #5 with a Jamaican name[d] Phyllis Reid. He ripped her off a few thousands, used her name and when he was a haunted man he took off for his native Grenada in July 1984 and obtained a visitors visa whereby he could only come in and go out and not to conduct any business. [B]ut he stayed on and has amass[ed] thousands . . . by sheer fraud schemes."

(1997 Rule 3.850 Clerk Tr. 2081). The truth of this memo is reflected in Carberry's series of convictions for fraud.

### 3. Detective Buhrmaster's testimony that Kris Maharaj denied being in Room 1215 was shown to be false.

When Det. Buhrmaster testified that Kris Maharaj had denied ever being in Room 1215 of the Dupont Plaza hotel, Mr. Maharaj's fingerprints in the room seemed inculpatory. Mr. Maharaj insisted that he told the police all along that he had come to the Dupont that morning for a meeting with Eddie Dames (whom he had never met), arranged by Neville Butler, regarding the sale of his newspaper in the Bahamas. Dames never showed, and Mr. Maharaj

left. The presence of his fingerprints in the room would, therefore, have no evidentiary value.

Crucially, prior to the trial, Officer David Romero stated in his deposition that Mr. Maharaj told his colleague Det. Buhrmaster that "[h]e had been there [in Room 1215] prior to the homicides, that's correct." (1987 Tr. 114; 1997 3.850 Tr. 659-60).[35] Given that the prosecutor spent an extensive amount of time going through the fingerprints in closing argument (e.g., Tr. 3994-4001, 4019-21), the fact that this one piece of evidence could have rendered it all without probative value is of immense significance – particularly given everything else.

### 4. The prosecution's ballistics evidence was eviscerated even by 1997.

The prosecution offered evidence concerning a pistol that purported to place Mr. Maharaj in possession of the literal "smoking gun". The prosecution began by demonstrating that Mr. Maharaj had bought a silver Smith & Wesson pistol some months earlier. He had obtained it through a friend who was a police officer, Lt. Buzzo. Detective Bellrose of the Miramar Police

---

[35] To be sure, he did try to say that this was a "mistake" when he testified in 1997, but the jury should have been permitted to decide whether this was true, or an example of police refusing to accuse each other of lying. The failure to bring this out was clearly an element of counsel's ineffectiveness, but it is also an element of the claim of innocence.

Department told the jury that he had wanted to sell his gun and that Lt. Buzzo told him he had a buyer. Det. Bellrose did not know who it was until much later, when he "found out" that it was Krishna Maharaj.

Next, Officer Gregory Jansen of the Plantation Police Department was called as a witness to describe how Mr. Maharaj had been stopped for speeding on the Florida Turnpike on July 2, 1986, three and a half months before the homicides. It appeared that Officer Jansen was selected to testify because Officer Jeri Nuzzo, also in the squad car, had resigned effective November 18, 1987 – during Mr. Maharaj's trial. He "chose to resign rather than face a disciplinary review." The allegations against him included falsifying a police report when he assaulted an unarmed citizen with his service weapon.

Officer Jansen responded to the call at 2:40 a.m. He searched Mr. Maharaj's rental car, and his report reflected that there was a Smith & Wesson 9 mm handgun in the trunk, with the serial number A235464. More than a year later, having briefly seen him in the dark, Jansen said he could identify Mr. Maharaj as the driver of the car.

Of course, it is highly improbable that the prosecution would have thought to go through the records of every traffic stop in Florida if they had not known to look. This is what made Det. Buhrmaster's testimony – that Mr.

Maharaj never mentioned having a handgun, and even denied it – so questionable in the first place.

In truth, the notes in the prosecutors' file reflected that Assistant State Attorney Paul Ridge had written to Det. Buhrmaster to "speak with FHP liaison about money and gun." In other words, Mr. Ridge had learned that an incident had happened. He wanted the detective to talk with the Florida Highway Patrol to see whether a story checked out. This was clearly how they came to call Officer Jansen to identify the gun that he had seen in Mr. Maharaj's car.

There was more definitive proof of this. While Det. Buhrmaster suggested that Mr. Maharaj had lied about owning a Smith & Wesson 9 mm pistol, in 1997 the defense presented hugely significant *Brady* material – Det. Buhrmaster's handwritten notes (Pet. Exh. 220) from the police file contradicting his testimony and reflecting that Mr. Maharaj specifically disclosed details about the gun:

> Approx. six months [before the crime] – [paid] $150 to for protection. F.H.P. took gun Orlando, Fla. $1,000.00 -- $700.00 & gun.  K Troop. July # Aug. 86.
>
>                 * * *
>
> * Subsequent to arrest, Don't you remember.  I told you in July that the gun was stolen.

(1997 Rule 3.850 Clerk Tr. 2040).[36]

Mr. Maharaj said this to Det. Buhrmaster at the time of his arrest. The key to Det. Buhrmaster's testimony was that Mr. Maharaj told him that he (Maharaj) had never owned a pistol. The note proves, without doubt, that this trial testimony was false.[37]

In addition, the fact that the gun had been stolen from his car three months before the crimes (and therefore could not possibly have been used to kill the Moo Youngs) was corroborated by an independent witness at the 1997 hearing, Manuelos Stavros. (1997 Rule 3.850 Tr. 185-188). Stavros had asked Mr. Maharaj for a loan of $1,000 to go to Greece for a sudden family funeral. He testified in 1997 without impeachment that Mr. Maharaj had arrived back at the house to give him the loan, angry at having been stopped by the police. Mr. Maharaj said at the time – months before the Moo Young murders – that

---

[36] Circumstantial evidence at trial also proved that the State knew this. There was a note from one of the prosecutors asking the police to investigate Mr. Maharaj's claim that his gun had been lost some months before the crime and the prosecution called an FHP officer to deny that they stole his gun. In truth, Mr. Maharaj did not say they stole it, though they may well have done so; he said that it was taken from him, either during the stop or later when he returned the rental car.

[37] Again, a jury would be entitled to doubt Det. Buhrmaster's testimony. He did not volunteer the (seemingly false) statement that Mr. Maharaj denied owning a pistol. Rather, he testified that Mr. Maharaj only said he had owned shotguns, and had to be prompted by a leading question to add the notion that Mr. Maharaj denied ever owning a handgun. (1987 Tr. 3437).

some of the loan money and his gun were missing from the car, corroborating

what he later told Det. Buhrmaster.

Significantly, the prosecution argued the opposite of this vigorously in

closing, arguing that both statements attributed to Mr. Maharaj – that he was

never in the room and that he had no pistol – seemed exculpatory until the

other evidence proved them to be lies:

> Consider the testimony. Really what you are going to have here
> is you have got a swearing match. Mr. Hendon is going to get up
> and say my client said those things … and Detective Buhrmaster
> is lying to you to convict my client.
>
> Test the credibility of that defendant against this homicide
> detective. This is a man who in his career with the Miami Police
> Department [has been] decorated numerous times. He has been
> the outstanding officer of the month on repeated occasions. He
> has been a dedicated homicide detective for numerous years.
>
> He has been designated a runner up in police officer of the year
> in Florida, and he himself has won the award in 1986. A
> dedicated police officer. No axe to grind against this particular
> defendant, just another homicide in the City of Miami that he is
> investigating.
>
> And he testified to this version of the events and yet the
> defendant, through his attorney, [is] going to tell you this man
> lied. He lies to you when he tells you what the defendant said,
> this man. Judge his credibility.
>
> One of the things Mr. Hendon is going to point out to you as he
> has pointed out to you before, Detective Buhrmaster if this was
> really the truth, why didn't Detective Buhrmaster take a taped
> statement or stenographic statement to you could read it
> yourself? Would you still have the same problem?

If Mr. Hendon is going to tell you that Detective Buhrmaster lied, he is going to lie to you about a statement he took verbally or he can lie to you about a statement that he took stenographically.

But if you read his statement in light of the facts that you know, you will see that contained within the statement itself are those facts which verifies [sic] that Detective Buhrmaster is telling you the truth when he takes the stand and tells you that the defendant told him this.

I will tell you one thing … one of the projects that Detective Buhrmaster tells you at the time he took this statement he was without a very important piece of physical evidence, that … makes this testimony and this defendant's … exculpatory statements so damaging in this particular case. It's because Detective Buhrmaster did not know the defendant's fingerprints were going to come up in that room.

If Detective Buhrmaster had known those fingerprints were in the room, you know darn well he would have taken a taped or sworn statement from this defendant, but he did not and therefore Detective Buhrmaster was not aware of the evidentiary significance of this particular statement.

If he had to do it all over again, or if he has a homicide to investigate next week, you know darn well that Detective Buhrmaster is going to take a stenographic or taped statement.

\* \* \*

And what does the defendant tell you? He didn't own any handgun. He has never owned any handguns. A lie. We know he has owned handguns because he bought one from a police officer, and we know he owns handguns because Trooper Veltri and Officer Jansen saw him in the possession not only of handguns, but rifles when they stopped him on the 26th. Right off the bat, he is lying, and why is he lying?

Because he knows he used a handgun to kill Derrick and Duane Moo Young. So his first opportunity to talk with Detective Buhrmaster, he starts off denying it. What is any guilty man going to do under the same circumstances?

47

> When he gets to the tough questions, Detective Buhrmaster knows that a semiautomatic pistol was involved because why? Because of the projectiles and because of the casings which were found at the crime scene, so what's the first thing Detective Buhrmaster asks him? You own any handguns?
>
> What's the first thing the defendant says?
>
> No. I don't and I have never owned any.

(Tr. 4030-35)

In other words, with respect both to the issue of the gun and whether Mr. Maharaj said he had been in Room 1215, the prosecutor assured the jury that if there were a record of this it would make Mr. Maharaj look even guiltier. *But there was a documentary record of the statement, it was in at least the constructive possession of the prosecution, and it disclosed precisely the opposite of what the prosecutor was arguing.*[38]

And yes, the experienced Det. Buhrmaster knew that a semiautomatic had been used. If he wanted to make someone look guilty, he would naturally say that Mr. Maharaj denied ever owning one. Either way – if the gun showed

---

[38] Note that the prosecution knew at the time that Officer Jeri Nuzzo, also in the squad car with Officer Jensen, had resigned effective November 18, 1987 – during Mr. Maharaj's trial. He "chose to resign rather than face a disciplinary review." The allegations against him included falsifying a police report when he assaulted an unarmed citizen with his service weapon.

up, or if it had splashed into one of the many waterways of Miami – it would

help make the man look guilty.

The fact that a prosecutor argues a fact that is precisely disproven by

*Brady* material is one of the most compelling indicators of materiality, as the

Supreme Court held in *Cone*:

> Memphis police officer Ralph Roby testified at trial that Cone
> had no needle marks on his body when he was arrested—an
> observation that bolstered the State's argument that Cone was not
> a drug user. The suppressed evidence reveals, however, that
> Roby authorized multiple teletypes to law enforcement agencies
> in the days following the murders in which he described Cone as
> a "drug user" and a "heavy drug user." A suppressed statement
> made by the chief of police of Cone's hometown also describes
> Cone as a serious drug user. And undisclosed notes of a police
> interview with Ilene Blankman conducted several days after the
> murders reveal discrepancies between her initial statement and
> her trial testimony relevant to Cone's alleged drug use. In sum,
> both the quantity and the quality of the suppressed evidence lends
> support to Cone's position at trial that he habitually used
> excessive amounts of drugs, that his addiction affected his
> behavior during his crime spree, and that *the State's arguments
> to the contrary were false and misleading.*

*Cone v. Bell*, 556 U.S. 449, 129 S. Ct. 1769, 1784 (2009) (emphasis supplied;

citations omitted).

If it was now clear that Mr. Maharaj did not have a gun similar to that

used in the crime, evidence from George Abchal indicated that his employer,

Adam Hosein, left the filling station that he used for money laundering, and

went to the Dupont Plaza the morning of the murders armed with a 9 mm

pistol consistent with the murder weapon. This would have dovetailed at trial with a note in the police file describing a message left for Hosein at Room 1215 (another fact that was wholly inconsistent with Butler's testimony).

Even without this, the defense could have seriously undermined the prosecution's case. In one of the endless inconsistencies from his first statement, Neville Butler had said that the gun was white. (The one Mr. Maharaj had once owned was silver.) Trial counsel had taken Butler up on this in his pre-trial deposition, but he forgot to do the same at trial, which meant that the jury knew nothing about the discrepancy. Trial counsel's ineffectiveness only exacerbated the State's presentation of false testimony.

On a parallel path, the weakness of the prosecution case can also be put down to recent revelations concerning ballistics as a questionable forensic science. Even if Mr. Maharaj had hypothetically had a 9 mm Smith & Wesson handgun, he showed in 1997 that the link between such a weapon and the murder is extremely tenuous. The trial testimony of Thomas Quirk was slanted to fit with the prosecution theory of the case.

The prosecutors called Thomas Quirk, an expert firearms examiner from the Metro-Dade Crime Laboratory, to discuss ballistics. Various bullets had been removed from the bodies of the two victims, Derrick and Duane Moo Young, and the shell casings that had been ejected in the room had been

gathered up. Quirk's task was to determine whether it was possible to say which type of gun had fired them. He went into such detail that the judge finally interrupted.

Quirk essentially told the jurors that the bullets found at the scene had come from the type of gun owned by Mr. Maharaj – a Smith & Wesson. Quirk opined that it was immediately clear to him that the bullets had been fired from one of six brands of guns, all nine-millimeter semiautomatics – Browning, Leyte, Llama, Sig Sauer, Smith & Wesson, or Star. He had then test-fired all six types of guns, recovered the slugs, and decided that the Smith & Wesson was the most likely, since the striations on the bullets (the marks made as the bullet traveled down the weapon's rifled barrel) were the closest match. After discussing the slugs, he moved on to the bullet casings.

"The only fired standard that I have in the lab," Quirk testified, "that matches the same type of morphology on the casings from the scene is a model thirty-nine Smith and Wesson." In other words, he was saying that the casings found at the scene were likely shot from a Smith & Wesson gun. All in all, he concluded that all these bullets were probably fired through just such a gun as Mr. Maharaj had owned.

Quirk's testimony stretched out over seventy-nine pages of transcript and had the imprimatur of "science." What it actually proved was little more than

nothing.

There were an estimated 200 million guns in private hands in the United States at the time. Of them, perhaps 65 million were handguns, and 26 million were semiautomatics.[39] It seems highly likely that the Moo Youngs were killed by one of these 65 million American handguns. The challenge for Quirk and his "science" should have been to meaningfully narrow the pool of possible murder weapons. He thought he could. Indeed, his testimony left the jurors with the clear impression that only one of these guns – the one belonging to Krishna Maharaj – was likely to have been used to commit the crime.

But Quirk's evidence was utterly unreliable. Efforts to identify the bullet used to commit a crime began in the nineteenth century. Ballistics testimony went unchallenged for decades. Indeed, some took to calling it "ballistics fingerprinting," again hoping to piggyback on the perceived reliability of fingerprinting.

Not until recently did lawyers begin to ask whether the testimony that had been used to put so many people in prison had any scientific basis. Sure enough, it turned out that the "science" had never been verified: no independent, unbiased studies had ever been done to prove that the bullets

---

[39] Philip J. Cook and Jens Ludwig, "Guns in America: National Survey on Private Ownership and Use of Firearms," *National Institute of Justice Research Brief* (1997), table 4A (1994 data)).

fired from one gun could be distinguished from the millions of others. In 2008, U.S. District Judge Jed Rakoff, a highly respected federal judge in New York, finally held a series of full hearings on whether ballistics qualified as scientific, provable expert testimony. Judge Rakoff was clearly nonplussed by the fact that ballistics had been accepted in the courts for more than a century. He speculated that the process might once have been more reliable, when firearms were effectively handmade and therefore more distinct one from the next. This notion, if it was ever true, had long since evaporated with the mass production of identical weapons. Ballistics experts purport to match bullets under a microscope, but when their own practice was put under close scrutiny, Judge Rakoff could find no evidence that they were capable of making the distinctions they claimed.

"Whatever else ballistics could be called," Judge Rakoff concluded, "it could not fairly be called 'science.'" Seen from the point of view of this belated exposition on the principles of *Daubert*, Quirk should not have been allowed to limit the possible murder weapon to 225,000 of a particular type of Smith & Wesson. He would have been forced to concede at least that several million Brownings, and similarly large numbers of Sig Sauer pistols, were candidates.[40]

---

[40] *United States v. Glynn*, 578 F.Supp.2d 567, 569 (S.D. N.Y. September 22,

Of course, there was another, far more important, element to Mr. Quirk's ballistics analysis of the gun evidence in Mr. Maharaj's case. Under the best of circumstances, scientific conclusions are only as good as the information that is fed into the formula being applied. If garbage goes in, then garbage comes out. For Mr. Quirk's testimony against Mr. Maharaj to have any meaning, Mr. Maharaj had to have owned the relevant type of gun at the time of the homicides.

As we have seen, he did not.

### 5. Tino Geddes's testimony was thoroughly disproven by 1997.

According to state witness Tino Geddes, Mr. Maharaj had involved him in three previous attempts on Derrick Moo Young's life, and also asked him to falsify an alibi. The prosecution felt this was very important material, and

---

2008). *See* Dr. Adina Schwartz, "A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification," *Columbia Science and Technology Law Review* 6 (2005), 1-42. *See also* National Research Council, *Forensic Analysis: Weighing Lead Bullet Evidence* (Washington, D.C.: National Academies Press, 2004): "Ultimately, as firearms identification is currently practiced . . . the decision of what does or does not constitute a match comes down to a subjective determination based on intuition and experience." The Browning nine-millimeter is a famous and widely circulated pistol, seemingly more common than the Smith & Wesson described by Quirk. Millions of them have been made; 251,000 were manufactured between 1954 and 1969. The Sig Sauer, used by the U.S. military and numerous American law enforcement agencies, also seems to be an intensely popular gun in the trade.

spent a great deal of time discussing it in closing. (Tr. 3933-42) Sure, it sounded "ridiculous" but it should be believed. (Tr. 3933)

While Geddes' tale was, indeed, ridiculous, he was a glib liar. Mr. Maharaj's trial counsel knew in 1987 that Geddes had been arrested for something in Jamaica, and the prosecutors had gone to help him out – although it turns out that counsel did not know what Geddes had actually done. Likewise, post-conviction counsel knew by 1997 that Geddes had a serious cocaine addiction, but it would not come out until 2014 - after he died – that he had far stronger reasons to change his evidence than disclosed at trial: he had close connections with the main Jamaican drug cartel, the *Shower Posse*. These connections stretched back to the Sixties, 20 years before his arrest at Kingston Manley International Airport in 1987, the moment he sought the assistance of the Miami prosecutors to avoid a lengthy sentence for violations of the draconian gun laws.

In 1997, Mr. Maharaj proved emphatically that Geddes had lied when he said he had confected his alibi and simply transposed what happened on October 15 - 16. Unlike his trial counsel, Mr. Maharaj's post-conviction counsel contacted each alibi witness, and all six of them confirmed their original sworn statements, and made it clear that they had never talked to

Geddes, let alone been put up to it by him. So Geddes was labeled a liar by half a dozen impartial citizens with no reason to deceive.

Further, in 1997, Mr. Maharaj proved that none of the three "attempts" could have been true. Because of the significance of Geddes' testimony it is important to recap the how his confabulation was totally dismantled then.[41]

### i. Tino Geddes's story about the "Dry Run" at the Dupont Plaza (that never happened)

---

[41] Because Geddes could not even pretend to keep the dates straight, the three non-events are discussed in no particular order.

In terms of understanding why trial counsel did such a woeful job with Geddes, it is worth noting that he deposed Mr. Geddes late in the day on June 1987, and he did not redepose Geddes after the prosecution made their trip on September 17, 1987, to appear on Geddes' behalf and prevent him getting a prison sentence on his weapons charges. This was only two and a half weeks before jury selection began in Mr. Maharaj's capital trial.

There was another, extraordinary reason for counsel's failing. According to the prosecutor (and it went without challenge by defense counsel), the defense lawyer had announced an intention to have his investigator *kidnap* Geddes:

> "I am going to object to that question knowing what you have said to us [the prosecutors] that you were planning on having your investigator kidnap Mr. Geddes and I did advise Mr. Geddes of that."

*Exhibit STG-E, TG Depo. at* 21 (June 7, 1987). The purpose of this is hard to understand, but it certainly placed defense counsel in a conflict (*per se* ineffective assistance of counsel) since it would have been a serious criminal offense. This would also obviously have given Mr. Geddes reason to be biased against the defense.

The prosecution made much of Tino Geddes' "dry run" story – it was, after all, a prosecutorial godsend: almost precisely the same "plan" to kill Derrick Moo Young practiced just two weeks before the actual murders, surely compelling evidence that Kris Maharaj was guilty?

The cynic might point out that Geddes' story did not surface until months after the supposed facts of the crime had been aired in the paper. And the jury might have found it telling that, on the day after the crime, October 17, 1986, Geddes gave a statement to *The Miami Herald* that was readily available at trial, and yet was not used by trial counsel:

> "I have seen some people who have done some crazy things. But I am certain that this man who I was sitting having a meal with didn't shoot anybody shortly before that. From his demeanor, no human could sit there with his editor, his wife and one of his columnists and could put on an act like that."[42]

Nevertheless, we must review what Geddes said about this plot.

### (a) Tino Geddes's eternally changing, and readily disprovable, story about the "Dry Run" at the Dupont Plaza

Counsel had an obligation vigorously to contest this testimony, since this was clearly the most important "plot" in terms of its impact on the trial. The jury was meant to see a clear *modus operandi* and believe various facts, each of which was readily disproved:

---

[42] *The Miami Herald, at 2B, col. 3 (Sat. Oct. 18, 1986) (Exh. STG-A at 2).*

- That Geddes was chosen by Mr. Maharaj to commit a serious crime with him (for no apparent reason).

- That Geddes was chosen by Mr. Maharaj to lure Carberry there (although Geddes said he was mad at him for leaving *The Echo*, and he said that he was continually tipping Carberry off as to Mr. Maharaj's supposed murderous intent).

- That this was a couple of weeks before the October 16 incident.

- That Mr. Maharaj had booked Room 408 in another person's name. (There is absolutely no evidence he did this.)

- This other person was Roopnarine Singh. (In 1997, Singh confirmed he did actually stay there, as Geddes would have known, but that the rest of the story was false.)

- Mr. Maharaj allegedly had a gun similar to the one he supposedly used in the Moo Young murder. (It is clear that he had lost it weeks before.)

- When they arrived, Mr. Maharaj was going to burst through the door connecting Room 408 with Room 406 and kill them. (This was perhaps the most patently false part of the story, since a simple visit to the hotel with a camera would have shown that there was no connecting door between the rooms.)

Given this, it became very important that defense counsel thoroughly investigate and challenge the state's theory as it was presented through Geddes. Had counsel had the tools to do this, he could have made it very clear that Geddes was lying again.

Because he was lying, Geddes got in a hopeless muddle about his story. He said at trial that he thought Mr. Maharaj was in Trinidad.  (Tr. 2227) Later,

58

he said he thought Mr. Maharaj was in Canada. Exh. STG-C at 4. In his deposition, he said he thought Derrick Moo Young had supposedly gone to Canada (Exhibit STG-E, TG Depo. at 63), though had the prosecution not hidden the *Brady* material it would have been clear that Derrick and Duane were handling their laundering in Panama at the time.

Mr. Maharaj allegedly called to tell Geddes to come alone to the Dupont. (Tr. 2227) Initially, Geddes said that Mr. Maharaj planned to kill Mr. Carberry at the hotel in the practice incident. (*Exhibit STG-E, TG Depo. at 56*) Then he added that Mr. Maharaj was going to do it to Derrick Moo Young at the same time. (Exhibit STG-E, TG Depo. at 58)

*When did this crucial event take place?* During his deposition, Geddes toed the line originally suggested by the prosecution and said that this incident took place "maybe about two weeks or so before the actual incident. . . ." (Exhibit STG-E, TG Depo. at 57) Initially, at trial, he said the same thing. (Tr. 3667) This was important, since it matched the records of Roopnarine Singh's visit.

However, then he got in a muddle because he was also trying to say that he bought his own Smith & Wesson in reaction to this incident. The dates would not work, since the gun the prosecution thought he had bought was

shown to have been purchased on July 27.[43] He therefore explained, "and when I say a couple, I do not necessarily mean two. This is how we speak. This is standard Jamaican." (Tr. 3667) So here "a couple" means more than twelve weeks. But now the Singh records that were meant to corroborate his story impeached it.

Later, he further impeached himself. In an effort to explain why he bought his gun in July 1986, he put the Dupont "dry run" prior to the Ryder Truck incident (discussed below), that supposedly happened months before:

> The only thing after [the alleged "dry run"] that that I did with Kris was the morning when I went with him the van, the U-Haul. The rental truck and after that, I mean, you know, I said, this is it man, you know, you're off the wall, you're crazy. I don't want no part of this. You know, like don't call me, don't communicate with me. That was it. But what you have to understand is that I was still into a working relationship with Kris so on mornings if Kris said, come on, we have to do things, anything. I don't know. I can't know beforehand that this is what his intentions are. Because it may be that we have to go to our printers, it may be that we have to get down. . . .[44]

There was some evidence prior to trial that this was all being concocted by the prosecution feeding material to Geddes. For example, Geddes said that "Mr. Maharaj had rented the room." (*Exhibit STG-E, TG Depo. at 57*) It was in a name that Geddes could not remember either at the deposition or at trial:

---

[43] While all this was nonsense, actually Geddes was often buying guns, as discussed below.

[44] Exh. STG-D at 14-15, Channel Four, July 25, 1995.

"I know that it was an Indian something name, but I really don't know what the name is." (Tr. 2255) But the prosecutor interrupted the deposition to tell him that it was Roopnarine Singh. (Exhibit STG-E, TG Depo. at 61)

Geddes said that there were "like two adjoining rooms with an adjoining door." (Tr. 2255; Exhibit STG-E, TG Depo. at 57) This was Room 408 *(Exhibit STG-E, TG Depo. at 62)*[45] and the connecting room would be to his left as you look at the door. (Exhibit STG-E, TG Depo. at 67) He assumed that both were rented (Exhibit STG-E, TG Depo. at 66), as indeed they would have to be if they had a connecting door with locks on both sides.

At the time, defense counsel asked:

> Mr. Hendon: Does the hotel record reflect there being double or adjoining rooms or double suits, or something to that effect, Paul?
>
> Mr. Ridge: I just gave it to my intern to make a copy.
>
> Mr. Hendon: Do you know whether [or] not that is on there?
>
> Mr. Ridge I don't remember that off the top of my head. We will get it back and see what the document says. (Exhibit STG-E, TG Depo. at 61)

---

[45] The Dupont Plaza Reservation information for Roopnarine Singh (of Roopnarine Singh Used Car, 86 Ibis Blvd, Philippine, Trinidad) reflects that he checked in on October 5, 1986, and left on October 7. (*See* Exhibit CB) The records reflect that Singh was actually in the Dupont Plaza in Room 408.

This was a good question. However, defense counsel never followed up on it, and the prosecution chose to keep what they knew to themselves.

For a man who has spent 30 years in prison for a crime he did not commit, the saddest aspect of defense counsel's ineffectiveness on this key issue is that he suggested what he should so - merely visit the hotel, and a photograph would have proved that this was a lie. Room 406 was to the left of Room 408, as you face the door. For Geddes's story to be true, Mr. Maharaj would have to enter Room 408 from Room 406 through the connecting door. The problem? *There is no connecting door between the two rooms.* Indeed, there is no connecting door between *any* of the rooms along the length of the fourth floor hallway.

Even if there were, what should defense counsel have been able to divine from a cursory review of the hotel records? In common with all such doors in hotels, the rooms in the Dupont that do have connecting doors have locks on either side, so that one would have to have rented both rooms to be able to open the door. From the records available, this was not the case.

Finally, and equally obvious, defense counsel might have contacted Singh, who would have categorically disabused the jury of Geddes' story.

At this point, defense counsel would have exposed a very large hole in this critical aspect of the case against Mr. Maharaj. But counsel would not

have been finished.[46]    At the time of trial, Geddes insisted that he cooperated with Mr. Maharaj simply out of loyalty to his boss.[47] We know this was a lie since he had already quit the paper. In 1995, then, he told a different story:

> "When I was in the hotel room, Kris had a gun in his hand.  He asked me to make a telephone call and I wasn't prepared to argue with a man with a gun in his hand." (Exh. STG-D at 15, Channel Four, July 25, 1995)

But this was the first time such a story had surfaced.

Mr. Maharaj supposedly told Geddes he could take care of up to three people himself. If there were more, Mr. Geddes would have to help him. (Tr. 2233) Yet, the prosecution's theory was that Mr. Maharaj was only expecting one person, Derrick Moo Young, and that Duane Moo Young came by accident.

---

[46] The rest of the story was also highly dubious even at trial. Geddes testified that Mr. Maharaj met him in a bar and gave him a key, saying not a word to him. (Tr. 2228) On cross-examination he changed the story, and Mr. Maharaj now has a drink with him without saying a word. (Tr. 2252)  Realizing that this sounded absurd, he changed to: "it was limited conversation." (Tr. 2253) In the lounge, Mr. Maharaj had an attaché case, no glove, and no canvas bag. (Tr. 2253) Geddes could not describe the bartender who served them, but "[w]hat I do know is that he was bilingual." (Tr. 2254) Of course, this is true of almost every bartender in Miami, which conveniently prevents the defense from being able to prove the lie.

[47] "He told me that he trusted me, he like me and he needed me as his editor." (Tr. 2235)

There is another major problem with Geddes's story. He says that he made about four calls to Mr. Carberry and one to the Moo Youngs from the room that night. (Tr. 2256) However, a phone call would be long distance to Ft. Lauderdale, so one could easily check. Had counsel checked, he would have found that no such calls appear on the Dupont telephone bill for this room. The prosecution knew this, and did not point out Geddes's apparent perjury.

At trial, Geddes said that the gun was chrome finish, light colored. (Tr. 2230) This fit with the prosecution's theory. However, at the time of the deposition, he remembered nothing particular about it. (Exhibit STG-E, TG Depo. at 65) It was rather obvious that this had been fed to him, but defense counsel failed to pick up on this significant point.

Geddes also injected the "one glove" theme that came up in Neville Butler's testimony. He said that Mr. Maharaj "had a glove on one hand." (Tr. 2230) (Exhibit STG-E, TG Depo. at 111) Again, either Mr. Maharaj was entirely insane or this never happened. Why wear one glove if one is trying to avoid leaving a trail of fingerprints that would lead the police to your door?[48]

---

[48] This issue is discussed in the context of Butler's testimony. However, it bears reiterating that a person who would think about the possibility of getting gunpowder residue on his right hand would surely also consider the possibility of leaving fingerprints with his left. The genesis of this harebrained idea is rather clear and should have been pointed out by defense counsel. First, Det.

64

Gilding the lily further, Geddes said at trial that there was no silencer on the gun. (Tr. 2232) Mr. Maharaj, he explained, had "said the rooms were soundproofed and you couldn't hear an explosion from outside." (Tr. 2233) This certainly fit with Butler's version of events, but it was entirely false. Had counsel merely visited the room, he would have known that the room clearly was not sound-proofed. Furthermore, the police reports suppressed as *Brady* material show that people heard an argument going on in the room. It would - as everyone, including Det. Buhrmaster, now concedes - have been impossible for a large number of bullets to be fired without being heard unless there was a silencer on the gun.

If defense counsel had been provided with these tools, or had found them, much of Geddes's testimony would have been in tatters at this point, before we ever get to Geddes's testimony as to what happened on the day of the crime.

> **(b) Tino Geddes told so many lies about the gun he allegedly bought that it is hard to sort them all out**

---

Buhrmaster asks Mr. Butler whether there is going to be a positive result when they do a paraffin test Mr. Maharaj's hand. To try to cover for this, Mr. Butler says no, he had a glove on. Therefore, the police do not bother with a test, since they think that a negative result will undermine their case.

However, it is one of many comments he made that illustrate a series of lies about the gun that he and the prosecution said he bought after the Dupont Plaza "dry run" in the first week of October. A brief timeline is vital to understand how Geddes lied, and how the prosecutors compounded this lie in violation of *Giglio v. Illinois*.

Geddes was arrested in Jamaica on weapons charges in early 1987.[49] After this happened, he contacted the prosecutors, who went to see him two or three times in Jamaica. This resulted in a deposition by defense counsel on June 5, 1987. Then, on September 18, 1987, both trial prosecutors went to Kingston to testify on Geddes' behalf at sentencing after he had been convicted in Jamaica. (Tr. 3646) Assistant State Attorney Kastrenakes represented that he told the judge in Jamaica:

> the facts and circumstances surrounding the purchase of the firearm and ammunition by Mr. Geddes and *the reason for the purchase, which was due to threats made upon Mr. Geddes by . . . Krishna Maharaj.*[50]

In 1995, John Kastrenakes told British television that he and Paul Ridge went to Jamaica to provide a "moral excuse" for the crime committed by one of

---

[49] The 2014 evidence shows that he was actually smuggling weapons in for the *Shower Posse*, but we will set that aside for now.

[50] *See* Letter of Paul Ridge to Eric Hendon (9/22/87) (Exhibit M) (emphasis supplied).

their witnesses (who, incidentally, they wished to appear in the United States

two weeks later):

> The only reason that Mr. Ridge and I went there was to tell the
> court the circumstances surrounding why he had ammunition in
> the States, why he had a gun and why he was a witness and what
> the threats were against his life and that his life was . . . he felt,
> in jeopardy, and that, in fact, that was a moral excuse as to why
> he had forgotten his . . . ammunition.[51]

Geddes testified that he bought the gun right after the supposed Dupont

"dry run" incident. (Tr. 3668) As discussed above, this was, according to the

prosecution, on October 5 or 6, 1986 – "corroborated" by the records of

Roopnarine Singh's hotel booking.

At trial, in response to questioning by the prosecution, Geddes testified:

> I purchased that gun because I had become involved in these
> escapades which I have already described with Mr. Maharaj, and
> I was, in fact, fearful for my own safety, and this is why I
> purchased this firearm.

(Tr. 3661)

Geddes said that the incident at the Dupont happened "a couple" of

weeks before the murder. (Tr. 3667) This had to be correct in order to fit with

the Singh hotel records. Unfortunately for him, the prosecution wanted to rely

on a record of the gun he said he had bought. This turned out to be dated July

---

[51] 1997 Exh. HD, Ch. 4 JSK at 29.

17, 1987,[52] at least ten weeks before he had sworn that the incident happened. Thus, he had to be telling a lie about one thing or the other, or both – either the motive for buying the gun, the "dry run", or both.

When he was confronted with the inconsistency at trial, he said, "[a] couple of weeks, like eight." (Tr. 3668) He repeated, "and when I say a couple, I do not necessarily mean two. This is how we speak. This is standard Jamaican." (Tr. 3667)

This meant that Geddes was clearly lying about the Dupont incident, since his story no longer meshed with the records. And if the Dupont incident did not happen, then the prosecution had misrepresented Geddes's motives to the Jamaican courts, and to the jury in this case – either knowingly, or because they had been duped by Geddes.

Because he was not telling the truth, he just could not keep this straight. The supposed murder plot involving trying to kill Carberry with a crossbow (below) was meant to have happened as long ago as June 1986. Tino Geddes insisted that he had no fear of Mr. Maharaj then, saying when the issue came up with Mr. Maharaj:

_____

[52] Tino Geddes, Journalist with Caribbean Times, buys a Smith & Wesson .38 with a blue finish (Serial No. 18D8777) from Sy's Gun & Pawn, 19567 NW 2nd Avenue, Miami, Fl. 33169. (Tr. IX-1684)

> At this point I produced my gun and fired a shot through the window and said, 'Kris, this is the only guarantee I have,' and he said he is very happy to know that I was an independent thinker.

Exh. STG-C, at 2. This tough man imitation is obviously more confabulation, but if he had a gun then, he surely did not buy it many weeks later out of fear of Mr. Maharaj.

Indeed, a moment later, when Geddes told his story about Mr. Maharaj wanting a crossbow (supposedly months before, before the first planned attack on Carberry), he said: "I took him to *my* gun shop -- I used to buy ammunition and accessories from them. . . ." Exh. STG-C, at 3 *(emphasis supplied)*. It is apparent, then, that Geddes was a regular proponent of Second Amendment freedoms – since, as we would discover in 2014, he was buying weapons for his *Shower Posse* friends in Jamaica.

### ii. Tino Geddes's story about the Second Attempted Murder (The Marriage Day Massacre)

The Ryder Truck incident was a critical one at the time of the trial. Again, this was portrayed, with no challenge from the defense, as a prior murder plot in which Mr. Maharaj planned to kill Derrick Moo Young and, potentially, anyone who was with him.

Geddes insisted that Mr. Maharaj wanted to get a Ryder Truck from W. Broward Boulevard "to get at" Derrick Moo Young, run him off the road and

kill him. (Tr. 2218) At trial, Geddes told the jury that the plan was for them to go to Griffin Road near where the Moo Youngs and Mr. Maharaj lived. They were going to run Derrick off the road on his way from home out to Expressway 27 where "it is not a very well used highway that very many vehicles travel up and down." (Tr. 2219) "It is the end of Griffin Road where Griffin Road comes out to the expressway." (Tr. 2251) (Exhibit STG-E, TG Depo. at 75) They were out in the open, with nothing hiding the truck. (Tr. 2251)

On one level, this story was so far-fetched that one might have expected that counsel could have disparaged it with ease. Unfortunately, counsel did not do so. Certainly, with a minimum of investigation, counsel could have exposed Geddes as the fraud he undoubtedly was.

First, a basic review of the area shows that there are a number of ways to get to and from the Moo Young house. Why he should turn left towards Highway 27[53] rather than right towards Interstate 75 is hard to guess, particularly if they did not know where he was going. While there was nothing beyond Highway 27 to the west, anything he might want to go to in Pembroke Pines, Plantation and Fort Lauderdale was east. It simply makes no sense that

---

[53] The Moo Young house at the time, 4901 SW 193rd Lane, is roughly two kilometers east of Highway 27, south of Griffin Road.

Mr. Maharaj would plant a bright yellow rental truck somewhere on the road towards a busy highway and expect to commit murder. (At another time he said that they were going to drive the truck through the wedding.)

Second, consider the rental of the truck. Mr. Maharaj allegedly told Geddes he was going to rent a truck to crash into the Moo Youngs' car. (Exhibit STG-E, TG Depo. at 78) It makes little intuitive sense to rent a truck (with the name of the renter) that is large, yellow and highly visible, in order to commit a murder. Indeed, defense counsel should have been prepared to tell the jury the truth - that a van was rented routinely for delivery of the *Caribbean Times* newspapers. Instead, counsel allowed Geddes to simply deny that they ever had other truck rentals for the business. (Tr. 2249) If only counsel had bothered to check, counsel could have proved that just one week later – on August 2, 1986 – Mr. Maharaj rented a White 82 Chevy Van for the same purpose,[54] as he did every week.

They allegedly rented a Ryder truck in Geddes's name but with Mr. Maharaj paying the bill with his credit card, so they were actually both readily traceable. According to Geddes, Mr. Maharaj asked Geddes to rent the truck in his name because Mr. Maharaj had a British driver's license (Exhibit STG-

---

[54] He rented it with full collision insurance from Apollo Auto Rental, 401 N. State Road 7, Hollywood, Fl. 33021 (305/987-6677) (1997 Exh. CC)

E, TG Depo. at 74), and Geddes said a Florida license was required. (Id. at 77) Minimal investigation (a phone call) would have verified that a British license is valid in the United States. If he did not know this, counsel could simply have asked his client, in which case he would have found that Mr. Maharaj frequently rented vehicles.

Geddes still could not get it straight when this supposedly took place. He said the incident came eight or ten days before the murders. (Exh. STG-C, at 6) He said they had hired the van immediately before the incident. (Exh. STG-C, at 4) According to the prosecution, the records reflect that this was July 25, 1986. (Exh. Q, RA 130) Geddes said the Ryder Truck incident was on the Saturday of Duane Moo Young's marriage *(Exh. STG-C, at 4),* but Duane was never married.[55] The prosecutor tried to correct him, saying it was Paul Moo Young's wedding. However, even supposing that we give him the benefit of the doubt on that point, July 25, 1986 was a Friday.

Then there was the question of what weapons were going to be used to commit this crime. Geddes said at his deposition, "I don't recall if he was going to use the crossbow at the wedding or if he planned to drive the truck

---

[55] As was his way, the prosecutor interrupted Geddes's deposition to say that it had to be Paul Moo Young's wedding, although this was not what Geddes had said, and it is not what he said in 1995. The truth is that Geddes simply made this fantasy up, and the prosecution was trying to patch it together as best they could.

through the wedding." (Exhibit STG-E, TG Depo. at 88) Defense counsel did not even raise this ludicrous statement to the jury. Prior to trial, Mr. Geddes testified that on another occasion he was with Mr. Maharaj when the latter bought two crossbows and some spears. (Exhibit STG-E, TG Depo. at 81-82) Counsel did not even query what Geddes meant by crossbows and spears: crossbows and arrows, or some kind of spearfishing gun used in scuba diving?

Because he was making all this up, Geddes simply muddled the story he was fabricating about the Ryder Truck murder plot with the story he told about Carberry (discussed in more detail below). On the same day as buying the crossbows Mr. Maharaj "bought some hunting knives and camouflage jackets..." (Exhibit STG-E, TG Depo. at 83)[56] Mr. Maharaj allegedly insisted that Geddes should put on "the camouflage jacket and hat." (Exhibit STG-E, TG Depo. at 83) Geddes testified that "I put on the floppy hat but I couldn't really go along with this sort of flamboyant thing." (Tr. 2226)

---

[56]Geddes testified on deposition that one knife was meant for him and "perhaps if you see Mrs. Maharaj, you can remind her that one of those knives was suppose[d] to be for me. I am not being funny, but I still would like to have the knife." (Exhibit STG-E, TG Depo. at 85) Again, this kind of frivolous nonsense should have been used to eviscerate his credibility at trial. Instead, defense counsel never even mentioned it.

There they were, supposedly, in mid-summer in Miami in a large and obvious yellow truck, wearing combat fatigues, camped out by the side of the road. Defense counsel never seriously questioned this tale.

Then, Geddes says, a police officer came up and asked what was happening. (Tr. 2250) While defense counsel made no effort to ascertain this at trial,[57] there is apparently no record of it. It is hard enough to believe that there would be no record under the circumstances he described then. However, now he says that when the police officer asked them what they are doing, they were both in camouflage uniforms and the officer saw the guns in the back of the truck. Exh. STG-C, at 5. This is obviously a lie, and only goes to show that the story was false in the first place.

All this was going to be critical evidence at trial, yet defense counsel made no effort to investigate it.[58] This great plot supposedly failed because Derrick Moo Young did not appear. (Tr. 2224)

---

[57]Defense counsel knew to investigate this, since Geddes said in his deposition that an officer came by and Mr. Maharaj said the truck had overheated. (Exhibit STG-E, TG Depo. at 75)

[58] As the *KDM International* records that were in the prosecution's possession (and were not turned over to the defense) reflect, Mr. Maharaj frequently bought things for his friends in Trinidad, from the Army and Navy stores (*see* 1997 *Exh. OAA*), which was why Mr. Maharaj did buy such things – not to carry out assassination plots on the highways of Florida.

Why did Geddes supposedly take part in this plot? Geddes testified that on "[f]ive occasions" (no more or less, apparently) he asked Mr. Maharaj to call this off. (Tr. 2249) Yet in his deposition, Geddes had said he never did try to talk Mr. Maharaj out of any of these crimes. (Exhibit STG-E, TG Depo. at 79) Why not? Geddes said he was "nervous" but prepared to go along with this. (Exhibit STG-E, TG Depo. at 78) He supposedly did not question what Mr. Maharaj was having him do on this and other things because "[t]hat is not the sort of thing you question your employer about." (Exhibit STG-E, TG Depo. at 26)

### iii.   Tino Geddes's Black-of-Night Midnight Murder Plot

The other attempted murder plot described (actually contrived) by Tino Geddes was the alleged plot against Carberry, who allegedly went with Mr. Maharaj  to West Palm Beach where Mr. Carberry was at the *Echo*'s printer (the *Town Crier*). According to Geddes, Mr. Maharaj was going to do him damage on the "lonely stretch of road which runs from Wellington down to Ft. Lauderdale." (Tr. 2216)

This whole story should have been shown by counsel as absurd. Geddes started talking about cross-bows again. The prosecution led Geddes to say that he was present when Mr. Maharaj bought two such weapons. He implied that Mr. Maharaj was going to kill Carberry with them. (Tr. 2214) He

suggested the same with two hunting knives (Tr. 2214) and he also mentioned camouflage gear again. (Tr. 2215) He did admit that Mr. Maharaj did not tell him what these were for. (Tr. 2215)[59] In fact, while it was ludicrous to think a middle aged businessman was going to dress up in camouflage gear and go after Carberry with a crossbow, defense counsel could have proven that these materials were bought by Mr. Maharaj for a friend of his.[60] Defense counsel did nothing to investigate or prove this.

Geddes now tells us that Mr. Maharaj had conspired to kill Carberry, that he had told this to Carberry, and that Carberry therefore published the "fact". *(Exh. STG-C, at 1).* This is simply false.[61]

---

[59] Before trial, he said that there were no Chinese throwing stars or numchaks that he saw in this stash of weapons. (Exhibit STG-E, TG Depo. at 86) Later he said that they had "some of these Chinese leather things with spurs on them." Exh. STG-C, at 5. Supposedly, he later said, they also bought some "very powerful air pistols that sell for $100 and don't create an explosion." Exh. STG-C, at 5. The story changed, but it did not get much more likely.

[60] As reflected in the *KDM International* records in the prosecution's possession (and not turned over to the defense), Mr. Maharaj frequently bought things for his friends in Trinidad and imported them into that country. (*See* Exh. OAA) No KDM records are available after early 1986 since the company had been dissolved at that time.

[61] Indeed, Carberry published a story about Mr. Maharaj threatening to kill him – but had to admit that the only thing Mr. Maharaj did threaten was that he would "kill" the *Echo* and its false gossip by establishing the Caribbean *Times* and selling a better product.

Had counsel explored the weapons that were attributed to Mr. Maharaj, he would likewise have cast the story into great doubt. Geddes said at trial that Mr. Maharaj admitted to having a shotgun in the car and that he saw a case for it:

> Q.    Were there any weapons in the car that backed up his claim to do bodily harm to Mr. Carberry?
>
> A.    Mr. Maharaj told me he had a shotgun.
>
> Q.    Did you see a shotgun or a shotgun case?
>
> A.    I saw a shotgun case. I didn't see a shotgun.
>
> (Tr. 2216)

Later, like fine wine, his story became more robust. In 1995, Geddes said that Mr. Maharaj had a pistol with him, "and the shotgun was on the backseat floor and the rifle in the trunk." Exh. STG-C, at 2.

According to Geddes in his deposition, Mr. Maharaj was planning to shoot Mr. Carberry (Exhibit STG-E, TG Depo. at 70), more conflation of his various confected stories. Geddes testified he said and did nothing in response to Mr. Maharaj purportedly announcing plans to kill Carberry. (Exhibit STG-E, TG Depo. at 71) At trial, he testified that all this bothered him but he did not do anything to stop it since he did not want to walk back to Ft. Lauderdale.

77

(Tr. 2246) At another time, he said he was not going to stop what was happening since it was all in the dark of night. Exh. STG-C, at 3.

He testified that he stayed around for a while, but then he said wanted to go to the deli because he got bored of being in Mr. Maharaj's company "much as I get along with Mr. Maharaj." (Tr. 2217)

"You must understand where this is," Geddes said at another time. "You would drive for miles and see no sign of life or light." It takes only a moment on the internet to prove that this was bogus. The *Town Crier* printer was, and still is, in the same building as the Publix supermarket. The hint is in the name: the supermarket was in a very public place in Wellington, a suburb of West Palm Beach, and the road was solid with houses between there and Fort Lauderdale. It was hardly a venue for a secretive assassination, though it was a place where a deli was readily available.

Unfortunately, defense counsel did not do this very basic investigation.

### iv. Other readily exposed lies told by Tino Geddes

Geddes swore in his first statement that he met with Mr. Maharaj on the morning of the crime, just before the prosecution believed the Moo Youngs to have been murdered. He assured the *Miami Herald* that Mr. Maharaj could not possibly be guilty. Then he recanted his earlier statements and testified for the prosecution.

Counsel allowed Geddes to simply lie unchallenged. If there had been an obvious need for a solid alibi to begin with, the witnesses became even more important when Geddes said he had confected it. There were many other ways in which he could have proven Geddes a liar.

**Geddes did not choreograph the alibi.** Geddes testified at trial that, before he spoke with defense investigator Ron Petrillo, he contacted other people at the Disco Lounge, briefing them to say the same thing. (Tr. 3622) He spoke with a mechanic next door, he said, and a middle aged couple working in the pub itself. (Tr. 3622) He testified that this was easy since the actual meeting was about 11:30 a.m. the day before. (Tr. 3623)

He said in deposition that he told Arthur McKinsey what to say. (Exh. STG- E, TG Depo. at 39) He did not. Arthur McKenzie was a mechanic who opened the Disco Lounge for them, and has testified that Geddes never talked to him – but, unfortunately, neither did defense counsel.

As for the other witnesses, they were not a middle-aged couple working in the Disco Lounge. They were a number of different people at Club 420. And they all deny ever speaking to Geddes about this, but they do insist that Mr. Maharaj could not have committed the crime. Unfortunately, as he admitted to both current counsel, trial counsel did not speak to any of them.

Of course, the fact that no alibi was presented at trial must have been seen by the jury as evidence that Geddes was telling the truth. Naturally, this was the way the prosecutor argued it. (Tr. 4042-43) Thus, at the 1997 hearing Mr. Maharaj attempted to call the other five alibi witnesses.[62] While he was not permitted to call them all, they stuck to their consistent exculpatory testimonies.

**The Mustache Issue.** Geddes said that he went to the airport at around 6:30 p.m.: "The first time that I saw [Mr. Maharaj] on that fateful day was at the airport." (Tr. 3606) He testified that he barely recognized Mr. Maharaj because the latter had shaved his mustache and cut his hair much shorter. (Tr. 3614) The prosecution made much of this, arguing that it proved a guilty conscience - Mr. Maharaj allegedly trying to change his appearance.

As a matter of logic, it simply could not be true. All the alibi witnesses said that Mr. Maharaj had just shaved his mustache. They were talking about when they saw him before, or contemporaneous with, the crime. But Geddes said he had persuaded them to place the events of October 15 on the date of

_____

[62] Mr. Maharaj strongly contests the suggestion that his lawyer's failure to investigate and present the alibi witnesses bars consideration, as a substantive issue, of this crucial and extremely credible evidence of innocence. However, lest there might be any confusion, as with all evidence of innocence, Mr. Maharaj asserts his right to present the alibi witnesses on the procedural issue of innocence under *Schlup v. Delo*, 513 U.S. 298 (1995).

the murder (the 16th). But if Mr. Maharaj had shaved his mustache off the day before, it could not logically have been done after the crime.

**What did Mr. Maharaj tell him?** Geddes has added a detail to his former story. He told British television that Mr. Maharaj discussed Neville Butler with him and voiced his fears that Butler could not be trusted:

> He had allowed Butler to leave the hotel room and he recognized it as a mistake because Butler, he said um, he had second thoughts about Butler. He wasn't sure whether Butler was really committed to him. (Exh. STG-D at 4, Channel Four, July 25, 1995)

If this were true, then he would surely have told the prosecution and the jury about this critical confession. The only reason he could have for not having said this before is that it is yet another fabrication on his part.

**The bloody clothes issue.** While it is indubitably true that Neville Butler gOt rid of the bloody clothes he was wearing when taking part in the crime, Mr. Maharaj did not as he was not involved in murdering the Moo Youngs. Geddes tried to say that he might have put them in the bag in Mr. Maharaj's car. It is clear that he has learned the whole story Neville Butler told about the bag in which Mr. Maharaj supposedly brought a "silencer pillow" to Room 1215. "I did not see the bag clearly. I really did not see it clearly, but it brought back memories of the bag that I [had] seen at the DuPont Plaza Hotel." (Tr. 3631)

### 6. Other evidence of innocence from 1997: Prince Ellis and Eddie Dames.

As of 1997, which is now two decades ago, there was other evidence that cast great doubt upon the State's case. Prince Ellis was originally a State witness in 1987, called essentially to give Eddie Dames an alibi. It had always been an enigma – why on earth would Mr. Maharaj plan a murder in a room registered to Eddie Dames, a man whom he had concededly never met and who, for all he knew, might walk in at any moment? Indeed, according to the prosecution, Dames did come back to the room later. While Dames was not called as a witness – doubtless because his story was inconsistent with the prosecution theory in several respects – Prince Ellis was called to testify that the two men were shopping at the time of the murders.

By 1997, Ellis had gotten to know Dames better and had come to the conclusion that he had been "used" as an alibi for Dames. He identified Dames as a drug dealer who used his role as an air traffic controller to help facilitate drug shipments through the Bahamas.

Ellis also revealed information about Neville Butler that was unknown to the defense at trial. He had seen Butler with a broken watchstrap and torn clothes with blood on them shortly after the murders – an inconsistency with Butler's story that suggested Butler had been much closer to the actual murder

than either version of his story would have allowed. The police neither sought, nor obtained, the clothes he was wearing at the time of the crime.

"Neville was saying something to the effect that they just went crazy and bullets were flying all over the place. They just started shooting," Ellis went on, emphasizing that Butler used the word "they" over and over. Again, this was wholly inconsistent with Mr. Maharaj committing the crime himself, and supported the emerging evidence pointing to the cartel.

### 7.  Other evidence of innocence from 1997: Adam Hosein and Nigel Bowe.

Adam Hosein was barely mentioned at trial, although he certainly should have been. Simply from knowing a little of his history, Mr. Maharaj suspected that Hosein had something to do with what was going on. However, his counsel did not investigate Hosein at all.

Hosein has a long and sordid history; going back fifty years to his involvement in one of the most infamous and gruesome cases in British history – the abduction of Muriel McKay, on the mistaken assumption that she was Rupert Murdoch's wife. She was murdered and then, apparently, chopped up and fed to the Hosein family pigs at a farm in Hertfordshire. He was suspected of this crime, but his two brothers were ultimately the ones convicted.

Closer in time to the Moo Young murders, Adam Amer Hosein was in league with Derrick and Duane in a number of companies that were being used as fronts for their narco-money laundering. Unbeknownst to the defense, there was evidence of this among the contents of the Moo Young briefcase. For example, one of the Moo Young front companies was called Amer International, based on Hosein's middle name. Most significantly, perhaps, Hosein was a director of Cargil International (Bahamas) S.A., the main Moo Young money-laundering company that was registered at the Nassau law office of Hosein's close friend and lawyer, F. Nigel Bowe.

As Mr. Maharaj proved in 1997, Bowe was counsel to Carlos Lehder and others and was, even in 1986, wanted under a federal indictment for drug trafficking. While he resisted extradition, he would ultimately be convicted on RICO charges and spend several years in a federal penitentiary.

The room at the Dupont Plaza Hotel where the murders occurred was, according to Eddie Dames, paid for by Butler. But the bill reflected it was actually paid for by Dr. Derek Jhagroo – close friend and confidant of Adam Hosein. Dr. Jhagroo has described to a number of people that Hosein admitted to him being involved in the murders.[63] According to Prince Ellis, Bowe was, in turn, linked to Dames.

---

[63] As recorded (secretly, but legally) by a BBC reporter:

According to newly discovered evidence that was provided by George Abchal: Hosein went to the Dupont Plaza Hotel that morning with a gun and came back later, telling Abchal not to mention where he had been.[64]  In the

_____

> *Mrs Jhagroo:* *** Derek told quite a few people the full details about the case; he said that Adam killed the guy and his son and all you hear is about how he killed him, he knows where Adam lives, he goes by Adam's, he and Adam ... Adam cook for him, Adam goes to his office, Adam calls him all the time on his telephone and on the home phone here.
>
> *Tim Samuels:* Is Krishna Maharaj innocent?
>
> Mrs *Jhagroo:* Totally innocent.
>
> ***
>
> *Tim Samuels:* How can, how can Derek be sure that Adam did the murders?
>
> Mrs *Jhagroo:* Because Derek knew it and Adam told him. And Derek knew before he killed he knew what happened that night, he knew everything step by step.
>
> ***
>
> Mrs *Jhagroo:* Yeah, he told me and I swear to God what I am telling you is the God's truth. He told me he could set Kris Maharaj free if he, he knew the information to set Kris Maharaj free. I swear to God he told me that.

*Affidavit of Tim Samuels*, BBC Reporter (dated Aug. 6, 2014). Samuels made it clear that Mrs. Jhagoo was not saying either that Hosein did the crime alone, or that he actually pulled the trigger. Samuels also recorded Dr. Jhagroo who said he knew Mr. Maharaj had been framed, but who refused to say anything else.

[64] *Affidavit of Tim Samuels*, BBC Reporter (dated Aug. 6, 2014) (Abchal "claimed that on the day of the murders Hosein said he was going to the

police files there was additional, newly discovered evidence linking Hosein to the crime scene – a message from him, left for Room 1215. The police apparently did nothing to follow that up, and did not even interview him.

### 8. The pervasive inconsistencies and perjury by "star witness" Neville Butler had been demonstrated by 1997.

Neville Butler was supposedly the eyewitness to Kris Maharaj committing the murders. Without him, the prosecution effectively conceded, "this would be a circumstantial case," which would be based on the:

> "lying to Detective Buhrmaster, the fingerprints being found in the room, his owning a gun, the exact kind of gun that was used to kill the Moo Youngs would be a circumstantial evidence…"

(Tr. 4011) In other words, if we take away Det. Buhrmaster's two statements (about Mr. Maharaj denying that he was ever in the room, and denying owning a gun), both of which have already proven to be false, there is essentially nothing except for Neville Butler.

That is the nub of the case. According to the prosecution, "you have a person inside the room. You have Mr. Butler inside that room who tells you exactly what happened on that particular date." (Tr. 4011-12)

---

DuPont Plaza hotel (scene of the murders); he had taken a gun and a silencer from his drawer; and later that night he told Abchal he had "eliminated" a problem.").

Because the State has placed such great weight on this serial perjurer, a thorough analysis of his testimony is important at this point - in order to demonstrate just how tenuous his evidence was from the very start. While examining his testimony is laborious it is important for the Court to see how precarious the conviction in 1987 was, and how Neville Butler's extraordinarily dubious testimony has been radically undermined since that time.

This is highly relevant both to the issue of innocence, and to the comprehensive *Brady* claim that has now developed.

### i.  Neville Butler is a serial perjurer – prior to the trial, during the trial, and since.

Even before the development of the plethora of evidence of Kris Maharaj's innocence, the case against him hung on a tenuous thread: without the testimony of Neville Butler there could certainly have been no conviction at all. It is obviously Mr. Maharaj's position, supported by very strong evidence, that Mr. Butler committed perjury at trial in saying that he (Mr. Maharaj) was involved in the crime.

But even in 1987 it was known – and even accepted by the prosecution - that Butler had committed perjury on several occasions even before the trial began.

### a. It is conceded by the State that Neville Butler committed perjury in his original sworn statement

Neville Butler's original line in perjury included, for example, the "sworn statement of Neville Butler" given to the police on the morning after the murders, which was introduced into evidence at the preliminary hearing as the central evidence supporting the denial of bail.[65] In addition to being sworn, he was admonished by the police detective in detail:

> Q. Mr. Butler, when you originally walked into the room, this stenographer here called on you to raise your hand and swear to tell the truth. You understood what he meant, didn't you?
>
> A. Yes.
>
> Q. And you understand what it is to tell the truth?
>
> A. Yes.
>
> Q. Do you understand what it is to perjure yourself?
>
> A. Yes.
>
> Q. You understand that you can be arrested and convicted, and if convicted you can go to jail for it?
>
> A. Yes.
>
> Q. Has everything that you told us today been the truth?
>
> A. The truth.[66]

---

[65] *See* Bail Hearing before Judge Arthur Winton, Trans. at 18-19 *State v. Maharaj*, No. 86-30610 (Nov. 13, 1986).

[66] Butler Sworn Statement (Nov. 17, 1986).

He had concededly lied.

In Butler's original false story he swore that he had scheduled a business meeting with Derrick Moo Young at the Dupont Plaza Hotel, in a room he had rented for Eddie Dames. To his great surprise, and wholly unheralded, Mr. Maharaj had appeared right when the meeting was supposed to take place. Derrick was not yet there, and Mr. Maharaj sat down for a chat. A few minutes later Derrick and his son Duane called from the hotel lobby. Butler vaguely noticed that Mr. Maharaj stepped into the bathroom as the Moo Youngs came in the door. Once they were in the suite, Mr. Maharaj emerged with a gun, which he pointed variously at all three of them. He was demanding large sums of money from Derrick, and he ordered Butler at gunpoint to tie up Derrick and Duane. Butler complied, fearing for his life, but left the knots very loose. An argument ensued, which ended when Mr. Maharaj shot Derrick once in the knee and then, when Derrick lunged at him, several more times in the torso. Then he shot the son.

This statement was the basis for the application for an indictment that included the kidnapping of Butler because, for example, Butler swore that "he was always pointing the gun at me."[67] Indeed, Mr. Maharaj allegedly

---

[67] Butler Sworn Statement (Nov. 17, 1986), at 13.

instructed Butler to follow him. He led him down the elevator to his car at gunpoint, at which point the two men waited for two or three hours in the car, seemingly unphased by the arrival of ambulances and the police.[68] Eventually they left, parting until that evening, when Butler led the police to Denny's Restaurant where Mr. Maharaj was having dinner.

If all this was true then Mr. Maharaj was guilty on two counts of capital murder, as well as the forcible kidnapping of Butler; as charged in the indictment. Butler conceded that this account was perjury.

The concession only verified the implausibility of the story. It beggars belief that a man intent on murder would show up at a location on the off-chance of encountering his victim, and then indulge in idle chatter with a potential witness until his victim showed up. That his careful planning would lead him to bring two immersion heaters with eighteen-inch electrical cords to tie up various people (who might include Derrick and Duane, of course, but also others such as Butler, and perhaps even Dames) instead of rope or handcuffs.[69] That he and Butler – a direct witness – would wait outside the

---

[68] Butler failed his polygraph test on this point, and it is clear that nobody on the prosecution team believed this story. Indeed, during the polygraph test they learned – but did not reveal to the defense – that Butler claimed to have gotten out of the car to feed the meter. Letter of Dudley H. Dickson, Examiner, Polygraph of Neville Butler, at 2-3 (March 2, 1987).

[69] The immersion heaters was another aspect of the story that was absurd from the beginning. This was the 1980s, and people used immersion heaters for

hotel for hours after killing two people while the police investigated it. That after kidnapping Butler at gunpoint he let him just walk away (under the scenario Butler first offered the police, it must have seemed far more likely that he would have died in the room).

> **b. While the details have never been released to the defense, it is abundantly clear that Neville Butler committed perjury with respect to the grand jury proceedings**

The prosecution prepared a summary of its presentation to the grand jury that was clearly based primarily on Neville Butler's information – as he was the only source of information as to what allegedly happened in Room 1215. This, in pertinent part, is replicated below (with footnotes added indicating matters that are most obviously false):

### GRAND JURY OUTLINE

STATE OF FLORIDA
    vs.
KRISHNA MAHARAJ,
Defendant.

### HISTORY OF THE CASE

On Friday, October 17, 1986, at approximately 2:40 a.m., the defendant, KRISHNA MAHARAJ, was arrested at the Miami

---

heating water to make instant coffee or tea. What they did not do was carefully plan a crime where they were going to hold a number of witnesses hostage in a room, and plan to tie them up with two short immersion heater cords. Indeed, from the questions asked at the Butler polygraph, it is clear that the prosecution did not accept this version either.

Police Department, 400 Northwest 2nd Avenue, Miami, Florida by Detective John Buhrmaster of the Miami Police Department…

On Thursday, October 16, 1986, at approximately 12:30 p.m., employees of the Dupont Plaza Hotel discovered the bodies of DERRICK MOO YOUNG and DUANE MOO YOUNG in suite #1215 of the Dupont Plaza Hotel. . . .

Police officers began processing the crime scene and interviewing hotel employees when two witnesses by the name of Eddie Dames and Prince Ellis approached the desk in the lobby and asked if there were any messages for room #1215. Upon interviewing these two witnesses the police discovered that Eddie Dames and Prince Ellis were businessmen from the Bahamas staying as guests at the hotel. Eddie Dames was a guest in room #1215 and Prince Ellis was a guest in room #526. Eddie Dames informed the police that a gentleman by the name of Neville Butler had rented room #1215 at the Dupont Plaza Hotel.[70]

Eddie Dames and Prince Ellis informed the police they arrived in Miami on Wednesday, October 15th, at 10:15 a.m., and spent the day engaged with their business activities. . . .[71]

Neville Butler gave a sworn statement to the police informing them that he was present during the homicide of DERRICK and DUANE MOO YOUNG. . . . Neville Butler informed the police he arranged a business meeting between himself and the MOO YOUNGS in an effort to establish a business relationship between the MOO YOUNGS and Eddie Dames and Prince Ellis. Neville Butler was present in room #1215 at the Dupont Plaza Hotel awaiting the arrival of the MOO YOUNGS when the defendant, KRISHNA MAHARAJ, appeared and entered the

---

[70] This was the truth, but contrary to the prosecution's position at trial that Mr. Maharaj had rented the room.

[71] This was contrary to the prosecution's theory at trial that Ellis and Dames did not meet up until the morning of October 16, but it was the truth as the other statements revealed that they had met at the hotel at around 10am.

suite. As they were talking there was a knock at the door and Krishna Maharaj excused himself to use the bathroom. The Moo Youngs entered the suite and sat down. Shortly thereafter, KRISHNA MAHARAJ reappeared wearing a glove on his right hand and holding a .9 millimeter semi-automatic pistol. KRISHNA MAHARAJ accused DERRICK MOO YOUNG of stealing $300,000[72] from him and demanded repayment of the money.

An argument ensued between DERRICK MOO YOUNG and the defendant. During the argument, Neville Butler tried to intervene, however, the defendant pointed the gun at Neville Butler's face and instructed him not to interfere.[73] The defendant turned upon DERRICK MOO YOUNG and shot him once in the leg.

The defendant ordered Neville Butler to bind both victims. Shortly thereafter DERRICK MOO YOUNG managed to get free of his bonds and lunged at the defendant. The defendant started shooting and struck DERRICK MOO YOUNG several[74]

---

[72] This is the only time in all the statements attributed to Butler that the figure $300,000 is mentioned. In his initial statement, Butler did not give a number. In his later statements, he came up with a very specific number ($160,000) which was meant to be corroborated by the Carberry newspaper story – all of which can now be exposed as nonsense (see below). But this inconsistent statement that he did not remember on the night of the crime, instead came to him later; rather, it shows that there was a very specific number that he made up once, which he later replaced with another very specific number (which he also made up).

[73] In his trial testimony Butler did not say he intervened or that Mr. Maharaj pointed a gun at him.

[74] This statement clearly posed problems for the prosecution. According to Butler, the shooter had allegedly shot one at Derrick's knee, and "several" when he leapt up. The prosecution theory was that all the bullets were fired from the same gun, which needed to be a Smith & Wesson 39 to fit their theory that Mr. Maharaj used the gun (albeit the gun that the evidence shows he had lost three months before). Such a gun holds 9 cartridges. The prosecution suggested that there were 17 spent projectiles recovered at the scene, along with eight spent casings. (Tr. 3326-27) It would seem likely that, if it had been

times. The defendant threatened DUANE MOO YOUNG and demanded repayment of the money.[75]

DERRICK MOO YOUNG who had been lying wounded on the floor, got up and tried to escape through the front door. He fell in the hallway directly in front of the door to suite #1215 and KRISHNA MAHARAJ grabbed DERRICK MOO YOUNG and pulled him back into the room.[76]

KRISHNA MAHARAJ ordered DUANE MOO YOUNG from the downstairs living room to the upstairs bedroom. Once they were upstairs Neville Butler heard KRISHNA MAHARAJ order DUANE MOO YOUNG to kneel down and put his hands behind his back. Shortly thereafter, he heard one muffled gunshot.[77]

KRISHNA MAHARAJ came downstairs and forced Neville Butler to follow him out of the apartment at gunpoint. Neville Butler convinced the defendant he should be allowed to leave.[78]

---

a S&W 39, it would have been empty by the time Derrick was shot the first two times, and either someone would have to reload the gun (while Duane Moo Youngs remained still), or there was at least one other person in the room with a weapon.

[75] Nowhere else does it appear in Butler's many statements that Mr. Maharaj allegedly continued to insist on getting the money from Duane after having shot Derrick several times. It is clearly another of Butler's ill-considered fabrications given before the prosecution had worked through the story to iron out as many inconsistencies as possible.

[76] Butler had to explain the blood on the carpet outside Room 1215, so this was what he came up with. Later, he backed away from this (Tr. 3038), - saying only a small part of Derrick got out of the door - as this explanation was inconsistent with the small amount of blood on the carpet, and did not take account of the blood on the door of Room 1214 (which was, importantly, Jaime Vallejo Mejia's).

[77] At trial, Butler said Mr. Maharaj only took a gun (not the green pillow) with him upstairs (Tr. 3041), so he omitted the part about the shot being muffled.

[78] This is another important inconsistency, since Butler did not say in other statements that he discussed why Mr. Maharaj should let him go. It was an obvious weakness of his story all along, since it made no sense that Mr.

Before allowing Neville Butler to leave the defendant instructed him[79] not to say anything to the police or he would be killed.[80]

KRISHNA MAHARAJ telephoned Neville Butler later that afternoon and arranged a meeting at a nearby restaurant to establish an alibi for the approximate time of the homicides. When Neville Butler met with the defendant police officers were present and transported KRISHNA MAHARAJ to the homicide office at the Miami Police Department.

After being advised of his Miranda rights the defendant informed the police he had been to the Dupont Plaza Hotel on prior occasions however he had not been there that day and he had never been in the hallway on the 12th floor or inside suite #1215.[81]

1997 Exh. FBA.

There are a dozen important inconsistencies between this outline and the presentation at trial – and that reflects a large proportion of the entire story told before the grand jury. The prosecution made a huge effort to show that Butler's conceded perjury only involved what happened outside the room, and

---

Maharaj would cold-bloodedly kill Duane, and then let Butler (almost a stranger, who had allegedly been part of a fraud against Mr. Maharaj) go free.
[79] This is another important inconsistency, since Butler did not mention a threat that if he went to the police Mr. Maharaj would kill him.
[80] Note the omission of the later statement that Butler sat in a car with Mr. Maharaj for three hours outside the Dupont Plaza while the police came and investigated the crime. This is a clear indication that could have been used to show that even the prosecution did not believe it – and yet they framed an argument to the jury as to why the jury should deem it true.
[81] One significance of this is the weight that the prosecution were already putting on this fact. This is, as demonstrated elsewhere, contrary to what Det. Rivero testified in deposition, since Mr. Maharaj did say that he had been inside the hotel (and Room 1215) that day.

95

not Mr. Maharaj's alleged actions. Therefore, all the inconsistencies about what happened in Room 1215 are particularly important *Brady* issues.

### c. It is conceded by the State that Neville Butler committed perjury – in a systematic way - during his first deposition.

Butler must have given various oral statements to the police and prosecution in the next two months, none of which have been shared with the defense. Then, on January 13, 1987, he gave a deposition, under oath, to defense counsel. Again, he was reminded what this meant:

Q. You understand you were sworn a few moments ago, and that everything you tell me is now under oath?

A. Yes.

Q. Do you understand the significance of being placed under oath?

A. Yes.

Q. Can you just for my edification tell me what the significance of being placed under oath is? Can you explain what that significance is?

A. Anything I say is factual and I could be charged with perjury.[82]

In this deposition, Butler testified that Dames was due to meet Derrick Moo Young at 9:30 a.m., and that the two of them came to the hotel for the meeting around 9 a.m.[83] However, while Dames waited in the room for about 15

---

[82] First Deposition of Neville Butle*r*, at 3-4 (Jan. 13, 1987), in *State v. Maharaj*, No. 86-30610.
[83] *Id.*, at 74.

minutes, he left after the phone call when "Mr. Moo Young [said he] could not keep the appointment and Mr. Dames had other things to do."[84] In this version, he said forthrightly that the call – reflected in the records as 9:47 a.m. - was made either by Dames or with Dames present, and "Mr. Moo Young … said he was awaiting a call from overseas and could not make the meeting" whereupon Eddie Dames left to carry out other business.[85] Importantly, .Butler said .Dames had never called .Moo Young before that time.[86]

Supposedly, he went back to the room around 10 a.m., and about 10:30 a.m. or 11 a.m., Mr. Maharaj randomly arrived.[87] Butler said he had mentioned the Moo Young meeting a "couple of times prior to that morning."[88] Of course, it made no sense that he had mentioned this meeting (set for 9:30 a.m.) and yet Mr. Maharaj arrived after ten, without knowing it had been postponed. Notably - and consistent with Mr. Maharaj's alibi – the independent witnesses testified consistently that they had seen Mr. Maharaj in Room 1215 around 8a.m., but not as late at 10:15 a.m.

The next exchange was, even according to the prosecution, pure fiction:

Q. And what happened when [Mr. Maharaj] got to the room [1215]? I mean from the standpoint did you and he engage in conversation?

---

[84] *Id.*, at 77.

[85] *Id,*, at 77.

[86] *Id.*, at 78.

[87]*Id.*, at 83, 85.

[88] *Id.*, at 83.

A. My first remark to him was, I think, "You know I'm meeting your friend here," and he said – I said, "What are you doing here?" He said, "Just hanging out."

* * *

Q. What did he say?

A. I wish I would not be quoted in context because it may not have been the exact words.

Q. To the best of your knowledge, if you can tell me exactly the conversation you and he had upon his arrival.

A. Upon his arrival, "What are you doing here?"

Q. Is that you saying that?

A.  That is my statement. He said, "Oh, just hanging out," or words to that effect. Then I said, "You know I'm meeting your friend here." And he said, "So," or something to that effect. There was really no comment, so to speak, and I said, "They will be here soon." He said, "That's all right."[89]

And so it went on for some time.

It is hardly surprising that the prosecutors later required Butler to undertake a polygraph, since nobody could possibly believe this nonsense: that Mr. Maharaj, from Fort Lauderdale, sauntered into a hotel room on the twelfth floor of the Dupont Plaza in Miami and acted "very nonchalantly"[90] as it if was all by chance. Or, that Butler accepted it equally nonchalantly –

_____

[89] *Id.*, at 85-86.
[90] *Id.*, at 86.

and all of this was for a meeting with Eddie Dames who was shopping and would not be back for an indeterminate amount of time.

Butler denied ever going to the hotel gift shop,[91] thereby eliminating the prosecution's effort to explain the presence of the water heaters (which Butler later said were used to tie up the Moo Youngs – another absurd contention).[92]

When the Moo Youngs arrived, he said he told them that Dames had left[93] - and he had not, apparently, thought to call them to let them know in the intervening two hours since their last call.[94]

He then described Mr. Maharaj coming out of the bathroom with a pistol in one hand and a *brown* pillow in the other that had apparently come out of

---

[91] *Id.*, at 89.

[92] This was clearly another issue that troubled the prosecutors as they included a number of questions about it in the polygraph. "During the subsequent testing [Butler] was asked if he remembered personally acquiring the heaters in question. He was also asked if he had purchased the emersible [*sic*] heaters. His responses were indicative of deception to his denials of both of these questions." Dudley H. Dickson, Polygraph of Neville Butler, at 3 (March 2, 1987).

[93] First Deposition of Neville Butler, at 99 (Jan. 13, 1987), in *State v. Maharaj*, No. 86-30610.

[94] Neville Butler was found to be deceptive in his polygraph on the fundamental point of whether he knew Derrick Moo Young was to be murdered before it happened. Dudley H. Dickson, Polygraph of Neville Butler, at 2 (March 2, 1987) ("during a subsequent test there was indication of deception to his denial").

the bag Mr. Maharaj was carrying[95] - he would later identify the pillow as a *green* one, which rather obviously matched another green one from a sofa Room 1215.[96]

He said he "did not get a close look at the gun,"[97] although apparently Mr. Maharaj pointed it at him the whole time, and for the three hours when they supposedly sat outside in the car. But then he already knew he had to say this, because he had previously said he was sure it was white, and yet in order for it to match Maharaj's former gun, it had to be silver.

He tried to explain why he said it was white to Det. Buhrmaster: "I am not familiar with guns."[98] But one does not have to be a ballistics expert to know the difference between the color white and the color silver.

Seeing the gun so unexpectedly nearly made him faint, he said.[99] There was then an argument about money, and Butler said, "I can't tell you more. I know it had to do with monies. I do not know the details of it."[100] He would,

---

[95] *First Deposition of Neville Butler*, at 101 (Jan. 13, 1987), in *State v. Maharaj*, No. 86-30610.
[96] First Deposition of Neville Butler (Day Two), at 16 (Jan. 16, 1987), in *State v. Maharaj*, No. 86-30610.
[97] First Deposition of Neville Butler, at 106 (Jan. 13, 1987), in *State v. Maharaj*, No. 86-30610.
[98] *Id.*, at 107.
[99] *Id.*, at 112.
[100] *Id.*, at 114-15.

later at trial, claim to remember all kinds of details, having contrived a story about a rather precise sum of $160,000 (see below).

Then, Butler said, "Moo Young's statement went something like this. 'Kris, give me that gun,' and he attempted to stand up."[101] Supposedly Kris Maharaj fired a shot, while Butler "started to head for the door."[102] Butler reiterated this, insisting that he said: "'My God,' and I started to head for the door. That is when I was stopped." Supposedly Mr. Maharaj stopped him, saying: "'You get back inside here. You come right back inside.' He had the gun pointed at me."[103]

Without mentioning anything about a heating element, Butler then described Mr. Maharaj handing him a cord to tie the two Moo Youngs up.[104]

At this point, after three hours, the first deposition was suspended for a day.[105] While defense counsel made very little of the details at trial, Neville

---

[101] *Id.*, at 116.

[102] *Id.*, at 117.

[103] First Deposition of Neville Butler (Day Two) (Jan. 16, 1987), in *State v. Maharaj*, No. 86-30610.

[104] First Deposition of Neville Butler, at 119-20 (Jan. 13, 1987), in *State v. Maharaj*, No. 86-30610.

[105] *Id.*, at 123. In the end, it was three days later before Neville Butler continued. First Deposition of Neville Butler (Day Two) (Jan. 16, 1987), in *State v. Maharaj*, No. 86-30610. By this time, two prosecutors were defending Mr. Butler much more vigorously, objecting on most pages of the deposition.

Butler later admitted that essentially everything described above was perjury – and the prosecution did not contest this.

Neville Butler stuck with variations of this initial story for five months - from his sworn interview with Det. Buhrmaster on the night of the crime through a number of meetings with the prosecutors, and his first sworn deposition - until the prosecutors essentially "took him to the woodshed" during his polygraph to try to eliminate aspects of his testimony that even they did not believe. Thereafter his testimony changed radically.

Even with "just" this admitted perjury in Butler's three sworn statements (presumably compounded with a number of meetings with the prosecution in between), it is extraordinary that such a witness could form the main foundation for a capital conviction.

In some states, the commission of perjury resulting in a wrongful capital conviction has itself been a capital offense – referred to as "murder by perjury".[106] Petitioner's search of the law books has failed to turn up an instance in which the star witness in a capital case had committed perjury in this manner.

And yet we are only just beginning the dismantling of any credibility that Butler might ever have enjoyed.

_____

[106] John Hogan, *Murder by Perjury*, 30 Fordham L. Rev. 285 (1961).

### d. The Butler polygraph test: a significant *Brady* violation

On March 2, 1987, the prosecution conducted a polygraph test of Neville Butler. As Assistant State Attorney Kastrenakes testified during state habeas proceedings (2014 Tr. 449-50), Butler's testimony that he had been kidnapped by Mr. Maharaj made no sense. Butler was, therefore, brought in for a polygraph, but – although the prosecution actually asked Mr. Maharaj to pay for the test[107] - defense counsel did not receive a copy of the report until counsel was searching the police files prior to the 1997 hearing. (1997 Rule 3.850 Tr. 254; *see also* 1997 Rule 3.850 Tr. 457, 1016-17)[108]

One reason for conducting the polygraph was, according to the prosecution, that Mr. Maharaj had passed a polygraph by with the nationally renowned George Slattery.[109] Indeed, Mr. Slattery is so highly respected that his work has been recognized in a federal court as "highly probative":

---

[107] Letter of Assistant State Attorney John S. Kastrenakes to Defense Counsel (February 9, 1987) ("Please consider this letter a request … that your client provide those necessary funds with which to conduct a polygraph examination of Mr. Butler").

[108] While this was raised in 1997, it is one very important element of the assessment both of Mr. Maharaj's innocence issues, of the fact that Butler is simply not a credible witness, and of the cumulative *Brady* violation.

[109] Letter of Assistant State Attorney John S. Kastrenakes to Defense Counsel (February 9, 1987) ("This further investigation is being done because of … the results of a polygraph examination which the defense conducted on its own with George Slattery.").

103

> "It is improbable that the appellant could have contemplated 'beating the machine' with Mr. Slattery. Historically, 75-80% of those who take polygraphs with Mr. Slattery fail them…"

Mr. Slattery is estimated to have a 97% accuracy rate.[110]

Another reason given by the prosecution for the Butler polygraph involved "some of the inconsistent remarks by Mr. Butler during his deposition…"[111] This is an interesting passing comment, as the prosecution has never turned over the evidence of these "inconsistent remarks" and compounded this by suppressing additional "inconsistent remarks" made by Butler *during* the lengthy polygraph session.

At trial, the State then directly *misrepresented* the facts to the judge:

> THE COURT: Who passed the polygraph?
> MR. HENDON: Krishna Maharaj took a polygraph and passed.
> MR. RIDGE: And Mr. Butler took a polygraph and passed.

(1987 Tr. 4435-36).[112]

The fact that Butler was said to be "deceptive" or practicing "deception" seven times in a brief report, and "ambiguous" or "inconclusive" on three

---

[110] *Tinsley v. Department of Justice*, USMSPB No. 0752-04-0116-1-1, at 11 (Apr. 20, 2004) (Vitaris, Admin. J.).
[111] Letter of Assistant State Attorney John S. Kastrenakes to Defense Counsel (February 9, 1987).
[112] As discussed below, while there are interesting issues surrounding various elements of the polygraph that should be admissible – for example, to show that Butler was lying when he said he voluntarily and spontaneously changed his testimony – one central point about the test was that Butler made a number of important and inconsistent statements during his test.

additional occasions, combined with the conclusion that he was "untruthful and was withholding and falsifying information"[113] compels the conclusion that, sad to say, the prosecutor practiced deception himself on both the trial judge and defense counsel.[114]

There are a number of important facets to the polygraph issue: first, the result; second, Butler's inconsistent statements reflected in Dickson's polygraph report; third, the fact that Butler changed his testimony not because of his public-spiritedness (as indicated at trial), but because he was forced to do so; and fourth, the fact that clearly neither the polygrapher nor the prosecutors believed elements of the story to which Butler clung even at the time of trial.

### (1) The Butler polygraph test: the *Brady* element of the suppression of the test

---

[113] Dudley H. Dickson, Polygraph of Neville Butler, at 3 (March 2, 1987).

[114] Meanwhile, the State's suggestion that Mr. Maharaj had been aware of the results was deemed flatly wrong by both this Court and the Court of Appeals. *Maharaj v. Crosby*, 432 F.3d 1292, 1311, 1312 (11th Cir. 2005) ("The State did not produce the examiner's opinion to Maharaj. *** As for the finding that the defense had knowledge of the polygraph results, the district court noted that there was substantial evidence in the post-conviction record to indicate that the defense was not aware of the fact that Butler's answer to one of the questions was indicative of deception."); *Maharaj v. Moore*, Civ. No. 02-22240-HUCK/TURNOFF, 18 (S.D. Fla. Aug. 30, 2004) ("there is significant evidence from the post-conviction proceedings that the defense was not aware of the polygraph results, as it appears from that record that neither trial counsel not the defense investigator knew that Butler's answers to certain questions had been indicative of deception").

In his testimony to the jury, Butler was asked about the bizarre notion that he and Mr. Maharaj might have remained outside the Dupont Plaza Hotel on a parking meter, engine running, for three hours after the murders, with police swarming all around. It is basic to a polygraph that the party using it propounds the questions on which there appears to be most doubt. One inquiry that the prosecution wanted put to Butler was the question about waiting outside in the car, because it was so implausible. Therefore, the examiner asked:

> "Did you actually remain in a car with Maharaj after the shooting for at least two and a half hours?"[115]

It is highly relevant that the prosecution wanted this question asked, of course, but the examiner's report is far more significant:

> During the pre-test discussion, [Butler] stated he had remained in the car with Maharaj after the shooting for approximately two and a half hours. His responses were *indicative of deception* to this statement. During further discussion, he stated he was in the car but they had moved the car from the parking lot to a meter space in front of the DuPont Plaza until Eddie Danes [*sic*] returned. He said this was the only traveling he had done after the shooting until Eddie Danes [*sic*] had returned. His responses were *indicative of deception* to this statement during subsequent testing. He further stated that *with the exception of getting out of the car to put quarters in the parking meter*, he had remained in the car with Maharaj at all times after the shooting until he had

---

[115] Letter of Dudley H. Dickson, Examiner, Polygraph of Neville Butler, at 2 (March 2, 1987).

> seen Eddie Danes. [*sic*] His responses were also *indicative of deception* to this statement.[116]

It is hard to know where to begin with this paragraph. The idea that he passed the test is clearly risible. Nobody believed this story because it was fatuous: why would Mr. Maharaj want to wait outside a very public hotel, swarming with police, to meet Dames, a man he had never met, if he had just committed a double homicide? And yet Butler stuck with it at trial, and the prosecution did not reveal that they did not believe it.

But neither did they reveal the crucial fact that Butler said he got out of the car to feed the parking meter. Previously, he had said he was held at gunpoint for hours. Even now, when Eddie Dames allegedly appeared, he supposedly leapt into Dames' rental car and fled the scene. So why remain there with Mr. Maharaj for three hours?

While defense counsel did not know about this prior statement, he did skirt around the issues of meter maids, and the opportunity to escape:

> Q. Mr. Butler, you testified that after you and my client allegedly, 'Went downstairs in the car, you parked in front of the hotel with the engines running and waited there for three hours with the windows rolled up.'
>
> A. In the vicinity of three hours, yes.
>
> Q. During that entire time you weren't approached by any meter-maid or police officers or anyone?

---

[116] *Id.*, at 2-3.

A. No one whatsoever.

Q. And the car ran for three hours?

A. Yes, or the full period of time we were sitting there.

Q. According to you, that time was approximately three hours?

A. Yes.

Q. You made no attempt to leave?

A. No I did not.

(1987 Tr. 3070)

Thus, this fact alone, in the polygraph test, was significant *Brady* material that should have been used to good effect by competent defense trial counsel.

### (2) The Butler polygraph test: the *Giglio* and Perjury element of the suppression of the test

Perhaps the most important facet of the test was the light it shed on the reason why Butler substantially changed his testimony. At trial, he repeated under oath, time and time again, that he came forward voluntarily to change his story:

> *"I voluntarily agreed to correct the wrongs I had--statements I had made when I approached the . . . State Attorney and told him about it."*

(1987 Tr. 3052)

> *"I did get in touch with the State Attorney to let him know of the lies I had told or the things I was covering up to protect myself."*

(1987 Tr. 3061)

> *"So when I did decide or when I did get in touch with the State Attorney and decide to come clean and explain everything to them, I think I corrected everything on the record that you are now questioning me about, sir."*

(1987 Tr. 3063)

> *"Again, I did, on my own, get in touch with the State Attorney to correct all the things that I said that was incorrect. Regardless of what the consequences were, I was prepared to abide by it because I felt I was wrong. I did a few things that were wrong, and having come to the State Attorney and told him that I was wrong, I was prepared to abide by whatever the consequences."*

(1987 Tr. 3063-64) At this point, even defense counsel started to refer to his changing testimony as his "change of heart." (1987 Tr. 3066)

> *"At that time I felt that I was convicted, that certain things I had done implicated me. After realizing and coming to my senses, it when I got in touch with the State Attorney and explained what I had done and prepared to stand the consequences."*

(1987 Tr. 3097)[117]

This was perjury, pure and simple. Furthermore, the prosecutors knew it was perjury at the time he said it, over and again, because they knew they had hauled him in and grilled him over several hours to get him to change his story.

---

[117] *See also* 1987 Tr. 3096 ("I told the State Attorney as I remember things").

In 1997, Mr. Maharaj advanced a strong argument that the State had knowingly presented perjured testimony. *See Maharaj v. Moore*, Civ. No. 02-22240-HUCK/TURNOFF, 27 (S.D. Fla. Aug. 30, 2004) ("It appears likely from the testimony of the prosecutors that [Butler], in fact, changed his testimony because he was confronted with either the request to take the polygraph or the results of the polygraph examination."). At the time, this was deemed insufficient, standing alone, to require a new trial. But now it must be aggregated with all the other favorable evidence – and the other evidence of Kris Maharaj's innocence.

### e. The change between Neville Butler's first deposition and his second highlights the importance of the *Brady* material

Two and a half months after the first deposition, Butler gave a second one.[118] As we have seen, unbeknownst to Mr. Maharaj until 1997, this was precipitated by the prosecutors summoning him in for a polygraph because they just did not believe the first (concededly variable) edition of his sworn testimony. However, the changes that Butler made to his story also illustrate the central relevance of a number of the *Brady* violations in the case and the premeditated manner in which exculpatory evidence was covered up.

---

[118] Second Deposition of Neville Butler (March 30, 1987), in *State v. Maharaj*, No. 86-30610.

Prior to the second deposition, the prosecutor detailed on the record the areas where Butler would be prepared to admit to having lied in the first deposition, albeit without telling counsel why he had retreated this far.

### ii. The *Brady* material was vital to a central part of the story: Eddie Dames' involvement in setting up the Moo Young meeting

Butler's initial story that Eddie Dames was involved; first, in calling the Moo Youngs to set up the meeting, and second, in calling Derrick at 9:47 a.m. on October 16, presented real problems for the prosecution. In his statement and deposition, Dames did not admit that he had any contact with Derrick Moo Young. If their "star witness" Neville Butler said that Dames was involved in arranging the meeting with the Moo Youngs, under the prosecution theory that made Dames a conspirator it the Maharaj plot; under the defense theory (which had the advantage of being true) it would mean that Butler was lying about the whole scheme, and that the Moo Young meeting was set up for other reasons – the cartel wanted to sort out what was happening to their money.

There are various facts that would have made it a simple matter for the defense to make out its case. One would be proof that Dames was in direct contact with the Moo Youngs; another would have been any evidence that Dames was himself involved in drugs; another would have been evidence that

would corroborate the half-dozen alibi witnesses, showing that Mr. Maharaj

left the Dupont Plaza before the murders took place.

> **a. The fact that Eddie Dames made calls to the Moo Youngs to set up the meeting undermines entirely the prosecution theory against Mr. Maharaj**

Prior to the deposition, the prosecutor laid out one reason for submitting

Neville Butler for further questioning:

> You know from taking Mr. Butler's deposition he originally told the police as well as yourself that the meeting was originally arranged between the Moo Young[s] and Eddie Dames and Prince Ellis. At this time, Mr. Butler is prepared to tell you that the meeting was arranged between the Moo Young[s] and your client at your client's request; that there was never any surprise as he testified to in his statement to the police and also in his statement to you. As you recall, he said he was surprised when you client showed up at the door. He is now going to tell what he states to be the truth in that he served as a broker between your client and the Moo Young[s] to arrange this meeting, a meeting that the Moo Young[s] had no knowledge that your client would appear at.[119]

From the prosecution's perspective, the meeting had to be arranged by Mr.

Maharaj, rather than Eddie Dames, because otherwise how could this be a plot

by Mr. Maharaj? And since both Dames and Butler were now denying that

Dames had any knowledge of what was happening, this theory was central to

the prosecution case.

---

[119] Second Deposition of Neville Butler, at 4 (March 30, 1987), in *State v. Maharaj*, No. 86-30610.

112

This makes it all the more prejudicial, then, that the prosecution covered up evidence to the contrary: it transpires that, on this point, there was compelling *Brady* material that Butler's original story was the truth, and this trial testimony was false. Mr. Maharaj found out in 1997 that, when he was speaking freely to the *William Penn* insurance investigator, Det. Buhrmaster had said:

> "Sometime prior to October 15, 1986, a man named Dames . . . had attempted to contact the Moo Youngs to arrange for shipment of equipment he had purchased in the Florida area. . ."

(1997 Rule 3.850 Clerk Tr. 2446, Pet. Exh. 276).

Likewise, Derrick Moo Young's daughter, Shaula Nagel, told Det. Buhrmaster (but not defense counsel) that she

> "remembered the names of Butler and Dames, only because her father had mentioned that he received several messages from a Mr. Dames, who he did not know, and did not bother returning the calls."

(1997 Rule 3.850 Clerk Tr. at 2453).

The defense was not told this and it undermined the State's theory of the case. That Dames called the Moo Youngs directly contradicted Butler's trial testimony that Dames knew nothing about Mr. Maharaj's supposed plot or

intention to set up a meeting in Dames's hotel room.[120] It also made it virtually impossible for the prosecution theory to be credible: how could Mr. Maharaj plan a crime in Room 1215 when it was registered to a man he did not know (Eddie Dames) who thought he had a meeting with the Moo Youngs in his own room that morning?

> **b. When, in his second deposition, Neville Butler said that Kris Maharaj was at the Dupont Plaza on October 15, this was consistent with Mr. Maharaj's version of events, and with the truth – that the Moo Youngs had produced a false letter of credit that morning to try to resolve their dire situation with the Cartel**

Kris Maharaj has always maintained that he went to the Dupont Plaza hotel for a meeting with Eddie Dames, arranged by Neville Butler, to discuss distributing the *Caribbean Times* in the Bahamas. Indeed, Kris said he went twice; one abortive trip on the morning of October 1[h], when Butler said Dames had not come in the night before, and a second abortive trip on the 16, when he waited for an hour and Dames did not show up. However, Kris had nothing to do with renting a room for Dames.

---

[120] We learned other things about Eddie Dames from Prince Ellis – that he was involved in drug trafficking, and that he helped Neville Butler confect his story – that tie to the burgeoning *Brady* violation. (See below)

In his first police statement, Butler told Det. Buhrmaster he got the room.[121] He repeated this in his first deposition.[122] He testified that he did not see Kris Maharaj in Miami that day.

Another reason given by the prosecutor for a second Butler deposition was that the prosecution had determined that Butler had lied about whether Mr. Maharaj was at the Dupont Plaza the day before. Certainly he had: precisely as Mr. Maharaj insisted. But the prosecution had worked Butler around to saying that Mr. Maharaj paid for the room. Butler would, the prosecutor said, speak to:

> certain transactions that took place the day before at the Dupont Plaza Hotel on October 15, 1986. I believe Mr. Butler has testified that he did not see your client there or saw him only briefly the day before. Mr. Butler will be telling a version concerning the details of a somewhat greater involvement by your client at the Dupont Plaza.[123]

By now, the prosecution had other witnesses to say that Mr. Maharaj was in the Dupont Plaza the day before. Indeed, the police had got Arlene Rivero, a sales representative for the Dupont Plaza Hotel, to give a sworn statement to Det. Buhrmaster saying she was *100 percent certain* that Mr. Maharaj was the

---

[121] *See* Initial Police Statement of Neville Butler at 4 (17 October 1986, 00:50 –01:30) (118882-99) ("Q.  When did you get that room? A. The morning he was due to arrive. Q. And that was Wednesday? A. Wednesday, yes.").

[122] Initial Deposition of Neville Butler at 9 (13 January 1987, 15:30–18:30) (108736-860).

[123] Second Deposition of Neville Butler, at 6 (March 30, 1987), in *State v. Maharaj*, No. 86-30610.

person who had reserved Suite 1215 for Eddie Dames around nine in the morning on October 15, the day before the murders.[124]

At trial, her evidence was not so solid. "I have already forgotten about it," she said. She blamed her uncertainty on the two-month delay between the crime and the time when the police asked her to make an identification.

"Were you positive about the identification?" the prosecutor asked her, trying to shore up her memory. "I want to say positive, but it looked familiar to me, so that is why I identified it," she replied as helpfully as she could. She had to admit though, that she had been shown only one picture of the person who might have booked the room—and that was a picture of Kris Maharaj.[125]

---

[124] Maharaj Record No. 044_105518-525 at 524 (initial sworn statement of Arlene Rivero to John Buhrmaster, March 3, 1987): "Q. You are one hundred percent sure that this was in fact the man? A. Yes."). She had been shown only one photograph and had signed the back of it attesting that it was the person. Prior to making the identification, she had given no description of the person—age, height, weight, unique features, and so forth. In other words, it was about as suggestive an identification as one can imagine, and Eric Hendon should have asked the court to exclude it from the trial. As the Supreme Court has held, "suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Neal v. Biggers*, 409 U.S. 188, 198 (1972). In truth, she might have seen Kris Maharaj on October 15, as he was there for the abortive meeting with Eddie Dames. However, he was not the one who reserved any room.

[125] Maharaj Trial Transcript at 2724. Arlene Rivero testified that the person was five eight, five ten, or taller, thereby including a large proportion of the population. Her colleague Inez Vargas put the man's height at five-five, Maharaj Trial Transcript at 2658—far from Kris Maharaj but close to Neville

Her testimony was not as strong as the prosecution might have hoped (and it was, according to Mr. Maharaj, false), but it was still significant. This wobbly testimony now had to be integrated with Butler's statements in which he had repeatedly asserted that he (rather than Mr. Maharaj) had booked the room himself on the morning of October 15. But when he was under oath at his second deposition, Butler said again that he had done the original booking.

"Well, I went to pay for it," Butler explained. "I said I want a reservation for Eddie Dames, and the lady promptly pulled out a card and said all right, whatever it was, and $55 a day I think it was, and she pulled out the card, had me fill out something, and she said room 1215."

Senior prosecutor Paul Ridge interrupted.

> *"My proffer was that he did not make the reservation, but he signed in and paid for it on the day before the shooting."*

Ridge did not merely tell Butler what to say; he spoke for his witness. A gaping inconsistency was well on the way to becoming a *fact* corroborated by an independent eyewitness.[126]

---

Butler. Ines Vargas was another witness who identified Kris Maharaj as perhaps being the person who made the reservation. Her identification was much more equivocal from the beginning—she said only "I think that he was the one that made the reservation." *M*aharaj Record No. 044_105542-554 at 549 (initial sworn statement of Inez Vargas to John Buhrmaster, March 3, 1987) Again, Det. Buhrmaster had shown her a solitary photo and had taken no prior description of the individual beforehand.

[126] By the time of trial, Butler had elaborated on this story. To cover for all the

At the same time, Butler was now saying he paid $55 a night, whereas before he had insisted under oath that it was "full price" and "was in excess of $55."[127] In other words, in addition to the prosecutor telling him what he was to say, they had earlier got together with him and tried to match his testimony to the record of payment.

Unfortunately, these maneuvers passed by defense counsel Hendon, and therefore were not effectively presented to the jury.

### c. The fact that Eddie Dames was present in Room 1215 for a call with Derrick Moo Young at 9:47 a.m. was true, but irreconcilable with the prosecution theory that Mr. Maharaj was there from 8 a.m. till noon

In Butler's original statement, and in more detail in his first deposition, he stated under oath that he and Eddie Dames were planning to meet Derrick

---

times he said he had made the reservation, the prosecutors now led Butler to say that he did not know that Mr. Maharaj had actually already done it. This time it was prosecutor Kastrenakes asking the questions—or rather, telling Butler what might have happened. "Did you know [Mr. Maharaj] had already registered into the room in the name of Eddie Dames?" Kastrenakes asked. "No, I was not aware of that," said Butler. Maharaj Trial Transcript at 27. But Butler could not keep his story straight. He slipped up and said once again at trial that he had made the reservation. Maharaj Trial Transcript at 2767. When the trial was over, and he again had no prompter, he reverted to his original story—that "I had booked a room in his [Dames's] name." Maharaj Rule 3.850 Exhibit HP, at 6 (1995 Channel 4 interview with Neville Butler).

[127] First Deposition of Neville Butler, at 9 (Jan. 13, 1987), in *State v. Maharaj*, No. 86-30610.

Moo Young at around 9:30am at the hotel.[128] The plan was for Derrick to show up around then for a meeting. He did not show up, and so at 9:47 a.m. they called him. Derrick said he was running later because he had an international call to make. At that point Eddie Dames left and went about his business. Then, .Butler said, Kris Maharaj just showed up nonchalantly, and apparently by chance, and ended up confronting Derrick and Duane when they eventually arrived, committing the murder.

This was the story .Butler (and .Dames) had come up with on the night of the crime, and it was downright implausible. It was one of the reasons for the prosecution requiring .Butler to be polygraphed.

In the second deposition, Butler changed this key element of his original tale: now, Mr. Maharaj was in the room the whole time from 8:00 a.m. to when the Moo Youngs were killed. This made little sense from the start.

It would be impossible for this story to be true if Dames came to Room 1215 at any point between 8:00 a.m. and the time of the murders, because then he would encounter Mr. Maharaj. Thus, the prosecution theory would be exposed as false.

---

[128] First Deposition of Neville Butler, at 48 (Jan. 13, 1987), in *State v. Maharaj*, No. 86-30610; *see also id.* at 74 (Eddie Dames spent 15 minutes in the room that morning).

"You had indicated ... you had called the Moo Youngs," one of the prosecutors asked Butler at trial. "Did you write the numbers down?"

"Yes, I at that time I couldn't remember the number ... all the numbers ... so I wrote a number down," Butler began. "Because I remember I wanted to call him to assure him that Dames was there, for me to put Dames on the phone and he would know—to let him know that Dames was here. And we were waiting to—"[129]

Butler had let slip an important truth, one that was fundamentally at odds with the prosecution theory. He testified that he put Dames on the line with Derrick Moo Young. Therefore, Dames had to have been in the room at 9:47 a.m. when the call was made. Dames and Mr. Maharaj could not have been in the room at the same time, as the two never met.

According to Mr. Maharaj's alibi, this was after he had left – he said he had been to the hotel at around 8:00 a.m., waited an hour, and left to go about his business, irritated by Dames's second no-show in as many days.[130] But

---

[129] In the deposition, Butler said he wrote the Moo Young number down because he was "giving Eddie [Dames] the number to call…" First Deposition of Neville Butler (Day Two), at 41 (Jan. 16, 1987), in *State v. Maharaj*, No. 86-30610. But this was one fact that had to change because Butler could not concede that Dames was in on the conspiracy without rendering his case against Mr. Maharaj wholly implausible.

[130] As noted, Mr. Maharaj explained in his own statements that he had been told by Butler that there was a meeting over the issue of selling copies of the *Caribbean Times* in the Bahamas with Eddie Dames on the 15th, but was only

according to the prosecution, at 9:47 a.m., Maharaj was meant to be in the room (waiting there for almost four hours to commit a murder, according to Butler's false testimony).

As of 1997 we know from another source - Prince Ellis - that Dames was indeed at the hotel at that time, since Ellis witnessed Butler and Dames talking there at around 10:00 or 10:30 a.m. Butler's slip up was consistent with the truth as we now know it, and inconsistent with the theory that Kris Maharaj was guilty. This was evidence – strongly exculpatory - that during the polygraph session the prosecution had cajoled Butler into changing his story into something that was clearly false.

> ### d. In 1997, it became clear that Neville Butler was closely involved in the crime in Room 1215, and that Eddie Dames actively helped to cover up the crime.

Mr. Maharaj learned in 1997, from Prince Ellis, that the central aspect of Butler's story was false: contrary to his trial testimony, Butler was closely involved in the violence in Room 1215. His watchstrap had been broken in the struggle, and he had blood all over his clothes. He came out of the murder scene panicked because the plan had gone awry. According to Ellis, Butler

---

told when he got to the Dupont Plaza that morning that it had been postponed a day. We now know that the Moo Youngs tried to pay off their cartel debt that day with financial paper – and so they were given another 24 hours while the documents were checked out.

insisted over and over again that "they" (the true killers) had "gone crazy" and committed the murders.

In 1997 Mr. Maharaj also learned from Ellis that Eddie Dames was closely involved in the cover up. Butler got together with Dames to confect a story that would satisfy the police. Dames had him change his bloody clothes before they went to the police, some hours later. The police never asked to see (or test) the clothes, and they were obviously destroyed long ago. But this was more evidence that Butler was involved intimately enough in the murders of the Moo Youngs that he got blood on himself.

### iii. Waiting in the car outside the Dupont Plaza for three hours while police swarmed the area: the *Brady* material here was strongly exculpatory

Another reason given by the prosecutor for a second Butler deposition was that Butler had various things to say about the time he and Mr. Maharaj allegedly spent in the car together after the murders:

> He is also going to testify to certain conversation[s] which took place in the car between himself and your client after the murder took place. Specifically those conversations will related to, one, the type of gun that was uses; two, the reason for staying at the Dupont Plaza in the care and also I think, three, an offer or offers by your client to attempt to buy the cooperation, loyalty or silence of Mr. Butler. These conversations all made in the car after the murders took place.[131]

---

[131] Second Deposition of Neville Butler, at 5-6 (March 30, 1987), in *State v. Maharaj*, No. 86-30610.

It is telling, of course, that Butler failed the polygraph twice on the issue of waiting outside the Dupont Plaza Hotel for three hours. As anyone who has used a polygraph knows, the examination is often based on an assessment of the least likely aspects of a witness's tale. Certainly, the prosecution and the polygrapher focused on this element of the story for the simple reason that it made no sense at all. Why would Mr. Maharaj want to meet the elusive Eddie Dames if he had never met the man? Why would he want to hang around the hotel, as it swarmed with police, merely for this?

If anyone did wait about outside the hotel,[132] there was a much more realistic explanation: perhaps Butler waited by himself, because he needed to intercept Eddie Dames and tell him what the cartel had done in Room 1215 before Dames met with the police.[133]

---

[132] We do not know whether this is true. However, we do know that it is false to say Mr. Maharaj was there, as his alibi witnesses place him firmly 40 minutes' drive to the north.

[133] Interestingly, in closing argument, the prosecution had reached the same conclusion – that Mr. Maharaj had no sensible reason to stay to meet Dames, but that Butler did: "Mr. Butler decided he had to talk to his friend Eddie Dames, and explain to him not to go up there [the Room 1215] and to warn him as to what was going on." (Tr. 4013-14) But it made no sense that Mr. Maharaj would have stayed, and had he really just taken part in a double murder, he would have left. It only made sense for Butler to stay – because he was the one who was involved, with his cartel co-conspirators.

And under the prosecution theory, why would Butler remain in the car with Mr. Maharaj all this time? The polygrapher's report is also significant because of the *Brady* material within it, discussed in more detail above.

> During the pre-test discussion, [Butler] … stated that *with the exception of getting out of the car to put quarters in the parking meter,* he had remained in the car with Maharaj at all times after the shooting until he had seen Eddie Danes. [*sic*] His responses were also *indicative of deception* to this statement.[134]

Thus, we have Butler saying he got out of the car to feed the meter. Had this fact been disclosed to the defense, counsel could have hammered Butler: why did he not walk away if he was out of the car and Mr. Maharaj was still in it?

Equally important, the prosecutor actually argued in closing that Butler did *not* wait on a meter, since that would obviously make his story incredible:

> So for the next three hours they are sitting, not right in front of the driveway, or *not at the metered parking lots,* not in the hotel lobby, not in the room, in their automobile but across the street. Mr. Butler's testimony has always been that they went form in front of the hotel to across the street *into a parking lot* where they sat for the next three hours.

> *How do we know that Mr. Butler is telling the truth* concerning where he and the defendant spent the next three hours?

> Bizarre as it seems that these two individuals would sit there while police are pulling up. They are going in the hotel. They are going up to the 12th Floor. They are investigating their case.

> How do we know that's true?

---

[134] Letter of Dudley H. Dickson, Examiner, Polygraph of Neville Butler, at 2-3 (March 2, 1987) (emphasis supplied).

Because of the phone calls. The phone calls start at 4:58…

(Tr. 4013-14) (emphasis supplied)

It is sad to say, but this reflects sheer gall on the part of the prosecutor, and underlines the importance of the *Brady* violation. First, Butler (not Mr. Maharaj) perhaps was at a metered spot – after all, he said he was. *Banks v. Dretke*, 540 U.S. 668 (2004) ("the prosecution referenced this very fact at one point during its closing argument in its attempt to convince the jury").

Secondly, the prosecutors did not believe Butler was truthful, and Butler *twice* failed the polygraph on precisely this point. Yet the prosecutors then came up with the entirely bogus point that he had to be telling the truth because *he* did not start sending and receiving calls until two hours after he would have left the area.

### iv. At the second Butler deposition, another key theory was how Mr. Maharaj was meant to extract money from the Moo Youngs

Prior to the second Butler deposition, the prosecutor also proffered another important change in Butler's story. This concerned the amount of money in dispute between the Moo Youngs and Mr. Maharaj that supposedly led to the murders. His original sworn statement was:

"I can only hazard guesses. That one had to do with moneys that apparently Moo Young spent that was belonging to people who

125

> Maraj [*sic*] introduced to him; or else some sums of money he claims, Maraj claims, was extorted from Maraj's family."[135]

Now, the prosecutor said, Butler would tell about -

> the nature of the money that your client was attempting to get from the Moo Young[s], what was going to happen with the checks once they were received. In other words, what Mr. Butler's part would be, what he would do with the checks. Specifically, that he would take the checks to the bank, have them certified, and then call your client who would then release the Moo Young[s] from captivity.[136]

Of course, this did not really make any sense. No sensible person would honestly believe that the Moo Youngs would have tens of thousands of dollars in their account, such that two checks would be certified by any bank (not even their local one), particularly when the person asking for their certification (Neville Butler) was neither the account holder nor the payee. The idea that this was going to be done in a matter of minutes, prior to the release of the Moo Youngs, was just risible.

The purported details of the transactions, therefore, became very important.

---

[135] Maharaj Rule 3.850 Exhibit FCW, at 6, Statement of Neville Butler (October 17, 1986, 00:50 a.m.).
[136] Second Deposition of Neville Butler, at 7 (March 30, 1987), in *State v. Maharaj*, No. 86-30610.

By the time of his second deposition, and later at trial, Butler had settled on a rather precise amount that was in dispute: $160,000.[137] Two checks were, he said, to be written to cover the $160,000, and Butler was to take them to Fort Lauderdale to be certified.

Butler was conflating two issues here, and this proves him to have been making up a story retrospectively in league with the prosecution after other evidence had come to light. The $160,000 figure came from a newspaper story. In July 1986, three months before the murders, Eslee Carberry and the *Echo* had published an article that made vague allegations of bribery *by Mr. Maharaj* in precisely that amount, $160,000.[138] From the prosecution's perspective, then, there was physical evidence (the newspaper article that was introduced through Carberry) that could be argued as "corroborating" Butler's testimony.

---

[137] Maharaj Trial Transcript at 2806, 3124; Second Deposition of Neville Butler at 38–39 (March 30, 1987, 14:15 p.m.) (108911-983). While Butler had denied knowing what the sums of money were in the first day of the first deposition, this changed in the second day of the first deposition, when the prosecution successfully put numbers into his mouth - "$240,000, $54,000, and $161,000." First Deposition of Neville Butler (Day Two), at 25 (Jan. 16, 1987), in *State v. Maharaj*, No. 86-30610. Presumably these came from a conversation the prosecutors had with Butler between the days of the deposition. But the number changed to something very specific later.

[138] Maharaj Trial Transcript at 2753. See "The *Echo* Will Not Be Bought," *Caribbean Echo* (July 25, 1986).

Yet the *Brady* material suppressed in the Moo Young briefcase and the subsequent revelations through *William Penn Life* show that on July 21, 1986, a payment of $150,000 (not $160,000, as alleged in the paper) was made by bank transfer from a Sun Bank Miami account, in the name of Hance and Sam Persad, *to a Moo Young account*. In other words, the Moo Youngs extorted $150,000 from the Persads, rather than Mr. Maharaj extorting it from the Moo Youngs.

This shows that the $160,000 figure was simply contrived based on the erroneous article by the *Caribbean Echo*. The true figure of what the Moo Youngs owed Mr. Maharaj was readily provable: the Moo Youngs actually owed Mr. Maharaj some $443,000. Duane had, sometime before October 16, written two checks for $200,000 and $243,000 to cover their debt to him. Both had bounced and the debt had been the subject of the civil litigation – as is reflected in the civil record.

Had Butler been telling the truth about Mr. Maharaj arguing over money with the Moo Youngs in Room 1215, $443,000 would have been the number Mr. Maharaj would have said, rather than something made up by the *Caribbean Echo*. He was not there, so he did not say it. Thus, another element of Butler's story could be proven to be false, based on the undisclosed *Brady* material in the prosecution's possession.

128

> **v.    Neville Butler changed his story over and over again in order to make it consistent with the other evidence.**

Because one issue is Kris Maharaj's innocence, it is important to analyze the rest of Neville Butler's narrative. Even where it is not tainted directly by the suppression of favorable material it is highly material to the issue of innocence.

At the first deposition, Butler gave very few details of his version of the crime. Interestingly, the majority of the details of what he said under oath were false. As the prosecutors realized that his story was simply implausible, they subjected him to a polygraph test, and began the job of reshaping his testimony to fit the facts in such a way that they seemed to be corroborated by other evidence.

When Butler told his new story it began to break down the moment he painted in the details, under oath, in his subsequent follow-up deposition. Nevertheless, by now the prosecutors knew their case must rise or fall on Butler's testimony, so they went about a systematic rehabilitation of everything he said: even to the extent that his assertions that should have been

impeached by the physical evidence or other witnesses, suddenly became "facts" that were corroborated by the physical evidence.[139]

Some of this could have been shown at the time of trial, but was not because defense counsel was manifestly unprepared and overwhelmed.[140] It was up to the defense attorney to rake Butler over the coals. Defense counsel had Butler's earlier statements yet, as lunchtime approached, he had made little headway and he stopped short and turned to the judge.

"Your Honor," he said, "I have several other legal pads full of information with reference to my cross-examination of Mr. Butler, and I must have left those matters at my desk at home."[141]

Defense counsel was permitted the lunch break to collect his papers and give more thought to his theory. But if cross-examination is meant to be the "greatest engine ever invented for the discovery of the truth," this particular engine suffered a catastrophic breakdown.

---

[139] It is possible that the prosecution did not do this maliciously, intentionally, or even consciously. One of the flaws in the legal system is the prosecutor's tendency not to see facts that contradict the theory of guilt. Regardless, the outcome for the person on trial is the same: an unfair trial and an inequitable result.

[140] Again, this particular element of the case sounds in ineffective assistance of counsel, but it also relates directly to the issue of innocence.

[141] *Maharaj Trial Transcript*, at 3106.

There were various basic points that should have been made forcefully to any jury.

> ### vi. Why would Mr. Maharaj decide to hire Neville Butler, and then immediately commit a serious crime with him, when Butler had allegedly been involved in a fraud against him?

When scrutinized in detail, the underlying premise of Butler's second story does not pass a basic logic test. Let us consider his claim that Mr. Maharaj had involved Butler – whom he barely knew – in a scheme to kidnap and even murder two people.

For starters, this "plan" assumed that Derrick would bring his checkbook to the meeting. Even if he did, the sum involved was very large and there was no chance that a bank would certify a check for that amount for a man whose annual income, as the prosecutors said, was no more than $24,000.

Why would Butler agree to kidnap a man, a crime punishable by life in prison in Florida for Mr. Maharaj, a man he barely knew? According to his own statement, Butler had not even really started working part-time for the *Caribbean Times*.[142] Butler tried to provide a motive for this: "He told me he believed I may have been involved in this extortion based on articles that were in the *Echo,* and he knew I had been contributing to the articles."

---

[142] First Deposition of Neville Butler, at 7 (Jan. 13, 1987), in *State v. Maharaj*, No. 86-30610.

But now let us think back briefly: the idea that Mr. Maharaj would have hired Butler to work on his paper if he thought Butler a fraudster is preposterous on its face. This part of the story would have to go, and when the trial came around some months later, Butler claimed that he did not actually have anything to clear up.[143]

This created an issue because it did not fit with the prosecution's theory. If Butler had not been accused of partaking in the extortion plot, he had no motive to do Mr. Maharaj's bidding. Thus, the prosecutors pressed him to

---

[143] Throughout his testimony before the jury, Butler's story leaped from one version to the next. One time he said Mr. Maharaj "never did express concern that I made . . .  knew anything about it," directly contradicting his earlier story. But later he changed again: "And indeed at some time later on, he said to me he thought I was involved in . . .  with exposing us . . . because in fact, my name was the one being used in Trinidad as having been behind the extortion. He told me that on a number of occasions." Trial Transcript, at 2759. He had been similarly inconsistent in his pretrial deposition, where somehow his involvement hinged on whether the name Butler was easier to remember than Carberry. *See* Second Deposition of Neville Butler at 12 (March 30, 1987, 14:15pm) (108911-983):

> "He [Kris Maharaj] never said that he knew that I contributed.  But the fact that my name was much more easier to remember than Carberry, and I believe his people in Trinidad told him Butler was suppose to come, and he sort of tied Butler because he know I worked for the *Echo* and the assumption was drawn at that point that I did all the talking on the telephone or I wrote the articles."

*Compare id.*, at 9–10 ("He felt all along that I may have been part of it, but after meeting with me and getting to know me that three or four weeks, he was satisfied that I had no participation in the extortion."). Bizarrely, in his deposition, Mr. Butler admitted that he actually had been involved in the extortion: "Calls had been made from my home." *Id.* at 11.

132

revert to his earlier story, using a leading question. "He convinced you that your name was being used in Trinidad in connection with this extortion?" suggested prosecutor John Kastrenakes.

"Yes," Butler said, only now remembering the contrived details of his complex story. Mr. Maharaj's plan, he then insisted, was to get a confession from the person behind the extortion – Eslee Carberry.[144] Here again he had gone off script. A moment before, the theory had been that Derrick Moo Young was the extortionist, and that the meeting had been set up in the hope of coercing Derrick into admitting what he was doing and getting the money back. Now he was saying it was Carberry.

"What did he say that the benefit would be to you of setting up this meeting with Derrick Moo Young?" Prosecutor Kastrenakes asked next. Butler had just said the meeting was to be with *Carberry*; Assistant State Attorney Kastrenakes substituted Derrick's name to get the story back on track.[145]

─────────────────

[144] Even at trial, Butler was not able to maintain consistency about who Kris Maharaj supposedly wanted to meet—Moo Young or Carberry. "He kept saying, well, Carberry is involved in it and I think I would like to meet with him, and if you would help me set up—he couldn't talk to me," Butler explained at one point. "He said that, 'I will have evidence, I will have documents to prove where he received the money, because the money was gotten from some bank.' I think he mentioned the Landmark Bank, and this was the story that he gave me." Maharaj Trial Transcript at 2756.
[145] Butler remained confused as to whether he and Kris Maharaj were meant

"Very simply," Butler continued, as if oblivious to the name change, "he said he would have my name cleared. I would get a statement from him, and once we sit down and talk, it would all be clarified, and he would see to it that my name would be cleared and not be associated with this sort of thing."

>  ### vii.   Why would Mr. Maharaj plan to commit a murder in a hotel room rented to another unknown person who might walk in the door at any moment?

A second patent problem with Butler's story involved the location of the murder, a room in a very public hotel that had been registered to the elusive Eddie Dames. Not only was Maharaj committing a crime with someone he barely knew –Butler – but he was doing it in a room rented by a man he had never met[146] –Dames – who might turn up at any moment to claim his key.

"What is Mr. Dames's occupation?" queried prosecutor Kastrenakes.

---

to be meeting Eslee Carberry or Derrick Moo Young—a rather crucial point in a murder prosecution, where the state made much of Kris Maharaj's motive to kill Derrick Moo Young. Mr. Butler went on to say he had already talked to Derrick Moo Young about some extortions, and Derrick was apparently the one to tell him that his name was linked with the crime: "Before he even suggested that, I tried to speak with Mr. Moo Young and became very concerned what he told me about my name being used in Trinidad as a person who is extorting money from his relatives. The reason I became very concerned, before I came to the United States, I was working with the Prime Minister in Trinidad and Tobago and I was publishing articles and well known and the president and everyone know who I was. And this would be a calamity as far as my name was concerned." Maharaj Trial Transcript at 2759.

[146] First Deposition of Neville Butler, at 13 (Jan. 13, 1987), in *State v. Maharaj*, No. 86-30610 ("No, he [Maharaj] did not know him [Dames]").

"He is a flight controller, and he also had a business in Nassau, a restaurant, discotheque business," Butler replied.[147] (The jury did not know that Dames was playing a rather common role of the air traffic controller – a conspirator in narcotics trafficking. This piece of the puzzle was delivered in Prince Ellis's evidence in 2014.)

The obvious question of why Dames had come into the plan at all now arises. In a supposed plot headed by Mr. Maharaj to trick Derrick Moo Young into meeting someone he would never meet, it made absolutely no sense to use the name of a real person when a fake name would better serve this purpose. Bringing Dames into the plan would needlessly create another witness against Mr. Maharaj.

> **viii.  The prosecution changed Neville Butler's testimony about the gun to make it consistent with the evidence purportedly linking Mr. Maharaj to the crime**

At trial, Butler claimed that Mr. Maharaj had gone into the bathroom around 11:30am, just before Derrick and Duane entered the room. Butler greeted them. "Tell the ladies and gentlemen of the jury exactly what happened next," the prosecutor asked. Butler replied:

> "As [Derrick] repeated, 'Where's Eddie Dames?' I think I mentioned to him, 'Well, Dames is not here, and I think you need to sort something out about extortion.' Before I was able to get

---

[147] Maharaj Trial Transcript at 2758–59.

> the word out, Maharaj came out of the closet and said, 'You know, you have to deal with me ...' He had in his right hand, a gun, and his left hand there was a small pillow or cushion. I think I remember crying out to him, 'Krishna, what is this? What is this?' Because I was as surprised as Moo Young was to see a gun, and I think I did cry out, 'What is this?'"

Butler's feigned surprise at Mr. Maharaj wielding a gun was new to the tale at trial, and it was hardly credible. If his post-polygraph story were true, he would have expected a weapon to be involved. Derrick was hardly likely to sign a $443,000 check as a result of artful persuasion alone.

Butler's account of the murder weapon was crucial to the case. On the night of the crime, Det. Buhrmaster had asked for a description of the pistol that Mr. Maharaj was supposedly waving about.

"Can you tell me what color the gun was?" Det. Buhrmaster had asked.

"It was white," Butler replied.

"Meaning shiny color?" Det. Buhrmaster asked. He was obviously confused. A white gun would be unique, like the trademark Colt revolver brandished by General George S. Patton as his tanks swept through Europe in 1944.

"No," Butler insisted. "One color, white." He was specific and emphatic. He had supposedly spent three or four hours earlier that day with the gun in question pointed at him – in the room, and then sitting out on the street waiting for Eddie Dames.

Unfortunately, to fit the prosecution's evolving theory, the murder weapon had to be a "shiny" silver nine-millimeter Smith & Wesson - like the one that Kris Maharaj had bought from a police officer a year before the crime. The officer who sold the gun described it at trial as "shiny." There was nothing white about it. By the time of trial, Butler's description had to change.

"Please describe the gun, as you saw it, to the jury," Mr. Kastrenakes asked Butler, in front of the jury.

"It was a flat gun, sort of flat in his hand," said Mr. Butler.

'Was it dark or a light color?'

"It appeared to be a light color," said Butler.

"How would you call the color as it appeared to you?"

"Whitish or silver, it was a light color, off-bone, white, could have been silver," Butler fudged as best he could. The murder weapon had just undergone a vital and strategic transmutation. This was hugely significant as Mr. Maharaj had only ever owned one handgun. Another yawning discrepancy had vanished, and his testimony was again "corroborated" by physical evidence.

And once more Mr. Maharaj's lawyer, Eric Hendon, failed to confront Butler with the metamorphosis at trial.[148]

---

[148] At the first deposition, Hendon had noticed the discrepancy and underlined

ix.    **Neville Butler's testimony about the "silencer pillow" was clearly false and known by the prosecutors to be false**

After the argument between Mr. Maharaj and Derrick, according to Butler, Mr. Maharaj shot Derrick in the knee; apparently to show that he meant business. Butler said Derrick made a desperate lunge at his assailant, whereupon Mr. Maharaj allegedly pumped several more shots into him. Butler then said that as Mr. Maharaj turned to question Duane, Derrick crawled to the door and threw himself out into the corridor, but Maharaj dragged Derrick back in and administered the *coup de grâce*, a bullet to the head.

A heavy-caliber handgun was fired repeatedly in the enclosed space, followed by a final shot in the public hallway, but none of the hotel staff heard anything.

In his original story, Butler told Det. Buhrmaster that there was no silencer on the gun. The detective seemed to find this improbable and probed

---

Butler's effort to explain the change away: "Q: My question to you is what color was the gun? A: Silver or white or something like that was what I saw. Q: Do you recall telling Detective Buhrmaster that the gun was white? A: Well, I am not familiar with guns. I may have said that. Q: Color has nothing to do with guns. I am asking do you recall telling him that the gun was white?" Maharaj Rule 3.850 Tr. 1455, Initial Deposition of Neville Butler at 106 (13 January 1987, 15:30–18:30) (108736-860).

the issue. Butler retreated, saying that Mr. Maharaj had brought a pillow with him to the room in a brown bag to muffle the shots.[149]

Again, this was a fact that could be readily checked. On a copy of Butler's first statement, one of the prosecutors had written: "Is that a hotel pillow?" This was clearly *Brady* material as it showed that the prosecution checked. Indeed, given Butler's testimony, it was actually a *Giglio* issue, as they would have learned he was lying.

---

[149] Initially, Butler said the gun was not muffled at all: Maharaj Rule 3.850 Exhibit FCW at 14, Statement of Neville Butler (October 17, 1986, 00:50 a.m.). In his first statement, Butler told Buhrmaster that none of the shots had been muffled: "Q. Any of the shots sound different to you, like the sounds being muffled? A. No. Q. All the shots downstairs sounded pretty much the same? A. All the same. Q. How about the shots upstairs? A. The shots upstairs may be a little muffled. It's only because it's upstairs it sounded a lesser noise to me." By the time of trial, he had come up with a story to explain why nobody heard the shots—Mr. Maharaj had allegedly brought a pillow with him to muffle the sound. *See* Maharaj Rule 3.850 Exhibit FCW, at 13-14, Statement of Neville Butler (October 17, 1986, 00:50 a.m.) (118882-99): "A. [by Butler] He had a pillow … as part of whatever he had in his bag and— Q. Are you saying that you thought he brought the pillow with him? A. Yes. As he walked around, all the time it was in his left arm. I cannot say whether he used it when he was firing or not." Notably, he could not stay consistent about this, as he said one time at trial that there was no muffling. Maharaj Trial Transcript at 2814. By 1995, when he was interviewed by a television station, he had gone back to saying that there was no muffling. Maharaj Rule 3.850 Exhibit HP at 15 (1995 Channel 4 interview with Neville Butler): "Well, I can't understand why nobody heard with all these gun shots going off, but apparently the hotel room is very airtight, you know, soundproof. However, nobody knocked on the door or anything of that sort." *Id.* at 39 ("They were loud, they were loud shots so if there was anybody within earshot they ought to have heard it."); *Id.* at 40 ("I can't imagine anybody can hear argument and not hear gunshots.").

There were photographs in the case record of the pillow with a bullet hole, as well as pictures of the rest of the crime scene; one glance (albeit not a glance that registered with defense counsel) showed that the perforated pillow matched the other green cushions on the hotel sofa.

In other words, Butler lied. He said Mr. Maharaj had brought a pillow with him to use as a makeshift silencer—a relatively silly story, since there would obviously have been plenty of pillows in a hotel room. He still hung onto this story when he testified in the resentencing trial years later in 2002. But the pillow had patently not been brought along to Room 1215 by Mr. Maharaj in a brown bag—it was one of a number of identical pillows already in the room.

At trial, the prosecution avoided the issue altogether. Prosecutor Kastrenakes pointedly did not ask Butler about any pillow. Defense counsel did not notice.[150]

---

[150] In his first deposition, prosecutor Paul Ridge led Butler into the prosecution's backup theory—that there were two pillows, one left at the scene and one apparently taken away—which was the best that they could do to neutralize his obvious muddling of stories. *See* Initial Deposition (Part 2) of Neville Butler at 39-40 (January 16, 1987, 08:00 a.m.) (108861-910) ("Q. [by Ridge] I will ask you do you recognize the pillow contained in these photographs? A. [by Butler] This doesn't appear to be the pillow. Q. Why do you say that? A. Because of the color. Q. The pillow you saw appeared to be brownish in color? A. Yes. Q. Could you be mistaken as to the color? A. I could be, but it is very doubtful."). More recently Butler reverted to his original story. When on cross-examination in 2002, despite being shown a

Another detail Butler offered was that Mr. Maharaj had a glove only on his right hand when he fired the gun. This did not pass the common sense test, with even Det. Buhrmaster expressing incredulity. If Mr. Maharaj wanted to commit a crime without being caught he would not want his fingerprints in the room, so he would wear two gloves. The one-glove story was very strange unless, in haste when talking to Eddie Dames about the story he needed to concoct, they had worried that the police would do a gunshot residue test on Mr. Maharaj and discover no evidence that he had fired a gun. If so. Butler was giving too much credit, as no such examination was ever performed.

As it stood, this created another logic problem when the fingerprint report came in. Six fingerprints were identified as coming from Mr. Maharaj's right hand - so he could not have been wearing a glove. Rather than view this as evidence of Butler's dishonesty, the prosecution constructed a complicated story for the jury that "corroborated" the single-glove theory. All the right-handed prints - on a soda can, a newspaper, and so forth - could have been left by Mr. Maharaj as he was waiting in the room, they suggested, and before he put a glove on to commit the murder. It is to speculate to suggest that someone

---

picture of the sofa in the room which had pillows identical to the one he had identified, he continued to insist under oath that Kris Maharaj had brought the hotel's pillow in a brown bag to the room to use as a silencer, and then took it away again.

would go to the trouble of bringing a glove to prevent gunpowder residue, but would not wear two gloves to avoid leaving fingerprints. This physical evidence now supposedly supported Butler's implausible story.

Butler continued to unfold his account of what happened in the hotel room. Derrick's inert body lay on the carpet of the Dupont Plaza Hotel. Now, according to Butler, Mr. Maharaj took Duane upstairs to die. Room 1215 was a split-level suite, with the bedroom up a set of stairs, around a corner at the top. It was a point of high drama in the trial. Butler said he was standing at the bottom of the stairs. The photographs of the crime scene proved at least three things: that Butler could not have seen what was going on upstairs[151] and, therefore, could not have described what was happening; that Kris Maharaj would not have been able to see Butler if he had been upstairs shooting Duane; and that Butler was within two feet of the door to the hallway and could easily have escaped.

"I was sure I was going to get shot," Butler told the jury dramatically. "I was sure my turn was next." But, if this were true, he made no effort to

---

[151] "The next thing I heard was boom!" Butler now describes it. "He shot the boy in the back of the head". *Maharaj Rule 3.850 Exhibit HP*, at 19 (1995 Channel 4 interview with Neville Butler). He couldn't know that the bullet was in the back of the head if he was downstairs. He could certainly have seen Duane being shot if he was close, or even taking part in the shooting with someone – and this would have explained how he had blood on his clothes.

flee[152]—which would have required him simply to open the door and run down the hall. Mr. Maharaj was gone for at least ten seconds, he said. Butler was no track star, but if he was scared for his life, he could certainly have made it to either of two sets of emergency stairs.

Instead, Mr. Maharaj allegedly came downstairs from the bedroom, his brown carry bag with him, and the two men walked out of room 1215 together. "I saw the gun in his hands, and I think he took it in his hands as we were walking out of the room going to the elevator."

Here, a very basic question reverberates. If Mr. Maharaj had committed two murders—one when the situation perhaps got out of control, and the second in very cold blood—then it is difficult to understand why he would not have shot Butler, too. Here is a man who had no real connection to Mr. Maharaj and, therefore, no loyalty, who claimed he had vociferously opposed shooting either man, and who was now the only witness to a very serious crime. Once again, defense counsel did not challenge Butler meaningfully at trial.

---

[152] When asked why he did not run, Butler replied, "Very simply, sir. I cannot move faster than a bullet." Maharaj Trial Transcript at 3079. But this was fatuous. He would have been out of the room long before anyone could have fired a bullet at him. Maharaj Trial Transcript at 3790.

According to Butler, the two men rode the elevator down together and walked out of the Dupont Plaza Hotel. Here is where the police reached another part of the Butler story that they did not believe – that he and Mr. Maharaj allegedly sat in the car in front of the hotel for almost three hours with the engine running and the air conditioning on. Police cars were screeching to a halt around them, blue lights flashing.

Butler suggested that they took this inexplicable course of action to meet the elusive Eddie Dames. But there was no suggestion that Mr. Maharaj and Dames knew each other, and Butler himself had claimed that Dames knew nothing about the plot. Waiting for a total stranger at that point would have been the last thing the alleged perpetrator of a double homicide would be inclined to do.

But here, as we have seen, there was another important fact that the jury could not know, because the prosecution had hidden the polygraph report on Butler. Butler's tale was almost complete at this point. He described how Dames appeared outside the hotel, whereupon Butler leapt out of Mr. Maharaj's car and drove off in Dames's rental – a story inconsistent with Dames's statement that he talked to the police inside the hotel. Mr. Maharaj is meant to have followed but then lost them on Biscayne Boulevard.

Butler then told the jury about a telephone conversation he supposedly had with Mr. Maharaj later in the day.

"Maharaj said, 'I want you to meet me at the *Denny's*—'" Butler testified. "I said, 'Which *Denny's*?' 'The *Denny's* at the airport.' I further said to him, I said, 'You know, the police know that I was there and they are looking for me.' He said, 'It doesn't matter. I want to see you so we can get all our stories.'"

"He wanted to get your story straight together?" prosecutor Kastrenakes clarified.

"Yes."

We know from independent sources that this was not true. Mr. Maharaj had arranged the dinner to include Marita Maharaj, Tino Geddes, and others – not a quiet *tête-à-tête* for two murderers to get their story straight together.

Meanwhile, however, the prosecutor had glided around another worrying segment of Butler's story—a long, and potentially crucial, time had passed. The phone call supposedly took place that evening, seven or eight hours after Derrick and Duane had been killed. Butler never accounted for this large chunk of time. The newly discovered evidence of Prince Ellis now tells us what had happened: Eddie Dames had been making sure that Butler got his story straight, and Butler had been disposing of his blood-stained clothes.

145

Butler then led the police to the *Denny's*, where Det. Buhrmaster arrested Mr. Maharaj on two counts of first-degree murder.

In this morass of manipulation, it was not easy to determine who was ultimately pulling the strings. However, to be sure, as defense counsel could have shown, the prosecutors helped Butler get his story straight and then presented it to the jury as if the physical evidence all buttressed what Butler had said.

> **x.     Butler obviously lied when he said he had neither got a deal nor the expectation of a deal from the prosecution**

True enough, the prosecutors worked hard to try to shape Butler's testimony. In reality though, we now know that the prosecutors were being manipulated by Butler and his cartel allies.

Even had Butler been telling the truth at trial, he was admitting that he had conspired with Mr. Maharaj to bring the Moo Youngs to the room where they were to be held (kidnapping) until they signed a check (extortion) turning over money. As Butler was involved in a felony that ultimately resulted in death, under Florida law he was guilty of felony murder - notwithstanding his protestation that he had never intended the Moo Youngs harm. Thus, he faced life in prison. As noted above, Butler had also admitted to committing perjury in his earlier statements.

For all these crimes he never spent a single night in jail. To this date, 30 years later, he has never spent a day in jail for these crimes.

"Has anybody from the state attorney's office or the police department promised you anything to make you say anything of that nature?" the prosecutor asked at trial.

"Nobody promised me anything," Mr. Butler insisted.

"Have you been promised any immunity whatsoever for your own involvement in this case?"

"Absolutely none."[153]

This was either a flat out lie or an intentional deception. Butler knew very well that he needed to toe the prosecution line or he would face decades in prison. For the prosecutors to pretend that there was no deal—overt or covert—was a charade. Butler remained at liberty before the trial and for the 30 years since. That is a mighty incentive for a witness to "cooperate".

In this case there was an "apparent effort [on the part] of the prosecution to conceal the true nature of the dealings with its key witness. . . ." *United*

---

[153] Maharaj Trial Transcript at 2839. *See also* Second Deposition of Neville Butler at 67-68 (March 30, 1987, 14:15 p.m.) (108911-983) ("In no uncertain terms," interjected Paul Ridge. "Mr. Butler has absolutely not been promised any immunity from prosecution for the perjury or the alleged perjury in this case. We made that clear to him in no uncertain terms. At this moment he does not know whether or not he will be arrested for the murder or whether or not he will be arrested for any possible perjury in this case.").

*States v. Butler*, 567 F.2d 885, 888 (9th Cir. 1978). This Court "will not tolerate prosecutorial participation in technically correct, yet seriously misleading, testimony which serves to conceal the existence of a deal with material witnesses." *Blankenship v. Estelle*, 545 F.2d 510, 513 (5th Cir. 1977). Indeed, the Florida courts have themselves recognized the rule (in other cases, not here) that, where a witness clearly expected a deal but the prosecution refused to put it in writing and disclose to the jury exactly what it was, this:

> only increased the significance, for the purpose of assessing his credibility, of his expectation of favorable treatment. Since a tentative promise of leniency could be interpreted by the witness as being contingent on his testimony, there would be an even greater incentive for him to "make his testimony pleasing to the prosecutor."

*Porterfield v. State*, 472 So.2d 882, 884 (Fla. 1st DCA 1985); *accord, e.g., Campbell v. Reed*, 594 F.2d 4, 8 (4th Cir. 1979); *United States v. Bynum*, 567 F.2d 1167, 1169 (1st Cir. 1978); *United States ex rel. Washington v. Vincent*, 525 F.2d 262, 265 (2d Cir. 1976); *Marrow v. State*, 463 So.2d 17, 19-20 (Fla. 2d DCA 1985).

### xi.    As the cross-examination of Butler showed, defense counsel failed, woefully, to develop a sensible theory of what actually happened

Defense counsel had 12 months to prepare for trial. He should have developed a complete theory of the case: indeed, in the case of an innocent client, it was his obligation to do so, not his client's – as Kris Maharaj could

not know who actually committed the murders. But defense counsel's patently inadequate theory involved Eslee Carberry and his tabloid paper, the *Caribbean Echo*. Butler had worked for Mr. Carberry for some months before his recent move to Mr. Maharaj's paper. Perhaps, counsel suggested, there was a dastardly plot between them to kill the Moo Youngs to provide a scoop for Mr. Carberry's paper.

"As a matter of fact, knowing Carberry's zest for sensationalism, you and he devised this particular plot which would provide the best sensational type of news that could have been put together and put in Mr. Carberry's paper," counsel said. "Isn't that correct?"

Instead of preparing for and exposing the many inconsistencies uttered by Butler, trial counsel instead ran with a theory so ludicrous that even someone juggling as many lies as Butler could confidently and emphatically deny it. This was, predictably, disparaged by the prosecution in closing as "unbelievable and absurd." (Tr. 3920) In this, at least, the prosecution was totally correct – albeit in part because defense counsel was deprived of exculpatory evidence that could have exposed the truth.

As can be seen through this litany of examples, a proper challenge to Butler's testimony and statements would have thoroughly undermined the prosecution's case. If Butler was to continue to be the State's star witness,

even as of 1987, the conviction was hanging on the thinnest of reeds. By 2014, that reed had long since given way.

## IV. THE TOTAL DESTRUCTION OF THE STATE'S CASE IN 2014 AND THE PROOF THAT THE CARTELS ACTUALLY COMMITTED THE CRIME

Twenty-seven years after Kris Maharaj was convicted of a crime he did not commit, the effort to expose the injustice of his imprisonment had moved much further. This was a result of the work of *pro bono* counsel over the years – counsel who have remained certain of his innocence. That which was rendered impossible to prove both by his indigence and the prosecution's failure to produce material exculpatory evidence at last became clear in 2014. Indeed, one critical question is whether the prosecution should be allowed to benefit from its concerted effort to evade its constitutional obligations. In particular, evidence of a known drug link to the murders, consistently denied by the State, has been established. Four witnesses asserted the involvement of the Colombian cartels. The prosecution knew or had reason to know this link existed, yet hid it from the defense.

1. ***Brady*** **material and newly discovered evidence concerning Jaime Vallejo Mejia proved that he was being investigated for membership in the Cartel conspiracy by State and Federal authorities from 1983 until his indictment in 1987, and was known to have been involved in the Moo Young murders**

First, Mr. Maharaj proved that Jaime Vallejo Mejia (from Pereira, Colombia) who occupied Room 1214 across from the murder scene, was deeply involved with narcotics and was wanted at the time of Mr. Maharaj's trial for his involvement in a large narcotics conspiracy.

Crucially, at the time of trial, defense counsel had speculated about Vallejo Mejia, the Colombian across the hall with blood on his door. (1987 Tr. 3495-3501; 3830-3832). The detective and the prosecutors disparaged this tentative theory, saying that there was no evidence to support it and that the police "checked [Vallejo Mejia's] story out" (1987 Tr. 3909-10) and found him "very legit." (1987 Tr. 3405; 1987 Tr. 3909-10).[154]

Now, through records that had been readily available to the prosecution but not the defense, we learned that Vallejo Mejia had taken $40 million in cartel money to Switzerland. (And yet this was only a small part of what we can now show about Vallejo Mejia.) The Vallejo Mejia indictment was returned on September 3, 1987 (Pet. Exh. 414, ROA vol. 29, 5376-5391), before Mr. Maharaj's trial. Two parallel investigations had been going on involving Vallejo Mejia for several years, one focused on a potential South

---

[154] *See Hildwin v. State*, 141 So. 3d 1178, 1189-90 (Fla. 2014) (newly discovered evidence particularly material where the state argued the contrary at trial); *Garcia v. State*, 622 So. 2d 1325, 1330 (Fla. 1993) (suppressed evidence "directly contradicts the state attorney's opening and closing arguments.").

Florida prosecution and one in Oklahoma. The former was terminated by the indictment in the latter. Suddenly, new evidence was available to add firm flesh to counsel's speculation.

The Vallejo Mejia indictment in Oklahoma was significant in many ways. He was indicted with two other people – Francisco Javier Ocando Paz and Enrique Fernandez Diaz. There were a number of unindicted co-conspirators, including an attorney and a pilot who were involved in the money laundering schemes. Generally, Mr. Vallejo Mejia would provide money to Mr. Fernandez Diaz, who would take it to Mr. Ocando Paz, who was responsible for getting it out of the country. It would then be flown (in many multiple millions of dollars) by the pilot to Switzerland. This was consistent with Vallejo Mejia being the kingpin in Miami distributing money around the United States for the cartel. The allegations in the indictment initially ran from October 1984 to August 1985, and involved Ocando Paz.

While the defense could not have discovered this with due diligence, all it would have taken from Det. Buhrmaster was a simple check on the NCIC computer. Certainly, the Florida Department of Business Regulation (FDBR) had no problem finding out whatever they wanted to know. Vallejo Mejia was nothing if not arrogant and, even while under indictment, was trying to set up another money laundering scheme involving a liquor store. Following up on

the Oklahoma indictment, the FDBR obtained his financial records and learned that Vallejo Mejia had half a million dollars in his bank account, had no obvious source of income, and was using various businesses that were classic laundering fronts. (Pet. Exh. 405A, ROA vol. 29, 5300-5357). This alone would have placed the "very legit" person in Room 1214 in a whole new light: how much of a coincidence would it have to be for a Colombian narcotics cartel operative to be across the hall, with blood on his door, yet have nothing to do with the crime?

Investigating a member of the Colombian cartels is not a simple matter for an indigent defendant locked up in a Florida prison. Mr. Maharaj had to proceed very carefully with his investigation into Vallejo Mejia for obvious reasons. It is now apparent that Vallejo Mejia was deported back to Colombia after his conviction in Oklahoma, whereupon he established a drug company called Proquim Química Industrial Ltda. which he ran in partnership with a man by the name of Ramiro Gonzalez Betancourt. Proquim operated out of a defunct factory in a dangerous part of Cali. Its stated aim was to produce and distribute cleaning products and chemicals under the brand name Bellot. There is no evidence that it did legitimate business: this was a typical front for importing the chemicals needed for drug synthesis.

Even more significant, Vallejo Mejia and Betancourt were both deemed sufficiently important in the Colombian narcotics trade for their names to appear on the computer drive of Jorge 40, the notorious Colombian drug lord.[155]

Meanwhile, the Vallejo Mejia *Brady* material has led Mr. Maharaj to a thorough investigation into precisely who this man was. As a result of this painstaking research inside Colombia – conducted entirely *pro bono* - it is now possible to show that Jaime Vallejo Mejia was a cousin of Pablo Escobar's.

The family connections are illustrative of the deep-rooted involvement of Mr. Vallejo Mejia in the narcotics business.

For example, Jaime Vallejo Mejia went by various aliases, because people would not use their real names for the most part – indeed, they would use a variety of different nicknames, as nobody wanted to be readily identified in the drug trade. He went by aliases including Don Eloy and El Estudiado in the United States and Abuelo (Grandfather) and Miracielo (Sky Gazer) in Colombia.

---

[155] The Government is under an obligation to provide discovery on this point, since the Jorge 40 materials have been in the possession of the Government since 2006.

Eduardo Vallejo Gutierres was the father of Jaime Vallejo Mejia. He was deeply involved in the cartels. He was a close friend of, and employed by, Joaquin Vallejo Arbelaez, who was Jaime Vallejo Mejia's grandfather. Vallejo Arbelaez was also godfather to Pablo Escobar. Joaquin was very rich and owned large amounts of land, and was very close to the mother of Pablo Escobar whose name was Hermilda.

Even at the time of the Moo Young murders, Joaquin Vallejo Arbelaez was known to have been deeply involved in the cartels:

> "On Aug. 18, 1989, the [cartel] mafia carried out the assassination of Colombian presidential frontrunner Luis Carlos Galan. As in 1984 with their murder of Lara Bonilla, the mafia employed its two-pronged strategy: Terrorize, then negotiate. When the government of President Virgilio Barco responded to the Galan killing with a furious crackdown on the drug traffickers, the drug cartels came up with another "Lopez Michelsen." On Oct. 8, cartel emissary Joaquin Vallejo Arbelaez surfaced with an interview in the Pastrana family's newspaper *La Prensa*, where he claimed to have been mediating secret talks between the drug lords and President Barco's private secretary, German Montoya, for over a year. The scandalous effect of Vallejo's claims was to cast doubt on the seriousness of Barco's anti-drug efforts and, the traffickers hoped, to force the government onto the defensive.

> "Vallejo, a former ambassador to the United Nations and interior minister on various occasions, is considered one of Colombia's most influential intellectuals. He is also the literal godfather of Medellin Cartel Chieftain Pablo Escobar. According to *La Prensa*, Escobar's father had been a foreman on one of Vallejo's estates: "Thirty-nine years earlier, Joaquin Vallejo had held the son of his *compadres*, Pablito Escobar Gaviria, in his arms,

acting as his godfather. . . . Today he is the godfather to The Godfather."[156]

Further, and merely by way of illustration, the close mutual relatives of Pablo Gaviria Escobar and Jaime Vallejo Mejia included the a number of brothers (first cousins to Escobar and second cousins to Vallejo Mejia) who were involved in their narcotics conspiracy, including Carlos Mario Gavíria Velez, Jose Obdulio Gavíria Velez, Luis Mario Gavíria Velez and Jorge Fernando Gavíria Velez.

Thus, Carlos Alberto Gavíria has been linked to money laundering for the cartels as well as being responsible for the cartel's accounts. An investigation in the Colombian daily *El Espectador* established that he was the holder of two Colombian bank accounts used to pay for the assassination of Guillermo Cano.[157] In addition, a joint US-Swiss financial investigation determined that he was the holder of a number of accounts in Switzerland, Luxembourg and Panama, all of which have been linked to the cartels.[158] These accounts contained millions of dollars. The most revealing was a joint

---

[156] "Who's who in the 'dialogue' with the drug mafia", *Executive Intelligence Review,* Volume 17, Number 23, June 1, 1990, pages 28-29

[157] http://www.semana.com/opinion/articulo/las-cuentas-suizas-del-cartel-medellin/108761-3

[158] *Ibid.*

account in his name and that of Jesús María Rivero García.[159] The piece in

*Semana* adds:

> "Judicially it is proved that name corresponds to a false identity that
> used belong to the *capo* Gustavo de Jesus Gaviria Riveros. In 1990,
> when Gustavo Gaviria was shot down by the police, the agents found
> among their papers a falsified document in the name of Jesús María
> Rivero García."[160]

As for Jose Obdulio Gavíria Velez, he was perhaps the most infamous

of the brothers:

> "He is the cousin of Pablo Escobar Gaviria, known as one of the most
> violent drug traffickers in Colombia in the 90s … one of the main actors
> in the La Macarena case, known as the largest crime in Latin America
> in recent years, where they were found in a common grave - located
> very close to a military barracks - at least two thousand Corpses with
> marks of execution. It is the biggest burial of victims of a conflict that
> has news in the continent and one of the main suspects is José Obdulio
> Gaviria Velez, who in 2010 tried to deny the existence of the mass
> grave."[161]

On April, 27, 2006 Colombian media outlet *El Tiempo* published an

investigative piece on Luis Mario and Jorge Fernando:

> "Luis Mario Gaviria Velez and Jorge Fernando Gaviria Velez, brothers
> of presidential counsellor Jose Obdulio Gaviria Velez, were imprisoned
> in the US for drug trafficking.
>
> The facts, which took place in 1983, are recorded in the judicial
> archives of this country. According to these records, although they deal
> with isolated incidents (in different dates and circumstances), the two
> brothers left the United States without their cases having been

---

[159] *Ibid.*

[160] *Ibid*.

[161] http://www.rebelion.org/noticia.php?id=142066

concluded and one of them (Luis Mario) paid a bond in exchange for his freedom.

\* \* \*

Luis Mario Gaviara, who spent over two months in a Miami jail is an official of the Presidential Agency for Social Action (former Social Solidarity Network), an entity created by the Government to serve populations affected by poverty, drug trafficking and violence.

\* \* \*

Those who know of his [Jorge Fernando Gaviria Velez'] case said that it was a covert operation and that his family link with then *capo* Pablo Escobar Gaviria (they are cousins), weighed heavily at the time of arrest."[162]

Given all this, and more to come, the idea that Jaime Vallejo Mejia was – as Detective Buhrmaster put it – "legit" is simply ridiculous, and stands not only as substantive evidence of who really committed these crimes, but as circumstantial evidence of incompetence, bias, and corruption on the part of the police.

Even more would be learned about Mr. Vallejo Mejia from Baruch Vega (*see below*) and others.

**2. Baruch Vega, a long time state and federal informant who told the government in 1986 that the Cartel did the Moo Young murders, filled in most of the missing blanks with respect to Kris Maharaj's actual innocence**

---

[162] http://www.eltiempo.com/archivo/documento/MAM-2001489

Prior to the 2014 evidentiary hearing in state court, purely by chance and through a local news reporter, the defense located Baruch Vega, who lived in Los Angeles. Earlier in his colorful life, he had been a CIA-recruited narcotics informant for more than 30 years. (ROA vol. 26, 4922-4923). Vega's status is irrefutable, as reflected in a published federal decision:

> [DEA Agent Tinsley] testified that, at the request of the FBI, he wanted the bare minimum of a paper trail for Mr. Vega. Both the DEA and the FBI used Vega as a confidential source. The FBI specified that Vega would be a 'non-testifier.' That is, that he would never be used to testify in criminal trials. This status was necessary because Vega was called a 'FCI-CI' or Foreign Counterintelligence Service Confidential Informant, who had been brought in by the CIA.

*Tinsley v. Department of Justice*, USMSPB No. 0752-04-0116-1-1, at 16 (Apr. 20, 2004) (Vitaris, Admin. J.).

Vega's testimony, standing alone, is more than would be needed either for a *Brady* claim or a parallel newly discovered evidence claim. He had worked for law enforcement in South Florida for 22 years, from 1978 to 2000. (ROA vol. 26, 4935). Vega worked for CENTAC (the joint State-Federal task force) in Florida (ROA vol. 26, 4926), thereby ensuring that his knowledge was known to the state authorities as well as the federal government.

Vega identified Jaime Vallejo Mejia as a major money launderer for Pablo Escobar and said that Derrick Moo Young was working with Vallejo Mejia, laundering money for the cartels. A state and federal investigation

159

against Vallejo Mejia and Derrick was "very advanced" (ROA vol. 26, 4935) by the time of the 1986 Moo Young murders, a fact corroborated by the 1987 Vallejo Mejia indictment.

Vega testified that his cousin Hernan Baron worked closely in narcotics with Vallejo Mejia, along with Alvaro Zuluaga. (ROA vol. 26, 4928-4930). Even today, Vallejo Mejia is still a major player in the Colombian narcotics conspiracy (ROA vol. 26, 4931-4932) – a fact that Mr. Maharaj has recently confirmed in the most compelling way. (*See below*).

Pseudonyms were, of course, common amongst drug dealers and members of the Colombian narcotics cartel. Vega first knew of Derrick as *El Chino Mau* (Derrick was of Chinese descent), but the FBI later confirmed his real name as Moo Young. (ROA vol. 26, 4932) Vega met Derrick in person once with Vallejo Mejia (ROA vol. 26, 4933), and described him as follows:

> Jaime Vallejos [Mejia] utilized *Chino Mau* as one of the providers for banking instruments in exchange for cash. They would provide, let's say, $1 million in cash and they would receive the equivalent less 15 percent that they used to charge at the time and they provide either wire transfers or cashier checks or money orders.

(ROA vol. 26, 4933)

Derrick was thought to be ripping off the other launderers (or, more particularly, Pablo Escobar) and Vallejo Mejia admitted directly to Vega that Derrick had to be killed:

A. Well, after the events of 1986, one day that I was meeting with Jaime and Alvaro [Zuluaga], and Jaime Vallejos [Mejia] … says -- and I'm going to say this in Spanish and I hope somebody help me to translate -- (in Spanish) *Tuvimos que matar a este Chine per puta por fran poso.*

Q.  Without the foul words, what does that mean?

A.  We have to kill this bastard SOB for being a crook. That's what it means.

(ROA vol. 26, 4934)[163]

From his work as a confidential informant, Vega testified that the name Tino Geddes came up a fair amount in his narcotics investigations, as did the name Adam Hosein. (ROA vol. 26, 4936). In other words, Vega linked the man who left a message in Room 1215 (Hosein) and a major prosecution witness (Geddes) into the narcotics conspiracy.

Vega also knew of two people – *Cuchilla* and *Popeye* – as hitmen for Pablo Escobar, and described a man named Jorge Maya as working for scobar in Miami – all of which tied into the case as described below. Standing alone, Vega's testimony was sufficient to mandate a new trial.[164]

---

[163] The record is slightly inaccurate in this regard, and the correct transcription is: "*Tuvimas que matar a este Chino de puta por tramposo*".

[164] Coincidentally, there is a case involving a different Mejia and a man called Wootton. *Mejia v. United States*, 291 F.2d 198 (9th Cir. 1961). One could replace the name Wooton with the name Vega in the following quote: "There is nothing in the record to show that Wootton was not a credible witness. *** 'Mr. Wootton's testimony certainly would be sufficient to create a reasonable doubt standing alone.'" *Id.*, at 200.

The state court's handling of Vega's evidence was patently erroneous in a number of ways. For example, Vega's testimony was not "merely" evidence of innocence; it constituted credible and unrebutted evidence of a systematic *Brady* violation. Vega said he reported back to his state and federal agents at CENTAC with all the information he developed. The *Brady* violation was proven by Vega's testimony without more. That said, unless they have been destroyed, there must be written records of the information accumulated in late 1986 – long before Mr. Maharaj's trial – that should have been turned over to the defense. However, prior to the 2014 hearing, the subpoenas *duces tecum* signed by the state court judge were flouted by the federal authorities.

In assessing Vega's testimony, the state court ruled as follows:

> Baruch Vega's testimony is quite interesting. Mr. Vega is a former CIA informant. He worked with *State and Federal* law enforcement agencies in south Florida. He testified that he formed a friendship with Jaime Vallejo Mejia, the man in the room across the hall from the murder scene. Mr. Vega also testified Jaime Vallejo Mejia was a member of Pablo Escobar's drug operation. Mr. Vega detailed a person he knew as 'El Chino Mao' was used by Mr. Mejia to launder money. Mr. Vega testified that he actually met 'El Chino Mao' at a restaurant or at the Mutiny Hotel. *According to Mr. Vega, 'El Chino Mao' attempted to purchase Mr. Vega's home using counterfeit money orders.* Mr. Vega testified he heard from the FBI that the real name of 'El Chino Mao' was Derrick Moo Young. According to Mr. Vega, not long after the murders, Mr. Mejia made a statement to him that 'El Chino Mao' or the 'Chinese Crook' had to be killed because he was stealing from Pablo Escobar. Through Mr. Vega, Mr. Maharaj believes he has essentially established a connection between the Moo Youngs, the man in the room across the hall from the murder scene (Mr. Mejia) and the man who left a message in room 1215 (Mr. Hosein). The Court

finds the State's attempt to dismiss Mr. Vega's testimony as an over indulgent fantasy from a spot-light seeking media hound is simply misplaced. *The Court finds Mr. Vega's testimony probative and also finds it establishes a credible claim of newly-discovered evidence*. However, this Court also finds Mr. Vega's testimony is profoundly weakened by his inability to identify a photograph of Mr. Mejia or Derrick Moo Young a/k/a 'El Chino Mao'. Although this Court finds Mr. Vega's *testimony compelling*, it is fraught with inadmissible hearsay and is woefully insufficient to establish a reasonably probability of acquittal on retrial. Therefore, the materiality of Mr. Vega's testimony is questionable.

(ROA vol. 27, 5110-11) (Order Denying Relief, at *6-7* (Jan. 9, 2015)) (emphasis supplied).

First, the state judge just got the evidence wrong. For example, Vega never said he was offered counterfeit money orders by Derrick Moo Young for his house. Had this been the case, there might be an argument that he should remember Derrick's face better. Rather, he was offered what were, to all intents and purposes, valid "cashier checks [and] money orders" by Vallejo Mejia, who wanted to buy the house for Pablo Escobar's wife Victoria. (Nov. 12, 2014, Tr. 369-70).

In rejecting this compelling testimony based primarily on the photographs, the trial court was patently in error. What did it matter whether he could identify pictures when he knew the names – nobody could argue sensibly that there were two Jaime Vallejo Mejias and two Derrick Moo Youngs involved in the Dupont Plaza Hotel. In any event, what he actually said was that the picture of Vallejo Mejia today was "quite different" from the man he knew 28 years ago (Nov. 12, 2014 Tr. 385), which is hardly surprising, since the man was in his fifties then and is now over eighty.

And as for Derrick Moo Young, he met him only once, briefly, with Vallejo Mejia. Then 27 years later was shown the only picture available – a blown up, black and white Xerox of a bad passport photograph from Petitioner's Exhibit 297 (the first picture shown here), which is barely recognizable as the same person shown in a different picture later in the same passport (the second picture). These pictures were not sprung on him at the hearing, but shown to him the day before by Mr. Maharaj's counsel. The fact



164



that he was not prepared to stretch his testimony should, in all likelihood, enhance his credibility before a jury.

Neither is it as if Vega's testimony stood alone. Rather, it was to be considered in the context of all the other compelling evidence.

**3. "John Brown", a federal informant who had helped the US government put many narcotics conspirators in prison, provided a direct admission from Pablo Escobar that the Cartel committed the Moo Young murders, and identified Jaime Vallejo Mejia ("The Evil Dwarf") as a close confederate of Escobar's**

"John Brown", a former cartel pilot, testified under a pseudonym. He had been in the witness protection program and was afraid for both his own safety and that of his family. He testified credibly and without impeachment about the statement made directly to him by Pablo Escobar at around Christmas 1986. As the trial court recognized, Brown "worked for Pablo Escobar and the Colombian cartels from 1985-1990" (ROA vol. 27, 5111), precisely the time period of this crime:

> Mr. Brown was a pilot who imported drugs into the United States for the cartels. Mr. Brown detailed how he met Pablo Escobar at his ranch in Los Napoles, Colombia, in 1986. According to Mr. Brown, Pablo Escobar told him that if he lied or stole from him, the penalty is death. Escobar told Mr. Brown that 'El Chino' or 'Los Chinos' stole from him

and he had 'El Chino' or 'Los Chinos' killed at a hotel across the street from the Holiday Inn. (ROA vol. 27, 5111).

Brown said that (at the time) he took the hotel to be the Dupont Plaza.[165]

There was absolutely no reason to doubt Brown. All the details of his testimony were consistent with what might be derived from other sources. For example, he testified that Pablo Escobar – before boasting that he and the cartel had ordered the murders of the Moo Youngs in October 1986 - spoke about the murder of CIA informant, Adler Barry Seal in Baton Rouge, on February 19 of the same year. Brown stated that Escobar referred to Seal by his nickname, "Little Bird." (ROA vol. 25, 4702). That was, indeed, the moniker he went by.[166]

It can hardly be disputed that Escobar was behind the Seal murder, carried out because Seal had informed on him; after all, three Escobar henchmen were convicted of doing precisely that and sentenced to life without parole. *See State v. Velez*, 588 So.2d 116 (La. App. 3d Cir. 1991) ("As a result

---

[165] The State sought unsuccessfully to impeach Brown, implying that they might have been other Chinese in other hotels. This defies common sense: the State has never sought to prove that there was another double homicide in a hotel in Miami around this time, let alone a double homicide of *Los Chinos* in a hotel near where Brown was staying.

[166] Gary Hines, *Witness: Defendant sought contract to murder Seal,* UPI (April 30, 1987), at http://www.upi.com/Archives/1987/04/30/Witness-Defendant-sought-contract-to-murder-Seal/3350546753600/ ("Seal, nicknamed 'Little Bird,' was marked for retaliation.").

of Seal's cooperation, indictments were brought against Pablo Escobar and Jorge Ochoa, two of the top men in the Medellin Cartel. *** [A] meeting was held in February of 1985, during which discussions were had concerning the contract on Seal. Defendant Velez was present at this meeting. Cardona-Salazar said that he was being pressured by Pablo Escobar and the Ochoas to have Seal eliminated as soon as possible.").

Escobar was not telling him this as a throwaway comment: he wanted Mr. Brown (whom he was meeting for the first time) to know that if he lied about the cartel, or stole from it, he would suffer the same fate. These were, then, classic examples of statements made in the court of, and in furtherance of, the narcotics conspiracy.

Brown came to know Escobar well over the course of five years and he met Jaime Vallejo Mejia – known as *El Enano Peligroso*, or "The Dangerous Dwarf", because he was only around five-five or five-six[167] – several times as Vallejo Mejia would visit Escobar's ranch. (ROA vol. 25, 4703-4705). Vallejo Mejia "was a money launderer for the cartel."

He also knew of *Cuchilla* and *Popeye*, who were both "*sicarios*" (assassins) for Escobar. (ROA vol. 25, 4704-4705). "Popeye was one of

---

[167] Again, this was very credible: Vallejo Mejia's registration document (Pet. Exh. 407, ROA vol. 29, 5364-5365) reflects that his *estatura* (or height) is 165 cm – slightly under five foot five inches.

Escobar's main people. He was a *sicario* also. He handled a lot of the bombings, and he also handled a lot of the murders that Escobar committed. Him and Jhonny Acosta." (ROA vol. 25, 4705).

Brown had been in the witness protection program and had testified 15 times for the government against narcotics conspirators. He had no motive to lie. Indeed, he emphatically did not want to testify, but felt a moral duty to do so: "As I told [the prosecutor]," he said, "you got the wrong guy." (ROA vol. 25, 4705).

Again, the state judge believed that this was all "a textbook definition of hearsay." (ROA vol. 27, 5111). Much of it was not hearsay at all, but merely Mr. Brown describing what he knew from first-hand experience about a number of people –Vallejo Mejia, *Cuchilla*, *Popeye* and others. In fact, it was a "textbook" exception to hearsay as these statements were made in the course, and in furtherance, of the cartel narcotics conspiracy.

**4. Jorge Maya, an enforcer for the cartel conspiracy, testified that they committed the Moo Young murders and described how his brother Luiz paid *Cuchilla* ("The Blade") for masterminding the crime**

Jorge Maya testified from Colombia. He was another member of the cartel conspiracy who remains wanted under a federal conspiracy indictment for laundering $2.5 billion dollars. As the U.S. Attorney stated in announcing the conviction of Jorge's brother:

According to statements made before U.S. Magistrate Judge Edwin G. Torres, between 1979 and 1994, defendant Sigifredo Maya and his co-conspirator brothers, Luis Carlos Maya, Jorge Maya, and Juan Maya, under the instruction of Pablo Escobar, were dispatched to Miami to direct the Medellin cartel's efforts in the importation and distribution of multiple-thousand ton shipments of cocaine throughout the United States. *** Court records also indicate that the Maya brothers served as enforcers for Pablo Escobar in the United States. This was demonstrated in December 1988, where an associate who was tasked with guarding a warehouse in Miami that contained more than 500 kilograms of cocaine claimed the shipment was stolen by a rival drug gang. The Maya brothers interrogated this associate and then promptly sent him back to Medellin to personally explain the loss to Pablo Escobar.[168]

"Essentially," as the state judge found, "Mr. Maya testified that the Moo Young murders were committed by the cartels and not Mr. Maharaj." (ROA vol. 27, 5109). However, the judge mistakenly thought it was all hearsay and double hearsay, because "Mr. Maya testified he lived in Miami from 1981-1982." (*Id.*) In reality, he testified that he "lived in Miami between '81 and '92 exactly." (Maya recorded testimony at 19). Regardless, there was no suggestion that either he or any of the people to whom he spoke had ever left the conspiracy.[169]

---

[168] U.S. Attorney Press Release, *Former Medellin Cartel Associate Pleads Guilty To Drug Trafficking Conspiracy* (May 5, 2011), at https://www.justice.gov/archive/usao/fls/PressReleases/2011/110502-01.html.

[169] The state court decided it was "impossible for this Court to assess his credibility" simply because he took the Fifth Amendment with respect to some of his own criminal "activities in 1984 and 1986." (ROA vol. 27, 5109). Quite

Maya testified that his brother Luis (another member of the cartel conspiracy) had spoken to Pablo Escobar (himself obviously a member of the conspiracy), who explained how the Moo Youngs were stealing from him. Maya testified that Manuel Guillermo Zuluaga Salazar (known as *Cuchilla*, or "The Blade") was a hit man who came to Miami to oversee the murders in around 1986. (ROA vol. 27, 5109). Luis Maya paid *Cuchilla* his 'fee' for the murder.[170]

### 5. Jhon Jairo Velasquez Vasquez ("Popeye"), Pablo Escobar's chief *sicario*, confirmed that the Cartel was responsible for the Moo Young murders

Then there was *Popeye*, the hitman identified by both Vega and Brown. His real name is Jhon Jairo Velasquez Vasquez, and he was Escobar's chief lieutenant at the time of the Moo Young murders. *Popeye* gave an affidavit from Colombia admitting that the Moo Young murders were ordered by Escobar and carried out by *Cuchilla* because the Moo Youngs were stealing Escobar's money:

> 5. As a member of the Cartel, I knew about the Moo Young assassinations in Miami, Florida, at the time they occurred. I particularly remember the name Moo Young because I have always thought about it as the mooing of a cow.

---

why this should be the case is hard to understand, since it is hardly uncommon for witnesses do this.

[170] The state court was simply mistaken in assessing Maya's evidence. For example, he did not live in Miami from 1981-1982 (ROA vol. 27, 5109), but rather from 1981-1992 – precisely the time of the Moo Young murders.

6. As a lieutenant of Pablo Escobar Gavíria, with whom I worked shoulder to shoulder, he told me directly that they had stolen his money and that of his partners and that therefore "they had to die".

(Pet. Exh. 503. ROA vol. 31, 5798-5807). He said the same on the BBC.[171]

At the time of the 2014 hearing, *Popeye* was "unavailable" because he feared for his life – he could not appear for a formal deposition as he had just been released from prison and an attempt had been made on his life that very week.

*Popeye*'s life was in real danger. (ROA vol. 30, 5625). Indeed, former DEA Agent Henry Cuervo spoke directly with *Popeye* who relayed how someone had just been murdered; the killers mistakenly thinking they were

_____

[171] Here, he said:

> Krishna Maharaj is a name he's never heard of, but he does recall who killed the Moo Youngs. An assassin known as *Cuchilla*, the Blade. *Cuchilla* was Pablo Escobar's most professional assassin. Because killing an American on American soil is terribly delicate. You have to be a professional killer. Later on, *Cuchilla* became much more famous because he killed the Moos. We don't speak English, but it's very easy to say Moo. We always heard that the Moos were killed because they were stealing money from Pablo Escobar. *Cuchilla*, the assassin, was later murdered himself.

(ROA vol. 27, 5016-5017). The statutory article on the journalist's privilege provides that a film may be authenticated without a witness, but "upon a showing, by affidavit of the professional journalist … that the … recording … is a true and accurate copy of the original…" Fla. Stat. § 90.5015(6). This was done using the precise words of the evidentiary rule. (Pet. Exh. 506, ROA vol. 31, 5839-5840).

eliminating him. (ROA vol. 26, 4916). Despite this, *Popeye* had arranged a call on a "burner" phone so he could talk to Cuervo, reaffirm his sworn statement, and reiterate that the cartel conspiracy (not Mr. Maharaj) was responsible for the Moo Young murders. (ROA vol. 26, 4915-4916). He was willing to appear as a witness later, if he was still alive.

The state court "assign[ed] absolutely no weight to this 'evidence.' The Court finds the testimony inadmissible hearsay with not even the slightest hint of authenticity." (ROA vol. 27, 5110). This was error. As a primary matter, we are dealing with Mr. Maharaj's life, so the idea that a repeated statement by a cartel member that they did the crime should be dismissed out of hand is extraordinary.

However, the issue here is whether there is likely to be evidence resulting in a different result at a retrial. *Popeye* said he would testify at a retrial, and now that he is free and no longer apparently in line for assassination there is every chance he will. As illustrated by the even newer evidence that has come to light in the last few weeks (discussed below), there are various ways in which *Popeye*'s evidence may be admissible. *Popeye* made the same statements to another person who knew him well, and who can therefore repeat them either as statements against penal interest, or as conspirator statements.

6. **The testimony of former DEA special agent Henry Cuervo provides a compelling overview, tying together the other evidence and identifying how a competent law enforcement officer would have followed up all the leads to prove who really committed these crimes**

All of this was pulled together by Henry Cuervo, a recently retired special agent for the DEA, who testified as an expert. The state court "credit[ed] Mr. Cuervo's testimony concerning how Colombian drug cartels operated in south Florida in the 1980s. He presents as a very informed and knowledgeable former law enforcement officer." (ROA vol. 27, 5113). Amongst everything else, Cuervo – who had long investigated precisely this narcotics conspiracy – spoke directly with *Popeye* about the case, who then confirmed what he had previously said. (ROA vol. 27, 5114).

In major part, though, Cuervo testified to the *Brady* violation that took place in the case. He critiqued the police investigation in the case, and identified a series of red flags that should have led law enforcement to consider whether narcotics traffickers were behind the Moo Young murders at the time of the offense. This analysis began with the simple fact that it was Miami in the 1980s, with narcotics-related murders sadly rife. But there were many other factors, including that the Dupont Plaza Hotel was a known venue for traffickers. (ROA vol. 24, 4585-4586).

There was also a Colombian, from Pereira, in the room across the hall, with a blood stain on his door. Without making a presumption, a diligent law enforcement officer would certainly want to look into him. (ROA vol. 24, 4587). Here, the proof of the pudding is in the eating: we now know that even a limited investigation would have revealed Vallejo Mejia's indictment for activities focused in South Florida going back to 1983. (ROA vol. 24, 4588-4589).

Cuervo knew DEA Special Agent Kimberly Abernathy, who readily relayed to him that there was a Customs investigation into Vallejo Mejia that was separate from the Oklahoma case. (ROA vol. 24, 4594). Of course, she had freely given the same information to the Florida Department of Business Regulation (FDBR), making it difficult to argue that the Miami Police Department – who was working directly with CENTAC – could not discover it.[172] Agent Abernathy – now using her married name Loveless – described their investigation into Vallejo Mejia that had been active since 1983.

---

[172] Cuervo also discussed Al Singleton, who had been listed as the State's expert witness, although the State thought better of calling him. "In the '80s, Al Singleton was a … homicide detective for Metro Dade. And … he would be over at our office, or we would be over at his office. And then I would run into him all the time, or individuals that he knew that we knew. We would help each other out in investigations." (ROA vol. 24, 4600) While the DEA would not share information with local police who might be corrupt, they would certainly share it with someone like Mr. Singleton. (ROA vol. 24, 4601).

Another red flag should have been the classic money laundering profile of Vallejo Mejia's companies – import-export and insurance – and the fact that he was trying to start another one, a liquor store. Cuervo described how law enforcement should have done precisely what the agent for the Florida Department of Business Records did – secure Vallejo Mejia's financial records. The records showed gross income of just $12,744.59 and a loss of over $40,000, yet a balance in his account ranging up to half a million dollars. (ROA vol. 24, 4595-4597).

When arrested on his federal indictment, Vallejo Mejia was able to put up a cash bond of $600,000, which was another obvious red flag. (ROA vol. 24, 4597-4598). Cuervo discussed how the documents from Colombia[173] showed that Vallejo Mejia got into another drug-related business back there – Proquim Industrial Limitada - discussed above. (ROA vol. 25, 4603-04).

Cuervo also went through some of the documents in the Moo Young briefcase, and those developed by William Penn Life Insurance Company, including; the IRS records, the documents offering hundreds of millions of dollars to various countries in loans, and the documents concerning the hundreds of millions of dollars in gems. He discussed the relevance of the

---

[173] With all of these issues, Cuervo testified that it would have been possible to follow them up with documents that they could obtain from Colombia if need be.

various materials and described how the gems would be used to launder money. He described what should have been done by law enforcement to follow all this up, both in the United States and in Panama and elsewhere.

Cuervo had direct experience of several of the cartel conspirators in this case from his law enforcement days. When he was in the DEA, Cuervo personally oversaw the investigation into Jorge Maya and his brothers, resulting in the $2.5 billion indictment against them. (ROA vol. 25, 4618 *et seq.*). According to Cuervo, Jorge Maya, the witness in this case, was the enforcer and actually ran *Cuchilla*. (ROA vol. 25, 4620-4623). Maya would certainly have known what was going on if Escobar wanted someone killed in South Florida.

Cuervo knew all about *Cuchilla* and testified (consistently with Maya and *Popeye*) that the assassin bought his farm shortly after the Moo Young murders, and that the Colombian government foreclosed on it as the proceeds of crime. (ROA vol. 25, 4617-4618).[174]

The prosecution has consistently propounded the theory that Escobar

---

[174] This was corroborated by the documents from Colombia, such as would have been available to Mr. Cuervo many years before if disclosures had been made. *See* Petitioner's Exhibit 420 ("On 21 August 1989, confiscation proceeding were carried out with respect to the real property of Finca Inversiones Taba located in the area of Llano Grande in the municipality of Rionegro (Antioquia) owned by Mr. Manuel Guillermo Zuluaga").

would have boasted about the Moo Young murders had he done them. But Cuervo confirmed the testimony of others (including Vega and Brown), that Escobar was not afraid of much, but he was fearful of being extradited to the United States (2014 Tr. 104, ROA vol. 25, 4663). While he might certainly use the Seal and Moo Young murders to threaten someone like Brown at his ranch in Colombia, he would not brag about it in public.

Cuervo confirmed the testimony of another witness, Prince Ellis, that Nigel Bowe was a Bahamian attorney who was the subject of further DEA investigation. (ROA vol. 25, 4631-4632). The Moo Youngs' front company, Cargil International, was registered at Bowe's office. (ROA vol. 25, 4633-4634).

He also discussed the Shower Posse in Jamaica, and how they fit in with the Cartel in Colombia: using a go-fast boat from the north coast of Colombia to Jamaica, as part of the transport of drugs to the United States.

The state court found Cuervo to be a "very informed and knowledgeable former law enforcement officer" and credited his testimony about "how Colombian cartels operated in south Florida during the 1980s." (ROA vol. 27, 5113) However, the state court felt the "majority" of his testimony was hearsay and would not be admissible at trial. (ROA vol. 27, 5113-14).

In this, the court erred in two ways. First, Cuervo was offered in large part to show how the *Brady* violation would have expanded exponentially had law enforcement done its job. But secondly, there is nothing about his testimony that was inadmissible. Indeed, the judge sustained objections to anything that was even arguably inadmissible. What he spoke to came well within both the kind of evidence he had often given in federal prosecutions, and the kind of testimony contemplated in the very case where a similar expert was used in another prosecution involving one of the prosecuting attorneys in this very case.[175]

**7.  Through no fault of Mr. Maharaj, William Penn's former lawyer Brenton Ver Ploeg testified in 2014 that various exculpatory documents had accidentally been kept from Mr. Maharaj in 1997, further linking the Moo Youngs to the narcotics conspiracy**

---

[175] The prosecution insinuated that Cuervo's evidence should not be considered at all. However, in the lead case allowing a cartel expert to testify in a Florida criminal trial, the unsuccessful litigant was the very same Assistant State Attorney in this case. *See State v. Nieto*, 761 So. 2d 467 (Fla. 3d DCA 2000) (defense properly allowed to call expert witness to testify about "the methods used by Columbian drug cartels, and in substance, that those methods are consistent with what happened in this case."). While Cuervo's testimony would be admissible at a trial, that is actually not the only issue here. He was offered, in part, as a "*Brady* witness" to detail how a seasoned law enforcement officer could or should have followed up the clues and evidence *that were present at the time of the crime*, and that developed thereafter. He was also able to shed light on the fact that a state law enforcement officer would clearly have had access to the joint Federal-State CENTAC work being done in conjunction with informants including Baruch Vega.

Some of the evidence indicating the relevance of drugs to this case came from sources totally unconnected to narcotics. Brenton Ver Ploeg, formerly counsel to *William Penn*, testified that when he had allowed Mr. Maharaj's representatives to review documents in his file in 1997 those in charge of his storage had failed to produce eight of his boxes. (ROA vol. 27, 5108). Thus when - in what can only be described as an excess of diligence - Mr. Maharaj sought to take a second run at the file in 2014, he found additional documents, introduced through the testimony of Ver Ploeg whom the state court found "unquestionably credible, trustworthy and reliable." (ROA vol. 27, 5108).[176]

With classic understatement, the trial court felt that this evidence *could* support the theory that Derrick Moo Young was "involved in money laundering enterprises." (ROA vol. 27, 5108).

In contrast, Brenton Ver Ploeg testified that, when he began to represent William Penn Life Insurance, the Moo Youngs' $1.5 million insurance "claim had been denied because of a suspicion of drug trafficking and money laundering and a host of illegal activities." (2014 Tr. 168, 198). The Moo Youngs had created companies that were clearly intended to be confused with

---

[176] The state court found that the limited number of documents adduced through him in 2014 were newly discovered, but failed even to mention the scores of documents presented through the same witness in 1997. (ROA vol. 27, 5108-09).

major international corporations (2014 Tr. 199) or, in some cases, companies owned by Mr. Maharaj. (*Id.* at 186). Despite pursuing an easier path that did not involve as much investigation (*Id.* at 169), Ver Ploeg and his law firm accumulated a mass of information that now supports Mr. Maharaj's defense. This has been derived from the Moo Young family, from Panama, California, and various other sources. The money laundering element of the Moo Youngs' business dealings "*sprang out immediately* from looking at the overall records that came in." (2014 Tr. 211) (emphasis supplied).

In 2014 there were important new documents in the materials newly located in Ver Ploeg's files.

### a. The William Penn files: further proof that Adam Hosein was involved in the Cartel conspiracy and the homicides

One new Ver Ploeg document involved Adam Hosein taking over the Moo Young money laundering operation, Cargil International Panama. (Pet. Exh. 390). This provides a critical link to earlier evidence. Trial counsel Hendon testified that his client was sure that Hosein must have had something to do with the crime:

> My client would mention Adam Hosein's name at least once a day. I mean there would not be a day that he would not mention Adam Hosein and his suspicions relative to Adam Hosein.

(1987 3.850 Tr. 311; *id.* at 312). Mr. Maharaj's suspicions were based solely on his knowledge of Hosein's past. Given what was developed in 1997and

this new evidence, it is clear that Hosein was closely involved in both the Moo Young money laundering and their murders.

### b.  The William Penn files: Astill Jadusingh and how the Moo Youngs originally got into narcotics

As the jigsaw puzzle of the Moo Youngs' involvement in narcotics gradually came into focus, other documents from the Ver Ploeg collection linked the Moo Youngs directly with a person called Astill Jadusingh. This new evidence reflects that Jadusingh was involved in their company, Eastern Rhine Estates. (Pet. Exh. 440). The documents were verified by Derrick's daughter Shaula Nagel (*Id.* at 15275). Another Ver Ploeg document confirms Eastern Rhine to be another Moo Young front company. (*Pet. Exh. 437*). Jadusingh was himself convicted on a drug conspiracy stemming from trafficking between Jamaica and the United States between 1982 and 1986. *See United States v Astill Jadusingh,* 1992 U.S. App. LEXIS 32353 (4th Cir. 1992) (Pet. Exh. 445).

### c.  The William Penn Files and Richard Solomon

Among the primary indicators – from Brenton Ver Ploeg's perspective – of the Moo Young money laundering were the extraordinary activities in which they engaged with the Los Angeles Church Loan Corporation (LACLC) until just a few days before their murders. These laundering schemes involved millions of dollars in gems, billions in Yen bonds, and an

attempt to purchase a bank in Panama for millions of dollars. Given that fully half of the banks in Manuel Noriega's Panama in the mid-1980s were controlled by the Colombian cartels, it is hardly surprising that this was a major red flag for former DEA agent Henry Cuervo.

There was a better than even chance based on this fact, standing alone and ignoring all the other evidence, that the Moo Youngs were laundering for the cartels. And the person with whom they were conducting this particular enterprise was one Richard Solomon. (e.g. *Pet. Exh. 421*). Newly discovered evidence – that obviously could not have been known in 1997 – reflects that Solomon was indicted in 2002 and convicted for a scheme involving some $70 million in false certificates of deposit related to non-existent insurance contracts. (Pet Exh. 446) (indictment in *United States v Richard Joseph Solomon et al.*, No. 8:06-CR-00026-T26 (M.D.Fla. Tampa)); *see also United States v. Solomon,* 513 Fed. Appx. 895, 2013 U.S. App. LEXIS 5548 (11th Cir. 2013, *cert. denied*, 134 S. Ct. 205 (2013) (Pet. Exh. 447).[177]

_____

[177] Mr. Maharaj does not claim that this is a major issue – it is just another of the building blocks of circumstantial evidence. As with Brenton Ver Ploeg and his work on the uninsurable Key Man insurance defense, the U.S. government clearly chose the easier basis for prosecution – proving bogus insurance claims, rather than proving that this was part of a broader money laundering scheme. The State's best argument is that the Moo Youngs were working with a crook; however, the evidence strongly suggests that, as with Jaime Vallejo Mejia's fake insurance company, this was a money laundering enterprise.

### d. The William Penn Files revealed that the 23 year old Duane Moo Young faced a quarter million dollar Tax Lien

Mr. Maharaj also introduced a tax lien concerning Duane Moo Young for the tax years 1985 and 1986 that was in the William Penn files. (Pet. Exh. 488). This reflects that the IRS had access to material showing that he had claimed to have earned income so substantial that he owed $275,621.29. A tax bill for this amount would reflect purported 'income' that was much greater.

Before locating this document, Mr. Maharaj had seen Derrick Moo Young's joint tax return filed with his wife, listing him as a disabled businessman, and showing their joint adjusted income as $16,998.77. This was based on her teacher's salary of $23,203.28; along with the marginally greater adjusted gross income in 1985 of $21,786.12. *See* 1997 Petitioner's Exhibit OAF.

Duane was just 23 years old at the time of his tragic murder. The prosecution argued at trial that, even if his father had been involved in a heated dispute with Mr. Maharaj, Duane was totally innocent. Indeed, this distinction was sufficient for the jury to vote for life for the murder of Derrick and death for Duane. (1987 Tr. 4497-98).

Yet, the Ver Ploeg documents tell a very different story – Duane was heavily involved in the Moo Youngs' criminal activities, with his signature all over the many documents in the Ver Ploeg files. This lien, however, shows for the first time that the information was known to the government. According to Henry Cuervo, in the world of money laundering such tax liens generally arise from false invoicing: where the individual claims to have sold a large quantity of goods as a way to try to "legitimize" the dirty money.

Thus, Brenton Ver Ploeg's testimony adds substantial color to a picture where virtually everyone associated with the Moo Youngs was involved in the drug conspiracy. All this comes on top of the material that he had provided in 1997. Ver Ploeg had no doubt that he was looking at a drug conspiracy. A juror would have had a reasonable doubt as a result of this material alone.

## 8. When Tino Geddes died, former members of the Jamaican *Shower Posse* revealed that the alibi witness who turned witness for the prosecution was himself deeply involved with narcotics

Mr. Maharaj had already shown in 1997 that Tino Geddes lied about Mr. Maharaj directing him to coach witnesses and taking practice runs on his murderous plot. The five alibi witnesses denied that they had been told what to say by Geddes (most had never even talked to him), and adhered to their original, sworn statements. And the three supposed "dry run" attempts on

Derrick Moo Young's life were proven to be pure fantasy – physically impossible under the terms of Geddes's testimony.

An unanswered question remained regarding Geddes's motivation for his *volte face*. At the time of trial it was known that the two prosecutors had traveled to Jamaica to help him out on a weapons charge.[178] (Defense counsel did not expose many of the lies Geddes told about this – for example, he could not have bought the gun out of fear for his life after Mr. Maharaj tried to kill Derrick Moo Young, as he bought the gun months before this confected incident supposedly took place.)

As of 2014 we learned much more. For 20 years prior to the Moo Young murders, Geddes had been deeply involved with the Jamaican *Shower Posse*, the island's main drug cartel known for "showering" its enemies with bullets. Far from being the honest journalist he was touted to be at trial, he was even then facing life in prison for trying to smuggle a number of weapons, a silencer

---

[178] Geddes had not bought a gun for his own protection, and accidentally left a couple of bullets in his luggage. Rather, he had tried to bring a number of guns, a silencer, and ammunition into Norman Manley International Airport, relying on a corrupt associate to let him safely through customs. Geddes was apparently bringing the guns in for his narco-cartel associates. However, his contact lost courage, Geddes was arrested, and he was facing life in prison under the harsh weapons laws in force at the time. In the end he got off very lightly – with just a fine – because of the intervention made by the two Florida prosecutors.

and ammunition into Jamaica for his narco-associates. The *Shower Posse* was closely allied with the Colombian cartel.

Not long after he died in November 2011, the veil of secrecy began to rise. Former members of the Jamaican *Shower Posse* began to discuss forthrightly Geddes's long history with that notorious drug cartel – a history that stretches back more than 40 years. Geddes's extensive association with the *Posse* linked him directly to the Colombian cartel, who often funneled drugs by fast boat from the north coast of Colombia to Jamaica and on to the United States.

**9. The additional evidence in 2014 of Neville Butler's penchant for perjury:  six other legal proceedings where he lied**

In 2014 Mr. Maharaj was able to show that Butler was a serial perjurer. To be sure, it was known at the time of trial that he had committed perjury to Det. Buhrmaster and in his first two days of depositions in this case. It was apparent in 1997 that he had committed perjury with respect to why he changed his story. Now, however, it is clear that he had committed perjury in at least six other legal proceedings. (*See* Petitioner's 2014 Exhibit 370)

**10. Icing on a very rich cake: Michael Flynn and evidence of Official Police Corruption in the Maharaj case**

As Cuervo testified, there can be no question that Miami law enforcement was deeply compromised by corruption in the mid-1980s.[179] It is not necessary to show that the police were so corrupt as to fabricate their case against Mr. Maharaj, or even to lie about him.

However, in any retrial, Mr. Maharaj clearly would make such a showing. It would begin with the extraordinary facts surrounding the state of law enforcement in Miami in 1985-86.

At the time of Kris Maharaj's arrest on October 16, 1986, the FBI labelled Miami the "murder capital of the USA". Dade County's murder rate was 23.7 homicides per 100,000 people, surpassing all other major metropolitan areas and three times the national average.[180] Rioting and

---

[179] The prosecution has consistently taken the position throughout the recent proceedings that efforts to show that narco-corruption in Miami was rife in the mid-1980s is so obvious as to be akin to trying to prove that the sun rises each day. For a good discussion of the issues surrounding the law enforcement crisis of the early 1980s in Miami, *see* Kim Michelle Lersch, *Drug Related Police Corruption: The Miami Experience*, Article 10, in Michael J. Palmiotto, *Police Misconduct: A Reader for the 21st Century* (Prentice Hall, 2001), at  https://www.ncjrs.gov/App/publications/abstract.aspx?ID=193782 ("In the late 1980's, nearly 10 percent of the entire Miami Police Department (Florida) was suspended or fired after a drug-related scandal; this paper explores the events that led up to this corruption scandal"). Miami jurors would have some personal knowledge or experience of this corruption, and certainly it would be underlined in any retrial.

[180] *See* Kim Michelle Lersch, *Drug Related Police Corruption: The Miami Experience*, Article 10, in Michael J. Palmiotto, *Police Misconduct: A Reader for the 21st Century* (Prentice Hall, 2001).

violence in the area had made law enforcement a dangerous profession and, as the population increased, the number of officers dropped alarmingly. Politicians knew something had to be done.

In one year in the early 1980s, 714 new police officers joined the force in a hiring frenzy - more than doubling the department. The rush resulted in applicants slipping past relaxed screening standards: they might have poor work and driving records, credit problems, even criminal records and drug abuse histories – they still got work. Training was inadequate and promotion expedited.

Meanwhile, more than two thirds of the cocaine coming into the United States was entering through the Miami area: bringing billions of dollars into the city, involving thousands of residents, and reaching every stratum of society. Because those in the police force doing the hiring wanted officers who could connect with the burgeoning foreign-born populations, including the Spanish-speaking influx who arrived on the Mariel Boatlift, "a lot of cops had either drug dealer friends or drug dealer relatives or drug dealer informants."[181] It was a family affair.

---

[181] This comes from a "source close to the investigation" of the River Cop Scandal, *Miami Herald*, May 15, 1987.

Officers on a low salary might find themselves making a traffic stop and being offered a month's or possibly a year's salary simply not to look in the trunk.[182] There was little chance that some officers would resist this temptation without strong leadership, and this was a commodity that Miami law enforcement lacked. The police chief was said to be inept, and several officers were indicted on drug-related offences; including Raul Martinez, who was head of the Police Anti-Corruption Unit. Another was George Staphylaris, who ran the Treasure Island Elementary School "Just Say No" Anti-Drugs Campaign.[183]

Between January 1985 and November 1987, 72 officers were suspended, fired, or asked to resign due to acts of misconduct. By 1988, this number had risen to 100,[184] a significant proportion of the entire force. And these were only the people who were caught. Police corruption was such that

---

[182] *The Christian Science Monitor*, May 7, 1987.

[183] Others included Robert Gonzalez (a Division Chief), who apparently obtained search warrants in order facilitate drugs rip-offs from rival gangs; Raymond Casamayor (Key West Deputy Police Chief), who was arrested on drugs charges in 1987; Walter Martinez (Deputy Chief), who was appointed to his role despite investigations into bribery and misconduct; and Rudy Arias, Officer of the Month and slated to be named Officer of the Year. *See* Larry Sherman, *New York Times*, August 3, 1986; *The Los Angeles Times*, October 6, 1986; *The Miami Herald*, December 17, 1987; *The Miami Herald*, November 28, 1988; *The Miami Herald*, September 10, 1989; *The Miami Herald*, January 26, 1990; K.M. Lersch, p.141.

[184] K.M. Lersch, *supra*, p.141.

it was said that many Miami cops were essentially part time: they enforced the law some, but ran their own criminal enterprises the rest of the time.

"We're not just talking about taking bribes or giving protection to criminals," opined Miami Police Captain Judith Bennett in a newspaper OpEd published just ten days before Derrick and Duane Moo Young died in the Dupont Plaza. "We're talking about setting up a criminal enterprise ... the police themselves pulled the robberies. They themselves stole the drugs. They were thugs, operating under a whole different set of rules."[185]

Unfortunately, in some instances the local prosecutors were little better. They worked daily with the very police who they should have been investigating, and sometimes they joined in with the corruption.[186] Judges, too, were participants. *Operation Court Broom* resulted in several judges being charged and either convicted, removed from office, or disbarred. One such person was Judge Howard Gross, the presiding judge for the first three days of the Maharaj trial when he was arrested for accepting a bribe from an agent with the Florida Department of Law Enforcement (FDLE) who had been posing as a drug trafficker.

---

[185] Captain Judith Bennett, Miami Police, *The Los Angeles Times*, 6 October 1986.
[186] For example, in the "*Hot Suits Case*," an Assistant State Attorney was involved in turning over stolen brand-name clothes.

It did not stop at the state level. The corruption spilled over into the federal agencies.[187]

In one bizarre example of police complicity in crime, a journalist alleged that a CIA operative called Ricky Prado (who later worked for Blackwater) had been a cartel hitman in Miami in the early eighties.[188] Ricky Prado should not be confused with Manuel Pardo, executed for murder on December 11, 2012. Manuel Pardo had been a law enforcement officer before he was sentenced to death for the murder of nine people in a 96-day killing spree in 1986 – again the year of the Moo Young murders. Pardo faithfully recorded each crime in his diary, taking instant photographs of his victims and collecting newspaper clippings about the murders in the aftermath. A search

---

[187] To mention just a few who made it into the newspapers, in 1985, Dan Mitrione, an FBI Agent based in Miami, was charged with drug dealing and other associated offences, *The Associated Press*, 19 October 1985; Raul Puig, a member of the SIS, destroyed evidence to help protect drug dealers and traffickers and who would later play an active role in Oscar Cantu's drug conspiracy, *The Miami Herald*, November 28, 1988; Roger Schow, a DEA Agent based in Miami, cooperated with drugs traffickers and dealers in accepting bribes to provide copies of secret reports about suspected drugs traffickers, *The Associated Press*, October 19, 1985; and Jorge Manresa and Jorge Lopez, both former narcotics detectives, who were convicted of "shooting up" the house of drug dealer Carlos Quesada and of destroying evidence to protect other criminals. *The Miami Herald*, December 4, 1989.

[188] No charges were brought against Prado and there seems to have been no official investigation into the journalist's shocking assertions. *See* Evan Wright, *How to Get away with Murder in America* (Byliner 2012).

of his apartment also revealed a collection of Nazi memorabilia; he had also tattooed a swastika on the leg of his dog.

Manuel Pardo had been hired by the Sweetwater Police Department in 1979. This came two months after being forced to resign from the Florida Highway Patrol, where he falsified 100 traffic notices. In 1985 he was fired, in turn, by Sweetwater because he had gone to the Bahamas to testify for a former colleague who was being held on narcotics charges. Pardo identified himself to Bahamian officials as an "international undercover officer" investigating drug trafficking between South America, the Bahamas and Jamaica. Apparently, being fired just led Pardo to change his narco-trafficking role: the following year he murdered his nine victims, while in the employment of Ramon Alvero, a local drug kingpin.[189]

---

[189] For the Pardo story, see *The Miami Herald*, January 22, 1985; *The Miami Herald*, February 28, 1985; *The Miami Herald,* June 12, 1986; *The Miami Herald*, March 31, 1988. In a final, written statement prior to his execution, he denied the charges involving three women, but accepted that he had murdered the six men. "I don't want this hanging over my head," he wrote, "especially in these last few minutes of life, because my war was against men who were trafficking in narcotics, and no one else." He said he had done the world a favour by killing them. At his trial, he had gone even further. Over the objection of his defense attorney, who deemed him insane, Pardo insisted on testifying: telling jurors that he enjoyed killing people and wished he could have murdered more. "They're parasites and they're leeches, and they have no right to be alive," he said in court. "Somebody had to kill these people." In addition to his mental problems, his lawyer argued that he was a product of the lawless, cocaine cowboys-fueled zeitgeist of 1980s Miami.

Close in time to this case, in July 1985, a number of Miami officers staged the notorious Miami Rivers Cops murders. They stormed a boat to seize 350 kilos of cocaine, and killed three of the drug dealers on board while three others leapt into the water and escaped. The drugs had a street value of $9 million. The gang of police officers called themselves "The Enterprise"; the Feds referred to them as the "Brotherhood of Greed".  Twenty-two officers were taken off the streets in the investigation, and 17 were ultimately implicated in the gang.

The officers reputedly spent millions on their defense lawyers – additional proof, if any were needed, of the corruption among the local police. The first trial ended in a mistrial on January 21, 1987. Because so many were now short on money their solidarity broke. Rodolfo "Rudy" Arias – who was honored for "Officer of the Month" a month prior to the Miami River incident – had been in the gang, but ended up cutting a deal and testifying against fellow cops.

Another officer, Armando "Scarface" Garcia, ended up on the FBI's Most Wanted List, and was apprehended in Cali, Colombia in 1994 after seven years on the run.

Officer Victor Zapata also became a fugitive, and was nabbed in Puerto Rico a month after Garcia's capture.

Osvaldo Coello, another of the officers, had jumped bond, and was captured in October 1987, just as the Maharaj trial was beginning. He had been on the run in the Bahamas and Jamaica,[190] following the same well-trod narcotics trail as this case (with Dames and Bowe in the Bahamas and Geddes in Jamaica).

Ricardo Aleman, who had been released from prison in 1992, was sent back to prison after robbing four banks in 2003.[191]

The reverberations continue to this day. One of the 1985 defendants was recently charged again with cocaine distribution.[192]

Meanwhile, in November 1987 alone – the month Mr. Maharaj was on trial – 21 officers resigned or were suspended, targets of an on-going FBI probe into police corruption. That month Eladio Paez, an undercover narcotic detective, who had been Officer of the Month became the 22nd officer to turn in his badge in a drug corruption investigation in November.[193] By then, some

---

[190] Jay Weaver, *Convicted Miami River cop charged again in cocaine smuggling case*, Miami Herald (Oct. 25, 2016), at http://www.miamiherald.com/news/local/crime/article110313597.html.

[191] Carlos Miller, *The Miami River Cops Case: The most corrupt case in the history of the Miami Police Department* (May 20, 2009), at http://www.miamibeach411.com/news/miami-river-cops.

[192] Jay Weaver, *Convicted Miami River cop charged again in cocaine smuggling case*, Miami Herald (Oct. 25, 2016), at http://www.miamiherald.com/news/local/crime/article110313597.html.

[193] Tom Lassiter, *River Cops Case back in Court as Five Defendants go on Trial*, Sun Sentinel (December 7, 1987), at http://articles.sun-

70 officers had been implicated in corruption and a further 30 cases were expected; although the police hoped the worst was over.[194]

It continued. In 1988, various officers were involved in the murder of Roberto Suarez in the El Barrelito restaurant. While reported that Erasmo Torrez killed Suarez, actually Miami Dade Police Department officers are said to have killed both Torrez and the wheelchair-bound Suarez. The officers supposedly took nine kilograms of cocaine from the restaurant.[195]

Then, looking at 2001 alone, as a sample:

> In February 2001, three South Florida police officers were indicted for drug trafficking, including using their patrol cars to transport drugs for drug dealers. Their actions came to light when one of the officers attempted to shake down an undercover officer posing as a drug dealer. Acting on a tip from an informant the officer pulled over the undercover officer's car, seized the $200,000 he was carrying and split the money with his informant.

---

sentinel.com/1987-12-07/news/8702100181_1_miami-river-cops-miami-officer-young-cops.

[194] *Street View of My House*, Sun Sentinel (December 7, 1987), at http://articles.sun-sentinel.com/1987-12-07/news/8702100181_1_miami-river-cops-miami-officer-young-cops.

[195] *Tragic Pasts Converge In Cafeteria Killings*, Joan Fleischman, Miami Herald Final Edition, Local News Section, November 10, 1988. Mendez held the record for the officer who had killed more people while on duty than anyone else. In this particular instance, it was conceded that he shot Torrez seven times, but the police reports suggested that Torrez had first killed Suarez. As of 1999, Mendez's file contained 45 complaints, ranging from discourtesy, to brutality, to fatal shootings. *See* Luisa Yanez, *Officer's File includes Four Fatal Shootings, 45 Complaints*, *Sun Sentinel* (Oct. 3, 1999).

In September 2001, nearly a dozen current and former Miami SWAT, narcotics, or special crime-suppression officers were charged with stealing evidence, planting guns at crime scenes and covering up their actions in a string of police shootings that killed three people - including the shooting death of an unarmed 73-year-old man in 1996. In that case, officers raided his apartment to serve a drug warrant and sprayed his bedroom with 123 bullets and then lied and said he had a gun. No drugs were found. The corruption and abuse were reminiscent of the "Miami River Cops" scandal in the 1980s in which more than 100 Miami police officers were arrested, suspended, or punished in a series of drug-related cases.

In October 2001, two current and former Hialeah police officers were charged with protecting and assisting drug dealers, setting up three robberies (including the robbery of a 7-11 store), serving as lookouts, and providing police badges, handcuffs, and pepper spray to robbers.[196]

Yet, despite all the information that has accumulated in the public domain, the task of unearthing everything that was going on in the Miami police force at the time of the Moo Young murders is not easy.[197]

_____

[196] Report: *Police, Drugs, And Corruption: A review of recent drug war-related scandals in five states and Puerto Rico* (2002), https://www.drugpolicy.org/docUploads/police_corruption_report.pdf.

[197] During the investigation of his own case, Mr. Maharaj has uncovered more than a dozen murders where the police were apparently either involved in the actual crime, or in covering it up on behalf of the cartel killers. Yet, it has proven impossible to persuade anyone, state or federal, to investigate these crimes, even though most have gone unsolved, and the victims' survivors must inevitably be grieving for the lack of commitment shown to their loved ones. Counsel submitted a dossier to the FBI Civil Rights division and another lawyer brought the cases to the attention of the Office of the Miami Dade State's Attorney and was told, each time, to leave a message outlining what

Nevertheless, Mr. Maharaj located an important witness to the direct corruption in his own case. Michael Flynn was a Miami Police Officer for 23 years (2014 Tr. 227) before being convicted and sentenced to prison for narcotics and kidnapping offenses. (*Id.* at 237). During his time on the police force, he had been familiar with – indeed, involved in – corruption where certain officers had worked with the cartels to protect their drug shipments or even cover up murders. (2014 Tr. 235-36).

While incarcerated, he became friends with another prisoner called Brian Doyle who had formerly been deputy press secretary for the U.S. Department of Homeland Security. (*Id.* at 229) In the course of conversations, the Maharaj case and Dupont murders came up.

Pete Romero was another police officer and a close friend of former-Officer Flynn. Officer Romero told him "Maharaj was innocent, that he got hooked up for it…" (2014 Tr. 230) "Hooked up" was a euphemism the police used for framing someone, Flynn emphatically insisted that this was true. (2014 Tr. 256)

Flynn stated that there was an arrangement between corrupt elements of the Miami Police Department and the cartels. When the cartel wished to

she had to say. She was promised a prompt reply. She never received a return call.

commit a serious crime, they would check with their corrupt contact in the Miami Police Department and a police officer would be present at the scene of the crime to make sure they did not get into trouble for it. This was, Flynn insisted, what happened in Mr. Maharaj's case – and a number of others.

In 1997, five people were killed in a notorious case at NW 6 Avenue and 63 Street. An officer was designated to be near the scene when that took place. The officer apparently went into the apartment where five people had been lined up, gagged, and shot, and knew that the mayhem had been caused by "Chino" or "El Chino", the name of one of the main cartel hitmen.[198]

In 2002, members of a Jamaican drug gang were robbed in their vehicle on their way to collect a shipment. One individual was killed. This was covered up by the Miami Dade Police Department. The incident was written up by the Miami Dade Police as an automobile accident that took place on the Florida Turnpike. The vehicle was towed to a storage lot on Sunrise Boulevard. Police officers were tipped off by a Jamaican male and recovered $50,000 from the passenger side panel of the vehicle.

And it happened in Mr. Maharaj's case. According to former Officer Flynn, corrupt elements of the police knew that the Moo Youngs were going

---

[198] This *El Chino* is, apparently, Jhon Henry Millan.

to be eliminated before it happened. These officers conspired to ensure that the true culprits – the cartel – were not blamed.

Also, it must be remembered that the trial judge in this case was arrested on the third day of trial for his own involvement in bribery by agents posing as cartel members – surely unique in any capital case.

Former-Officer Flynn had nothing to gain by testifying; in fact, doing so had caused him only hardship. (2014 Tr. 271).

Former-Officer Flynn's testimony is both newly discovered evidence and *Brady* (after all, who but the State can be held responsible for State agents intentionally "hooking up" or framing a person for capital murder?).[199]

## 11. Additional Allegations of Fact from 2014: the research that went into *The Injustice System: A Murder In Miami and a Trial Gone Wrong*

In addition to the allegations set out above, Mr Maharaj incorporates by reference all the allegations and evidence adduced at his first Rule 3.850 hearing in 1997. He also incorporates all the additional facts as set forth in the book written about the case by one of Mr. Maharaj's defense lawyers, Clive

---

[199] It should be noted that, regardless of whether it is ultimately possible to prove this element of the conspiracy, it is not necessary to the case. However, it is most certain that such evidence would be included in any retrial of the case.

Stafford Smith, *The Injustice System: A Murder in Miami and a Trial Gone Wrong* (Viking 2012).[200]

## V.   2016 & FURTHER CLOSELY-RELATED PROOF THAT SHOWS BEYOND ANY SENSIBLE DOUBT THAT KRIS MAHARAJ IS INNOCENT

The proof of innocence continues to accumulate. In November 2016, an additional witness has come forward who will testify before this Court to various crucial facts. The witness insists on anonymity at this time, and will be referred to as *Witness A*.

*Witness A* is currently seeking asylum in the United States because *Witness A* has received multiple threats of death. Such threats are directly as a result of involvement in this case, and for seeking to ensure that the truth ultimately comes to light. The asylum application has been accepted and will be resolved in the near future, the witness expects to have had the asylum claim decided by the time it is necessary to testify before the Court.

### 1. Two more cartel members – both cooperating federal witnesses – state that the Cartel committed the murders

---

[200] This book was written before the recent material about Colombia came to light. One important element of the book is the systematic dismantling of Neville Butler's testimony showing how, when his various statements are compared, it is clear that he changed his story comprehensively from one that was *inconsistent* with the physical evidence to one that was now *consistent* with the physical evidence – and that the prosecution told the jury it should be deemed reliable because it was now, belatedly, consistent.

*Witness A* has been involved directly in an interaction between two additional members of the Colombian cartel. The additional members are both cooperating United States federal witnesses who can be forced to testify before this Court through their cooperation agreement (although they refuse to speak directly to undersigned counsel without being told to by their federal handling agents). One was a federal witness, Juan Carlos Lopez; the other was a Cartel hitman who currently resides in Texas, and whose name is Jhon Henry "El Chino" Millan. Neither has renounced his involvement in the cartel to this date; indeed, both will also have to tell their cartel superiors before revealing more about what happened in 1986.

*Witness A* can provide direct evidence of their conversation, which went (in significant part) as follows. Millan explained that he knew about the Moo Young murders. When Lopez asked Millan whether he knew the Moo Youngs, Millan replied: "*Claro que si.*" (Of course.) Millan went on to explain that the Moo Youngs had had business in *La Pintada* (a well-known farm belonging to Escobar), a short-hand statement that they were working for Escobar.

When Lopez asked what happened to them, Millan replied that they were "defrauding" Escobar (he used the word "*estafadores*"). He said: "The truth

is people were sent to skin [*pelar*] them." (The word "*pelar*" is used among cartel people when referring to killing someone.)

Lopez said some lawyers wanted to speak about the murders, but Millan made it very clear that he would not simply talk to them if they came to see him.[201] Lopez asked whether Millan knew someone called Kris Maharaj. He said no, he did not.

With adequate discovery in federal court, the co-conspirator statements, which are also against penal interest, can be translated into broader evidence of Mr. Maharaj's innocence.

### 2. Jaime Vallejo Mejia has made further incriminating statements (in the course of kidnapping *Witness A*) demonstrating that the Cartel conspiracy is still active and he is still a member

With remarkable bravery and accompanied by another corroborating witness, *Witness A* agreed to personally visit Jaime Vallejo Mejia – the Colombian in Room 1214. *Witness A* did some background checking and learned that Vallejo Mejia has long been a senior member of the cartel. (His brother Hernan, a minister, became embroiled in a scandal when it became known that Jaime Vallejo Mejia was a narcotics money launderer.)

---

[201] After the discussion with Henry was over, Lopez explained that the federal agent running Henry could secure the information from him. Lopez explained the rule among narcotics traffickers that if someone steals a grain of salt it is as if they stole the whole sack, since they clearly could do so. Therefore, they would be killed.

*Witness A* is aware of the legal trouble Vallejo Mejia got into in the United States, tracing a number of Swiss bank accounts to him. *Witness A* developed evidence that it was Escobar who provided the money for Vallejo Mejia's bail after this arrest.

*Witness A* discovered that Vallejo Mejia owned a tango club in Pereira, Colombia. *Witness A* took a friend who was a government lawyer to try to speak with him. Eventually, Vallejo Mejia had a car transport the two of them some distance out of the city to his private farm.

*Witness A* met with Vallejo Mejia alone as he would not allow the second person to be present (indeed, *Witness A*'s friend was held outside by gunmen). *Witness A* described Vallejo Mejia accurately – as a short man, bald, with a round face. While he is old, he obviously takes good care of himself and his skin is still very well cared for. His nails were absolutely perfect. He is somewhat overweight. He was wearing very fancy shoes, probably Italian, a blue short-sleeve shirt and beige trousers. Around his neck he wore a very beautiful medal of the Virgin of Carmen.

*Witness A* explained the issue, and the humanitarian reason for the meeting. Vallejo Mejia replied that he knew how the American system works, and if the American lawyers want to prove that Kris Maharaj is not guilty, they obviously want to prove who did it. He smiled, and said, "OK, if you

trust Americans, that is fine, but I don't. They betray everyone. In the end you are in jail."

*Witness A* went on to appeal to him through Marita Maharaj's situation, asking him as a Catholic for his mercy. Vallejo Mejia laughed and said, "Ok, you're a blind Catholic." He said he respected faith, but reality was different. He became very serious. He said: "Stop it. Dear [*A*]. Please don't put your nose where it doesn't belong." He said this was "Rule Number One". Vallejo Mejia concluded: "Nobody who was involved in the cartel would take the risk to help someone like that they did not know. I am not an exception."

At that point, *Witness A* was kidnapped with the friend who had accompanied her to the farm. They were hemmed in on all sides by men with guns, searched thoroughly, and locked in a stable. Because *Witness A*'s friend was a government employee, the longer they were there the more they were in danger. After considerable, effort they were able to break out of a high window in the stable. Dogs were set after them, which was terrifying, but they eventually got away.

This encounter made it clear to *Witness A* that Vallejo Mejia is still involved in the narcotics conspiracy to this day, and remains a very dangerous person.

### 3. Any question on the admissibility of statements by cartel *sicario* Popeye has been cleared up

*Witness A* was also able to speak directly with Jhon Jairo Vasquez Velasquez – a notorious Escobar assassin or *sicario* – whose nicknames include JJ and Popeye. At the time *Witness A* initially brought the case up with *Popeye,* they had a cordial relationship. *Popeye* said he knew about the Moo Youngs, whom he called the "Moos". He insisted that Maharaj could not be guilty of the crime because this was a murder committed by the cartel. The Moo Youngs were working for the cartel and had allegedly stolen money from them. For this they were killed.

*Popeye*'s statements about the Moo Young murders included the following:

  a. "As a member of the Cartel I knew about the Moo Young murders in Miami, Florida, at the time they happened. I particularly remember the Moo Young name because I always thought of it as *moo* like a cow."

  b. "I worked shoulder to shoulder with Pablo Escobar. Escobar complained directly to me that the Moo Youngs had stolen his money and that of his partners and had to die."[202]

  c. Mr. Escobar said that "the money was entrusted to middlemen to be taken to Switzerland. They were using a Bank in Panama that the Moo Youngs said they or their contacts controlled."[203]

---

[202] This is consistent with the testimonies of both John Brown and Jorge Maya, discussed above.

[203] In the Moo Young briefcase were documents where the Moo Youngs were seeking to take over a Panamanian bank for $600 million.

d. *Popeye* said that one of the people "who actually committed the murders was Guillermo Zuluaga, aka *Cuchilla*, of Medellin, Columbia. I know the details about *Cuchilla*'s involvement because he admitted directly to me in person that he had done it."

e. *Popeye* said that *Cuchilla* had been the person in charge of the execution of Barry Seal in Louisiana in February 1986, when Mr. Seal was killed as he parked his Cadillac outside the Salvation Army hostel where he was staying.

f. *Popeye* said that Jhon Henry Millan[204] and Jaime Vallejo Mejia[205] had also been involved in the Moo Young murders.

g. *Popeye* said that "the Moo Youngs came to the hotel where they were meant to turn over the money they owed. They came with lots of documents trying to prove they were not stealing, and they provided a letter of credit that was meant to guarantee the missing money."

h. "The letter of credit turned out to be false. When this was ascertained, the order was given to kill them."

i. *Popeye* said that "the murder of the Moo Youngs was common knowledge within the cartel."

j. *Popeye* described how "*Cuchilla* used the money he earned from the Seal and Moo Young murders to purchase a farm in Medellin, Colombia. This was later seized by the Colombian government as being the fruits of his crimes."[206]

---

[204] This is the same Jhon Henry "El Chino" Millan discussed above.

[205] This is the same Jaime Vallejo Mejia discussed above, who was also the individual in Room 1214.

[206] Mr. Maharaj has been able to corroborate this with documents concerning the seizure of the farm.

Whatever the State may say about *Popeye*, his testimony has recently been deemed credible in sending other people to prison.[207] And to the extent that the state court ruled that the evidence submitted from *Popeye* was not admissible because it was not established that he was the declarant, there will be direct testimony from *Witness A*[208] who knows him personally[209] and will clearly identify him as the declarant.

### 4. More cartel members willing to describe the Moo Young involvement in narcotics money laundering, and the Cartel's involvement in their murder

As noted above, Witnesses B and C are also willing to describe in detail their work with Jaime Vallejo Mejia in laundering money, the Moo Young involvement in the same conspiracy, and the reasons for the cartel murder of the Moo Youngs – evidence proving still more clearly that "if a hit man for the cartel committed the murders, Mr. Maharaj did not."

---

[207] For example, in the recent case of retired General Miguel Maza Marquez, jailed for 30years. *See* Salud Hernandez-Mora, *De látigo de Pablo Escobar a cómplice de magnicidio de Luis Carlos Galán* El Mundo (Nov. 25, 2016), at http://www.elmundo.es/internacional/2016/11/25/5838181cca47418f748b4588.html (identifying Popeye, "chief among the hired assassins" of Pablo Escobar, as one of three witnesses leading to the conviction).

[208] *Witness A* can provide much more evidence, but to reveal it here might compromise the commitment made by defense counsel to anonymize *Witness A*'s identity until testimony becomes necessary.

[209] It is clear beyond peradventure that *Popeye* remains a member of the cartel – indeed, he is even more involved in his old business now that he has been released from prison than he has been while incarcerated.

For example, Witness B worked with Jaime Vallejo Mejia for more than 15 years. They worked together in the US, where Mr. Vallejo Mejia often went by one of his aliases, *El Estudiado*. One of Mr. Vallejo Mejia's jobs was to invest money to launder it, and he bought many properties in the Miami area for Pablo Escobar. Along with Mr. Vallejo Mejia, he had to collect the money and had to oversee laundering. Mr. Vallejo Mejia also played an important role in paying the bribes (*sobornos*) when one of the *muchachos* was in trouble.

According to Witness B and Witness C, the Moo Youngs were involved in the money laundering, and were killed by the cartel when money went missing.

More than 200 pages into a petition, Mr. Maharaj completes the outline of his new evidence – evidence that not only eviscerates the prosecution's case, but identifies the true killers. There can be no doubt, even before he is granted the discovery that should have been provided long ago, that he meets any standard of innocence and that he has shown clear evidence of a number of constitutional violations.

## VI. 2016 & THE NEED FOR LONG-DENIED DISCOVERY FROM THE FEDERAL DISTRICT COURT

It is sad, after more than 30 years, that it is very clear that there is exculpatory evidence out there that the government – primarily the *federal* government – has refused to turn over to Mr. Maharaj all this time.

The state court had issued various subpoenas for information that was in the possession of the federal government that could help prove Mr. Maharaj's innocence. These were not fishing expeditions, but each was a carefully crafted subpoena *duces tecum* based on the evidence. For example, because Baruch Vega stated under oath that he was working for the government and reported back to his handlers concerning the specific statements and involvement of Jaime Vallejo Mejia in this crime, it would seem highly probable that the FBI and the DEA would have a record of this.

Likewise, Baruch Vega testified to the fact that the names of Derrick Moo Young, Tino Geddes and Adam Hosein all came up in his dealings with his minders. Similarly, there is clear evidence that the federal government was investigating Nigel Bowe for his involvement in the drug conspiracy at the very time of these murders. Thus, it is entirely reasonable to think that the subpoenas would produce extremely relevant material concerning the case. However, without explanation, and without agreeing to meet with undersigned counsel to discuss issues of equity, the federal authorities simply refused to comply.

To be sure, the federal authorities have the power to do so under *United States ex rel. Touhy v. Ragen,* 340 U.S. 462, 71 S. Ct. 416, 95 L. Ed. 417 (1951). However, while the Supreme Court held that the subpoenas could be removed, this only came after the federal officers had offered to disclose some materials – an offer that was rejected by the state litigant. Indeed, even 28 U.S.C. §1442 plainly says the federal government "may" remove the state order – it is not mandatory.[210]

Thus, while Petitioner has enough evidence already to meet any standard that may be required of him; he also has the right to meaningful federal discovery, and would expect to receive at least the following from all the relevant federal agencies:[211]

- Full disclosure of any information concerning investigation into Derrick Moo Young's involvement in narcotics trafficking or money laundering, as identified in the testimony of Baruch Vega and the many documents developed by William Penn Life Insurance Company.

- Full disclosure of any information concerning investigation into Duane Moo Young's involvement in narcotics trafficking or money laundering, as identified in the testimony of Baruch Vega and the many documents developed by William Penn

---

[210] *See* 28 U.S.C. § 1442: Federal officers or agencies sued or prosecuted ("(a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following *may* be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending…") (emphasis supplied).
[211] This would include the FBI, DEA, ATF, Customs, and IRS.

Life Insurance Company, including evidence that he was debriefed by any federal agency in 1984-1986.

- Full disclosure from the IRS as to the basis for the tax lien levied on the 23 year-old Duane Moo Young in the sum of $275,621.29.

- Full disclosure of any narcotics links identified by any federal agency between the Moo Youngs and the Jadusinghs.

- Full disclosure of any investigation into any Moo Young business, including but not limited to the various iterations of Cargil International, NEC Corporation, Amer International, or Eastern Rhine Estates.

- Full disclosure of the relevant material relating to the investigation of Jaime Vallejo Mejia, going back at least to 1983 concerning what was known to the government about his cartel involvement, as developed in the various investigations identified by former DEA Agent Henry Cuervo and in the documents concerning his Oklahoma prosecution and the discussion of his liquor licence application.

- Full disclosure of the relevant material as directly identified by Baruch Vega concerning the involvement of Jaime Vallejo Mejia, Mortimer "Tino" Geddes, Adam Hosein, Neville Butler, Eddie Dames, F. Nigel Bowe, and any other conspirator named in this pleading, in cartel narcotics activities, as highlighted by the testimony of Baruch Vega and the various other documents.

- Full disclosure of the information in the possession of federal informant Jhon Henry Millan concerning cartel involvement in the murder of Derrick and Duane Moo Young, as admitted in the statements made in the hearing of *Witness A*.

- Full disclosure of the information in the possession of federal informant Juan Lopez concerning cartel involvement in the

murder of Derrick and Duane Moo Young, as admitted in the statements made in the hearing of *Witness A*.

- Full disclosure of information developed by the federal government concerning official police corruption in the Miami Police Department in the 1980s, such as may corroborate the allegations made by former Miami Police Department Officer Michael Flynn.

Mr. Maharaj has shown through independent witnesses that this evidence exists, so there are concrete and specific reasons for seeking the disclosures. He has exercised due diligence in trying to obtain this information but has been denied. It is important to the continuing effort to secure justice in his case, and should be allowed prior to any final decision on his claims.

## VII. THERE CAN BE NO DEBATE OVER WHETHER KRIS MAHARAJ AND HIS PRO BONO COUNSEL HAVE ACTED WITH DUE DILIGENCE IN HIS CASE

There can be no question that Mr. Maharaj and his *pro bono* counsel have acted with due diligence through this process. Mr. Maharaj has been indigent for over 20 years, and has been dependent upon others. His counsel have acted without payment for more than two decades, because of their strong belief in his innocence. Counsel have gone far beyond the call of duty, including trips that they have had to fund themselves to various countries (including the Bahamas, Colombia, Jamaica, and Trinidad & Tobago) and around the United States.

Sometimes, counsel have been fortunate – as when a local Miami reporter contacted Baruch Vega, who was then living in Los Angeles, on the off chance that he might recall something from a quarter century earlier; only to discover that he knew a great deal about the case, and was horrified to learn that Kris Maharaj had been convicted. Sometimes counsel have done things that seemed hopeless as, for example, visiting Brenton Ver Ploeg on the off chance they missed something in 1997, only to find that they had accidentally been denied access to eight boxes of important materials.

All the courts that have considered the issue have found counsel to be diligent. In 2004, this Court specifically held:

> The Court recognizes that Petitioner has been diligent in attempting to develop the factual basis for at least most of the claims related to this matter. Petitioner's counsel, who are essentially working *pro bono*, have obviously expended a great deal of effort, time, and money investigating their client's case by obtaining documents from a variety of sources, speaking to a number of witnesses, obtaining at least one expert report without funding, and taking other steps to develop the evidentiary record. They also made extensive efforts to secure funding from the state court system in order to contract experts and pay for investigative expenses of tracking down and interviewing important witnesses both in this country and abroad. Thus, it appears that there may have been external forces which prevented Petitioner from fully developing the record in the state proceedings…

*Maharaj v. Moore*, Civ. No. 02-22240-HUCK/TURNOFF, at 12 (S.D. Fla. Aug. 30, 2004).

This was acknowledged by the state court in its January 2015 judgment:

"The level of commitment [of Mr. Maharaj's *pro bono counsel*] is unquestionable and counsel exerted a considerable amount of time, money and effort to secure relief for Mr. Maharaj. This Court finds Counsel for Mr. Maharaj has continued to be as diligent as can reasonably be expected".

(ROA vol.27, 5106)

Thus, it cannot reasonably be said that Mr. Maharaj lacked due diligence.

## VIII. PETITIONER KRIS MAHARAJ EXHAUSTED HIS STATE REMEDIES WITH RESPECT TO EACH CLAIM PRESENTED

Kris Maharaj has exhausted his state court remedies with respect to all the issues presented to this Court. The claims were exhausted on direct appeal, in the 1997 state court hearing, and in the 2014 state court hearing.

All the evidence was presented at these hearings. To the extent that *Witness A* adds a gloss on the evidence presented in the state courts there are a number of ways in which the *Witness A* evidence is either exhausted or otherwise admissible in the federal proceedings.

All the *Witness A* evidence goes to the same legal issues that were raised in the state court proceedings, and merely supplement some of the material offered in support of those claims. Petitioner was unable to present *Witness A* at the time through no fault of his own, because *Witness A* was in fear of death if it was known that the evidence was being given. It is only now that *Witness*

*A* is in the United States seeking asylum that the evidence will be available for an evidentiary hearing.

It would in any event be fruitless to submit the evidence to the state court given the state court's erroneous understanding of the hearsay rule – it would all be ruled to be hearsay by the state judge.

The evidence *Witness A* gives on *Popeye* is precisely the evidence submitted in state court, but adds an admissibility argument to the material. Because the state court was anyway wrong on the admissibility – as discussed above – the state court has had a fair opportunity to consider the material.

With respect to Jaime Vallejo Mejia, the material from *Witness A*, while important, is cumulative of the other evidence that shows him, without doubt, to have been a cartel member all along.

With respect to the discussion between the two cartel operatives in the United States - Juan Lopez and Jhon Henry Millan – this is again significant, but cumulative, evidence of the claim of innocence and the *Brady* claim. Furthermore, given that the state court erroneously deemed such evidence to be hearsay, it is inevitable that the same rule would be (mis)applied.

Finally, this is a matter of equity. Mr. Maharaj is 78 years old on January 26, 2017, and to submit the evidence in state court would be a futile act as he

would be likely to die of his various ailments before such a hearing could take place.

Regardless, all this evidence must be considered separately as a gateway to the constitutional issues that must result in Mr. Maharaj's conviction being vacated. Whether under the rule governing successors (see below) or under *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851 (1995), the evidence must be considered as a *federal* matter, in a preliminary hearing on *federal* procedural matters. Thus, there is no issue of exhaustion for this purpose, since the question is solely one of federal procedure.

## IX. THE STATE COURT ADJUDICATION RESULTED IN A DECISION THAT WAS BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED IN THE STATE COURT PROCEEDING.

The state court decision simply did not apply federal law at all. The judge did not deem there to be relevant facts to apply to the legal issues, due to a fundamental misunderstanding of the law of evidence.[212]

### 1. The Statements By People Involved In The Cartel Conspiracy Were Admissible As Co-Conspirator Statements

---

[212] Regardless of this error, it is clear that this evidence is admissible as a matter of the *federal* rules of evidence to support a *procedural* determination of innocence either as a *Schlup*-gateway or to authorize the consideration of a successor habeas petition.

Fla. Stat. § 90.803(18)(e) provides that co-conspirators' statements are admissible as an exception to the hearsay rule.[213] The same is true of the federal rules. Fed. R. Evid. § 802(d)(2)(E); *see, e.g.*, *Bourjaily v. United States*, 483 U.S. 171, 173-74 (1987). The fact that the state court did not mention – or analyze – the idea that much of the "hearsay" evidence presented would be admissible as co-conspirator statements is perplexing. After all, the entire evidentiary hearing concerned the Colombian drug cartels (who were engaged in one of the largest conspiracies of all time) and their involvement in the crime, which formed a part of that conspiracy.

### i.     The parameters of the Co-Conspirator Statement rule were clearly met in this case

We are left to guess, as the state court order is opaque on this point, but perhaps the trial court believed that the co-conspirator rule did not apply to the defense submission of statements. The overwhelming majority of cases involve statements submitted against the accused,[214] often given great weight:

---

[213] Fla. Stat. §90.803(18)(e) defines co-conspirators statements as "a statement by a person who was a coconspirator of the party during the course of, and in furtherance of the conspiracy".

[214] *See, e.g.*, *Larzelere v. State*, 676 So. 2d 394 (Fla. 1996); *Brown v. State*, 648 So. 2d 268 (Fla. 4th DCA 1995) (in a first-degree murder prosecution the State called a witness who testified to a statement made by a co-conspirator to Brown on the day of the shooting: "We have to ride all night, we are going to kill him."); *Foster v. State*, 132 So. 3d 40 (Fla. 2013) (capital prosecution; co-conspirators Young and Shields testified that Black Magnotti, a leader in in the gang, had said that the victim, Mark Schwebes, "had to die"; this and

217

> For the past forty years, an unbroken stream of precedent … has established that the uncorroborated testimony of a co-conspirator or accomplice is sufficient to prove guilt beyond a reasonable doubt.

*Craig v. Singletary,* 127 F.3d 1030, 1044 (11th Cir. 1997); *see also United States v. LeQuire,* 943 F.2d 1554, 1562 (11th Cir. 1991).

It would be strange (and unconstitutional) if the rule could benefit the prosecution, and yet the testimony of a co-conspirator (here, corroborated by others) could not raise a reasonable doubt.[215] Indeed, there are two Florida Supreme Court cases where the defense sought to submit such evidence where there seems to have been no question that the rule should benefit the defense as well.[216] There is a strong argument that the co-conspirator rule should be

---

testimony about planning and carrying out the killing, and subsequent conversations about the murder, properly admitted).

[215] As the court continued in *Craig*, "[i]t would be anomalous for us to hold that even though a codefendant's uncorroborated testimony can prove guilt beyond a reasonable doubt, the confession of a co-defendant … is insufficient to establish probable cause. We do not mean that any co-defendant confession, however outlandish, will suffice to establish probable cause irrespective of the circumstances. For example, the confession of a mental patient that he and the suspect, aided by an army of little green men, committed the crime clearly would not pass muster. *** But that will not be the case with most co-defendant confessions, and it is not what we have here. Newsome's confession was not on its face incredible." *Id.*

[216] *Allen v. State*, 137 So. 3d 946 (Fla. 2013) (witness said that the co-defendant had admitted to him in prison that he had choked the victim; issue waived at trial, and the conspiracy to commit the murder was terminated); *Sims v. State*, 754 So. 2d 657 (Fla. 2000) (common law wife to Curtis Baldree said he had admitted he lied against Sims; not admissible under § 90.803(18)(e) because there was no evidence that Baldree's statement was being offered as part of a conspiracy).

218

applied more liberally to the defense since, while the accused has a constitutional right to confront his accusers, the State does not. Be that as it may, Mr. Maharaj prevails regardless.

It goes without saying that "the admissibility of hearsay statements of co-conspirators is not dependent upon the existence of a count charging conspiracy." *Brown v. State*, 648 So. 2d 268, 270 (Fla. 4th DCA 1995) (citations omitted). *Tresvant v. State*, 396 So. 2d 733 (Fla. 3d DCA 1981); *Brown v. State*, 648 So. 2d 268, 270 (Fla 1995). However, it is important to define any conspiracy. In order to avoid the obvious consequences of the rule, the State tentatively suggested that the instant conspiracy should be viewed as only a conspiracy to murder the Moo Youngs. But this cannot be correct. The Moo Youngs themselves were members of a much broader, international narcotics conspiracy and their own co-conspirators ordered and carried out their murder.

Consider *United States v. Finestone*, 816 F.2d 583, 583 (11th Cir. 1987), where the trial concerned a drug conspiracy and yet the co-conspirators' involvement in a homicide was introduced to prove the conspiracy – despite the fact that the defendant concededly had no personal involvement in that overt element of the conspiracy. In *United States v. Levine*, 905 F.Supp. 1025, 1033 (M.D. Fla. 1995), the defendant argued that (at least for him)

involvement in the drug cartel conspiracy ended in 1981, after he had a falling out with other members over financial matters. However, the court held that the conspiracy was certainly still going several years later, and since he had not withdrawn from it he should be deemed still a member in 1988 (the relevant date for the purpose of the statute of limitations).

A drug conspiracy is generally charged broadly, and may encompass many "overt acts" over many years or decades. In fact, a federal RICO case requires *at least* two separate crimes to qualify as a conspiracy.[217] The logical question is; whether people are working together and have reason to impart information to each other? Here, the conspiracy was the "Colombian cartel narcotics conspiracy" – one that included co-conspirators in the United States, the Bahamas, Panama, Jamaica, and various other countries. That conspiracy began in the 1970s and, in one form or another, continues today for people still "in the game"; like Jaime Vallejo Mejia and Jhon Jhairo Velasquez Vasquz (*Popeye*), or people who clearly have not withdrawn from it, like Jorge Maya, Juan Lopez, or Jhon Henry Millan.[218]

---

[217] *See, e.g.*, 18 U.S.C. § 1962 (RICO refers to a "pattern" of racketeering activity, and at least two overt acts are required).

**218** It is black letter law that a conspirator remains a conspirator until he or she renounces the role in the conspiracy. *See* Fla. Stat. § 777.04(5) (the only defenses to a conspiracy charge are abandoning and preventing the crime, or persuading other conspirators not to commit the crime).

There is no question that sufficient evidence was presented concerning the existence of the drug cartel conspiracy in the mid-1980s – and its reach into South Florida. For example, the trial court "credit[ed] Mr. Cuervo's testimony concerning how Colombian drug cartels operated in south Florida in the 1980s. He presents as a very informed and knowledgeable former law enforcement officer." (ROA vol. 27, 5113) Baruch Vega, "John Brown", *Popeye* and even Jorge Maya all contributed details concerning the conspiracy.

In order to be an admission of a party, the statement must be made while the conspiracy is in existence and before it is terminated. *Allen v. State*, 137 So. 3d 946 (Fla. 2013); *Antunes-Salgado v. State*, 987 So. 2d 222 (Fla. 2d DCA 2008). Certainly if the conspiracy extends beyond one of the particular crimes charged, then the statements may be properly admitted. *See, e.g.*, *Larzelere v. State*, 676 So. 2d 394 (Fla. 1996) (two prosecution witnesses testified that the defendant told both witnesses that Jason was the gunman and that he "screwed up ... he was supposed to be there at 12:30, but he was a half hour late, so [the dental assistant] and a patient were there. That's why I had to fake a robbery").

All statements in this case were made in the course of this conspiracy.

221

- With respect to Baruch Vega, who was a confidential informant,[219] Mr. Vallejo Mejia (who was clearly a conspirator) was speaking to him at the very time of the murders. Prior to that, Vega met with Vallejo Mejia and Derrick Moo Young when the latter two were deep into the conspiracy.

- John Brown (then working for the cartels) was speaking to another conspirator (none other than Pablo Escobar) in 1986, when the cartels were at the height of their power and shortly after the murders. Escobar was using the murders as a threat to ensure the continued, secretive operation of the conspiracy.

- Jorge Maya spoke to another conspirator (his brother Luis) who was relating his own role and that of others in the drugs conspiracy and the murders.[220]

---

[219] Given that Baruch Vega was a confidential informant ('CI'), it is worth noting that the person to whom the statement is made need not be actually involved in the conspiracy and may even be working for the government – meaning that the statement "harms" rather than "furthers" the goals of the conspiracy. *See United States v. Diaz*, 377 Fed. Appx. 883, 891 (11th Cir. 2010) ("a co-conspirator's statements to a confidential informant…are admissible… Had the co-conspirator known the true identity of the confidential informant, he would never have spoken to her in the first place."), citing *United States v. Underwood*, 446 F.3d 1340 (11th Cir. 2006); *Bourjaily v. United States*, 483 U.S. 171, 173-74 (1987) (one of the seminal conspirator cases, involving a co-conspirator of the accused speaking to a confidential informant). *See also Arguelles v. State*, 791 So. 2d 500, 503 (Fla. 4th DCA 2001) (statements made to CI properly admitted as co-conspirator statements); *State v. Duarte*, 681 So. 2d 1187, 1189 (Fla. 2d DCA 1996) (statements to CI admissible under the coconspirator exception; as with Baruch Vega here, "the CI's firsthand testimony comprised most of the testimony linking the appellee to the conspiracy."); *Amado v. State*, 563 So. 2d 736 (Fla. 2d DCA 1990) (statements to CI properly admissible though CI tipped off police); *see also Robertson v. Warden*, 506 Fed.Appx. 951 (11th Cir. 2013); *United States v. Byrom*, 910 F.2d 725, 737 (11th Cir. 1990) (statements to CI admissible, and CI statements admissible to show context).

[220] To the extent that Jorge Maya related what Luis told him Pablo Escobar said, this fits into the rule of Fed. R. Evid. 805 ("Hearsay within hearsay is not

- With respect to *Popeye*, there was a strong argument that his statements were admissible under § 90.803(18)(e) and parallel federal law since he was relating statements made contemporaneously with the crime by another conspirator (Escobar).[221]

- Equally, the statements made *by Popeye* to Cuervo could also qualify, since the Colombian cartel conspiracy continues today and *Popeye* remains a party to it.

- In terms of his statements to *Witness A*, it is clear that *Popeye* still idolizes Escobar, and now that he is out of prison (where he continued his work in the conspiracy) he is deeply involved in the criminal activity again, including making death threats against *Witness A* for repeating what he said.

- With respect to Juan Lopez and Jhon Henry Millan, we have two conspirators talking together about the crime.

In *United States v. Levine*, 905 F.Supp. 1025 (M.D. Fla. 1995), the defendant argued that he withdrew from the Medellin drug cartel conspiracy in 1981. The court held he had not effectively withdrawn:

> Although 'a conspirator's participation in a conspiracy is presumed to continue until all activity relating to the conspiracy is ceased,' a defendant may demonstrate withdrawal from the conspiracy by establishing: 1) that he has taken affirmative steps to defeat the objectives of the conspiracy, and 2) that he made a reasonable effort to communicate these acts to his co-conspirators or disclosed the scheme

---

excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").

[221] To the extent that the foundation for Popeye's statements was not met, this is now cured by the evidence of *Witness A*, who will testify both to who Popeye is, and what he said.

to law enforcement authorities.' The mere cessation of criminal activity is not sufficient to demonstrate a withdrawal from the conspiracy.

*Id.* at 1033 (citations omitted).[222]

Likewise, the statements were made "in furtherance" of the conspiracy. For example, regarding "John Brown", Pablo Escobar was specifically taking a recent event (the Moo Young murders) to impress on a new conspirator the rule that he should not steal. However, "in furtherance" does not mean that any goal of the conspiracy has to be achieved by the statement, but simply that it is a statement by a conspirator about the conspiracy. Indeed, co-conspirator

---

[222] *See also Hyde v. United States*, 34 S. Ct. 793, 803 (1912) ("It requires affirmative action [for a conspirator to withdraw from the execution of an offense or to avert a continuing criminality] … As [the conspirator] has started evil forces, he must withdraw his support from them or incur the guilt of their continuance. Until he does withdraw there is conscious offending …"); *United States v. Ginorio*, 990 F.Supp.2d 1250, 1252 (M.D. Fla. 2013) (evidence of withdrawal from conspiracy insufficient. "Defendant makes much of the fact that various co-conspirators testified that Defendant ceased participating in the conspiracy after losing approximately 20 kilograms of cocaine in November or December of 2007. However, none of the co-conspirators testified that Defendant took any affirmative step to disavow or defeat the objectives of the conspiracy, nor did any co-conspirator testify that Defendant communicated his withdrawal from the conspiracy."); *United States v. Starrett*, 55 F.3d 1525, 1529 (11th Cir. 1995) (Outlaw claimed he withdrew from conspiracy by adding a 1980 "out date" to his club tattoo, selling his motorcycle, joining a church, getting a job, moving out of state, and "cut[ting] off virtually all contact" with co-conspirators; this was insufficient since he failed to communicate his withdrawal to his co-conspirators, or disclosure of the criminal schemes to law enforcement); *United States v. Reed*, 980 F.2d 1568, 1583 (11th Cir. 1993) (lack of overt acts for 10 years not sufficient evidence of withdrawal).

statements often tend to reflect people boasting about what they did, or complaining about something that went wrong. *See, e.g.*, *Larzelere v. State*, 676 So. 2d 394 (Fla. 1996) (complaints about what went wrong).

> ii. **Given that no fewer than six people involved in the Colombian conspiracy have provided a consistent version of events that tended to prove Mr. Maharaj totally innocent, a far more careful analysis is legally required**

The whole is often greater than the sum of its constituent parts – a significant legal principle the state court did not consider. Ultimately, the admissibility of a co-conspirator (or any other out-of-court) statement is rooted in the notion that it seems reliable. An important factor is whether one piece of evidence tends to buttress another. The Supreme Court referred to:

> simple facts of evidentiary life *** individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts. *** [A] piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence.

*Bourjaily v. United States*, 483 U.S. 171, 179-80 (1987). Here, there is no reason to believe that Baruch Vega had any reason to make up stories that would favor Mr. Maharaj; "John Brown" had every reason *not* to get involved, as did Jorge Maya and *Popeye*; Jhon Henry Millan did not know that his conversation was being overheard. All of their evidence is consistent, and points towards the murders being committed by the cartels as part of their

narcotics conspiracy – not by Mr. Maharaj. Yet, the state court excluded all of this without any meaningful analysis.

>       iii.   **The state court mistook its function, which is merely to rule on admissibility and then assess the impact of any statement on the jurors**

The state court's ruling must, in this instance, be subjected to *de novo* review. The state court was simply wrong on the interpretation of the co-conspirator rule – and on other legal issues as well. Tempting though it may be, it is not the judge's function to rule on the ultimate credibility of a statement. Rather, the judge must evaluate whether the statement fits a hearsay exception, and then decide whether it might raise a reasonable doubt *for a juror* (the decision maker). Thus "[t]he credibility of an in-court witness who is testifying with regard to an out-of-court declaration against penal interest is not a matter that the trial court should consider in determining whether to admit the testimony concerning the out-of-court statement." *Carpenter v. State*, 785 So. 2d 1182 (Fla. 2001).

The impact of this rule is well illustrated again by the example of Baruch Vega. Notwithstanding the fact that the trial court felt Vega was "interesting" and his evidence was "compelling", "probative and...establish[ed] a credible claim of newly discovered evidence", the trial court passed judgment on his credibility. The postconviction court thought his

testimony "profoundly weakened by his inability to identify a photograph of Mr. Mejia or Derrick Moo Young…" (ROA vol. 27, 5111).

First, a juror would likely conclude that the court's criticism was irrelevant. Vega was speaking about a man named Jaime Vallejo Mejia and a man named Derrick Moo Young. The State's argument – that these could be different Mejias and Moo Youngs committing a similar and contemporaneous crime in a different hotel in downtown Miami - does not undermine its impact.[223]

Second, the picture of Mejia showed to Vega was from 2014, three decades after Mr. Vega last saw the man. It was, therefore, hardly surprising that he said he could not say for sure who it was. Neither was it surprising that he did not recognize the Xerox of a passport photograph of Derrick Moo Young, since it was a indistinct picture that Derrick's best friend might not recognize, and Vega only met Derrick Moo Young once. Indeed, this is more likely to be seen by a juror as strong evidence of Vega's trustworthiness, since

---

[223] There could surely be no serious question that Vega was talking about the right two people. Indeed, the very fact that Derrick used the pseudonym "*Chino Mau*" was proof positive of his involvement in the conspiracy. *Verni v. State*, 536 So. 2d 1162, 1164 (Fla. 2d DCA 1988) (defendant's use of pseudonym 'Joe' was evidence of involvement in conspiracy); *Garcia v. State*, 492 So. 2d 819 (Fla. 2nd DCA 1986) (Garcia was identified by a co-conspirator as his 'brother' and this was deemed adequate to show Garcia's involvement in the conspiracy).

he was shown these pictures first by defense counsel and refused to make an

identification – as he surely would have done if he were merely trying to say

what the defense wanted.

### 2. The Statements by People Involved In the Cartel Conspiracy Were Admissible As Statements against Penal Interest

As an alternative – perplexingly not even mentioned by the state court

– the witness testimony must be analyzed as statements against penal interest.

In *Voorhees v. State*, 699 So. 2d 602 (Fla. 1997), the Court held:

> The test of admissibility under this section, after showing the declarant's unavailability, is whether the statements were relevant, tended to exculpate [the defendant], and met the test of corroboration. We conclude that the proffered statements met these admissibility requirements, and the weight to be given the statements should have been for the jury to determine.

*Id.* at 613. *Merritt v. State*, 68 So. 3d 936 (Fla. 3d DCA 2011). For example,

in *Brown v. State*, 69 So.3 d 316 (Fla. 4th DCA 2011):

> Miller's statements were voluntarily made, without intending to shift blame, in a personal setting, to a friend. Moreover, Miller implicated himself as well as Appellant, and provided details of the crime which were consistent with the other evidence in the case. These facts included the number of victims and their ethnicity, Appellant's nickname, the day of the week the crime took place, the manner of death, and the particular conduct resulting in the deaths. As such, we hold that the trial court properly admitted Miller's statements.

*Id.* at 319-20.

For statements against a declarant's interest to satisfy hearsay

exception, they do not need to fully exonerate the defendant; nor need they

fully implicate the declarant. *Masaka v. State*, 4 So. 3d 1274 (Fla. 2d DCA 2009). Consider, first, the testimony of John Brown: Escobar confessed to him that he had *Los Chinos* killed in a hotel across from Brown's in Miami (that Mr. Brown immediately recognized to be the Dupont Plaza) because they had been stealing his money. This clearly exposed Pablo Escobar to prosecution for his role in the murders and exculpated Mr. Maharaj. After all, "where evidence tends in any way, even indirectly, to establish a reasonable doubt of defendant's guilt, it is error to deny its admission". *Rivera v. State*, 561 So. 2d 536, 539 (Fla. 1990).

Indeed, the facts of *Machado v. State*, 787 So.2 d 112 (Fla. 4th DCA 2001), parallel the facts here: "Because Olivera voluntarily made the statements to his friend's son, Enrique, Jr., without any fear of capture, without intending to shift blame, and while in a personal setting, we hold that the trial court properly admitted his statements." *Id.* at 114. Mr. Escobar voluntarily made his statements to Brown, not fearing capture at that moment (on his farm), but very definitely was afraid of prosecution if he ever got caught.

The same is true of Vallejo Mejia's statements to Baruch Vega: while Vallejo Mejia did not say he personally was involved in the crime, he was a part of the conspiracy, and he was held responsible for the Moo Youngs losing money.

Similarly, Luis Maya's statements to his brother Jorge: by paying money to *Cuchilla* (The Blade) for carrying out the murders, Luis became at the very least an accessory after the fact to murder. Although he was anyway liable as a conspirator.

Also, Escobar's statements to *Popeye* (implicating himself in the murders) and even *Popeye*'s to Henry Cuervo, since *Popeye* was a member of the cartel conspiracy and liable for prosecution as such.[224]

The same is true of the conversation between Juan Lopez and Jhon Henry Millan. Both are conspirators and both are exposed to criminal liability for their involvement in murder – which has no statute of limitations.

Crucially, all of them exonerate Mr. Maharaj. And equally crucially, all the statements point consistently in the same direction, and – because there is absolutely no evidence that six independent people, none of whom know Mr. Maharaj, have some coordinated plot to exonerate him - are therefore mutual proof of reliability.

In dismissing this evidence, the state court did not even mention Fla. Stat. § 90.804(2)(c):

---

[224] *See United States v. Feola*, 420 U.S. 671, 692 (1975), citing *Blumenthal v. United States*, 332 U.S. 539, 557 (1947) ("it is clear that one may be guilty as a conspirator for acts the precise details of which one does not know at the time of the agreement.").

*Statement against interest.*—A statement which, at the time of its making, was so far contrary to the declarant's pecuniary or proprietary interest or tended to subject the declarant to liability or to render invalid a claim by the declarant against another, so that a person in the declarant's position would not have made the statement unless he or she believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement.

Under the Federal Rules, a statement against penal interest is defined somewhat differently:[225]

**(3) *Statement Against Interest*.** A statement that:

(A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

(B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

---

[225] Indeed, as Mr. Maharaj insisted in state court, the Florida rule is arguably unconstitutional to the extent that it allows the state to introduce statements *against* the accused, notwithstanding the Confrontation and Due Process Clauses, under a regime that is far looser than the rules governing the exculpation of an innocent person:

> With respect, Mr. Maharaj believes the statute itself to be a violation of due process, since how can evidence be admitted against a criminal defendant under one standard, but only for him under a higher standard? *Cf. Wardius v. Oregon*, 412 U.S. 470, 472 (1973) ("the Due Process Clause . . . forbids enforcement of . . . rules unless reciprocal … rights are given to criminal defendants.").

Brief of Appellant (Florida Third District Court of Appeal) at 37 n.32.

Fed. R. Evid. § 804(b)(3*).*

More than ignoring the rule of evidence, as noted above, the state court's order violated a clear rule of law embodied in that rule. Namely, that the credibility of an in-court witness who is testifying about an out-of-court statement against interest made by the defendant should not be considered in determining whether to admit the statement. Instead, it is the jury's duty to assess the credibility of the in-court witness who is testifying about an out-of-court statement.[226]

### 3. The Statements by People Involved In the Cartel Conspiracy Were Admissible As a Matter of Due Process

When considering other bases for admitting these statements it is also important to have regard to the U.S. Supreme Court decision in *Chambers v. Mississippi*, 410 U.S. 284 (1973).[227] The Court concluded that the exclusion

---

[226] *Kaczmar v. State*, 104 So. 3d 990, 1005 (Fla. 2012) ("'the credibility of an in-court witness who is testifying with regard to an out-of-court declaration against penal interest is not a matter that the trial court should consider in determining whether to admit the testimony . . . [i]nstead, it is the jury's duty to assess the credibility of the in-court witness who is testifying about the out-of-court statement.'"), quoting *Dewolfe v. State*, 62 So. 3d 1142, 1146 (Fla. 1st DCA 2011) , quoting *Carpenter v. State*, 785 So. 2d 1182, 1203 (Fla. 2001).

[227] Before reaching the constitutional issue, the Court should, of course, consider the residual exception in Fed. R. Evid. § 807:

(a) IN GENERAL. Under the following circumstances, a hearsay

of hearsay regarding a third party's confessions to a crime violated the defendant's constitutional right to due process - the state's rules of evidence notwithstanding.

Chambers was convicted of the murder of a police officer. During his trial he sought to introduce evidence that McDonald orally confessed three separate times and also offered a sworn, albeit later recanted, confession. However, because Mississippi law would not allow the defense to impeach its own witness, Chambers was precluded from introducing evidence relating to the alleged confessions. Justice Powell, writing for an eight Justice majority, began by observing that:

> [t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's observations. The rights to confront and cross-examine witnesses and to call witnesses on one's own behalf have long been recognized as essential to due process.

---

statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:

(1) the statement has equivalent circumstantial guarantees of trustworthiness;
(2) it is offered as evidence of a material fact;
(3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
(4) admitting it will best serve the purposes of these rules and the interests of justice.

233

*Id.* at 294. Chambers' rights were violated by the trial judge's refusal to permit testimony from three witnesses who would have testified that McDonald made confessional statements shortly after the crime. While Mississippi sought to defend this exclusion as a straightforward application of the hearsay rule, the Court observed that the hearsay rule has developed many exceptions that allow the admission of hearsay statements "made under circumstances that tend to assure reliability." *Id.* at 299. The exclusion of the evidence violated due process.

Recently, in *Bearden v State*, 161 So. 3d 1257 (Fla. 2015), the Florida Supreme Court considered when the Due Process Clause would require admission of a hearsay statement even where it did not technically fit the Florida definition of a statement against interest.[228] The Court noted that in *Chambers,* various factors had been important, including the spontaneity of the statement, corroboration by other evidence and the fact that it was against

---

[228] The Court noted that "the Florida courts have consistently applied the constitutional analysis in *Chambers*, despite the exception in section 90.804(2)(c), Florida Statutes, for declarations against penal interest. *See Grim v. State*, 841 So. 2d 455, 464 (Fla. 2003); *Sliney v. State*, 699 So. 2d 662, 670 (Fla. 1997); *Gudinas v. State*, 693 So. 2d 953, 965 (Fla. 1997); *Hartley v. State*, 686 So. 2d 1316, 1321 (Fla. 1996); *Lightbourne v. State*, 644 So. 2d 54, 57 (Fla. 1994). As these opinions implicitly recognize, a trial judge may be required to admit a third-party confession under constitutional principles, even if it does not qualify as a declaration against penal interest under the state law of evidence." *Bearden v. State,* at 1265-66.

self-interest. *Id.*\*18. However, "*Chambers* does not necessarily establish an immutable checklist... Instead, the primary consideration in determining admissibility is whether the statement bears sufficient indicia of *reliability*." *Id.* \*18 (emphasis in original). The Supreme Court concluded that the trial court erroneously excluded the statement under circumstances in which the evidence was less reliable than in Mr. Maharaj's case. The same result should, therefore, apply here. *See Garcia v. State*, 816 So. 2d 554, 565 (Fla. 2002) (the State cannot "apply the hearsay rule 'mechanistically to defeat the ends of justice.'"), quoting *Chambers*, 410 U.S. at 302; *Curtis v. State*, 876 So. 2d 13, 22-23 (Fla. 1st DCA 2004) ("The question is not whether there is *some* evidence casting doubt on the confession. Rather, the question is whether there is substantial evidence to corroborate the confession.") (emphasis in original).

It cannot be that co-conspirator statements, or statements against penal interest, may be used by prosecutors[229] to send people to prison; but not to exonerate them. The exception has been recognized in United States law since the foundation of the nation:

---

[229] *Crawford v. Washington*, 541 U.S. 36, 75-76 (2004) (Rehnquist, C.J., concurring) ("The thousands of federal prosecutors and the tens of thousands of state prosecutors need answers ... [as to what is "testimonial" under the hearsay rule] now, not months or years from now.").

Although the hearsay exception for co-conspirator statements existed in American common law in 1791, it was not squarely approved by the Supreme Court until 1827. John Gooding, owner of the vessel General Winder, went on trial for violation of the Slave Trading Act. The indictment alleged that he knowingly outfitted his boat, hired a captain and crew, and dispatched the vessel for the purpose of procuring Africans and taking them to Cuba and the West Indies for sale as slaves, in contravention of the Act. The Government sought to introduce conversations between Captain Hill, who Gooding had hired to run the ship, and another man named Coit, whom Hill was attempting to hire as a ship's mate. The conversations laid out the general slave-trading operation and the payment plan and named the defendant as being the overall master. The defense objected to the introduction of this testimony, arguing in essence that the theory of imputing statements made by an authorized agent to the principal should only apply in civil cases, not criminal ones. Rejecting this claim, Justice Story articulated the idea that once a conspiracy is established, the acts of each conspirator are considered acts by all of them and are evidence against them all.[230]

Of course, the concern expressed in this law review article – and reflected in *Crawford v. Washington*, 541 U.S. 36 (2004) – is the accused's Sixth Amendment right to confrontation. This is a right that does not inure to the benefit of the state, and, therefore, there can be no argument that the confrontation clause somehow limits Petitioner's use of such statements.

### 4. The Statements by People Involved in the Cartel Conspiracy are Anyway Admissible in Support of the Procedural "Gateway" Issues before this Court

---

[230] Michael Siegel & Daniel Weisman, *Admissibility of Co-Conspirator Statements in a Post-Crawford World*, 34 Fla. State Univ. L. Rev. 877, 883 (2006) (footnotes omitted).

It would seem unconscionable that such a weight of evidence proving that Mr. Maharaj has suffered an injustice for so long should be dismissed without any meaningful discussion of the rules of evidence in state court. However, it is actually not necessary to reach the – clear – conclusion that the state court patently made "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding…"

At this junction, this Court is faced with an assessment of a number of federal gateway issues.

### i.    The Statements by People Involved in the Cartel Conspiracy are Admissible in Support of the *Schlup* Issue

Firstly, there are questions of procedural limitations. *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928, 185 L.Ed.2d 1019 (2013) ("actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or, as in this case, expiration of the statute of limitations"). In the recent case of *Floyd v. Cain*, ___ F.Supp.3d ___, 2016 U.S. Dist. LEXIS 124660 (E.D. La. Sept. 4, 2016), for example, Floyd was convicted of murder in 1983 and did not even initiate a federal habeas until 2006, 23 years later. His *Schlup-McQuiggins* claim of innocence was determined without reference to any factual findings made in state court,

because the issue has nothing to do with state court but is solely related to the power of the federal court to entertain the claim. He prevailed.

The facts in this case are considerably stronger than in *Floyd*. However, unless the State concedes as much, they must be subjected to an evidentiary hearing before the District Court.

### ii.   The Statements by People Involved in the Cartel Conspiracy are Admissible in Support of the § 2244(b) Issue

Secondly, there is the issue of whether Mr. Maharaj has demonstrated "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.…" 28 U.S.C. § 2244(b)(2)(B)(2). Again, this is not a substantive issue, but a procedural gateway to the federal constitutional issues.

There is a plethora of constitutional error that Mr. Maharaj can easily prove beyond any doubt, let alone by clear and convincing evidence. For example, there can be no doubt at all that the government covered up a large amount of exculpatory material – as discussed both above and below.

Mr. Maharaj has also surely alleged, and can prove, that no reasonable fact finding would have found him guilty beyond a reasonable doubt. But this

is a *federal* issue, a gateway to the federal claim. It neither is, nor can be, a state law issue, since it has nothing to do with a state law claim. Thus, the evidence must be assessed under federal evidentiary standards.

## X. THE STATE COURT ADJUDICATION RESULTED IN A DECISION THAT WAS CONTRARY TO, OR INVOLVED AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED FEDERAL LAW, AS DETERMINED BY THE SUPREME COURT OF THE UNITED STATES

The decision of the state court was contrary to, and an unreasonable application of, clearly established federal law. This is clear since the ruling essentially did not apply the facts to any law for several reasons.

One, the state judge did not even mention the clearest *Brady* material in the case in the context of the issue. For example, it is not at all clear that he realized that all of Baruch Vega's testimony was *Brady*. Vega was reporting to CENTAC, the joint state-federal narcotics task force, so everything Vega said was both *Brady*, and necessarily would lead to more *Brady* material in the shape of documents in the hands of the government. Neither did the state judge mention anywhere in his order the Oklahoma indictment against Jaime Vallejo Mejia, and the additional material that Mr. Maharaj discovered in the files of the Florida Department of Business Regulation (FDBR).

At the same time, the state judge essentially excluded most of the evidence of innocence from consideration for any purpose. He clearly did not,

therefore, include in the assessment of the *Brady* violation the cartel material that would have developed from the original suppressed evidence.

Two, the state judge did not say what standard he was using for imputing knowledge from a state agent to the prosecution, but whatever standard he used was wrong. *Strickler v. Greene*, 527 U.S. 263, 280-82 (1999) ("irrespective of the good faith or bad faith of the prosecution", the Brady "rule encompasses evidence 'known only to police investigators and not to the prosecutor.'").[231]

---

[231] *See also Kyles v. Whitley*, 514 U.S. 419, 433 (1995); *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (prosecution obligation to disclose favorable evidence even if it is only known to the police); *Allen v. State*, 854 So. 2d 1255, 1259 (Fla. 2003) (obligation to disclose favorable information "known to others acting on the government's behalf" including here, the FDLE); *Garcia v. State*, 622 So. 2d 1325 (Fla. 1993) ("'Evidence will be considered suppressed' where exculpatory evidence is withheld by a police agency, even without the knowledge of a prosecutor"); *see also United States v. Rodriguez*, 799 F.2d 649, 654 (11th Cir. 1986) (the "purpose of the rule is not to punish the Government . . . but to protect the defendant's right to a fair trial, which may be affected whether the conduct is intentional or not") *Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir. 1997) ("Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned."); *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980) ("If disclosure were excused in instances where the prosecution has not sought out information readily available to it, we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government. This we decline to do."); *Briggs v. Raines*, 652 F.2d 862 (9th Cir. 1981) (NCIC information within constructive possession of state prosecutor); *State v. Ireland*, 500 P.2d 155, 162 (Kan. 1975) (FBI rap sheets available and therefore "virtually always within the constructive knowledge of a state prosecutor"); *Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir. 1975)

Consider the multiple investigations into Jaime Vallejo Mejia that began around 1983 and culminated in the indictment against him before Mr. Maharaj's trial. While this was a federal indictment, the material was clearly available to the state agents. Either by simply entering Vallejo Mejia's name in the law enforcement database, or by doing what the state agents for the Florida Bureau of Business Regulation (FDBR) did – which was simply call Agent Abernathy, who passed along a large amount of information concerning the $40 million laundered by Vallejo Mejia through Switzerland, and the extraordinary amount of money in his bank accounts. If the FDBR could readily do this when the only thing at stake was a liquor license, it becomes difficult for the Miami Police Department to deny that they could do the same thing in a homicide case.

Consider also that Baruch Vega testified that he told state and federal agents about the material at the time he learned of it – whether that be information about Vallejo Mejia's narcotics dealings; the involvement of Derrick Moo Young (*el Chino Mao*), Adam Hosein, and Tino Geddes in drugs; or the fact that the murders were carried out by the cartels. Vega worked for state and federal law enforcement, so this information was clearly within

---

(*en banc*) ("evidence actually or constructively in [the prosecution's] possession or accessible to it"), *cert. denied*, 425 U.S. 911 (1976).

the constructive knowledge of the prosecution. His testimony was unrebutted, as was the evidence by Cuervo that the DEA and other federal agencies would have shared information with state law enforcement agents in these cases.

Particularly on point is *Rogers v. State*, 782 So. 2d 373 (Fla. 2001), where the prosecution failed to produce a string of police reports from several police agencies that would have assisted the defense:

> Applying *Brady*, *Kyles, Strickler*, and *Young* to the circumstances of this case, we conclude that the failure by the State to make available to Rogers the reports of the various law enforcement agencies that were investigating the robberies of retail establishments which occurred along the Interstate 4 corridor from the fall of 1981 through the spring of 1982 was a *Brady* violation. Our holding is dictated by our conclusion that the police reports of the various law enforcement agencies in the joint investigation of the similar robberies were in the constructive possession of the prosecutor and were material documents within the scope of materiality as set out by *Kyles*, *Strickler*, and *Young*.

*Id.* at 380.  CENTAC 26 was a joint federal-state agency based in Miami – rather than an agency spread all down I-95 and along I-4 "from Jacksonville to Tampa" (as in *Rogers*, 782 So. 2d at 380).

Three, the state judge did not aggregate the *Brady* material from the 1997 hearing with the material in 2014. He never mentioned the former, and, therefore, did not conduct any meaningful analysis of the way in which it fit with the latter. *Kyles*, 514 U.S. at 436 (the state's obligation to disclose evidence favorable to the defense "turns on the cumulative effect of all such evidence suppressed by the government").

In 1997, the state argued, and the courts accepted, that no link had yet been shown between Jaime Vallejo Mejia and drugs. This was notwithstanding the fact that he was from Pereira, in Colombia, and was registered to Room 1214 – the only other room occupied on the twelfth floor - across the hall from the murder scene, and which had blood stains on the door. Yet now we have shown that he was being investigated for money laundering at the very time of the murders, his arrest warrant was issued before the trial (the Oklahoma City materials), and the CENTAC informant Baruch Vega had told his minders that Derrick Moo Young was in league with Vallejo Mejia.

Consider also the mass of material in the Moo Young briefcase. In the wake of the 1997 hearings, the state again argued that there was no evidence that these documents were relevant to narcotics money laundering; an argument facilitated by the denial of funds for Mr. Maharaj's forensic accountant to testify to her analysis of the link. Now, of course, we know that the opposite was true all along: the Moo Youngs were deep into money laundering, and the government knew it. The extraordinary material in the briefcase (and developed even further by William Penn) provides a wealth of documentary evidence that supports the independent testimony of Baruch Vega concerning their money laundering with Vallejo Mejia and the

statements from John Brown, Jorge Maya, Popeye, Juan Lopez, and Jhon Henry Millan about their involvement with the cartel.

## XI. THIS PETITION CONTAINS ALLEGATIONS OF FACT UNDERLYING THE CLAIMS THAT, IF PROVEN AND VIEWED IN LIGHT OF THE EVIDENCE AS A WHOLE, WOULD BE SUFFICIENT TO ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THAT, BUT FOR CONSTITUTIONAL ERROR, NO REASONABLE FACTFINDER WOULD HAVE FOUND THE APPLICANT GUILTY OF THE UNDERLYING OFFENSE

The compelling evidence detailed above is, in Petitioner's view, considerably more than necessary to meet this standard. However, Petitioner has found justice in his case so hard to come by for more than 30 years. He is taking no chances now. Therefore, unless the State of Florida is willing to concede the inevitable, he is waiving no issue of fact.

Indeed, then, this issue is more complicated upon closer inspection than it might seem. There are some things that are relatively obvious: for example, it does not matter whether trial counsel's utter failure to meaningfully cross-examine Neville Butler is labeled "ineffective assistance of counsel" or something else. In making his case for innocence, Mr. Maharaj asserts his right to expose Butler for what he is: a serial perjurer who not only concededly committed perjury in the first iteration of his story about the Moo Young murders, but who lied at least six times about the reason for his change in testimony, and who can now be shown to have lied in at least six other legal

proceedings. Also, most fundamentally, as someone who lied from beginning to end of his testimony against Mr. Maharaj (as set out in detail above).

Likewise, it does not matter whether the fact of Neville Butler's lie detector test is, or is not, admissible in a state court proceeding. The fact that he lied at least six times during the trial about voluntarily correcting his story, and that he made important inconsistent statements during the test, is admissible in Mr. Maharaj's case.

Likewise, again, it does not matter whether trial counsel's unfounded and ill-informed failure not to call half a dozen alibi witnesses constituted "ineffective assistance of counsel" or not. Mr. Maharaj intends to rely on the testimony of the alibi witnesses in support of his claim of actual, factual innocence since they are clearly credible, and additionally refute the falsehoods told by Tino Geddes (who, it will be recalled, testified that he had confabulated the alibi).

There are other more complicated issues. Given that various witnesses are now dead, this Court must evaluate whether their testimony would be admissible at a retrial. For example, where it can be shown that Tino Geddes (who is now dead) provided false testimony at the first trial, and was subject to cross-examination that was ineffective in part because of the fact that counsel did not know particular facts, will the state trial court allow Geddes'

testimony to be read to the jury? Mr. Maharaj contends that the evidence would be excluded *in toto*.

There will also be litigation prior to any retrial as to whether Neville Butler may testify at all, based on the fact that he has committed perjury on a number of occasions. He has also clearly lied about whether he has been given a benefit from his testimony. One issue before the state trial court on retrial would be whether he even understands the meaning of an oath. Fla. Stat. 90:603(2).[232] Given that there are many examples of him committing perjury, the state is manipulating his "credibility" by failing to prosecute him for perjury. This is, separate and distinctly, a species of prosecutorial misconduct.[233]

---

[232] *See, e.g.,* Miss. Code Ann. § 13-1-11 (2014) ("A conviction of a person for any offense, except perjury or subornation of perjury, shall not disqualify such person as a witness, but such conviction may be given in evidence to impeach his credibility. A person convicted of perjury or subornation of perjury shall not afterwards be a competent witness in any case, although pardoned or punished for the same.").

[233] Of course, what might happen at a retrial will forever be a matter for this Court to decide, rather than the state court, since a finding that "no reasonable factfinder would have found the applicant guilty of the underlying offense" will – none too soon, after all these years – be an effective finding that the evidence is insufficient to convict. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (conviction cannot stand if no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").

## XII. THIS PETITION CONTAINS CLAIMS CONCERNING NEW RULES OF CONSTITUTIONAL LAW, MADE RETROACTIVE TO CASES ON COLLATERAL REVIEW BY THE SUPREME COURT, THAT WERE PREVIOUSLY UNAVAILABLE.

There are a number of new rules of constitutional law that were not in effect at the time of Kris Maharaj's conviction became final in 1993. These rules are retroactive to his case and compel reversal of his conviction. The facts that support these claims are, likewise, new. These rules include the following:

- *Kyles v. Whitley*, 514 U.S. 419, 436, 115 S. Ct. 1555 (1995) (the state's obligation to disclose evidence favorable to the defense "turns on the cumulative effect of all such evidence suppressed by the government").

- *Strickler v. Greene*, 527 U.S. 263, 280-82, 119 S. Ct. 1936 (1999) ("irrespective of the good faith or bad faith of the prosecution", the Brady "rule encompasses evidence 'known only to police investigators and not to the prosecutor.'").

- *Banks v. Dretke*, 540 U.S. 668 (2004) ("The State here nevertheless urges, in effect, that "the prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence" … so long as the "potential existence" of a prosecutorial misconduct claim might have been detected. A

247

rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process.") (citations omitted).

There can be no question that each of these cases applies to Mr. Maharaj's case. Likewise, under the rule of each case, Mr. Maharaj prevails on his *Brady* claims.

## XIII. A NUMBER OF ISSUES WERE PRESENTED TO THE STATE COURT, AND THEREBY EXHAUSTED, BUT WERE NOT ADJUDICATED ON THE MERITS

The federal rules provide that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d).

With various issues, the state court simply did not make a ruling. For example, one was the question of the cumulation of error. In *Walker v. Engle*, 703 F.2d 959 (6th Cir.), *cert. denied*, 464 U.S. 951 (1983), for example, the Sixth Circuit granted relief where six pieces of evidence were admitted, each "marginally relevant [or] irrelevant," but none of which individually violated

the Constitution. *Id.* at 968.  However, the overall effect was to deny the accused "fundamental fairness." *Id.*[234]

    This issue is particularly important in Mr. Maharaj's case because of the close interrelation of three constitutional rights – the *Brady*[235] right to appropriate disclosures, the *Giglio*[236] right to a trial free of the taint of perjured evidence, and the *Strickland*[237] right to the effective assistance of counsel – with the ultimate issue of the prisoner's innocence. Certainly, if the ultimate issue of innocence is to be "viewed in light of the evidence as a whole," 28 U.S.C. § 2244(b)(2)(B)(2), then all the evidence must be evaluated – including, in this case, the way in which the evidence would look very different in 2017 than it did in 1987, because of all the error.

---

[234] *See also United States v. Pearson*, 746 F.2d 787, 796 (11th Cir. 1984) ("We have held that the 'cumulative effect' of multiple errors may so prejudice a defendant's right to fair trial that a new trial is required, even if the errors considered individually are non-reversible."); *see also United States v. Preciado-Cordobas*, 981 F.2d 1206, 1215 n.8 (11th Cir. 1993); *McDowell v. Calderon*, 107 F.3d 1351, 1368 (9th Cir. 1997), *vacated in part*, 130 F.3d 833 (9th Cir. 1997) (*en banc*), *cert. denied*, 118 S. Ct. 1575 (1998) ("[a]lthough no single error may warrant habeas corpus relief, the cumulative effect of such errors may deprive a petitioner of the due process right to a fair trial"; not met in this case).

[235] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963).

[236] *Giglio v. United States*, 405 U.S. 150, 153, 92 S. Ct. 763 (1972).

[237] *Strickland v. Washington*, 466 U.S. 668 (1984).

Neither did the state court rule on Mr. Maharaj's claim of innocence (the word "innocent" never appears in the state court's ruling, notwithstanding the fact that it was the centerpiece of his case).

## XIV.  REQUIRED INFORMATION - PROCEDURAL HISTORY

While the history of this case is well known, Kris Maharaj sets out the required information below. He was convicted of a double homicide in the Circuit Court of the Eleventh Judicial Circuit, In and for Miami-Dade County in 1987. He has consistently maintained that he had nothing to do with the crime. Indigent, and a victim of the funding crisis that beset Florida's scheme for providing investigation assistance and legal representation to applicants for postconviction relief, Krishna Maharaj was unable to persuade the courts to overturn his conviction on direct appeal or in state or federal court postconviction proceedings; though his death sentence was reversed. He has been denied clemency.

The Circuit Court of the Eleventh Judicial Circuit, entered the judgments of conviction and sentence under consideration in this petition.

Krishna Maharaj is a British citizen currently being held at the Southwest Florida Reception Center, Doral, Florida. He was born in Trinidad on January 26, 1939, when Trinidad was still subject to British rule. As such, he was born

with British nationality. He moved to England in 1960 and lived there exclusively until 1985. He became a successful businessman.

In 1985, he began to spend time in Florida, as he had investments in real estate in the Fort Lauderdale area. He maintained his British nationality. He was not a citizen of the United States at the time of his arrest on these charges in Miami, Florida.

Mr. Maharaj was charged by indictment dated November 5, 1986, with two counts of first degree murder and related offenses. (Tr. 1-5a) He was charged with the deaths of Derrick and Duane Moo Young in the Dupont Plaza Hotel on October 16, 1986. The charge involving the kidnapping of Neville Butler was dropped prior to trial, when Butler changed his story.

Mr Maharaj pled not guilty.

Mr Maharaj, confident that his innocence meant that the state's case was weak, hired a lawyer on a flat rate. Upon the instigation of counsel, Mr Maharaj did not testify on his own behalf at the first phase of the trial.

Mr. Maharaj was tried by a jury from October 5 to October 19, 1987. The jury rendered verdicts of guilty as to two counts of first degree murder, two counts of kidnaping with a firearm, and unlawful possession of a firearm while engaged in a criminal offense. (Tr. 4184-4187) He fainted when convicted.

At the penalty phase, Mr. Maharaj testified to his innocence of the crimes charged.

The jury recommended life imprisonment for the murder of Derrick Moo Young and the death penalty, by 7 to 5 votes, for the murder of Duane Moo Young.  (Tr. 4498-4499).

On December 1, 1987, the trial court imposed the death penalty on Count II for the first degree murder of Duane Moo Young. It also imposed consecutive terms of life imprisonment as to Counts I, IV, and V, and 15 years imprisonment consecutive on Count VII. (Tr. 1783-1784)

Mr. Maharaj was subsequently declared indigent. He has been indigent for at least the last 22 years.

Before the preparation of the record on appeal, Mr. Maharaj, via counsel, moved for a stay of appellate proceedings and for relinquishment of jurisdiction to file a writ of error *coram nobis*. This was based on newly discovered evidence generated in a civil case by the law firm of *Shutts & Bowen* who were then representing William Penn Life Insurance Company in their defense of the claims made by the Moo Young family.

That law firm was investigating the claim of Shaula Ann Nagel to the $1,000,000.00 (one million dollar) life insurance policies taken out by each of the victims shortly before their deaths. This investigation revealed the

involvement of the victims, the Moo Youngs, in illegal business transactions including a $100,000,000.00 (one hundred million dollar) fraudulent letter of credit and money laundering.

The Florida Supreme Court granted the defendant's motion and relinquished jurisdiction for a period of 90 days for the conduct of an evidentiary hearing on Mr. Maharaj's claims. *State v. Maharaj* (1990 Order) (*Maharaj I*). However, the State of Florida would not provide funding for counsel. For this reason, no counsel appeared in court for him and no hearing was held before expiration of the 90 days.

On direct appeal, the Florida Supreme Court affirmed Mr. Maharaj's convictions and sentences. *Maharaj v. State*, 597 So.2d 786, (Fla. 1992) (*Maharaj II*).

The United States Supreme Court denied certiorari on January 11, 1993. *Maharaj v. Florida,* 506 U.S. 1072, 113 S. Ct. 1029 (1993). Justice Blackmun voted to grant certiorari.

Undersigned counsel was asked to enroll in the case by the British Government. However, the State of Florida would not provide funding for any investigation or advocacy work by counsel. Nonetheless, a Rule 3.850 Motion for state post conviction relief was filed in November 1993, based on such

skeletal investigation as could be conducted without funds. The Motion was originally denied without a hearing by Circuit Judge Leonard Glick.

The Supreme Court of Florida later determined that Judge Glick should have been disqualified from sitting, as he had been a supervising prosecuting attorney on the case. In addition, the Court held that a hearing should have been held on the substance of the petition. *Maharaj v. State*, 684 So. 2d 726 (Fla. 1996) (*Maharaj III*). The Court ordered that "a hearing [be held] on Maharaj's motion, which hearing shall commence within ninety days from the date this opinion becomes final." *Maharaj III*, 684 So.2d at 728. The hearing should have begun by March 10, 1997. Mr Maharaj pressed for a speedy and adequate hearing. However, he was repeatedly denied funds or any resources for preparing for this hearing.

The hearing did not take place until October 1997. It was held before Circuit Judge Jerald Bagley and lasted a week. (Rule 3.850 Tr.135-1137) The trial court granted relief as to Mr Maharaj's death sentence, finding that his death sentence had been illegally imposed. This illegality was due to the original trial/sentencing judge soliciting the prosecution, *ex parte*, to prepare an order sentencing Mr Maharaj to death before the judicial sentencing hearing even took place. However, the trial court refused to grant relief as to

Mr Maharaj's convictions (Rule 3.850 Clerk Tr. 6576), or his non-capital sentences.

Mr Maharaj therefore appealed, asking the Florida Supreme Court to vacate his convictions and sentences. On November 30, 2000, that court denied relief. *Maharaj v. State*, 2000 Fla. LEXIS 2325, 25 Fla. L. Weekly 1097 (Fla. Nov. 30, 2000) (*Maharaj IV*). Rehearing was denied on January 24, 2001.

Petitioner sought to challenge his convictions in federal court at that time, but was denied the right to do this until he had undergone a resentencing trial. This took place in 2002; he was sentenced to life imprisonment on the remaining capital charge against him.

His remedies exhausted, Krishna Maharaj brought his Petition for a Writ of Habeas Corpus challenging his convictions and his non-capital sentences. A magistrate recommended that relief be denied and, on August 30, 2004, the District Court denied relief. Order on Report and Recommendation, No. 02-CIV-22240 (S.D. Fla. 2004) (*Maharaj V*). The District Court entered an order granting a COA with respect to certain claims. However, the District Court did not specify whether a COA was granted or denied with respect to other issues. Petitioner, therefore, filed a motion for a COA before the Court of Appeals with respect to the issues not addressed by

the lower court. The Eleventh Circuit denied the supplemental COA. After briefing of the other issues, the Court denied relief. *Maharaj v. Secretary, Department of Corrections*, 432 F.3d 1292 (11th Cir. 2005) (*Maharaj VI*). The Court refused Petitioner's invitation to revisit the denial of the COA, and to consider the other issues that were intimately linked into the appeal. *Id.* at 1303 ("He now claims that he should be permitted to present every argument contained in his original federal habeas petition."); *id.* at 1320 ("The district court's COA was limited … and we decline petitioner's invitation to consider any other[ issues]"). On January 25, 2006, the Eleventh Circuit denied Petitioner's timely motion for rehearing.

Mr Maharaj then unsuccessfully sought certiorari review. *Maharaj v. McDonough*, U.S. Sup. Ct. No. 1555 (Oct. 2, 2006).

Subsequently, Mr Maharaj sought clemency, which was denied.

Mr. Maharaj was still dependent entirely on assistance of *pro bono* counsel. Because counsel continued to be convinced of their client's innocence, they continued to investigate the case, and eventually secured sufficient evidence to merit filing a successor state postconviction petition. This was heard at an evidentiary hearing in November 2014. The trial court denied relief on January 9, 2015.

Mr. Maharaj appealed to the Third District Court of Appeals, which denied his appeal on July 13, 2016, and denied rehearing on September 1, 2016. Because these were denials without written opinion, under Florida law Mr. Maharaj's state court remedies were then exhausted.

Krishna Maharaj is serving two life sentences with the addition of other sentences to serve consecutively. He is not eligible for parole until he is 101 years old; at which time he will be dead. Newly discovered evidence undermines each piece of the State's case against him and – both independently and in conjunction with various legal infirmities in the convictions - forms the basis of this petition for a writ of habeas corpus.

## XV. GROUNDS FOR RELIEF

Each of the following arguments is predicated on the United States Constitution, the Constitution of the State of Florida, and such other law as may be set forth in this pleading and in other pleadings filed on these issues.

1. **UNDER ANY REASONABLE INTERPRETATION OF THE DEFINITION OF INNOCENCE, KRIS MAHARAJ IS INNOCENT OF THESE CRIMES AND THE CHARGES SHOULD BE DISMISSED**

All other factual matters and allegations contained elsewhere in this *Petition* are incorporated herein.

Under whatever reasonable standard of innocence recognized as a matter of federal law, Kris Maharaj is innocent of the crimes alleged against him.

Mr. Maharaj's convictions must be vacated and the charges should be dismissed before he dies in prison.

## 2. MR. MAHARAJ WAS DENIED HIS CONSTITUTIONAL RIGHTS BECAUSE CRITICAL EXCULPATORY EVIDENCE WAS NOT PROVIDED TO THE DEFENSE AT THE TIME OF TRIAL

All other factual matters and allegations contained elsewhere in this Motion are incorporated herein.

The evidence identified was wrongfully suppressed by agents of the state.

This evidence, which must be aggregated, includes various material presented to the State court in 2014, as clarified by even more recent evidence. This includes all the material set forth above, including:

1.    *Brady & Jaime Vallejo Mejia.* All the information derived from the suppressed fact that Jaime Vallejo Mejia had been investigated for money laundering going back to 1983, culminating in his Oklahoma indictment in 1987. In 2004, this Court ruled:

> Although Petitioner continues to contend that either Adam Hosein or Jaime [Vallejo Mejia], a Colombian who was staying in the room across the hall from where the murder occurred, could be the real killers, he has still produced no evidence that either of them was involved.[238]

---

[238] *Maharaj v. Moore*, Order at 23 n.19, No. 02-22240-HUCK (Aug. 30, 2004).

Significantly, at the very start of the prosecution closing at the culpability phase, the prosecution argued:

> That Jaime Mejida [*sic*], simply because he is Colombian and he is in the import/export business, must be responsible for the deaths of Derrick and Duane Moo Young, simply because he lived across the hallway from the suite where the murders took place.

> When Detective Buhrmaster took the stand, [the] theory of defense focused on Jaime Mejida. Why didn't you go into this suite? Why didn't you conduct firearms test, paraffin on Mr. Mejida? Why did you not take elimination prints from Mr. Mejida?

> Because Detective Buhrmaster told you that I spoke with Mr. Mejida. He was a Colombian gentleman in his mid 50s, about 5'2", 5'3", 150 pounds. He had worked at the Dupont Plaza. *We checked his story out*. He resided at Dupont Plaza. He continued long after the murders occurred to work and live at the Dupont Plaza Hotel.  (Tr. 3909-10)

With respect to Vallejo Mejia, in addition to Vega's evidence (below), the material that is now available includes:

a. The Oklahoma documents, reflecting the investigation going back to 1983. So if Det. Buhrmaster had "checked his story out" beyond seeing whether he was living in the Dupont, he would have found this out.

b. The Florida Department of Business Regulation documents. IThe FDBR "checked his story out" when Vallejo Mejia applied for a liquor license and found all the material.

c.   The Proquim Ltda. materials concerning his narcotics company in Colombia.

d.   Expanded by the revelations then revealed by John Brown during the Vallejo Mejia investigation concerning Pablo Escobar warning him that the Cartel was responsible for the Moo Young murders. The fact that Vallejo Mejia was 5'2" or 5'3" fit with Brown's description and Vallejo Mejia's sobriquet "The Evil Dwarf".

e.   Expanded by the revelations then revealed by Jorge Maya during the Vallejo Mejia investigation concerning Pablo Escobar ordering Luiz to pay *Cuchilla* for the Moo Young murders.

f.   Expanded by the revelations then revealed by *Popeye* during the Vallejo Mejia investigation concerning additional evidence that the Cartel's responsibility for the Moo Young murders.

g.   Expanded by the revelations then revealed by Jhon Henry Millan (*El Chino*) during the Vallejo Mejia investigation concerning the Cartel's responsibility for the Moo Young murders.

h.   The most recent interview by *Witness A* concerning Vallejo Mejia's ongoing involvement in the cartel conspiracy.

i.  To be supplemented by various materials that the United States Government has yet to reveal, including:

    i.  documents concerning the Jorge 40 cache of information;

    ii.  the complete story from federal witness Juan Lopez;

    iii.  the complete story from federal witness Jhon Henry Millan;

    iv.  disclosure (long withheld by Det. Buhrmaster) of the source of his information, mentioned by him in the October 16, 1986, statements of two Dupont staff members that someone (presumably, now, the cartel) had paid a staff member to ensure that no room other than 1214 (Vallejo Mejia's) and 1215 (the murder scene) was rented on the twelfth floor that day;

    v.  the other requested disclosures discussed above.

2.   *All the Brady material derived from Baruch Vega*, who was reporting back to state and federal law enforcement through CENTAC. This includes:

    a.  Evidence of Derrick Moo Young's involvement with drugs and money laundering with Jaime Vallejo Mejia. This was then supplemented with evidence linking the Moo Youngs with the

Jadusingh narcotics trafficking in Jamaica, from *William Penn Life Insurance*.

b.  Evidence of Vallejo Mejia's money laundering, and statement regarding murders.

c.  Evidence of Adam Hosein's work with cartel conspiracy.

d.  Evidence of Tino Geddes' work with cartel conspiracy:

> Again, Tino was another person involved. I heard the name in various occasion. One of them with the group from La Gorda Key, and Frank Barder who was the owner of La Gorda Key, they were flying narcotics into La Gorda, and then from La Gorda into Miami in small planes. And he was one of the people involved with them. I never knew his specific dealings. I knew he was part of this organization. (2014 Tr. 377)

e.  To be supplemented by the various documentary evidence denied Mr. Maharaj by the federal authorities during the state proceedings.

3.  *The Brady material from "John Brown"* flowing from the Vallejo Mejia information concerning the cartel committing the crimes.

4.  *The Brady material from Jorge Maya* flowing from the Vallejo Mejia information concerning the cartel committing the crimes.

5.  *The Brady material from "Popeye"* flowing from the Vallejo Mejia information concerning the cartel committing the crimes.

6.      *The Brady statements by Juan Lopez and Jhon Henry "El Chino" Millan,* derived from the earlier Vallejo Mejia *Brady* material, stating that the cartel was responsible for the Moo Young murders.

7.      *The recent revelations from William Penn Life Insurance*, *Brady* derivations from the earlier life insurance policies and the briefcase materials, including:

a.  the new 2014 documentary evidence of Adam Hosein taking over the Moo Young laundering company, *Cargil International (Panama)*;

b.  the new 2014 Duane Moo Young tax lien reflecting the IRS notice that the 21-22 year old without an obvious profession owed $ 275,621.29 for 1985-86;

c.  the narcotics links between the Moo Youngs and the Jadusinghs.

8.      *The evidence disclosed by prosecution witness Prince Ellis* revealing various exculpatory evidence concerning Butler and Dames:

a.  Eddie Dames' involvement in narcotics dealings, both from Dames himself and, more importantly in *Brady* terms, from official channels in the Bahamas who worked with the US law

enforcement (set in the context of the prosecution objecting to any questions of Ellis on the subject in his 1987 deposition);[239]

b.  Neville Butler's involvement with Mr. Dames and drugs;

c.  the links between Dames and the notorious Bahamian lawyer F. Nigel Bowe;

d.  the police letting Eddie Dames off when he was caught with drugs on the evening of October 16, after a call with Det. John Buhrmaster;

e.  Eddie Dames' meeting with some people who were Hispanics, possibly Colombians, in the Dupont Plaza Hotel on the morning of October 16;

f.  Neville Butler's torn and bloodied shirt and his broken watch strap indicating that he had been involved in the struggle in Room 1215;

g.  Eddie Dames' discussions with Neville Butler concocting what he should tell the police.

---

[239] As with the *Brady* material related to Vallejo Mejia, it is highly significant that the prosecution actively denigrated the idea that Dames could have had anything to do with the murders. (Tr. 3909-10) This not only elevates the significance of *Brady* material, but it also reflects a species of active deception of the jury, on the part of the government.

9.    *The Tino Geddes information revealing the Brady information* that was covered up concerning his links with drugs, and why he changed his story to help the police:

      a.  his close links to the Jamaican *Shower Posse* drug cartel;

      b.  revealing the reason he was arrested for bringing weapons into the country, and the scope of his legal exposure.

10.   *The Brady evidence of police corruption submitted through Michael Flynn*, which is imputed to the government material since the government is ultimately responsible for corrupt police practice. *People v. Curry*, 627 N.Y.S.2d 214 (N.Y.App.Div. 1995) (motion to withdraw guilty plea granted under *Brady* where state failed to disclose information about investigation into police corruption involving narcotics shakedowns). This would be compelling at any new trial. (*See above*)[240]

This material must be aggregated with the *Brady* and *Giglio* material developed earlier. On the first appeal, although Mr. Maharaj was denied relief, this Court held as follows:

> The Court does find, nonetheless, that in these three areas, Petitioner has made a substantial showing of a constitutional violation sufficient to entitle him to appeal of these issues. Since it appears that the police did have custody of the contents of the briefcase after the defense investigators specifically asked to

---

[240] Mr. Maharaj reiterates and reincorporates all the Brady material mentioned above that has not been repeated here, as he does not mean to waive anything.

look at it, the Petitioner has made a substantial showing of the deprivation of a constitutional right since it is possible that evidence adduced from the investigation of the contents could have, if admissible, bolstered the Petitioner's theory that he was set up by someone else who had a motive to murder the Moo Youngs. It is also possible that knowledge of the life insurance policies could have, at the least, led to discoverable evidence from the insurance investigation, which may, again, have bolstered the defense. And finally, the statements from the polygraph exam, thought their effect would have likely been of little significance given the substantial impeachment of Butler that trial counsel was able to achieve, may possibly have had some impact on the jury. *See also United States v. Glover*, 596 857, 867 (9th Cir. 1979) (noting it would be a Brady violation if "the government failed to reveal that a polygraph administered at the prosecution's behest to its principal witness indicated he was lying.").

*Maharaj v. Moore*, Order at 22, No. 02-22240-HUCK (Aug. 30, 2004). Thus, this Court deemed three of the elements of the 1997 claim to be sufficient for a COA, at a time when the vast majority of the *Brady* material (discussed above) was still hidden from Mr. Maharaj. The new 2014 *Brady* material fills in precisely the holes identified in the defense case by the courts in 1997.

We must now revisit the Court's findings as the material is aggregated with all the other evidence that has belatedly come to light, after being hidden by the government for decades of injustice. The earlier evidence includes:

1.     *The fact of the Life Insurance policies taken out by Derrick and Duane Moo Young shortly before their deaths*. In addition to showing that they knew their lives were in jeopardy – which could only be from the cartel,

as nobody would seriously think that Mr. Maharaj, who had never shown physical violence towards anyone, would attack them – the fact of life insurance would have led the defense to the *William Penn Life Insurance* materials, even if the State continued to hide the briefcase, and this would have strongly "bolstered" the evidence of what really happened.

2.      *The material in the Moo Young briefcase found at the crime scene*. This material included the following (as a sample):

a.   *The Moo Youngs' passports* (Pet. Exh. 297). These reflected an extraordinary amount of travel for someone who was meant to be a disabled businessman. Derrick Moo Young, for example, made the following trips: UK (6 times), Canada, Cayman Islands, Granada, Honduras, Mexico, Netherlands, Panama (5 times in 1986 alone), Trinidad (5 times), and Venezuela;

b.   *A draft letter from Derrick offering a $100 million loan.* (1997 Rule 3.850 Clerk Tr. 2270, Pet. Exh.250 at 005966);

c.   *A draft memo written by Derrick concerning a $250 million loan from Cargil International (Panama).* (1997 Rule 3.850 Clerk Tr. 2274, Pet. Exh.250 at 005970);

d. *A draft of a letter to one Amer Edoo concerning a loan of $250 million to Trinidad*. (1997 Rule 3.850 Clerk Tr. 2276, Pet. Exh. 250 at 005972);

e. *A June 27, 1986, letter from Roberto Alvarez of Alpine Inc., Puerto Rico, to Duane in Panama about $1 to $2 billion for loans to Trinidad*. (1997 Rule 3.850 Clerk Tr. 4677, Pet. Exh. 353 at 010972);

f. *A May 1986 telex from Derrick to Dr. Enrique Van Brown about placing the "other 3 billion" when the first deal is done*. (1997 Rule 3.850 Clerk Tr. 4922, Pet. Exh. 354 at 011205);

g. The June 6, 1986, letter from Derrick, of *Cargil International*, to Dr. W.C. Bryant representing that *Cargil* has $5 billion for processing in Japanese Yen bonds. (1997 Rule 3.850 Clerk Tr. 4947, Pet. Exh. 355 at 011230).

These (along with the life insurance policies) were provided to the *William Penn* investigator (John Healey), but not to Mr. Maharaj's investigator (Ron Petrillo). Det. Buhrmaster told Investigator Healey:

> Buhrmaster has the briefcase that they found ... of the Moo Youngs; it looks like he ran his business out of the trunk of his car. Corporate documents, corporate stock, etc., were all found in the briefcase, which is still in the possession of the police department.

*(*Exh. OC at 4) Mr. Healey also learned that the Moo Youngs' "United States passports are in the hands of the Miami police department. . . ." (Exh. OC at 8) Now, the contents of the briefcase have, themselves, been "bolstered" in 2014 and 2016 by the specific admissions of various witnesses.

3.     *All the material that the William Penn Life Insurance company developed as a result of both the insurance policies and the briefcase*. This included a mountain of evidence concerning the Moo Youngs, including but not limited to the following:

    a.  1997 Exh. OK. This was Jadusingh information which led to the later discovery by Mr. Maharaj that the Jadusinghs, who were neighbors and close friends of the Moo Youngs, were convicted on drug charges;[241]

    b.  1997 Exh. OU & OW. NEC International Inc. S.A. documents. This provided the lead to the third Moo Young laundering front company in Panama;

    c.  Building on the passports that were in the briefcase, the William Penn investigation revealed that, while traveling, Derrick and Duane stayed at very expensive hotels and ate in fancy

---

[241] Shaula Ann Nagel, the daughter of Derrick and sister of Duane Moo Young, used the alias Eva Jadusingh.

restaurants. (1997 Rule 3.850 Clerk Tr. 2998-3059, Pet. Exh. 302, ROA vol. 29, 5413-5541);

d. 1997 Exh. OAF. The extensive and expensive travel reflected in these documents contrasted with the tax returns reflecting a complete family income of $16,988.77 in 1984, and $14,168.48 in 1985;

e. 1997 Exh. OAI, OAJ. These phone records revealed the Moo Youngs' calls on their laundering business, as discussed above;

f. 1997 Exh. OAK reflects a cash purchase of a car for $9,172. The contemporaneous bank records in 1997 Exh. OCW reflect the money being transferred from Panama for the car, but also for a payment of $65,247.32 to Duane. (Exh. OCW at 580265);

g. 1997 Exh. OCS including a draft of the $1.5 billion loan letter to Minister Hayes in Barbados using the Yen bonds;

h. 1997 Exh. OCY including all the documents concerning the L.A. Church Loan Corporation gems, worth supposedly around $134 million;

i. Other 1997 Exh. OCY documents including:

i.  A Letter of Roberto Alvarez of Alpine Inc., Puerto Rico, to Derrick in Panama about $1 to $2 billion for loans to Trinidad; (Exh. OCY at B002197)

ii.  A Letter of S. Scott, Secretary, to Roberto Alvarez of Alpine Inc. Replying regarding $1 to $2 billion for loans to Trinidad; (*Exh. OCY at B002199*)[242]

iii.  A Letter from Richard Solomon[243] to Derrick (of Cargil International) promising $600 million for assistance in purchasing a bank in Panama; (Exh. OCY at B002176)

iv.  Of what turns out to be vital importance, September 17th, 1986, letter from "S. Scott" supposedly splitting the (false) letter of credit; (1997 Exh. OCY at B002222; 1997 Exh. AF) This was the letter of credit that was spontaneously mentioned by the Cartel personnel in 2014 as the reason the October 15 meeting was aborted. Derrick gave it to Jaime Vallejo Mejia to avoid the consequences of the lost

---

[242] This links up with another element of the Brady material, where Shaula Nagel admits that S. Scott was actually their childhood babysitter in Jamaica, and was a false name being used by the front corporations.

[243] As became known in the 2014 proceedings, evidence came to light that Richard Solomon went on to other "work" in Panama and was eventually convicted on federal mail, wire and insurance fraud charges.

money, it was checked out overnight, and found to be false.

j.  1997 Exh. OCZ including:

    i.  A Telex from Derrick to Dr. Enrique Van Brown about $100 million to Paraguay and Venezuela; (Exh. OCZ at B000365)

    ii.  A Telex from Dr. Enrique Van Brown to Derrick about $100 million to $1 billion for St. Lucia; *(Exh. OCZ at B000364)*

    iii.  A Telex from Derrick to Dr. Enrique Van Brown $1 billion for Paraguay; *(Exh. OCZ at B000361)*

    iv.  A Telex from Derrick to Dr. Enrique Van Brown about placing the "other 3 billion" when the first deal is done; (Exh. OCZ at B000374)

    v.  A Telex from Derrick to Bryant about $250 million for Trinidad and $1 billion for Paraguay; *(Exh. OCZ at B000355)*

k.  1997 Exh. ODA which was the Cargil International Japanese Yen Correspondence. This includes:

i.  A "Documentary Letter of Credit" from the International Bank of the South Pacific which has been rather obviously changed, having the names whited out, and not yet filled back in. (Exh. ODA at B001891)

ii.  There follows a copy of the same Documentary Letter of Credit that is filled in for Derrick in favor of Amer Enterprises/Cargil International – both fronts for the money laundering, involving Adam Amer Hosein; (Exh. ODA at B001894)

iii.  Derrick letter for Cargil to Bryant that Cargil has $5 billion for processing in Yen bonds (Exh. ODA at B001885);

iv.  Derrick letter to Bryant about $5 billion in loans to Barbados, Trinidad, Costa Rica, Panama, Venezuela, and Paraguay (Exh. ODA at B001921);

v.  A Derrick "S. Scott" letter on Cargil International Corp. SA (Panama) stationary to Richard Hayes, Min. of Finance, Government of Barbados, Bridgetown, Barbados offering a loan to the country of $1.5 billion. They say that their bank is Credit Suisse, Calle Ricardo Arias y 51E, PO Box 6-4396 El Dorado, Panama, Rep. Panama (Exh. ODA

at B001890) (Exh. Y) (RA 153), important documentary
evidence concerning the Moo Young laundering work in
Panama;[244]

l.  1997 Exh. ODB. Moo Young Trinidad loan documents between
$100 million and $2 billion;

m. 1997 Exh. ODC. Moo Young Paraguay loan documents;

n.  1997 Exh. ODI & ODJ. Documents establishing a false identity
in the name "Shernette Scott".

While this was not deemed to be sufficiently exculpatory without links
between the Moo Youngs and drug trafficking, those links have now been
established. Again, the materials have been "bolstered" in 2014 and 2016 by
the specific admissions of various witnesses that the suggestion made by Mr.
Maharaj in 2004 (that the Moo Youngs were involved in drugs) was absolutely
true.[245]

---

[244] It must be borne in mind that in 1986 Panama was in the total control of
General Manuel Noriega, who was removed in the invasion in 1989, and was
prosecuted for his involvement in narcotics in the Southern District of Florida.
[245] Mr. Maharaj incorporates by reference all the allegations earlier in the
pleading, as well as those in his state court pleadings, and reiterates that the
*Brady* material must be read in connection with the extensive evidence of
ineffective assistance of counsel with respect to how he was ineffectually
challenged. There are many, many other seemingly minor facts that would be
relevant in any retrial to show how the Moo Youngs conducted their
laundering frauds, and how their criminal activities escalated. Thus,
essentially every bad act alleged against Mr. Maharaj in the dispute between

4.      *Brady material concerning Det. Buhrmaster's notes concerning what Mr. Maharaj said to him.*[246] A vital element of the notes involved what Mr. Maharaj told Det. Buhrmaster on the night of his arrest. While Det. Buhrmaster suggested that Mr. Maharaj had denied ever owning a Smith & Wesson 9 mm pistol (which the prosecution asserted was a lie by a guilty man), in 1997 the defense presented Det. Buhrmaster's handwritten notes

---

him and the Moo Youngs was actually a twisted version of the truth – instead the Moo Youngs were doing it to him. To give one example of many, consider the genesis of their corporate rip-off schemes. KDM International Inc. was set up in 1984 with Duane Moo Young, Indira Maharaj, and Marita Maharaj as the officers, two Maharaj family members to one Moo Young, giving Mr. Maharaj initial control over his investment. (1997 Exh. FAG) In 1985, Derrick and Duane Moo Young set up KDM Distributors Inc. with the two of them as the only officers. The office address was listed as the same - 4901 SW 193rd Lane - as KDM International. (1997 Exh. FAG) Gradually thereafter, the Moo Youngs started to siphon off KDM International funds into KDM Distributors. Indeed, because of the confusion between the two names, on March 3, 1986, Duane Moo Young changed the officers of KDM International to only him and his father, taking the Maharaj names off the registration. (1997 Exh. FAO) By July 28, 1986, there is a letter reflecting Duane Moo Young's claim to be President/Director of KDM International, being paid over $40,000 a year. It is signed by Frank Williamson, another of Derrick Moo Young's aliases. (1997 Exh. AQ) As set out in the 1997 state petition, as proved at the evidentiary hearing, and as laid out in *The Injustice System*, there were a number of these scams, all of which are relevant. These issues are incorporated by reference.

[246] There is discussion of these notes in this Court's earlier decision, but the focus is entirely on the fact that Mr. Maharaj asserted his rights twice. *Maharaj v. Moore*, Order at 23-24, No. 02-22240-HUCK (Aug. 30, 2004). While this was one element of the claim, the Court makes no mention at all of the way in which the notes prove – without any dispute over the past 19 years – that Det. Buhrmaster lied about a critical element of the prosecution case.

(Pet. Exh. 220) from the police file contradicting his testimony and reflecting

that Mr. Maharaj specifically disclosed details about the gun:

> Approx. six months [before the crime] – [Kris Maharaj paid]
> $150 to for protection. F.H.P. took gun Orlando, Fla. $1,000.00
> -- $700.00 & gun.  K Troop.  July # Aug. 86.
>
> * * *
>
> * Subsequent to arrest, Don't you remember.  I told you in July
> that the gun was stolen.[247]

This was vital in two ways:[248] one, it showed Det. Buhrmaster to be lying by

radically inflating the prosecution case;[249] two, it rendered the entire

---

[247] 1997 Rule 3.850 Clerk Tr. 2040. Circumstantial evidence at trial also proved that the State knew this. There was a note from one of the prosecutors asking the police to investigate Mr. Maharaj's claim that his gun had been lost some months before the crime and the prosecution called an FHP officer to deny that they stole his gun. In truth, Mr. Maharaj did not say they stole it, though they may well have done so; he said that it was taken from him, either during the stop, or later when he returned the rental car. This material led to the helpful corroborative evidence from Manuelos Stavros, to whom Mr. Maharaj had complained on the very night of the incident.

[248] With respect, this Court and the state courts missed the primary point of the material in 1997 in ruling that this was "supposedly suppressed evidence regarding Petitioner's gun being stolen … prior to the murders." *Maharaj v. Moore*, at 25. While this is true (and corroborated by independent witnesses), thereby making it impossible for Mr. Maharaj to use the gun in the murders, the indisputable point is that Det. Buhrmaster lied about Mr. Maharaj saying that he did not have a gun – a point not mentioned in the earlier opinions, though it was the focus of much of Mr. Maharaj's presentation. This was, as discussed above, a crucial issue and the prosecution devoted several pages of argument to telling the jury that they could not possibly believe that a decorated officer like Det. Buhrmaster would lie – when they had direct evidence in their possession that he had. (Tr. 4030-35) (quoted in full above)

[249] In *Bowen v. Maynard*, 799 F.2d 593 (10th Cir. 1986), *cert. denied*, 479 U.S. 962, 107 S. Ct. 458 (1986), the court considered the state's suppression of evidence of another suspect, a police officer from South Carolina, Lee

presentation of evidence concerning ballistics to be probative of nothing.[250]

And yet this was a major aspect of the prosecution closing argument. (Tr. 3927-34; 3943-45)

5.    *Brady material concerning what Det. Buhrmaster said to the William Penn investigator*:

> Sometime prior to October 15, 1986, a man named Dames . . . had attempted to contact the Moo Youngs to arrange for shipment of equipment he had purchased in the Florida area. . . .[251]

---

Crowe. This was itself of great importance. However, the court elaborated how the defense could have used the evidence to impeach the eyewitness identifications. *Id.* at 611. The court further observed:

> The withheld evidence also raises serious questions about the manner, quality, and thoroughness of the investigation that led to Bowen's arrest and trial. A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible Brady violation. . . .

*Id.* at 613. *See also Lindsey v. King*, 769 F.2d 1034 (5th Cir. 1985).

[250] This must be set in the context, also, of Det. Buhrmaster's false testimony that Mr. Maharaj denied being in Room 1215 that day. This was contradicted by the sworn, pre-trial testimony of his police partner, Officer David Romero, who stated in a deposition that Mr. Maharaj told his colleague Buhrmaster that "[h]e had been there [in Room 1215] prior to the homicides, that's correct." (*Exh. P*, Tr. 114) In this way, the two "guilty lies" attributed to Mr. Maharaj were both shown, rather, to be law enforcement lies.

[251] 1997 Rule 3.850 Clerk Tr. 2446, Pet. Exh. 276. There is a curious and inaccurate mention of this letter in this Court's earlier decision. *Maharaj v. Moore*, Order at 25, No. 02-22240-HUCK (Aug. 30, 2004) ("a careful review of that letter reveals that there is no relevant information which Buhrmaster discussed with the insurance investigator of which the defense was not also aware, except to the extent that it suggests the police department had recovered the contents of the victim's briefcase prior to the interview….").

This was arranged "several days before the meeting." This was confirmed elsewhere in the 1997 *Brady* material, where Derrick Moo Young's daughter, Shaula Nagel, told Det. Buhrmaster (but not defense counsel) that she:

> remembered the names of Butler and Dames, only because her father had mentioned that he received several messages from a Mr. Dames, who he did not know, and did not bother returning the calls.[252]

This was absolutely critical in showing that; far from knowing nothing about what was planned for the Moo Youngs, Dames both planned it and then (we now know from Ellis) worked in its immediate aftermath with Butler to fabricate a story that implicated Mr. Maharaj, but not the cartel members.

      *6.      Brady evidence concerning Neville Butler – the evidence before the Grand Jury.* In the brief outline of the grand jury proceedings (all that Mr. Maharaj has been allowed to see) there are at least a dozen significant inconsistencies with the story told at trial.[253]

---

This is just not the case, as it overlooks the crucial importance of the discussion of Eddie Dames' several calls to the Moo Youngs trying to set up the Dupont Plaza meeting.

[252] 1997 Rule 3.850 Clerk Tr. at 2453.

[253] To be sure, this Court discussed the grand jury issue. *Maharaj v. Moore*, at 28. With respect, as set forth above, the dozen inconsistencies in a very brief document were not "minor" – the entire story was different from what was presented at trial, including the supposed facts of what happened in the room. Be that as it may, it is only one part of a systematic dismantling of the perjured evidence of the State's "star witness," all of which much be viewed in aggregation.

7.      *Brady material concerning Neville Butler - the facts surrounding the Butler polygraph.*

> a.   It proved that Butler had lied repeatedly about how he came to change his testimony: this Court agreed that it was "arguable that the testimony was false and the prosecutor knew it was false was Butler's statement that he voluntarily changed his testimony…"[254] If it was arguable, this was certainly an argument that Mr. Maharaj should have been allowed to put to the jury, along with proof of the half-dozen times when Butler committed perjury on this point.

---

[254] *Maharaj v. Moore*, at 27. While this Court stated that the jury would never have learned of the polygraph, *id.*, there were many ways that defense counsel could have used the facts to challenge the *series* of lies that Mr. Butler told when asked about his change of testimony. For example, counsel would have shown the basic fact that Butler did not "voluntarily" come in after a pang of conscience (as he said half a dozen times under oath) – rather, he was caught by the prosecution, who challenged him over the space of several hours with elements of the story that they simply did not believe. Counsel would have been able to show that Butler was repeatedly confronted with facts to which he had testified – such as the absurd waiting outside the hotel story – with the prosecutors and Det. Buhrmaster clearly saying they did not believe it. All this would have been done at the second deposition (which, unbeknown to defense counsel, was occasioned by the polygraph process), when counsel could have asked whatever he wanted (about the polygraph) and set Butler up for examination at trial.

279

b. This is all the more prejudicial because the prosecution and Det. Buhrmaster specifically prepared how they would deceive the jury on this point.

c. Part of the 1997 *Brady* material involved Det. Buhrmaster's notes made in preparation for testifying:

> Cross-examination:
>
> 1. "Nevells [*sic*] change" -- he never has changed his story about how it happened, he just changed on 02 Mar 87,[255] that he did in fact set up this meeting and what Maharaj was going to do there (exception he committed the murder).
>
> 2. He was afraid that he was also involvement [*sic*] in the murder.
>
> 3. It's still unknown what status of N. Butler & what will happen to him pending arrest. (*1997 Exh. IW-B at 2*)

d. Without mentioning the polygraph itself, counsel could have challenged Butler about the aspects of his testimony that the prosecution clearly did not believe and must have challenged him on during a session that went on for several hours.

---

[255] This was the date of the polygraph, for which he was present. Det. Buhrmaster therefore clearly knew that Butler was lying about why he changed his testimony. This makes the premeditation of this preparation all the less acceptable.

e.  It included facts (such as his suggestion that he got out to feed the meter) that were inconsistent with the notion that he was being held against his will by Mr. Maharaj or anyone else.

f.  All of which suggested that, if he did indeed want to wait near the hotel after the crimes it was to meet up with Dames before the latter talked to the police. This was necessary to ensure that their stories were consistent.

It was, with respect, always rather illogical to conclude that because Neville Butler had already been impeached to a certain extent, that additional impeachment would have no impact. It would seem to make more sense to say that because his credibility was already in question, additional impeachment would tip him over the edge into total implausibility. The 2004 conclusion also ignores the fact that defense counsel actually made a woeful stab at impeaching him even with the materials he had – breaking his cross-examination to announce that he had left his legal pads with his notes at home, could he go to get them. Certainly, given what we now know, the polygraph results have led to a great deal more impeachment of Butler, such that no reasonable person could have based a conviction for capital murder on him.

8.    *The Brady evidence concerning Neville Butler – that he was clearly lying about Kris Maharaj coming to the scene with a pillow to use as*

*a silencer.* According to a document discovered in 1997, Assistant State Attorney Ridge told Det. Buhrmaster to "[d]etermine whether the pillow used as a silencer belonged to the Dupont Plaza." (Exh. IAW at 2) Det. Buhrmaster presumably investigated as ordered by Assistant State Attorney Ridge and discovered that the pillow used was a green one that matched the furniture in Room 1215. While the resulting memo has still not been revealed, this was clearly exculpatory.

9.    *The Brady evidence concerning Neville Butler – that he patently benefitted from a deal.* By 1997, it was already clear that Butler was never going to be prosecuted for his admitted involvement in the crime, or for his perjury, let alone for his actual involvement in the crime. Now, in 2016, it is clear beyond any doubt that Butler was never going to be prosecuted, so long as he toed the prosecution line.

a.   The prosecutor made much of this during closing argument:

> Mr. Butler told each and every one of you, I have made no deals. The prosecutor and the police have not promised me what is going to happen to me after the outcome of this trial. For all Mr. Butler knows, he could answer the door tonight, tomorrow night, next week and Detective Buhrmaster is going to be standing out there with an arrest warrant. He is very candid. The prosecutors at no time have every made a deal with me. I do not know what is going to happen to me after this case is resolved. That is not a deal, ladies and gentlemen. (Tr. 3979)

282

b. Det. Buhrmaster clearly prepared to make the same "argument" in his testimony:

> It's still unknown what status of N. Butler & what will happen to him pending arrest. (1997 Exh. IW-B at 2)

It is, of course, an extraordinary power that allows the government to make such concessions to a witness. If the defense attempted to assure a witness of such a benefit, the defense lawyer would be jailed for perverting the course of justice. Such a power must therefore be used sparingly and with total honesty. Such was not the case here.[256]

10. *The Brady material concerning Adam Hosein.*

a. In 2004, this Court discussed the *Brady* material *showing that Adam Hosein had received a call at the Dupont Plaza that day.* With respect to Adam Hosein, the Court believed in 2004 that there was no "information indicating any involvement by Hosein in any aspect of the case."[257] Well now there is – and it was only hidden from Mr. Maharaj and this Court in 2004 because the government failed to reveal it.

---

[256] As with everything else – but most importantly here – the Brady material concerning Neville Butler must be read in connection with the extensive evidence of ineffective assistance of counsel with respect to how he was ineffectually challenged.

[257] *Maharaj v. Moore*, Order at 23, No. 02-22240-HUCK (Aug. 30, 2004).

b. This Court did not discuss the 1997 *Brady* material that *linked Adam Amer Hosein to the Moo Youngs in their money laundering business*. In 1997, this was primarily the information developed from the briefcase materials concerning Amer International along with the Bahamaian connection to Mr. Hosein's friend, F. Nigel Bowe (see below).

This must now be read in light of the fact that Adam Hosein has been identified as a contemporaneous target of the state and federal drug investigation (by Baruch Vega). Furthermore, that he went to the Dupont Plaza that morning with a pistol (according to George Abchal), and that he confessed his involvement to Dr. Jhagroo (in addition to the other information discussed below).

11. *The Brady evidence concerning Cargil International (Bahamas)*. In 1997, Mr. Maharaj had developed evidence concerning Cargil International (Bahamas), which the expert evidence (for which he was denied funds) would have shown to be a money laundering front. This evidence included:

a. an offer of expert proof, disallowed because Mr. Maharaj was not allowed the funds, that Cargil International was a money laundering front;

284

b. evidence, now supplemented with certified proof, that the Moo Youngs had registered their Cargil front company in the Bahamas with its address at the office of F. Nigel Bowe;

c. proof that Nigel Bowe, lawyer to the cartel, had been wanted since before the Moo Young murders for his involvement with the cartel, and that he had eventually been extradited and convicted for his part in the cartel conspiracy;

d. evidence that Nigel Bowe and Adam Hosein were associates.

This must now be added to the proof that the Moo Youngs were actively working on money laundering through Vallejo Mejia; that Adam Hosein was part of the state and federal CENTAC investigation.

12. The *Brady* material concerning Eddie Dames:

a. according to the material discovered in 1997, prosecutor Ridge told Det. Buhrmaster to "[c]heck out the business contacts of Dames and Prince."(Exh. IAW at 1) No matter what the result, it was exculpatory. Either Det. Buhrmaster found the links with F. Nigel Bowe and the material concerning law enforcement investigation of Dames for drugs, which Mr. Maharaj has now discovered (which would have been highly exculpatory), or he did not (in which case it was sloppy police work)

285

b.  this must be read in conjunction with the new evidence from the State's witness, Prince Ellis. This evidence explained that Dames was involved in the drug conspiracy, that he helped Neville Butler confect the story about Kris Maharaj (that was subsequently radically changed at the behest of the prosecution), and that he used Ellis as a stooge for his own false alibi.

13.  *The Brady material concerning Eslee Carberry and the Caribbean Echo*.[258] The prosecution told the jury that "the best time you will spend in that jury room deliberating is reading those articles" (Tr. 3912)[259] and recapping Carberry's testimony – all of which, it transpires, was false:

---

[258] The material concerning Carberry falls partially in Brady and partially in ineffective assistance of counsel, but both is included here to avoid a confusing muddle of the facts.

[259] The prosecution used the articles for motive but they had a much broader prejudicial impact that the jury certainly have tainted the jury. "The naive assumption that prejudicial effects can be overcome by instructions to the jury," wrote Justice Robert H. Jackson more than fifty years ago, "all practicing lawyers know to be unmitigated fiction." *Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring); *see also Addonizio v. United States*, 405 U.S. 936 (1972) (Douglas, J., dissenting from denial of certiorari) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury, all practicing lawyers know to be unmitigated fiction.").

And as the allegations were false, and readily disprovable, their impact on Mr. Maharaj would have been vastly reduced. In terms of a motive, this would anyway have been weak compared to Escobar's penchant for killing those he thought had ripped him off.

a. Mr. Maharaj allegedly stole *The Caribbean Times* from Derrick
Moo Young. (Tr. 2367) In point of fact, had counsel had access
to the material in the briefcase and followed up as did William
Penn, he would have learned that Derrick and Duane were trying
to steal the *Times* from Mr. Maharaj - albeit without the latter's
knowledge;

b. Carberry testified that Derrick Moo Young told him that a bribe
of $160,000 was paid to Persad to hush up *The Echo*. (Tr. 2373)
Derrick supposedly gave him a check to substantiate that. (Tr.
2373) In fact, now that we have it, the check proves that Derrick
was the one involved in a payment *from* Persad, in the sum of
$150,000, and that in all likelihood it was part of an extortion
effort on Derrick's part;

c. Carberry testified that "Krishna Maharaj, the proclaimed unfiled
owner of a local Caribbean newspaper" allegedly forged a check
from Derrick Moo Young. A third party complaint had been
"filed by Attorney Paul May on behalf of Duane Moo Young,
President of KDM International" (Tr. 1622) The evidence
suppressed by the prosecution shows that the Moo Youngs were

trying to fabricate evidence to cover up the fact that they had

stolen the money from Mr. Maharaj;

d.  Carberry said that "according to Detective Inspector Waldham of

the Economic Crime Division, the entire Moo Young - Maharaj

entourage is being investigated." (Tr. 1622) In fact, as the

prosecution well knew, Det. Waldman had concluded that the

Moo Youngs were making up things against Mr. Maharaj to

settle a score.

14.  Another element of the Carberry *Brady* issue in 1997 involved a

memo written apparently to Sgt. Bohan and Sgt. Vivian by someone who read

about Carberry being involved in the case. *(Exh. IAM-A at 5)* The witness

apparently gave his or her name and address to Sgt. Vivian "some time ago."

(Exh. IAM-A at 6)

a.  In pertinent part, the State's informant reported of Carberry:

> This crooked, notorious thief and con and fraud artist from
> the island of Grenada came to the USA via Texas then he
> quickly opened up his paper then rob everyone and landed
> in Miami in 1982 about August or thereabouts.  Then he
> started again he ripped off any and everybody and business
> and he moves about.  He had a storefront office at 7911
> Biscayne Boulevard #5 with a Jamaican name[d] Phyllis
> Reid.  He ripped her off a few thousands, used her name
> and when he was a haunted man he took off for his native
> Grenada in July 1984 and obtained a visitor's visa
> whereby he could only come in and go out and not to

288

conduct any business. [B]ut he stayed on and has amass[ed] thousands . . . by sheer fraud schemes.

(1997 Exh. IAM-A at *1*) In his businesses, he "uses only people who have legal status as his front." (1997 Exh. IAM-A at 2);

b. this raises several questions, in addition to the aspects of Carberry's dishonest and dissolute character that the defense would have wanted to investigate.[260] For example, if the Government knew that Carberry was illegally in the country, and illegally operating a business here, the obvious question is why he was not deported? The defense should have been able to explore with him whether his cooperation with the Government was predicated in part upon a fear that he would be sent back to Grenada if he did not;[261]

c. the memo provides an important link to narcotics with yet another state witness, since in "82 & 83 he [Carberry] lived off drug money in Miami and got so rich and took off to Grenada. Stayed at the St. James Hotel, paid up well for the few m[o]nths he stayed there. . . ." (1995 Exh. IAM-A at 4) The natural question for the state police was whether they investigated this;

---

[260] Carberry later received a criminal record that resulted in his deportation.
[261] Indeed, he later was deported to Grenada where he apparently now resides.

d.  the informant promised to provide more evidence to the police: "I shall collect some concrete evidence that I have of other folks and businesses ripped off [by Eslee Carberry]." (1997 Exh. IAM-A at 7) If the informant did this, then the defense had a right to see the evidence. If the police showed no interest in receiving evidence that might impeach one of its star witnesses, then this would reflect very badly on the prosecution, and should be independently discoverable;

e.  the memo in the possession of the police mentions a "car theft from Texas." (1997 Exh. IAM-A at 4) Sure enough, this would have led Mr. Maharaj to the fact that, on September 22, 1982, Carberry was arrested on a governor's warrant out of Texas. (Exh. S-EC-A) *State of Florida v. Eslee Carberry aka Ewarta Carberry*, No. 82-23403 (11th JDC, 1982);

f.  while the State was intent on using him against Mr. Maharaj in this case,[262] Carberry was eventually prosecuted in Florida for a

---

[262] When presented with this in 2004, this Court relied on the state court finding: that "because '[t]he jury was well aware of the surly [*sic*] reputation of both Carberry and the newspaper he ran,' and thus use of this memo for impeachment would not have added anything to the case that would have undermined the verdict." *Maharaj v. Moore,* at 24, quoting *Maharaj IV,* 778 So.2d at 775. There are at least two important caveats to this – one, that again the Florida court did not mention the most significant element of the memo,

bad check written to the Franklin Press in 1988. (Exh. S-EC-B)
(*State of Florida v. Carberry Int'l Publishing Co. & Eslee
Carberry*, No. 89-33050 (Dade Co, 11th JDC, Fla.)). He was
placed in pre-trial diversion, but was "unsuccessfully
terminated" for failure to repay the money. Thereafter, he was
rearrested, and the federal government deported him back to
Grenada.[263]

15.     The *Brady* material concerning Tino Geddes which, as detailed
above, included various material to go with the 2014 evidence that he had a
long association with the Jamaican *Shower Posse*:

a.  in 1995 the prosecutors admitted that they had interviewed all the
alibi witnesses and each had given a statement to the prosecutors
that was consistent with their original sworn statement. This
material has never been provided to the defense, and it would be
compelling since it shows that the prosecutors knew that half a

---

which is why the police ignored it and did not investigate the sordid history
of their witness (the answer would have been clear to the jury, and would have
reflected on the prosecution case rather than just this witness); two, it is yet
another element to be aggregated in the *Brady* claim.

[263] Mr. Maharaj incorporates by reference all the allegations earlier in the
pleading, and reiterates that the *Brady* material concerning Eslee Carberry
must be read in connection with the extensive evidence of ineffective
assistance of counsel with respect to how he was ineffectually challenged.

dozen witnesses said that Geddes was lying about talking to them and confecting the alibi;

b. in 1995, Geddes admitted:

> For a time when they came over to interview me, I took them over the north course and I took them around Jamaica. I think they had a wonderful time.

(Exh. STG-D at 12, Channel Four, July 25, 1995) Indeed, there is a picture of the two prosecutors and Geddes drinking away at a bar together. (*See* Exhibit STG-B) It turns out that they went to a strip club with him, and one can only imagine what impact that would have had on a jury – such an inappropriate interaction between the prosecutors and a witness;

c. piecing the dates of everything together, it was clear in 1997 that the prosecution had misrepresented the case to the Kingston court to help Geddes escape prison on his weapons charges. They said Geddes had a "moral" defense to the charge because he had bought the weapon after the supposed Dupont "Dry Run" on October 5 or 6, 1986. This was false, since he bought the gun in question months before, and had several other weapons as well. In addition to abusing their immense power, they reassured the jury of a crucial "fact" that was untrue;

d. equally troublesome[264] was defense counsel's failure to challenge the assumption throughout Mr. Maharaj's trial that Geddes was now telling the truth. Indeed, during Geddes's deposition, for example, prosecutor Kastrenakes interrupted:

> I would interrupt that with saying that we did advise Mr. Geddes that he could not be prosecuted for perjury because he has, in fact, recanted and I advised him of Florida law with respect to that.

(Exhibit STG-E, TG Depo. at 113) This statement is truly incredible, and a telling issue for cross-examination. If what Geddes said satisfied the prosecution, then it was not perjury; if it was unsatisfactory, then it was.[265]

16.     Mr. Maharaj incorporates by reference all other allegations concerning *Brady* material made in his earlier pleadings.

"The suppression by the prosecution of evidence favorable to an accused" violates due process. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

---

[264] But sounding in ineffective assistance of counsel.

[265] Mr. Maharaj incorporates by reference all the allegations earlier in the pleading, and reiterates that the *Brady* material concerning Tino Geddes must be read in connection with the extensive evidence of ineffective assistance of counsel with respect to how he was ineffectually challenged.

Exculpatory evidence that trial counsel unreasonably failed to discover and present to the jury violates the defendant's right to the effective assistance of counsel guaranteed by the Sixth Amendment of the U.S. Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984).

Applying these three standards, there is a reasonable likelihood that the outcome of the trial would have been different.

### 3. MR. MAHARAJ WAS DENIED HIS CONSTITUTIONAL RIGHTS BECAUSE THE JURY HEARD SIGNIFICANT PERJURED TESTIMONY

All other factual matters and allegations contained elsewhere in this Motion are incorporated herein.

A *Giglio* claim must be viewed in aggregation. In other words, the court must look at all the allegations of perjured evidence together, and then assess them against the evidence adduced at trial.

Mr Maharaj incorporates and re-alleges all the allegations of perjured evidence made in earlier challenges to his conviction, in both state and federal court. This includes but is not limited to:

1. Neville Butler's entire testimony, but most obviously from the perspective of the prosecutors:

    a. his story (repeated six times to the jury) about how he

voluntarily came forward to change his testimony;

    b.  his efforts to deny that Eddie Dames had been the one to set up the meeting with the Moo Youngs;

    c.  his story about the green (hotel) pillow used to muffle shots being brought by Mr. Maharaj to Room 1215;

    d.  his "ridiculous" statement that Mr. Maharaj wanted to sit outside the Dupont Plaza for three hours so he could meet Eddie Dames;

    e.  his statements that he did not expect a deal from the prosecutors and that he might be arrested at any time.

2.  Tino Geddes's entire testimony, but most obviously to the prosecutors:

    a.  his testimony about the assistance he received from the prosecutors with respect to his weapons charges;

    b.  the story he told about the need for him to buy a gun;

    c.  the story he told about the supposed 'Dry Run' in the Dupont Plaza;

d.  the other two "murder plot" stories; and

e.  the false story he told about manufacturing the alibi.

3.  A substantial proportion of Det. Buhrmaster's testimony, including most obviously to the prosecutors:

a.  his testimony that Mr. Maharaj denied ever owning a pistol;

b.  his testimony that Mr. Maharaj denied ever being in Room 1215;

c.  his carefully prepared story that Butler voluntarily changed his testimony;

d.  his carefully prepared story that Butler might be arrested at any moment;

e.  his supposed investigation into the set-up of the Moo Young meeting, when he knew that Eddie Dames had been calling to set it up for some days before October 16;

f.   his suggestion that he looked into Jaime Vallejo Mejia and he was "legit".

In addition to this, Mr. Maharaj alleges that the entire case against him

was falsified by the witnesses and the police as set forth elsewhere in this pleading.

Agents of the state clearly knew that perjured evidence was being presented.

### 4. MR. MAHARAJ WAS DENIED HIS CONSTITUTIONAL RIGHTS BECAUSE HE WAS PROVIDED WITH INEFFECTIVE ASSISTANCE OF COUNSEL

All other factual matters and allegations contained elsewhere in this Petition are incorporated herein.

The Sixth Amendment guarantees those accused of crimes to have the assistance of counsel for their defense. *U.S. Const. amend. VI.* The purpose of this Sixth Amendment right to counsel is to protect the fundamental right to a fair trial. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). The skill and knowledge counsel is intended to afford a Defendant "ample opportunity to meet the case of the prosecution." *Strickland*, 466 U.S. at 685, citing *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275, 276, 63 S. Ct. 236, 240 (1942).

A *Strickland* claim must be viewed in aggregation. In other words, the court must look at all the allegations of ineffectiveness together, and then assess them against the evidence adduced at trial.

Mr Maharaj incorporates and re-alleges all the allegations of ineffectiveness made in earlier challenges to his conviction, in both state and federal court.

Counsel failed to make any reasonable effort to investigate critical evidence in this case, as set forth above.

Counsel failed to investigate a defense for trial and instead suggested a ludicrous theory that Carberry and Butler conspired to kill the Moo Youngs to improve the circulation of the *Caribbean Echo*.

Counsel failed to investigate and present the alibi, and therefore made a decision without investigation – he read the sworn statements taken by his predecessor counsel and decided that the alibi, which was true, was "too good." This was particularly prejudicial because the prosecutors interviewed all the witnesses and decided they were all consistent.

Counsel failed to investigate the illegal conduct of the victims immediately prior to their deaths including money laundering, fraud, and narcotics trafficking.

Counsel failed to obtain or preserve records of chief prosecution witness Neville Butler's failed lie detector test. (Exh. J)

Neither did counsel locate witnesses to testify to the vast amount of exculpatory evidence that is discussed above.

"At the heart of effective representation is the independent duty to investigate and prepare." *Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982)

Counsel filed not one meaningful pretrial motion. This case was tried in 1987. By 1984, the Supreme Court had already noted that there was habitually a "barrage of pre-trial defense motions . . . implemented in capital cases." *Downs v. State*, 453 So. 2d 1102, 1106 (Fla. 1984). In this case, there were none.[266]

In this case, the "barrage" of motions should have been filed; to challenge the effort to solicit a bribe from Mr. Maharaj, to exclude false and prejudicial evidence, to suppress the statement allegedly taken from Mr. Maharaj, to suppress the identification of Mr. Maharaj which was highly suggestive and ultimately false, to enforce discovery, to ensure proper voir dire conditions, and so forth.

Counsel failed to move to suppress or object at trial to a highly suggestive

---

[266] Mr. Maharaj gives some specific examples below of motions that should have been filed, litigated and granted.

and tainted photographic lineup identification of Mr. Maharaj by hotel employees, Inez Vargas, and Arlene Rivers. The identification consisted of Black individuals - much darker in complexion than Mr. Maharaj - shown to the employees six months after the event. (Tr. 2642-2645, 2648, 2653, 2723-2725, 3478-3484, 2491; State's Exhibit 93)

A large quantity of evidence was introduced at trial related to prior alleged bad acts committed on the part of the accused. Most of these charges were based on the hearsay reports of the tabloid *Caribbean Echo*; all of the charges were either wholly false or extraordinarily exaggerated. Counsel's inaction with respect to prior charges (let alone convictions) was clearly ineffective. For example, it is clear that "the failure to object to an invalid conviction can constitute a constitutionally deficient performance." *Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986), *cert. denied*, 474 U.S. 1073, 106 S. Ct. 833 (1986) (failure to object to previous conviction for same crime for which defendant was then being charged).

Counsel failed to properly advise the defendant of his constitutional right to present evidence and testify on his own behalf, thereby resulting in Mr. Maharaj's uninformed and ill-advised waiver. Mr. Maharaj repeatedly and expressly expressed his desire in open court "to prove his innocence". (Tr.

2857, 3014) However, when it came time to present a defense, counsel advised Mr. Maharaj that the case had been won on attacking the prosecution case, and that there was no need to present a defense. This advice fell outside the range of effective assistance of counsel. In contrast, counsel told Mr. Maharaj to testify at the penalty phase when it was entirely too late to do anything. Under Florida law, even "whimsical doubt" is not relevant to mitigation. *Burr v. State*, 466 So. 2d 1051 (Fla.), *cert. denied*, 474 U.S. 879, 106 S. Ct. 201 (1985).

Counsel failed to move for mistrial when Judge Gross was arrested. *United States v Jaramillo*, 745 F.2d 1245 (9th Cir. 1984). (Tr. 2865) This was done because counsel did not have adequate resources, and therefore elected to proceed rather than have to undertake the costs of a second trial.

As has been made abundantly clear, counsel had available a large quantity of impeachment material that (a) should have come from statements taken prior to trial; (b) should have come from depositions; or (c) should have come from independent investigation.

Defense counsel failed to explain the presence of the defendant's fingerprints in the hotel room. This critical evidence was readily available, yet defense counsel allowed Det. Buhrmaster to lie to the jury unimpeached.

Defense counsel consulted no experts save for a polygrapher (whose immensely exculpatory report he failed to use effectively). Had counsel done so, counsel could have learned important information concerning ballistics, crime scene investigation, fingerprint analysis, identification testimony and the like.

Counsel failed to object to a number of statements by prosecuting counsel and testimony by witnesses that was clearly inadmissible, including as merely a sample:

- the testimony of Eslee Carberry vouching for credibility of Tino Geddes; (Tr. 2386-2387)

- the testimony of a truck rental records custodian, and rental agreement implicating Mr. Maharaj in an alleged collateral act of misconduct; (Tr. 2319, 2321)

- the introduction of various irrelevant phone records never linked to the defendant; (Tr. 2679)

- the repetitious and inadmissible testimony of chief prosecution witness Neville Butler. This omission prompted the Court to comment on the defendant's failure and to send the jury out of the courtroom; (Tr. 3022)

- counsel failed to move for a mistrial, thereby waiving review, upon Det. Buhrmaster's comment relative to the failures of the defendant's investigator; (Tr. 3565)

- counsel failed to object to the prosecutor vouching for credibility of Neville Butler by stating how "candid" he was; (Tr. 3131)

- counsel failed to object to the prosecutor making lengthy reference to the conflict in "testimony" between Mr. Maharaj and other witnesses, when Mr. Maharaj did not testify.

Counsel failed to show the jury that the photographs introduced into evidence by the State refuted the State's theory and chief prosecution witness Butler's testimony. At trial, Butler testified that Derrick Moo Young ran out of the hotel room, Mr. Maharaj followed him into the hallway, and fired the final, fatal shot. Butler testified that Mr. Maharaj then dragged Derrick Moo Young by his legs back into the room. (Tr. 3039) This version of the facts was corroborated by the State's expert medical testimony. However, if Butler's story was true, the body of Derrick Moo Young would have been in the completely opposite position from which it was found (Derrick Moo Young's head, not his feet, would have faced the door). (Exh. S)

He failed to use the evidence effectively. For example, he failed to refute Det. Buhrmaster's claim that the defendant might have changed his

clothes after the murder and bought new ones. The photographs that Det. Buhrmaster took of Mr. Maharaj after his arrest showed the clothes he was wearing were not new. The fact that Mr. Maharaj's clothes were not bloody, torn, or contaminated by gun powder residue was crucial evidence of innocence. He failed to challenge Det. Buhrmaster on the fact that Neville Butler clearly *had* changed his torn and bloody clothes and the police made no effort to secure them.

Counsel suggested no instructions, and made no objections to the instructions given. These instructions contained several errors, and omitted other instructions that would have been critical to Mr. Maharaj's case.

The closing arguments in this case were totally inadequate. Counsel proposed a ludicrous defense in a case where his client was factually innocent. Counsel failed even to argue to the jury, in refutation of the State's claim, that if Mr. Maharaj intended to avoid arrest by killing Duane Moo Young, why would he not have killed Butler, too?

There is clearly a reasonable probability that, but for counsel's tepid performance, the outcome of the trial would have been different.

### 5.  MR. MAHARAJ WAS INTENTIONALLY FRAMED BY MIAMI LAW ENFORCEMENT OFFICERS WHO WERE CORRUPT

All other factual matters and allegations contained elsewhere in this petition are incorporated herein.

While it is totally unnecessary for Mr Maharaj to prove this, he can now show that he was intentionally framed by corrupt law enforcement officers.

## 6. POST CONVICTION COUNSEL FOR MR. MAHARAJ WERE RENDERED INEFFECTIVE DURING HIS PREVIOUS CHALLENGES TO HIS CONVICTION BY THE LACK OF FUNDS AND RESOURCES PROVIDED FOR THE PRESENTATION OF HIS CASE

All other factual matters and allegations contained elsewhere in this Motion are incorporated herein.

The courts have held that *pro bono* counsel had worked diligently to assert Mr. Maharaj's rights during all proceedings.

Nonetheless, to the extent that there has been any failing in the presentation of Mr. Maharaj's case, whether due to lack of funds or by oversight, he received ineffective assistance of counsel in his state postconviction proceedings. He, therefore, deserves to have all the issues raised at that time revisited with the benefit of adequate funding and resources now. *See Martinez v. Ryan*, 132 U.S. 1309 (2012).

## 7. THE CUMULATION OF ERROR IN THE PROSECUTION OF MR. MAHARAJ VIOLATED HIS FUNDAMENTAL RIGHTS

All other factual matters and allegations contained elsewhere in this Motion are incorporated herein.

Mr. Maharaj's trial was tainted by many other substantive errors, each of which he raises (or re-raises) here. These include all issues previously raised in state and federal court, including but not limited to:

1. the suppression of favorable evidence;

2. the knowing or unknowing use of perjured evidence;

3. the failure to discover evidence, whether due to counsel's fault or not;

4. deficient actions by ineffective counsel;

5. the denial of adequate funds to present his case;

6. the securing of an indictment by the presentation of perjured testimony to the grand jury;

7. the denial of his right to testify on his own behalf. *Rock v. Arkansas*, 483 U.S. 44 (1987);

8. the failure to suppress unconstitutionally obtained (and falsely reported) statements made by Mr. Maharaj;

9. the failure to suppress unconstitutional and unreliable identification testimony. *United States v. Wade*, 388 U.S. 218, 87 S. Ct. 1926 (1967);

10. the violation of the *Williams* rule, and the federal constitutional implications of presenting this patently false evidence tarring Kris Maharaj's character;

11. the solicitation of a bribe from Mr. Maharaj prior to trial by Judge Howard Gross;

12. the continuation of the trial after Judge Howard Gross was arrested for taking bribes in the case of a putative Colombian drug trafficker;

13. the general corruption of the legal process evinced by the sequence of misconduct committed by Judge Gross, Judge Harold Solomon, and Judge Leonard Glick;

14. the failure to respect his rights under the Vienna Convention on Consular Relations, and the related bilateral treaty between the United States and the United Kingdom;

15. the cumulation of error in this case to date.

Viewing these errors along with all the error identified elsewhere in this motion, it is clear that Mr Maharaj's conviction was obtained in violation of the law.

The Florida Supreme Court has held that a cumulation of error may require reversal of a conviction. "Gunsby is entitled to a new conviction-phase

proceeding. *We reach this conclusion based on the combined effect of the errors in this case,* which include the State's erroneous withholding of evidence, the ineffective assistance of counsel in failing to discover evidence, and newly discovered evidence reflecting that this was a drug-related murder rather than a racially motivated crime." *State v. Gunsby*, 670 So. 2d 920, at 921 (Fla. 1996) (emphasis supplied).

Likewise, as a matter of federal law, the cumulation of error can support an order for a new trial.

In making this assessment this Court should aggregate the impact of all the new evidence presented in this petition in light of both the evidence at trial and the evidence produced at earlier proceedings before this Court or the federal courts.

This Court should additionally cumulate the impact of all errors committed at trial, as well as those identified in this motion and earlier motions or pleadings challenging the convictions in this case.

When this is done, it is abundantly clear that Kris Maharaj merits either a new trial or the dismissal of all charges against him.

## PRAYER FOR RELIEF

For these reasons, Mr. Maharaj asks this Court to grant all relief to which he is entitled in this proceeding, including but not limited to:

1) funding for his defense;

2) an order mandating the preservation of all evidence held by the Court, the State and state and federal law enforcement in this case;

3) the right freely to amend the petition as necessary;

4) an opportunity to reply to any pleading filed by Respondent;

5) discovery of information necessary to a fair hearing;

6) the right to take depositions of relevant witnesses;

7) the authority to exercise compulsory process, including the issuance of subpoenas for the production of witnesses and documentary evidence;

8) an evidentiary hearing on the allegations made herein;

9) vacatur of his convictions and sentences;

10)    dismissal of the indictments of Krishna Maharaj related to the murder of Derrick and Duane Moo Young with prejudice;

11)    his immediate release from state custody; and

12)    all other and further relief that the Court deems just and proper.

Respectfully submitted,

*PRO BONO* COUNSEL FOR
PETITIONER, KRISHNA MAHARAJ

*S/ Benedict P. Kuehne*
BENEDICT P. KUEHNE
Miami Tower, Suite 3550
100 SE 2 Street
Miami, FL 33131-2154
Tel: 305 789 5989
ben.kuehne@kuehnelaw.com
efiling@kuehnelaw.com

CLIVE A. STAFFORD SMITH
La State Bar No. 14,444
Reprieve, PO Box 72054
London UK, EC3P 3BZ, ENGLAND
Tel: +44 (0)20 7353 8140
clive@reprieve.org.uk

## <u>CERTIFICATE OF COMPLIANCE</u>

This document is printed in Times New Roman 14-point font and contains 63,315 words, as counted by Microsoft Word.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document has been served by mail and email upon the following on May 25, 2017:

Office of the State Attorney
1350 N.W. 12th Avenue
Miami, FL. 33136-2111
felonyservice@miamisao.com

Richard Polin
Assistant Attorney General
1 SE 3 Avenue, Suite 900
Miami, FL 33131
crimappmia@myfloridalegal.com

*<u>S/ Benedict P. Kuehne</u>*
**BENEDICT P. KUEHNE**

## VERIFICATION

I declare pursuant to 28 U.S.C. § 1746 under penalty of perjury that the

foregoing is true and correct.

Executed April ___, 2017.

_____
Krishna N. Maharaj