UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 17-21965-CIV-MARTINEZ
MAGISTRATE JUDGE ALICIA-OTAZO-REYES

KRISHNA MAHARAJ,

      Petitioner,

vs.

JULIE L. JONES,
Florida Department of Corrections; et al.,

      Respondents.
_____/

**AMICI CURIAE BRIEF OF MEMBERS OF THE
HOUSE OF COMMONS AND MEMBERS OF THE HOUSE OF LORDS**

**A. Overview**

  Justice Oliver Wendell Holmes wrote, "[w]hatever disagreement there may be as to the scope of the phrase 'due process of law' there can be no doubt that it embraces the fundamental conception of a fair trial, with opportunity to be heard." *Frank v. Mangum*, 237 U.S. 309, 347 (1915) (Holmes, J., dissenting). In this brief, the undersigned amici submit a similar and equally fundamental proposition: there can be no doubt that the phrase "due process of law" embraces the right of an imprisoned person to present proof of his innocence. Whatever procedural restrictions may apply in post-conviction proceedings, the process that is due must permit an innocent person to adduce evidence that he or she did not commit the crime. This is the growing consensus view world-wide, and it is a consensus that should inform this Court's provision of due process of law.

  In *Herrera v. Collins*, the United States Supreme Court left open the question whether a person sentenced to death may petition for a writ of *habeas corpus* based on evidence of actual innocence:

> *"Nowhere does the Court state that the Constitution permits the execution of an actually innocent person. Instead, the Court assumes for the sake of argument that a truly persuasive demonstration of actual innocence would render any such execution unconstitutional and that federal habeas would be warranted if no state avenue were open to process the claim."*[1]

The same principles must apply whether a person is sentenced to death or to imprisonment. If it is unconstitutional to execute a person who can persuasively demonstrate that he or she is innocent, it must also be unconstitutional to keep him or her imprisoned, in this case until he dies. Amici submit that, in circumstances where an innocent person has been wrongfully convicted, if he or she is able to adduce meaningful evidence of his or her innocence, he or she ought to be entitled to seek relief, notwithstanding any procedural bars, time limitations or other legal impediments that might prevent him or her from doing so. To be sure, there are differences of opinion on the purpose of the criminal justice system (for example, some jurisdictions place more emphasis on rehabilitation of offenders, others on punishment of offenders, and others on the rights of victims and their families). But it is not controversial that the criminal justice system should only imprison those who are actually guilty of the crimes of which they have been convicted.

There are numerous procedural safeguards, both under United States law and internationally, aimed at ensuring defendants get a fair trial and that only the guilty are convicted and imprisoned. However these safeguards sometimes fail, resulting in innocent people being convicted of crimes. To take the United States as an example, persons charged with capital crimes are afforded stringent procedural and due process rights, as well as appeal rights, yet there have been 159 exonerations from death row in the United States since 1976.[2]

---

[1] *Herrera v Collins*, 506 US 390 (1993) at 427
[2] Death Penalty Information Centre: Innocence List, https://deathpenaltyinfo.org/innocence-list-those-freed-death-row (accessed on 6 July 2017)

While legal certainty and finality are sensible aims of every legal system, it is an unfortunate fact, no matter how effective the procedural safeguards, that innocent people are convicted. It is also an unfortunate fact that, despite rules establishing procedures and deadlines for post-conviction review, definitive proof of innocence may occasionally emerge after those deadlines and processes have elapsed. This case is a prime example. Mr. Maharaj asserts that a Columbian drug lord ordered the murders of the Moo Youngs, and that his erroneous conviction resulted from myriad confounding circumstances that included the co-conspirators covering their tracks, dubious witnesses who had motives to curry favor with the prosecution, and a tangled web of relationships between members of the multi-billion dollar drug trade, informants and law enforcement. Mr. Maharaj's extraordinary quest to unearth the truth took his team on a long and winding road that may not align fully with procedural post-conviction requirements, but which has at long last finally yielded *evidence*.

Given the elaborate processes in the United States for post-conviction review, the interests of finality have yielded procedural rules that have spawned an odd by-product: the Government may contend that if an innocent person adduces the evidence of his innocence too late in the post-conviction process, the prisoner must not simply show that he is innocent, but also must overcome procedural hurdles as well.

The undersigned amici are Members of Britain's House of Commons and of its House of Lords. Amici respectfully submit that the erroneous conviction of an innocent person is in and of itself a constitutional violation and must always assume primacy in a post-conviction review proceeding. The text of the phrase "due process" indicates that the process that the state owes is that which is "due" under the circumstances. In the case of the innocent, that which is due must include a mechanism by which the erroneously convicted can adduce evidence of their innocence, regardless of when that proof comes to light. This has increasingly become the consensus and non-controversial view world-wide, where there is

widespread recognition that the erroneously convicted ought to be entitled to relief based solely on evidence of their innocence.

The United States Supreme Court has looked to international norms to inform its interpretation of constitutional questions. *See Roper v. Simmons*, 543 U.S. 551, 575–76 (2005) (Kennedy, J.) ("[T]he task of interpreting the Eighth Amendment remains our responsibility. Yet at least from the time of the Court's decision in *Trop*, the Court has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments.'"); *Lawrence v. Texas*, 539 U.S. 558, 572–73 (2003) (Kennedy, J.) (The Court used international norms to inform its interpretation of issues arising under the Due Process clause.); *Atkins v. Virginia*, 536 U.S. at 316 n.21. (2002) (Stevens, J.) (Citing multiple "*Amici Curiae* . . . [to confirm] within the world community, the imposition of the death penalty for crimes committed by mentally retarded offenders is overwhelmingly disapproved . . . Although these factors are by no means dispositive, their consistency with the legislative evidence lends further support to our conclusion that there is a consensus among those who have addressed the issue.").

Amici respectfully submit that this case similarly merits consideration of international norms, which reinforce support for the right to relief from an erroneous conviction on the independent ground of newly discovered evidence. We set out below some of the approaches taken in various jurisdictions to illustrate this point.

B.   **The United States**

Various federal and state laws permit the use of DNA evidence to exonerate regardless of the procedural posture of the conviction. There have been 350 DNA test-based exonerations in the United States since 1989.[3]

It seems incongruous that DNA evidence may be used to prove a convicted person is innocent, regardless of procedural hurdles, but other evidence of innocence may face procedural roadblocks. Amici thus detail international principles that counsel in favor of recognizing any compelling evidence of innocence, not merely just one type of evidence.

C.   **The United Kingdom**

A series of high profile miscarriage of justice cases, including the "Guildford Four," the "Birmingham Six" and the "Maguire Seven," exposed weaknesses in the criminal justice system in England and Wales and led to the establishment of the Royal Commission on Criminal Justice in 1991.[4]

Taking the Birmingham Six case as an example, the six defendants were convicted of 21 counts of murder arising out of the IRA bombing of two public houses in Birmingham in 1975. The trial judge, Mr Justice Bridge (a respected judge who later sat as a judge in the House of Lords, the UK's then highest court), was clearly convinced of the guilt of the defendants as he stated that, if the defendants were telling the truth, the police had been involved in a conspiracy "unprecedented in the annals of criminal history" which "involved giving perjured evidence in which the police must have spent many hours … trying to ensure that their various lies would accord with each other".[5] After the jury returned the verdicts Mr

---

[3] The Innocence Project, https://www.innocenceproject.org/dna-exonerations-in-the-united-states/ (accessed on 19 July 2017)
[4] Criminal Cases Review Commission: Our History, https://ccrc.gov.uk/about-us/our-history/ (accessed on 4 January 2018)
[5] Evidence to the Royal Commission on Criminal Justice, available at: http://www.chrismullinexmp.com/speeches/evidence-to-the-royal-commission-on-criminal-justice (accessed on 4 March 2018). Mr Justice Bridge went on to invite the jury to "Consider the scale of the conspiracy in terms of those involved, it ranges does it not, from detective constables and police constables right up through the police hierarchy … If there had been one officer … who said to himself 'I cannot stomach this', if he had reported the

- 5 -

Justice Bridge described the evidence in the case as "the clearest and most overwhelming that he had ever heard".[6]

However, in 1991 the Court of Appeal quashed the convictions as fresh scientific evidence placed the expert evidence presented at trial in grave doubt and an investigation carried out by the Devon and Cornwall Constabulary revealed that the evidence given by the police at trial was unreliable.[7]

A different group known as "The Guildford Four" were also convicted of murders arising out of IRA bombings. When sentencing the defendants, the judge in this trial (Mr Justice Macpherson) said "[i]f hanging were still an option, you would have been executed".[8] However, the convictions in this case were quashed by the Court of Appeal after it emerged that at least five of the twelve police officers who gave evidence at the trial had seriously misled the court.[9]

These cases demonstrate the fundamental importance of providing convicted persons with an opportunity to present evidence of their innocence as both of the trial judges were convinced that the defendants were guilty, when subsequently their convictions were quashed by the Court of Appeal.

The Report of the Royal Commission recommended that a new body be established to consider alleged miscarriages of justice, to supervise their investigation if further enquiries

---

matter to some very senior officer or even to some independent force. If he had gone to the press and said, 'This is what is happening', the gaffe would have been well and truly blown would it not? … Consider, lastly, the subtle artistry that has gone into the preparation of these statements, if indeed they are works of fiction. If the evidence of the defendants is true, it shows the police not only to be masters of the vile techniques of cruelty and brutality to suspects. It shows them to have a lively and inventive imagination."

[6] R v McIlkenny (1991) 93 Cr. App. R. 287 at 293
[7] R v McIlkenny (1991) 93 Cr. App. R. 287 at 318
[8] The Times, 30 December 2017, https://www.thetimes.co.uk/edition/ireland/conlon-told-tanaiste-i-cant-face-another-18-years-of-living-hell-gvd6skhsn (accessed on 4 January 2018)
[9] Report of the inquiry into the circumstances surrounding the convictions arising out of the bomb attacks in Guildford and Woolwich in 1975, Sir John May, 30 June 1994, 293-297

are needed, and to refer appropriate cases to the Court of Appeal.[10] The recommendations of the Royal Commission led to the Criminal Appeals Act 1995 which established the Criminal Cases Review Commission (the "**CCRC**").[11] The Scottish Criminal Cases Review Commission (the "**SCCRC**") was established in 1999 under Part XA of the Criminal Procedure (Scotland) Act 1995.[12]

The CCRC and the SCCRC are independent, government-funded bodies with broad powers to investigate and refer claimed miscarriages of justice to an appellate court for post-conviction review.[13] Between 1 April 1997, when the CCRC started work, and 31 May 2017, the CCRC referred 632 cases to the Court of Appeal, of which 624 appeals were heard. Of those 624 appeals, 418 were successful and 193 were dismissed.[14] The SCCRC referred 130 cases to the High Court between 1 April 1999, when it started work, and 31 March 2016. The High Court heard 117 of those cases and 77 appeals were successful.[15]

In these "wrongful conviction" contexts, the Court of Appeal has substantial power to correct miscarriages of justice, including the power to receive newly discovered evidence: "the Court of Appeal may, if they think it necessary or expedient in the interests of justice - (c) receive <u>any evidence</u> which was not adduced in the proceedings from which the appeal lies" (emphasis added).[16] The ability of courts in England and Wales and Scotland to review newly discovered evidence provides a model for providing justice in this limited circumstance of the discovery of evidence.

---

[10] Report of the Royal Commission on Criminal Justice, 6 July 1993 at p.182, https://www.gov.uk/government/publications/report-of-the-royal-commission-on-criminal-justice (accessed on 4 January 2018)
[11] Criminal Cases Review Commission: Our History, https://ccrc.gov.uk/about-us/our-history/ (accessed on 4 January 2018)
[12] Scottish Criminal Cases Review Commission: Legislative Framework, http://www.sccrc.co.uk/legislative-framework
[13] Griffin, *Correcting Injustice: Studying how the United Kingdom and the United States review claims of innocence*, 41 U. Tol. L. Rev. 107 2009-2010 at 108 and SCCRC: Legislative Framework, http://www.sccrc.co.uk/legislative-framework (accessed on 2 January 2018)
[14] CCRC Case Library: Case Statistics, https://ccrc.gov.uk/case-statistics/ (accessed on 6 July 2017) and Griffin at 112-113
[15] SCCRC: Case Statistics, http://www.sccrc.co.uk/case-statistics (accessed on 2 January 2018)
[16] Griffin at 114, Criminal Appeal Act 1968 s.23(1)(c) (as amended by the Criminal Appeal Act 1995 s.1(a))

In addition, the appellate courts in the United Kingdom will allow an appeal against an unsafe conviction.[17] The meaning of an "unsafe" conviction was considered by the Court of Appeal in *R v Pendleton*. The Court of Appeal held that the court must consider "whether the evidence, if given at the trial, <u>might</u> reasonably have <u>affected the decision</u> of the trial jury to convict. If it might, the conviction must be thought to be unsafe" (emphasis added).[18] That standard reflects the primacy that the United Kingdom places on ensuring that no innocent person remains imprisoned.

**D.     France**

In France a person convicted of a crime can raise new evidence of innocence by filing a *révision* in the Court of Cassation. A *révision* can be filed on various grounds, including the independent ground that new evidence places the accused's guilt in doubt.[19]

The passage of the *Loi 2014-640* in 2014 demonstrates increasing recognition of the need to allow new evidence to be adduced after a person has been convicted of a crime. It was the *Loi 2014-640* that permitted the filing of a *révision* request when new facts or evidence are discovered that were not known at the time of the conviction[20] and that changed the requisite standard from evidence that shows the innocence of the accused to evidence that places the accused's guilt in doubt.[21]

**E.     Germany**

In Germany, there are two avenues by which a person may challenge his or her conviction: a general appeal or a revision. A general appeal results in a new trial which will address both guilt and sentencing and the appeals court must collect and present any evidence

---

[17] Criminal Appeals Act 1995 s.2(1)
[18] Griffin at 116, [2001] UKHL 66, *R v Pendleton* at 19
[19] Garrett at 131
[20] Garrett at 131, C. PR. PÉN. art. 624
[21] Garrett at 131, C. PR. PÉN. art. 624

necessary to arrive at a new judgment, whether previously adduced or not.[22]  A revision is confined to legal questions only, whether they are of procedural law or substantive criminal law.  However, on the request of the appellant the German Federal Supreme Court has to review the initial court's factual findings and assessment of evidence for obvious contradictoriness, incompleteness or lack of a sustainable objective basis.  Furthermore, one can also base an appeal to the German Federal Supreme Court on a lack of complete investigation of the matter.  The Appellant would be required to show in his complaint that no use has been made of a particular type of admissible evidence of which the court could have made use if it had investigated the matter properly and that this evidence would have led to a different result.

Article 359 of the Code of Criminal Procedure allows the defence and the prosecution to apply to reopen a case on these grounds: (1) a document admitted against the defendant was false or forged; (2) a witness provided a false statement; (3) a judge committed a criminal violation of his or her duties; (4) a civil court judgment on which the criminal judgment was based is quashed; (5) new evidence is produced that tends to support the defendant's acquittal; or (6) the European Court of Human Rights has found the conviction was based on a treaty violation.[23]  Within the meaning of Article 359, evidence is new if it has palpably not been taken into account by the initial court.  As Article 359, suggests, Germany, like the United Kingdom and France, considers that evidence of innocence is reason enough to re-examine the conviction and determine whether a prisoner should be released. It does not require the evidence to be tied to a procedural or constitutional breach.

F.  **India**

As the home of one of the largest prison populations on the planet, India makes an instructive case study on the issue of evidence of innocence.  Although India does not codify

---

[22] Garrett at 133-134, Thomas Weigend, *Germany*, in CRIMINAL PROCEDURE: A WORLDWIDE STUDY AT 268-269
[23] Garrett at 134

a specific right to adduce evidence of innocence after conviction, there are a number of safeguards set out in legislation and case law to protect against wrongful convictions. There have been some high profile wrongful conviction cases in India, which makes innocence highly topical in this jurisdiction.[24]

The defendant is entitled to appeal on issues of fact and law after conviction and the Code of Criminal Procedure, s.391 gives the courts power to consider additional evidence on appeal, to the extent that such additional evidence is "necessary".[25] Accordingly, there is an opportunity to adduce new evidence of innocence on appeal Further, in death penalty cases, the High Court must conduct a mandatory review of the sentence imposed.[26] This review can include the production of new evidence. The Supreme Court of India has held that this mandatory review is one of the most important safeguards of the Indian Constitution, that a person not be deprived of life except after a fair, just and reasonable proceeding established by a valid law, and after the courts have had regard for every relevant circumstance about the crime as well as the prisoner.[27]

More recently, in 2014, the Supreme Court acquitted six men who had been imprisoned for a terrorist attack on a temple in Gujarat in 2002. In its judgment, the Court drew attention to the numerous failings in the investigation, the conviction and the sentencing. Further, the Court emphasised the need for the courts to be more proactive in circumstances where there is a gross violation of fundamental rights of citizens.[28]

In the early 1980s, Justice Bhagwati observed that the Court should "be prepared to forge new tools and devise new remedies for the purpose of vindicating the most precious of

---

[24] Garrett p13; http://ohrh.law.ox.ac.uk/righting-wrongful-convictions-is-anguish-enough/, https://scroll.in/article/831285/acquitted-of-terror-charges-mumbai-man-pens-book-on-what-to-do-if-you-are-arrested-in-a-false-case
[25] Garrett p12; Central Government Act, Code of Criminal Procedure, Section 391(1973)
[26] *State of Maharashtra v. Sindhi A.I.R.* [1975] S.C. 1665
[27] *Bachan Simh v. State of Punjab* A.I.R. [1980] S.C. 898
[28] *Adambhai Sulemanbhai Ajmeri v. State of Gujarat* (2014) 7 SCC 716

the precious Fundamental Right to life and personal liberty".[29] The media attention generated by the acquittal in 2014 is expected to empower the Supreme Court to exercise its powers under Article 142 more frequently in circumstances involving wrongful convictions. Although India has not expressly codified a right to appeal based on newly discovered evidence, its Supreme Court's actions strike chords with other international jurisdictions that similarly have recognized, by action or legislation, the fundamental importance of exonerating wrongly convicted persons.

Indian courts are no strangers to the principle that justice must be done where new evidence requires it. Thus, the Supreme Court of India recognised the opportunity to adduce new evidence of innocence on appeal in *Indira Kaur & Others. v. Sheo Lal Kapoor,* stating that: "[i]t is no doubt true that this Court will unlock the door opening into the area of facts only sparingly and only when injustice is perceived to have been perpetuated. But in any view of the matter <u>there is no jurisdictional lock which cannot be opened in the face of grave injustice</u>".[30]

### G. International Law

The need for fair mechanisms to raise innocence after a final conviction has gained traction. There is commentary and dialogue supporting the right to provide evidence of one's innocence, which is indicative of the broad sea-change of opinion at the national level. Fairness of trial, accuracy of sentences and a right to a presumption of innocence are accepted international rights and will generally be upheld by the state.

Article 14(6) of the International Covenant on Civil and Political Rights (ICCPR) provides that persons whose convictions were reversed based on new evidence of innocence

---

[29] *Khatri And Others vs State Of Bihar & Ors* 1981 SCR (2) 408
[30] *Indira Kaur & Ors. v. Sheo Lal Kapoor* (1988) 2 SCC 488 (emphasis added)

should receive compensation.[31]  This implies a presumption that the judiciary has the power to reverse a conviction based on newly discovered evidence.

The UN published a paper in 2014 which recognised the need to address the problem of wrongful convictions.[32]  Whilst attention often focuses on the death penalty, such discussions are equally applicable to those unlawfully imprisoned.

Article 4, section 2 of Protocol No. 7 of the European Convention on Human Rights (ECHR) permits the "reopening of the case … if there is evidence of new or newly discovered facts, or if there has been a fundamental defect in the previous proceedings" (without undermining the protection conferred by Article 4, section 1 which protects a person from being tried or punished in criminal proceedings for which he has been finally convicted or acquitted).  What follows from this is a right to adduce evidence of innocence after conclusion of proceedings.  Whilst the ECHR may be read so as to encourage post-appeal claims of innocence, this is subject to the "margin of appreciation", which recognizes a need for deference to national courts and the extent to which the state strikes a fair balance between the interests of the individual and the need to ensure an effective criminal system.  It should be for beacons of civilisation to lead by example when it comes to defending, protecting and respecting the rights of individuals and human rights.  The US is in so many ways an exemplar to the world.  We urge the US to play a leading role in supporting the individual's right to present evidence of innocence.

There is a growing world-wide consensus around the rights of convicted persons to present evidence of their innocence even when such evidence emerges outside the normal channels of trial or post-conviction review.  This principle has been recognized within the United States with regard to DNA evidence.  Failure to recognize such a right with regard to

---

[31] http://www.ohchr.org/EN/ProfessionalInterest/Pages/CCPR.aspx (accessed on 22 December 2017)
[32] www.ohchr.org/Lists/MeetingsNY/Attachments/52/Moving-Away -from-the-Death-Penalty.pdf (accessed 18 July 2017)

other compelling new evidence of innocence creates an unacceptable risk of innocent people serving long prison sentences (possibly until death) for crimes they did not commit.

**H.     Conclusion**

The Great Writ of habeas corpus was an import from England, where Sir William Blackstone described it in his Commentaries on the Laws of England as "the glory of the English law."  In Mr. Maharaj's quest to return home to England, he comes again to this Court to seek that Great Writ.  Whatever procedural arguments may be raised, the *evidence of his innocence* must be the paramount consideration.  That is the process that Mr. Maharaj is due.

Dated:  May 21, 2018.                    Respectfully submitted,

By   */s/ Edward M. Mullins*
Edward M. Mullins (FL SBN 863920)
emullins@reedsmith.com
Christina D. Olivos (FL SBN 119580)
colivos@reedsmith.com
Raymond A. Cardozo (*pro hac vice* pending)
rcardozo@reedsmith.com

REED SMITH LLP
1001 Brickell Bay Drive, Suite 900
Miami, Florida  33131
Telephone:  786.747.0200
Facsimile:   786.747.0299

Of Counsel:
Michael Skrein
Gautam Bhattacharyya
Catherine Johnson
Charlotte Stewart-Jones
REED SMITH LLP
The Broadgate Tower
20 Primrose Street
London EC2A 2RS
England

Kaitlin J. Hanigan
Charles P. Hyun
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA  90071

- 14 -

**Signatories:**

**Members of the House of Commons:**

Debbie Abrahams
Peter Aldous
Hilary Benn
Luciana Berger
Sir Peter Bottomley
Alan Brown
Chris Bryant
Sir Vince Cable
Maria Caulfield
Bambos Charalambous
Joanna Cherry
Ann Clwyd
Mary Creagh
Jon Cruddas
Sir Edward Davey
Martin Docherty-Hughes
Julie Elliott
Vicky Ford
Barry Gardiner
Ruth George
Roger Godsiff
John Grogan
Harriet Harman
Helen Hayes
Lady Hermon
Julian Knight
David Lammy
Chris Law
Sir Oliver Letwin
Clive Lewis
Tony Lloyd
Jonathan Lord
Caroline Lucas
Shabana Mahmood
Christian Matheson
Kerry McCarthy
John McDonnell
Lisa Nandy
Stephen Pound
Mark Pritchard
Yasmin Qureshi
Joan Ryan
Antoinette Sandbach
Tommy Sheppard
Angela Smith
Karl Turner

- 15 -

Stephen Twigg
Chris Williamson
Sammy Wilson
Edward Miliband
Tom Brake
Ben Bradshaw

**Members of the House of Lords:**

Lord Ashdown
Baroness Bakewell
Lord Balfe
Lord Bird
Baroness Blackstone
Lord Bishop of Durham
Lord Cashman
Lord Collins
Baroness Corston
Lord Bishop of Chelmsford
Lord Crisp
Lord Desai
Lord Bishop of Chester
Baroness Garden
Lord Griffiths
Earl of Listowel
Baroness Harris
Lord Haskins
Lord Haworth
Baroness Hayman
Baroness Healy
Lord Hodgson
Lord Hollick
Lord Holmes
Lord Bishop of Worcester
Lord Inglewood
Lord Bishop of Norwich
Baroness Jolly
Baroness Jones
Lord Judd
Baroness Kennedy
Lord Kennedy
Lord Kinnock
Lord Knight
Baroness Lister
Lord McNally
Baroness Miller
Baroness Morris
Baroness Neuberger
Lord Newby
Baroness Quin

Lord Ramsbotham
Lord Rea
Lord Rennard
Earl of Sandwich
Lord Shipley
Lord Bishop of St Albans
Baroness Stern
Lord Swinfen
Lord Taverne
Lord Tope
Lord Triesman
Baroness Walmsley
Baroness Warsi
Baroness Wolf
Lord Wood
Lord Wallace
Lord Macdonald
Lord Bishop of Worcester
Lord Carlile

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 21, 2018 I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel or parties of record.

By  */s/ Edward M. Mullins*
        Edward M. Mullins