# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
## CASE NO. 17-21965-CIV-MARTINEZ/OTAZO-REYES

KRISHNA MAHARAJ,     )
  Petitioner,      )
            )
v.            )
            )
MARK S. INCH, Secretary,    )
Florida Dep't of Corrections,   )
  Respondent.      )

## PETITIONER'S RESPONSE IN OPPOSITION TO RESPONDENT'S APPEAL/OBJECTIONS TO MAGISTRATE JUDGE'S ORDER SETTING EVIDENTIARY HEARING (DE108)

**BENEDICT P. KUEHNE**
**Florida Bar No. 233293**
**Miami Tower, Suite 3550**
**100 S.E. 2 Street**
**Miami, Fla. 33131-2154**
**Tel: 305.789.5989**
**ben.kuehne@kuehnelaw.com**
**efiling@kuehnelaw.com**

**CLIVE A. STAFFORD SMITH**
**La. State Bar No. 14,444**
**Reprieve PO Box 72054**
**London EC3P 3BZ, UK**
**Tel: +44 (0)20 7353 8140**
**clive@reprieve.org.uk**

Petitioner Krishna Maharaj opposes Respondent's Appeal/Opposition to the Magistrate's Order Setting a Hearing ("*Respondent's Appeal*") (DE108).

As petitioner's counsel discussed with the Assistant Attorney General handling this case, petitioner is eighty (80) years old and in substantially declining health. Any delay in these proceedings only imperils his health and may result in the effective denial of any remedy to him if he does not live to see his case to its end. So, in this instance "Justice delayed is justice denied." Petitioner has languished for 33 years (first on death row and now in prison after *pro bono* counsel successfully obtained a vacation of his death sentence and the imposition of life imprisonment) for a crime he did not commit. He has spent much of his life working to prove his factual innocence and has gathered the evidence to establish that fact.

The collateral victims include his 79-year old wife Marita, who has stood by him loyally all this time, and who suffers almost as much as he.

*Respondent's Appeal* is merely a delaying legal maneuver in this case. Last week, Respondent sought and obtained a ninety-day continuance of the hearing, after being informed that petitioner's counsel consented to a thirty (30) day reset, but any lengthier delay was inconsistent with the petitioner's fragile health. Three (3) months may not seem like a long time for federal litigation purposes, but it may be seriously prejudicial to petitioner and his wife, both of whom are octogenarians.

Respondent filed a lengthy appeal reflecting a detailed – but legally flawed – understanding of the case to avoid a hearing altogether. The arguments are without any merit, largely because the Eleventh Circuit Court of Appeals already

ruled to the contrary in remanding this case. *In Re Maharaj,* No. 17-10452-F (11th Cir. March 28, 2017) (unpublished). For the reasons set forth below, this Court should expeditiously deny *Respondent's Appeal.*

## I.   PETITIONER IS INNOCENT OF THESE CRIMES, IS EIGHTY YEARS OLD, IS IN POOR HEALTH, AND HAS BEEN DENIED JUSTICE FOR 33 YEARS.

Respondent suggests the Magistrate Judge could not properly conclude that petitioner met his preliminary burden in this case. That is inaccurate both because the Eleventh Circuit already ruled he has, and because petitioner filed a detailed, fact-specific, and well-documented habeas petition that dismantles the false case against him and proves who committed the crimes for which he was wrongly convicted. Indeed, the Magistrate Judge already required the submission of various pleadings, none of which is mentioned by Respondent, in which the parties already addressed all the contentions now presented to this Court.

The Eleventh Circuit approved petitioner's successive petition based on the extensive showing that petitioner is *factually innocent*. The Eleventh Circuit's directive is precisely the path taken by the Magistrate Judge. The Eleventh Circuit's order referred to petitioner's evidence of innocence as "compelling," noting "the testimony of five additional witnesses whose stories independently corroborate one another's" (*In Re Maharaj,* Slip Op. at 6 (11th Cir. Mar. 28, 2017):

> Mr. Maharaj has made *prima facie* showing that his new evidence, when viewed in light of the evidence as a whole, would demonstrate that he could not have been found guilty of the Moo Young murders beyond a reasonable doubt because if a hit man for the cartel committed the murders, Mr. Maharaj did not.

* * *

Three of those witnesses mention a man named Cuchilla, an assassin hired by notorious cartel leader Escobar. Two attest that Cuchilla committed the Moo Young murders at Escobar's direction because Escobar believed the victims were stealing from him. All five individuals' stories reflect that the Moo Youngs were killed by the cartel.

These witnesses are, in truth, just the tip of the proverbial iceberg, reflected in at least 498 exhibits already filed with this Court. Petitioner will not recap all 300 pages of his habeas petition. Briefly, the evidence before the Court proves:

1. Petitioner was a self-made millionaire with no criminal record.
2. Petitioner has a powerful and unrebutted alibi for the time of the crime. Respondent made no effort to dispute this.
3. Petitioner comprehensively dismantled the prosecution's case as it was presented in 1987:
    a. *The fingerprints in Room 1215*. The fingerprints were a major part of the prosecution case at trial, but they mean nothing if there is an innocent explanation. There is, and always has been. Petitioner was in the room to meet with Eddie Dames, arranged by Neville Butler, but left when Dames did not show up. The prosecution suppressed evidence that the lead detective lied about petitioner's original statement. On this point, the Eleventh Circuit noted: "The presence of Mr. Maharaj's fingerprints in the room is consistent with his version of the events leading up to the murder." *In Re Maharaj*, Slip Op. at 6.
    b. *The gun petitioner allegedly owned*. It was alleged that he owned a 9 mm handgun that could have been the murder weapon. The Eleventh Circuit characterized this as a weak item of proof in the first place. *Id.*, Slip Op at. 6 ("his possession of one of thousands of guns that could have been the murder weapon, which was not strong evidence of guilt"). However, he has now proven that the lead detective lied, and that the weapon was stolen from him weeks before the crime. He did not even own a 9 mm gun.
    c. *Tino Geddes*, a crucial, now deceased, witness against him has been proven to have been affiliated with the drug cartel responsible for procuring the victims' deaths (via the notorious "*Shower Posse*"), was helped by prosecutors when he was facing a lengthy sentence on weapons charges in his native Jamaica, and his version of events has been categorically disproven by the physical evidence.
    d. *Neville Butler*, the key "eyewitness" at trial, was shown to be affiliated with drug dealers himself, to have had blood on his clothes indicating his involvement in the murder, to have changed his testimony

dramatically after he failed a polygraph (which he failed again even after his changes), to have committed perjury repeatedly during the trial, and to have committed perjury in at least six other cases.

    e. *Eddie Dames*, in whose name Room 1215 was booked, is now known to have been the person who asked Derrick Moo Young to meet there, has been shown to have drug links himself in the Bahamas with convicted cartel lawyer Nigel Bowe, and who absented himself from the room in order to create an alibi for the pre-planned murder.

    f. *Adam Hosein*. A telephone message for Hosein was taken for Room 1205. New documentary evidence reflects that Adam Hosein took over the Moo Young drug laundering company, *Cargil International (Panama),* after they died, establishing the fact that he was in league with them in money laundering.

4. Petitioner has shown through documentary evidence suppressed by the prosecution that the victims, Derrick and Duane Moo Young, were far from being the honest businessmen portrayed at trial:

    a. They were laundering money around the Caribbean to the tune of *five billion dollars*, and skimming money off the top from Pablo Escobar and the cartel, thereby proving a true motive for their murder.

    b. Duane Moo Young had a tax lien discovered by petitioner in 2014 where the IRS stated that the 21-year old without an obvious job owed $ 275,621.29 in taxes for 1985-86.

5. Petitioner has shown that Jaime Vallejo Mejia, who was in the only other occupied suite on the 12th floor of the Dupont Plaza that day, was not "legit", as the lead detective testified. He was under indictment for a cartel drug conspiracy and remains to this day a major member of the drug cartel.

6. Petitioner introduced evidence from a series people affiliated with the Colombian drug cartel that the murders were a "cartel hit" and petitioner was framed for it. These include:

    a. Baruch Vega, a government informant for CENTAC (a state-federal law enforcement joint task force agency in which the State of Florida and the City of Miami were members), who was introduced to Derrick Moo Young by Mejia, and to whom Mejia later admitted that the murders were carried out by the cartel because they stole money.[1]

    b. John Brown,[2] an informant who had testified for the prosecution in fifteen trials, resulting in scores of cartel members being imprisoned, testified that he was told personally by Pablo Escobar at Christmas 1986 that they had killed the Moo Youngs, that it was done by *Cuchilla*

---

[1] Vega was deemed "credible" by the state judge and testified without rebuttal that he shared this information with Centac soon after the murders, long before the trial.

[2] Formerly in the Witness Protection Program, "John Brown" was permitted to testify using a pseudonym for his safety.

    (or "The Blade", who was a notorious hitman for Escobar). Brown said his motive for testifying for the defense for the first time was because "you got the wrong man."

c.   Jorge Maya, wanted in the United States for his involvement in a $2 billion drug laundering indictment, testified via satellite link from Medellin that the cartel did the murder, and that his brother paid the leader of the assassins for the hit (*Cuchilla*).

d.   Jhon Jairo Velasquez Vasquez ("Popeye"), a senior assassin for Pablo Escobar and the Medellin drug cartel, gave a series of statements, including one to former DEA Special Agent Henry Cuervo, placing responsibility for the murders on the cartel.

e.   Special Agent Cuervo used the experience from his long career with the DEA to tie these threads together.[3]

f.   Since that time, Witness A[4] provided another tape recording of two further cartel witnesses, Juan Lopez and Jhon Henry Millan, discussing how the cartel killed the Moo Youngs.

7.  Petitioner's state proceedings were riddled with judicial misconduct.

a.   Judge Howard Gross was arrested on the third day of trial for accepting a bribe on behalf of a Florida law enforcement officer who was posing as drug cartel member seeking bail.

b.   Judge Harold Solomon was determined to have met *ex parte* with the prosecution *prior to taking evidence at the judicial sentencing hearing* to instruct the prosecutors to draw up an order imposing a death sentence on petitioner.

    All this evidence of innocence is before the Magistrate Judge, along with a great deal more,[5] with the *Brady* material specified in detail in the *Habeas*, at 251-

---

[3] Former Miami police officer Michael Flynn testified how the cartels had a deal with corrupt police in the area, and said specifically that his former partner, Officer Pete Romero, told him "Maharaj was innocent, that he got hooked up for it…" (2014 Tr. 230) "Hooked up" was a euphemism the police used for framing someone, and Romero was apparently the one who helped to frame petitioner for the cartel.

[4] Witness A has been threatened with death for making disclosures concerning "Popeye" and other cartel members, a fact strongly corroborated by the fact that Witness A has now been given asylum in the United States.

[5] Petitioner incorporates his habeas petition, all the other pleadings, and all the exhibits. An inevitably lengthy evidentiary hearing on petitioner's innocence would be replete with interesting and complex legal issues such as the admissibility of his polygraph where he was found to be truthful by nationally renowned George Slattery, who is so highly respected that his work has been recognized in a federal court as "highly probative":

    "It is improbable that the appellant could have contemplated 'beating the

292. Despite Respondent's unsubstantiated suggestions, there is no doubt the Magistrate Judge gave careful, exacting consideration to petitioner's documented claims of innocence and *Brady* violations. Indeed, even in the absence of specific citations and factual findings, a judge is generally presumed to follow the law – as she clearly has with respect to the setting of an evidentiary hearing.

## II. RESPONDENT CONTINUES TO ARGUE AS IF THE INNOCENCE ISSUE IS ONE WHERE THERE IS DEFERENCE TO A STATE COURT, RATHER THAN A FEDERAL PROCEDURAL GATEWAY TO THE MERITS OF THE *BRADY* CLAIM.

Another fundamental flaw in Respondent's appeal is one that Respondent has repeated for the past two years. Respondent suggests yet again that the Magistrate Judge should have paid deference to some non-existent state court finding on the issue of innocence.

First, the state court failed to make a meaningful finding of innocence because the court effectively excluded all evidence that proved who committed the murders. Thus, there is nothing to which deference attaches. More significant, though (as petitioner has briefed on multiple occasions and as the Magistrate Judge accepted), in this context the issue of innocence is a *federal procedural* gateway and not a state substantive issue.

Thus, this is a *federal* issue, involving the *federal* gateway in *federal* court,

---

machine' with Mr. Slattery. Historically, 75-80% of those who take polygraphs with Mr. Slattery fail them…"
Slattery is estimated to have a 97% accuracy rate. *See Tinsley v. Department of Justice*, USMSPB No. 0752-04-0116-1-1, at 11 (Apr. 20, 2004) (Vitaris, Admin. J.).

where the *federal* rules apply to the admissibility of evidence. *See United States v. Lowery*, 166 F.3d 1119, 1125 (11th Cir. 1999) ("When it comes to the admissibility of evidence in federal court, the federal interest in enforcement of federal law, including federal evidentiary rules, is paramount."); *United States v. Moss*, No. 10-60264-CR, 2011 WL 2669159, at *8 (S.D. Fla. Mar. 21, 2011) (citing *United States v. Lowery*, 166 F.3d 1119, 1125 (11th Cir. 1999).[6]

Respondent accepts that the gateway issue requires a showing "by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found Petitioner guilty of murder." *Respondent's Appeal, at 8*, citing 28 U.S.C. § 2254(e)(2)(B). This standard was long since met here.[7]

The Magistrate Judge accepted petitioner's position that

> "'Courts have consistently emphasized that actual innocence for the purposes of *Schlup* is a procedural mechanism rather than a substantive claim.' *Finch*, [___ F.3d ___,] Slip Op. at 11 [(4th Cir. Jan. 25, 2019)], quoting *Teleguz v. Pearson*, 689 F.3d 322, 327 (4th Cir. 2012). This means that there is not a state court finding to which deference should be shown because it was not a state law issue."

---

[6] This is particularly significant here, as the state court did not even consider most of petitioner's evidence, under a patently erroneous interpretation of the state hearsay rules, ignoring the age-old exceptions for co-conspirator statements and statements against penal interest.

[7] *Hill v. Mitchell*, ___ F.Supp.3d ___, Slip Op. at 13, No. 1:98-cv-452 (S.D. Ohio, Apr. 24, 2019) (quoting *Eberle v. Warden, Mansfield Corr. Inst.*, 532 F. App'x 605, 612-13 (6th Cir. 2013) (quoting *House v. Bell*, 547 U.S. 518, 538 (2006))) ("[A] court must survey 'all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial.'"); *Rivas v. Fischer*, 687 F.3d 514, 518 (2d Cir. 2012) ("We are not here called to determine whether Rivas is in fact innocent. However, on the record before us, we 'cannot have confidence in the outcome of [Rivas's] trial' unless we can be assured that 'the trial was free of nonharmless constitutional error.'") (quoting *Schlup*, 513 U.S. at 315, 115 S. Ct. 851).

*Petitioner's Memorandum on The Scope of the Evidentiary Hearing* at 2-.

Petitioner argued to the Magistrate Judge – uncontradicted by any legal authority offered by Respondent then or now – that the evidence was already more than enough to find that the gateway had been crossed:

> The *Schlup* gateway is the first step of the process, readily surmounted. If this Court adopts the approach in *Wolfe v. Johnson*, 940 F. Supp. 2d 280 (E.D. Va. 2010), the case should move directly to this point whereupon the standard rules of habeas apply.

*Petitioner's Memorandum on The Scope of The Evidentiary Hearing* at 9.[8]

The Magistrate Judge's decision is consistent with law and policy. A gateway evidentiary hearing is not necessary but is needlessly time consuming. This case has been litigated over 33 years, and the proof of innocence is abundant – 300 pages of the petition and some 500 exhibits so far. The Magistrate Judge properly concluded that such an evidentiary hearing was unnecessary on the gateway issue, so this case should move directly to the discrete issue of whether a constitutional infirmity requires *habeas* relief.[9]

## III. RESPONDENT'S OTHER ASSERTIONS IN THE APPEAL TO THIS COURT HAVE NO MERIT.

---

[8] *See also id.* at 1-2 ("As detailed in his petition, Mr. Maharaj presented abundant evidence such that the Court could grant relief as a matter of right. *See Wolfe v. Johnson*, 940 F. Supp. 2d 280, 288 (E.D. Va. 2010) (concluding an evidentiary hearing was not necessary for *Schlup* reasons as the petitioner's presented evidence was ample to meet the standard without conducting a hearing)").

[9] For clarity, petitioner strongly insists that there is a *substantive* constitutional right to relief for someone who is "merely" innocent. It makes no sense to find by clear and convincing evidence that someone is innocent, and yet still deny him his liberty. Clear and convincing evidence generally means something like 85% certainty, whereas tossing a coin is merely 50%. Thus, Respondent advocates a legal system in which Florida's justice system is less reliable than a coin toss. Petitioner is prepared to show a distinct constitutional flaw in his convictions.

Beyond the gateway issue of innocence, Respondent makes various assertions that are not supported by either the record or the law.

## A. Respondent is defaulted from making the factually unsupported argument that petitioner has not shown due diligence.

Respondent belatedly states, at page 8:

> The order and record are devoid of any indication that Petitioner's claims rely … on "a factual predicate that could not have been previously discovered through the exercise of due diligence..." 28 U.S.C. § 2254(e)(2).

Respondent has not contested petitioner's diligence in years. It now comes late in the day and mischaracterizes petitioner's extensive efforts that have been met with ready acceptance that he and his *pro bono* counsel have been diligent.

Respondent is both procedurally defaulted from asserting this[10] and factually wrong. Petitioner, bankrupted by this injustice, has proceeded with *pro bono* counsel for a quarter of a century without any funds. Doggedly, he has managed to develop the evidence of his innocence. Every single court has found that his actions have been diligent. As this Court held in 2004:

> The Court recognizes that Petitioner has been diligent in attempting to develop the factual basis for at least most of the claims related to this matter. Petitioner's counsel, who are essentially working *pro bono*, have obviously expended a great deal of effort, time, and money investigating their client's case by obtaining documents from a variety of sources, speaking to a number of witnesses, obtaining at least one expert report without funding, and taking other steps to develop the evidentiary record. They also made extensive efforts to secure funding from the state court system in order to

---

[10] Procedural rules are applied with equal force against the prosecution as against the defense. *See, e.g., Boykins v. Wainwright*, 737 F.2d 1539, 1545 (11th Cir. 1984); *see also Hitchcock v. Dugger*, 481 U.S. 393, 399, 107 S. Ct. 1821 (1987) (waiver of harmless error by failing to raise it).

contract experts and pay for investigative expenses of tracking down and interviewing important witnesses both in this country and abroad. Thus, it appears that there may have been external forces which prevented Petitioner from fully developing the record in the state proceedings

*Maharaj v. Moore*, Civ. No. 02-22240-HUCK/TURNOFF, at 12 (S.D. Fla. Aug. 30, 2004).[11] It is therefore both frivolous and too late to make a contrary assertion now.

### B. Respondent's assertion that there is not a factual basis in the record for an evidentiary hearing is frivolous.

Respondent argues there is insufficient reason in the record for a hearing. But Respondent confuses the requirement that petitioner should make allegations in his pleadings with a non-existent rule that the Magistrate Judge must repeat those allegations in an order, *Respondent's Appeal, at 10*:

> Findings regarding the need for an evidentiary hearing, and an adequate basis in the record for those findings, are a precondition to holding an evidentiary hearing. *See, e.g., Holland v. Jackson*, 542 U.S. 649, 652-53 (2004); *Williams v. Norris*, 576 F.3d 850, 860 (8th Cir. 2009) ("Williams requested an evidentiary hearing without citing § 2254(e)(2) or attempting to satisfy its mandatory restrictions." and "[t]he district court granted the hearing without reference to § 2254(e)(2), citing only Rule 8(a) of the Rules Governing Section 2254 Cases resulting in "reversible error.").

It is not clear what principle Respondent would have this Court draw from *Holland*, where the court merely held the state court reasonably applied federal law regarding ineffective assistance of counsel. Likewise, the relevance of the

---

[11] In 2015, the state court found the same:
> "The level of commitment [of Mr. Maharaj's *pro bono counsel*] is unquestionable and counsel exerted a considerable amount of time, money and effort to secure relief for Mr. Maharaj. This Court finds Counsel for Mr. Maharaj has continued to be as diligent as can reasonably be expected".

(ROA vol. 27, 5106) See also *In Re Maharaj*, Slip Op. at 5 ("Mr. Maharaj has sufficiently alleged his own diligence.").

Eighth Circuit case is opaque: *Williams* did not even cite the law and failed to even attempt to satisfy basic procedural conditions. By contrast, petitioner cited and discussed extensive law in his petition and included pertinent supporting facts.

Respondent is and long been on notice as to proof of petitioner's innocence.

### C. Respondent has no support for the assertion that the Magistrate Judge must follow Respondent's preferred, dilatory process in responding to a patent injustice.

Respondent asserts the Magistrate Judge is bound to hold hearings on whether petitioner can meet other AEDPA procedural requirements for the clear *Brady* claim before holding a merits hearing *Respondent's Appeal, at 11-12*:

> Instead, based on this history, the next step should be assessing Petitioner's attempt to meet his AEDPA burden, not an evidentiary hearing. *See, e.g.*, *Clark v. Attorney General, Fla.*, 821 F.3d 1270, 1291 (11th Cir. 2016) (addressing the *Brady* claim based on the state evidentiary hearing, and determining that "Clark has failed to show that the Florida courts based their decisions on unreasonable applications of clearly established Federal law or unreasonable determinations of the facts."); *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1060-61 (11th Cir. 2011); *Murrah v. McDonough*, 256 F. App'x 323, 324-25 (11th Cir. 2007) (noting "The record was adequately developed" in state court to address the claim without the need for an evidentiary hearing).

In Respondent's cited cases, the court determined the record was sufficiently developed to justify the *denial* of a hearing. The cases do not stand for the converse. The Eleventh Circuit already found a *prima facie* case for relief, a conclusion the Court would not have reached if there was no basis for a hearing.

Respondent has always been welcome to present – in a timely fashion – any legal arguments that contest petitioner's well-documented *Brady* claims. The Magistrate Judge repeatedly gave Respondent this opportunity, considered

Respondent's submissions, and found no merit to them.

### D. Respondent's suggestion that all evidence was presented in state court and subject to binding state court findings is directly contrary to the Eleventh Circuit order, especially when the state court ignored most of the material presented by petitioner.

Respondent argues that there is no "jurisdiction" for a hearing because all the evidence is available from state court, at page 9:

> Further, there is no jurisdiction for such a hearing because all the evidence is available in the state court record.

Acceptance of this argument would require this Court to overrule the Eleventh Circuit, which already determined the opposite. The Court of Appeals described how petitioner "aggressively" sought more material on the issue of innocence both before and after the 2014 state court hearing: For example, "[o]ne of the witnesses. Witness A, only came forward in 2016, during Mr. Maharaj's investigation." *In re Maharaj*, Slip Op. at 5. Such evidence was, obviously, not heard by the state court, and yet is clearly admissible.[12]

Petitioner sought to present extensive evidence in 2014, but the state judge declared much of it inadmissible in an erroneous hearsay ruling.[13] As petitioner

---

[12] Petitioner will anticipate the erroneous argument Respondent may make - that this evidence is not "exhausted" and cannot therefore be heard. There are two distinct responses to this, as the Eleventh Circuit implicitly recognized: one, as petitioner has noted throughout, the proof of the federal gateway did not have to be presented in state court at all; two, it is always permissible to adduce additional evidence in a hearing that was kept hidden in state court to flesh out, rather than initiate, a constitutional issue.

[13] Petitioner fully briefed this, but it is worth a brief recap here. Prosecutors cannot use co-conspirator statements to convict and send defendants to death row, but then argue that similar statements are not admissible to exonerate someone. This is highlighted by the testimony of John Brown, who had testified to similar co-conspirator facts in fifteen trials, resulting in scores of convictions, but was not permitted to testify to a similar

detailed in his petition, the state court ignored unrebutted evidence relevant to several legal issues and applied the wrong legal standard.

In the end, the very least the Magistrate Judge could do was order the hearing; the Magistrate Judge could also have ordered relief without permitting the state another opportunity to argue in opposition.[14]

### IV. SINCE THE ELEVENTH CIRCUIT ALREADY EXPLICITLY HELD TO THE CONTRARY, IT IS NOT MERITORIOUS FOR RESPONDENT TO ASSERT THAT PETITIONER HAS NOT MADE OUT A *PRIMA FACIE* CASE ON THE MERITS OF THE *BRADY* VIOLATION.

Respondent makes some other arguments that are unfounded. One seems to be that the Magistrate Judge is under an obligation to explain clear constitutional law to the parties in the resulting order. To be sure, there are various parameters that define a *Brady* claim, but the parties are presumed to know the law and can surely figure out for themselves what evidence is going to be relevant.

### A. The state court misapplied *Brady* in several ways, and ignored much of the evidence, such that the Magistrate Judge's ruling was not only correct but mandated.

Respondent says petitioner is merely reiterating the testimony in state court and that this bars a federal hearing, *Respondent's Appeal, at 12*:

> The Magistrate's order is contrary to law because it provides for unbridled presentation of evidence regarding "the Brady claim." (D.E. 105 at 2). The state court already heard evidence, and re-doing in federal court the evidentiary presentation that occurred in state court is impermissible. See *Valle v. Sec'y for Dep't of Corr.*, 459 F. 3d 1206, 1212 (11th Cir. 2006)

---

statement *made by Pablo Escobar himself* that should have set petitioner free.

[14] It is true the evidence already in the record compels relief for petitioner, and if Respondent is willing to stipulate to that fact then we can all save some time and resolve the case in petitioner's favor without a hearing.

(noting that "Valle merely reiterates the testimony produced at the evidentiary hearing that the state courts already rejected."); *Murrah v. McDonough*, 256 F. App'x 323, 324-25 (11th Cir. 2007) (noting "The record was adequately developed" in state court to address the claim without the need for an evidentiary hearing); see also *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F. 3d 1248, 1280- 81(11th Cir. 2016) (remanding for an evidentiary hearing where determination of the facts was unreasonable and there was no state evidentiary hearing).

All this has been exhaustively briefed both in the Court of Appeals and before the Magistrate Judge. If Respondent was correct and the cold record demonstrated a lack of merit to the claim, there would have been no need for a remand from the Eleventh Circuit.

None of Respondent's citations supports its argument. In *Valle* an evidentiary hearing was not at issue; in *Murrah* a hearing was denied because that petitioner had not made the case for one. Respondent cites *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F. 3d 1248, 1280-81 (11th Cir. 2016), but that case supports petitioner. There, the Eleventh Circuit held that an evidentiary hearing was mandated where (as here) the state court misapplied federal law.

### B. Respondent misstates the law of *Brady.*

Respondent argues that petitioner cannot prevail on the merits of his claim. In this regard, again remember that the Eleventh Circuit already held the contrary, so it is not surprising that the Magistrate Judge disagreed with Respondent. Nevertheless, it is worth taking a moment to consider how Respondent misunderstands the law of *Brady*.

### 1. The Magistrate Judge ordered a hearing on the *Brady* issue as instructed by the Eleventh Circuit, yet

**Respondent would have this Court overrule this.**

Respondent argues that petitioner did not prove in state court that the state

knew about the drug cartel link, *Respondent's Appeal, at 5*:

> In Florida court, Petitioner produced no evidence that the State, in 1986, had knowledge of his alleged cartel-killer scenario. The prosecutor testified that they did not coordinate with the Federal government or have ready access to specific task force files. (D.E. 38-6 at 113). The investigating detective had already testified at the 1987 trial (D.E. 37-14 at 4- 5), that checks of Mejia led to no adverse information about him;

To the contrary, the unrebutted evidence proves that petitioner had no

access to criminal records checks or law enforcement records on Jaime Vallejo

Mejia at trial (in 1987) or at his first state post-conviction hearing (in 1997). Equally,

the unrebutted evidence proves that the state did.

At trial, it is true that Detective Buhrmaster testified under oath in 1987 that

he checked into Jaime Vallejo Mejia, the Colombian in Room 1214, and

determined he was "legit". He did swear to this under oath, but he swore falsely.

Indeed, he continued to assert this in 1997.

Compounding the prejudice stemming from this falsehood, at the very start

of their closing at the culpability phase, the prosecution ridiculed the idea that Mejia

was linked to the cartel and insisted that Buhrmaster had checked him out. The

prosecutor disparaged the defense:

> That Jaime Mejia, simply because he is Colombian and he is in the import/export business, must be responsible for the deaths of Derrick and Duane Moo Young, simply because he lived across the hallway from the suite where the murders took place.

> When Detective Buhrmaster took the stand, [the] theory of defense

focused on Jaime Mejia. Why didn't you go into this suite? Why didn't you conduct firearms test, paraffin on Mr. Mejia? Why did you not take elimination prints from Mr. Mejia?

Because Detective Buhrmaster told you that I spoke with Mr. Mejia. He was a Colombian gentleman in his mid 50's, about 5'2", 5'3", 150 pounds. He had worked at the Dupont Plaza. *We checked his story out.* He resided at Dupont Plaza. He continued long after the murders occurred to work and live at the Dupont Plaza Hotel.  (Tr. 3909-10)

*See Banks v. Dretke*, 540 U.S. 668, 672, 124 S. Ct. 1256, 1261 (2004) ("The prosecution's penalty-phase summation, moreover, left no doubt about the importance the State attached to Farr's testimony").

In state court, petitioner proved that if Buhrmaster had been honest, and if he had made a minimal effort, he would have learned that Mejia was not legit at all, but instead was even then the focus of two major drug investigations that ultimately led to his indictment some weeks before petitioner's trial.

In terms of proving how easy it was for the police to access this evidence, petitioner proved in state court:

a. Buhrmaster had the Moo Young briefcase, and – as Special Agent Cuervo testified without rebuttal – in the mid-1980s in South Florida any competent law enforcement officer would have seen the documents reflecting Moo Young loans of hundreds of millions of dollars and immediately made the drug connection.

b. A forensic accountant made clear that these documents could only mean that the Moo Youngs were laundering large sums which, at that time, would have to come from narcotics.

c. Agent Cuervo testified that any competent detective would have closely investigated Mejia, given that he was from Colombia and was in the only other room occupied on the twelfth floor.

d. Petitioner proved what Buhrmaster would then have discovered. The Florida Department of Business Regulation (FDBR), an agency with far less clout than the homicide department, did indeed "check Mejia's story out" when Mejia applied for a liquor license. They merely called

the DEA and learned of all the material submitted in petitioner's *Exhibit 405*. Mejia had been under investigation since 1985 and was arrested in Miami, but prosecuted Oklahoma. He was known to have been laundering millions of dollars.

e.  The agency primarily responsible for this investigation was a joint State/Federal task force called CENTAC. The state gave notice of their intent to call former homicide detective Al Singleton as a witness in State court, but wisely decided against this when, in his deposition, it became clear that he was a member of CENTAC from 1981,[15] and therefore had ready access to all this material.

f.  Miami-Dade Police Sgt. June Hawkins, Singleton's wife, also worked with CENTAC, and worked directly with Baruch Vega, who was a CENTAC informant.[16]

g.  Baruch Vega worked for the State/Federal drug task force CENTAC and reported prior to the murders a number of crucial facts:[17]

    i.   Mejia was working for Escobar.
    ii.  Mejia had introduced Derrick to Vega as a drug associate.

h.  Immediately after the murders, Vega reported to CENTAC that Mejia had boasted that the cartel had killed the Moo Youngs because they had been stealing money (all of which was consistent with the material in the briefcase).

The prosecution had the opportunity to rebut this evidence and presented nothing. However, the state court misapplied the law, finding that the state did not have this evidence – when the issue was whether it was readily available to the state. The Eleventh Circuit already held petitioner made a *prima facie* case that the "the police knew but did not disclose" the *Brady* material. *In re Maharaj*, Slip

---

[15] "Godmother Griselda Blanco shot to death in Colombia", *Gangsters Inc. Blog*, 04/09/12, http://gangstersinc.ning.com/profiles/blogs/godmother-griselda-blanco-gunned-down-in-colombia

[16] "Secret Agent Man - Fashion Photographer Scores Big Off Pals In The Narcotics Trade", *Wall Street Journal*, 07/12/00, http://www.gpo.gov/fdsys/pkg/CRECB-2000-pt18/html/CRECB-2000-pt18-Pg26558-2.htm

[17] Petitioner repeatedly sought and was denied discovery on these matters. It is inevitable law enforcement would have noted Vega's information. This smoking gun reflects the identity of the real murderers - all known to law enforcement just days after the crime.

Op. at 5. This is the issue on which the Magistrate Judge ordered a hearing.[18]

### 2.    Respondent is wrong to suggest that a *Brady* claim does not encompass evidence developed as a result of the evidence originally suppressed.

Respondent suggests that other proof – for example, that *Cuchilla* led the hit squad, that Jorge Maya's brother delivered Escobar's payment for this, and that Escobar threatened John Brown with the murder – has nothing to do with *Brady*:

> Petitioners' filings fail to specifically plead the *Brady* violation, and instead, they rely upon the "Cuchilla" theory on its own.

*Respondent's Appeal, at 18. Id., at 19* ("The "cartel killer" theory does not link to the *Brady* claim."); *Id., at 16* ("Even if there is to be evidence that is new in Federal court, the evidence cannot be about the "Cuchilla" murder; there must be a link to the *Brady* claim in the evidence that assists the federal court in assessing the claim of violating the *Brady* rule.")

The original documentary *Brady* material linked Mejia to Escobar as a money launderer, and Baruch Vega's evidence finally provided an explanation – long suspected but unproven – for the Moo Young briefcase and the millions of dollars they were offering around the Caribbean. As the Eleventh Circuit explained, petitioner then "aggressively" pursued these leads and developed the other

---

[18] No doubt – sadly – Respondent will continue to contest petitioner's right to liberty, but the issue must be viewed in the cold light of day: the Magistrate Judge determined that petitioner has shown his innocence to a high degree of certainty, yet Respondent continues to oppose his release based on the extraordinary view that a trial may be theoretically fair, yet reach the wrong result. If this were the case, the court is obligated to intervene.  If it were true that the police did not know about this information, one might think they would be aghast that they, too, were duped, and that they would lead the charge to see the wrongful conviction set right.

evidence. Without the original exculpatory material, petitioner would not have had the tools to find the other material – indeed, for three long decades he did not.

Respondent's position (that these fruits of the suppressed evidence are irrelevant) defies both the law and logic. The police may – as here – have had little desire to investigate leads that pointed to other suspects. It would be a strange rule that limited the scope of a *Brady* violation to what the police bothered to find. Indeed, very often a *Brady* violation is framed in terms of how the failure to turn over evidence prevented the defense from following up the leads that the police should have investigated. *See, e.g., State v. Kula*, 562 N.W.2d 717 (Neb. 1997) (murder conviction reversed, and new trial ordered where prosecution failed to disclose material evidence regarding other suspects before the first day of trial, whereupon the defense had no time to investigate them).[19]

For these reasons, petitioner opposes the State's appeal and respectfully requests that it be expeditiously denied so that justice can belatedly be served.

Respectfully submitted,

---

[19] Indeed, the very fact that the police investigation was shoddy or intentionally ignored another suspect is itself *Brady* material. See *Kyles v. Whitley*, 514 U.S. 419, 445, 115 S. Ct. 1555, 1571, 131 L. Ed. 2d 490 (1995) ("various statements would have raised opportunities to attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the investigation, as well"). *See also Lindsey v. King*, 769 F.2d 1034, 1042-43 (5th Cir. 1985) (*Brady* material resulted in the "discrediting, in some degree, of the police methods employed in assembling the case against him."); *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986), *cert. denied*, 479 U.S. 962, 107 S. Ct. 458 (1986) (the state suppressed of evidence of another suspect, a police officer from South Carolina, Lee Crowe; "A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation").

*S/ Benedict P. Kuehne*
**BENEDICT P. KUEHNE**
Fla. Bar No. 233293
Bank of America Tower, Suite 3550
100 S.E. 2d Street
Miami, Fla. 33131-2154
(305) 789-5989
ben.kuehne@kuehnelaw.com
efiling@kuehnelaw.com

**CLIVE A. STAFFORD SMITH**
La State Bar No. 14,444
Reprieve PO Box 72054
London EC3P 3BZ, UK
Tel: +44 (0)20 7353 8140
clive@reprieve.org.uk

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing delivered on October 7, 2019, to: Michael Mervine, Assistant Attorney General, Office of the Attorney General, 1 SE 3rd Avenue, Suite 900, Miami, Florida 33131; Tel: (305) 377-5441; Fax: (305) 377-5655; crimappmia@myfloridalegal.com; Michael.Mervine@myfloridalegal.com.

By:   *S/ Benedict P. Kuehne*
     **BENEDICT P. KUEHNE**