UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 17-21965-CIV-MARTINEZ/AOR

KRISHNA MAHARAJ,

       Petitioner,

v.

FLORIDA DEPARTMENT OF
CORRECTIONS, Julie L. Jones,
Secretary, SOUTH FLORIDA
RECEPTION CENTER, Jose Colon,
Warden, FLORIDA ATTORNEY
GENERAL, Pam Bondi,

       Respondents.

_____ /

## REPORT AND RECOMMENDATION

THIS CAUSE came before the Court upon Krishna Maharaj's ("Petitioner" or "Maharaj")

Petition for Relief from a Conviction or Sentence by a Person in State Custody, pursuant to 28

U.S.C. § 2254 ("Section 2254") [D.E. 29] ("Petition").[1]   This matter was referred to the

undersigned pursuant to 28 U.S.C. § 636 by the Honorable Jose E. Martinez, United States District

Judge [D.E. 5].  The State has filed a Response to the Petition (hereafter, "Response") [D.E. 36];

a Notice of Filing State Court Trial Transcripts (hereafter, "Trial Transcripts") [D.E. 37 & D.E.

37-1 through 37-16]; an Appendix Part 1 to the Response (hereafter, "App'x 1") [D.E. 38 & D.E.

_____

[1]  Petitioner initially filed a 318-page "Second Petition for Writ of Habeas Corpus by a Prisoner in State Custody (28 U.S.C. §2254)" [D.E. 1].  After the Secretary of the Florida Department of Corrections (hereafter, "Respondent" or "State") filed a Motion for More Definite Statement [D.E. 13], Petitioner filed a "Supplement to Petition for Writ of Habeas Corpus Filed in Reply to Respondent's Motion for a More Definite Statement" (hereafter, "Supplement to Petition") [D.E. 16].  Petitioner refiled D.E. 1 and D.E. 16 as D.E. 29-3 and D.E. 29-4, respectively, and expressly incorporated them into the Petition.  See Attachment [D.E. 29-1 at 7-8].  Petitioner has also submitted a compilation of prior court decisions [D.E. 29-2].

38-1 through 38-9]; and an Appendix Part 2 to the Response (hereafter, "App'x 2") [D.E. 39 & D.E. 39-1 through 39-6].  Also before the Court is Petitioner's Reply to the Response (hereafter, "Reply") [D.E. 42]; and Parliamentarian Amici Curiae Brief (hereafter, "Amici Brief") [D.E. 87]. After full consideration of these materials, the undersigned respectfully recommends that Maharaj's Petition be DENIED.

## PROCEDURAL BACKGROUND

In 1987, Petitioner was convicted of the 1986 murders of Derrick Moo Young and his son Duane Moo Young (hereafter, "the Moo Youngs") in the Circuit Court in and for Miami-Dade County, Florida.  See Maharaj v. State, 597 So. 2d 786, 786-87 (Fla. 1992), cert. denied, 506 U.S. 1072 (1993).  Petitioner was sentenced to death for the murder of Duane Moo Young and to life imprisonment for the murder of Derrick Moo Young.  Id. at 787. Petitioner was also convicted of two counts of kidnapping and one count of unlawful possession of a firearm while engaged in a criminal offense, for which he received two life sentences, plus a consecutive term of fifteen years. Id.  All convictions and sentences were affirmed.  Id.

Petitioner filed a first motion for post-conviction relief pursuant to Fla. R. Crim. P. 3.850 ("Rule 3.850"), whose summary denial was reversed by the Florida Supreme Court.  Maharaj v. State, 684 So. 2d 726 (Fla. 1996).  After remand, the trial court's denial of relief as to the guilt phase was affirmed.  See App'x 2 (1997 Rule 3.850 Proceedings); Maharaj v. State, 778 So. 2d 944 (Fla. 2001), cert. denied, 533 U.S. 935 (2001).  After a new penalty phase, Petitioner's death sentence was modified to life imprisonment.  See Petition [D.E. 29 at 2].  Thereafter, Petitioner unsuccessfully pursued Section 2254 relief in this Court and the Eleventh Circuit.  See Maharaj v. Sec'y for Dep't of Corr., Case No. 02-22240-CV-PCH (S.D. Fla. Aug. 31, 2004), aff'd 432 F.3d 1292 (11th Cir. 2005), cert. denied sub nom. Maharaj v. McDonough, 549 U.S. 1072 (2006).

In 2012, Petitioner filed a second motion for post-conviction relief pursuant to Rule 3.850, which was denied at the trial court level and on appeal. See App'x 1 ("2012 Rule 3.850 Proceedings"); Order on Defendant's Motion for Post Conviction Relief Based upon Newly Discovered Evidence Pursuant to Fla. R. Crim. P. 3.850 (hereafter, "2012 Rule 3.850 Order") aff'd, Maharaj v. State, No 3D15-321 (Fla. 3d DCA July 13, 2016) [D.E. 38-3 at 1-13, D.E. 38-9 at 78-79].

Prior to seeking Section 2254 relief in federal court again, Petitioner had to comply with "[t]he Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)[, which] established a stringent set of procedures that a prisoner 'in custody pursuant to the judgment of a State court' [] must follow if he wishes to file a 'second or successive' habeas corpus application challenging that custody." Burton v. Stewart, 549 U.S. 147, 152 (2007) (citing 28 U.S.C. § 2254(a), 28 U.S.C. § 2244(b)(1)). "In pertinent part, before filing the application in the district court, a prisoner 'shall move in the appropriate court of appeals for an order authorizing the district court to consider the application.'" Id. at 152-53 (citing § 2244(b)(3)(A)).

In compliance with the AEDPA, Petitioner sought leave to file a successive federal habeas petition from the Eleventh Circuit. See In re Maharaj, Case No. 17-10452-F (11th Cir. Mar. 28, 2017) (hereafter, "Successive Petition Order") [D.E. 63-1]. As more fully discussed below, leave was granted by the Eleventh Circuit only with respect to certain claims brought pursuant to Brady v. Maryland, 373 U.S. 83 (1963) (hereafter "Brady claims"). Id.

## LIMITATION ON THE SCOPE OF THE PETITION

In considering Maharaj's application for leave to file a successive petition, the Eleventh Circuit first set out the applicable standard as follows:

Krishna Maharaj, proceeding with counsel, seeks an order authorizing the district court to consider a second or successive 28 U.S.C. § 2254 petition for a writ of habeas corpus. We may grant such authorization only if:

3

> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2).

<u>See</u> Successive Petition Order [D.E. 63-1 at 2-3].  The Eleventh Circuit noted that Maharaj could obtain the requested authorization if it determined that his application had made a *prima facie* showing that the statutory criteria was met.  <u>Id.</u> at 3.  The Eleventh Circuit then proceeded to analyze Maharaj's application as follows:

> In his application, attachments to the application, and supplement to the application, Mr. Maharaj indicates that he wishes to raise the following claims in a second or successive § 2254 petition: (1) he is actually innocent; (2) the government suppressed favorable evidence, in violation of *Brady v. Maryland,* 373 U.S. 83 (1963); (3) the government knowingly presented perjured testimony at trial, in violation of *Giglio v. United States,* 405 U.S. 150 (1972); (4) his trial counsel was ineffective; (5) he was intentionally framed by law enforcement officers; (6) his post-conviction counsel was ineffective; and (7) cumulative error in his prosecution violated his fundamental rights. He asserts that his claims are predicated on newly discovered evidence that, if proved and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. **Because we conclude that Mr. Maharaj has made *a prima facie* showing that his subclaims 2(c) through (f) satisfy § 2244(b)(2)(B), we grant his request for authorization to file a second or successive habeas petition in the district court.**

<u>Id.</u> at 3-4 (emphasis added).  Because Maharaj's claim (2) was that "the government suppressed favorable evidence, in violation of *Brady v. Maryland,* 373 U.S. 83 (1963)", <u>id.</u>, it is clear that the Eleventh Circuit's leave to file a second federal habeas petition was limited to Maharaj's *Brady* claims.  Therefore, pursuant to the AEDPA, the Court's federal habeas

4

jurisdiction is limited to those *Brady* claims.  Burton, 549 U.S. at 152-53; see also In re Hill, 715 F.3d 284, 296 (11th Cir. 2013) (denying leave to file a successive petition because the application "d[id] not meet either of the two narrow exceptions enunciated in § 2244(b)(2)").

> Maharaj disregards this limitation by presenting four claims in his Petition:

> Ground One:   Violations of Brady v. Maryland.

> Ground Two:  Actual innocence.

> Ground Three: Denial of fundamental fairness and due process by presentation of perjured testimony at trial by prosecution.

> Ground Four:  Ineffective assistance of defense counsel.

See Petition [D.E. 29].  In accordance with the Successive Petition Order, the AEDPA, Burton and Hill, however, the Petition is limited to Ground One, Violations of Brady v. Maryland.  Moreover, "claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  Herrera v. Collins, 506 U.S. 390, 400 (1993).  Therefore, the Petition should be denied for lack of jurisdiction as to Grounds Two, Three and Four; and is being substantively addressed only as to Ground One, Violations of Brady v. Maryland.

## THE *BRADY* CLAIMS PRESENTED TO THE ELEVENTH CIRCUIT

As noted by the Eleventh Circuit, "[i]n Claims 2(c)-(f), Mr. Maharaj alleges that the State suppressed materials or information from five individuals who could testify that a [drug] cartel hit man actually committed the murders [of the Moo Youngs].  *See Brady v. Maryland*, 373 U.S. 83 (1963)."  See Successive Petition Order [D.E. 63-1 at 4].  The Eleventh Circuit continued as follows:

> The alleged *Brady* material includes four pieces of evidence regarding information from five individuals about the Moo Young murders.  First, a federal informant and former pilot for [drug cartel leader Pablo] Escobar known by pseudonym as "John Brown" provided information that in 1986, when the murders occurred, Escobar

told him that "El Chino" or "Los Chinos" had stolen from him. Escobar stated that he had "El Chino" or "Los Chinos" killed at a hotel, which Brown understood to be the Dupont Plaza Hotel.  Mr. Maharaj alleges that Brown also would attest that "Cuchilla" was one of Escobar's assassins. Second, a man named Jorge Maya, an "enforcer" for the cartel, provided information that the victims were murdered by the cartel.  Specifically, Jorge stated that his brother, Luis Maya, had spoken with Escobar, who explained that the Moo Youngs were stealing from him.   On Escobar's orders, Luis Maya paid Cuchilla, the hit man "who came to Miami to oversee the murders." DE 1, attachment 1 (Second Pet. for Writ of Habeas Corpus) at 163.  Third, Mr. Maharaj's new evidence includes an affidavit from Jhon Jairo Velasquez Vasquez (known as "Popeye"), one of Escobar's lieutenants at the time of the murders, explaining that Escobar ordered the Moo Young murders and Cuchilla carried them out.  According to Popeye, Escobar had the Moo Youngs killed because they were stealing from him. Fourth, Mr. Maharaj alleges that an additional witness who insists on anonymity, "Witness A," came forward in 2016 to state that he can provide evidence of a conversation between two cartel members, Juan Lopez and Jhon Henry Millan. During this conversation, Millan stated that the Moo Youngs were working for Escobar. When Lopez asked what happened to the victims, Millan replied, "The truth is people were sent to skin [pelar] them."   DE 1, attachment 1-2 (Second Pet. for Writ of Habeas Corpus) at 194-95.

Id. [D.E. 63-1 at 4-5] (internal citation omitted).

Petitioner sought leave to conduct discovery in this case, which the undersigned denied.

See Petitioner's Motions for Discovery [D.E. 44, 47-56, 65]; Order Denying Discovery Motions

[D.E. 70].  On appeal, the undersigned's Order Denying Discover Motions was affirmed [D.E. 76,

100].  Also, "after full briefing and oral argument, the undersigned conclude[d] that an evidentiary

hearing 'would not assist in the resolution of [Petitioner's] claim.'"   See Order Re: Evidentiary

Hearing [D.E. 124 at 7] (quoting Breedlove v. Moore, 279 F.3d 952, 960 (11th Cir. 2002)).[2]

Accordingly, this Report and Recommendation as to Petitioner's *Brady* Claims is based on a

review of the state court record and conducted in accordance with the requirements of Section

2254.

---

[2]  The Court denied without prejudice Petitioner's Appeal from the undersigned's Order Re: Evidentiary Hearing.  See Order [D.E. 126].

## APPLICABLE LAW

*1.     Section 2254*

Title 28, United States Code, Section 2254 provides, in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(d), (e)(1).

"The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002) (citation omitted).  "The AEDPA prevents defendants – and federal courts – from using federal habeas review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010).  "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." Woods v. Donald, 575 U.S. 312, 316 (2015).

Federal habeas "relief may be available if the state habeas court decision is 'contrary to' clearly established United States Supreme Court precedent." Hall v. Head, 310 F.3d 683, 690 (11th Cir. 2002). "Alternatively, 'if the state court confronts a set of facts that are materially indistinguishable from a [relevant Supreme Court decision and] arrives at a result different' from that decision, such a result is also contrary to Supreme Court precedent." Id. (internal citation omitted). Additionally, "a petition for habeas relief may also be granted if the state court decision involved an 'unreasonable application' of Supreme Court precedent." Id. at 691. Finally, "a state court's factual findings are presumed correct, unless rebutted by the petitioner with clear and convincing evidence." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001) (citation omitted).

### 2. *Brady* Claims

As summarized by the Eleventh Circuit in Breedlove:

> *Brady* places an affirmative duty upon the state to reveal any "material" evidence in its possession that would tend to exculpate a defendant. The state violates due process if it does not disclose any materially exculpatory information it possesses, regardless of whether the failure to disclose was in good faith. The duty to disclose covers both exculpatory evidence and evidence tending to impeach a state witness. Exculpatory or impeachment evidence is material for the purpose of *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

Breedlove, 279 F.3d at 961 (internal citations omitted).

For purposes of *Brady*, "the prosecution team generally is considered a unitary entity, and favorable information possessed by the police but unknown to the prosecutor is nonetheless subject to the *Brady* test." Id. (citing Kyles v. Whitley, 514 U.S. 419, 437 (1995)). With regard to materiality and a reasonable probability of a different result:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

Kyles, 514 U.S. at 434.

## THE 1987 TRIAL

The following summary of the facts giving rise to Maharaj's conviction is taken from the

Eleventh Circuit's opinion in the federal habeas phase of the 1997 Rule 3.850 Proceedings:

Krishna Maharaj is a British national, born in Trinidad, who was living in South Florida in October of 1986. He owned and operated a newspaper, the *Caribbean Times,* that catered to the West Indian Community. In the spring of 1986, Maharaj approached Eslee Carberry, the owner of another South Florida community newspaper, the *Caribbean Echo,* and told Carberry Derrick Moo Young had stolen money from him. He gave Carberry documents that purported to corroborate his accusations about Derrick Moo Young, and paid the *Caribbean Echo* a $400 "sponsorship fee" to publish an article detailing the alleged theft.

After the article appeared in the *Caribbean Echo,* Derrick Moo Young contacted Carberry to provide his side of the story. Carberry testified that he met with Derrick Moo Young twice, and that Moo Young provided documents detailing a lawsuit he had filed against Maharaj. Subsequently, the *Caribbean Echo* published a series of articles describing Maharaj's alleged involvement in an illegal scam to take millions of dollars out of Trinidad.

The state's most important trial witness was Neville Butler, a reporter for the *Caribbean Echo.* Butler testified that in the course of writing for the *Caribbean Echo,* he had occasion to meet Derrick Moo Young and had assisted in writing some of the articles critical of Maharaj. At some point in September of 1986, Butler contacted the *Caribbean Times* after hearing from a friend that Maharaj might be interested in having Butler write for his paper too. He met with both Maharaj and Maharaj's wife, and although he was never officially hired, he wrote several articles for the *Caribbean Times* under various pen names.

Butler testified that shortly after he became associated with Maharaj and his periodical, Maharaj told him that Carberry and Moo Young were trying to extort money from Maharaj's relatives in Trinidad in exchange for suppressing still other stories critical of Maharaj and his family. Maharaj also told him that Carberry and Moo Young suggested to people in Trinidad that Butler was really behind the extortionate attempts. Butler said that Maharaj asked him to set up a meeting with Derrick Moo Young, so that Maharaj could: (1) extract a confession from Moo Young that he was actually behind the extortion and bribery; (2) require Moo Young to write two checks to repay him for the fraud; and (3) cause Butler to go to a bank with the checks and certify them, at which time Maharaj would permit Moo Young to leave.

Maharaj made it clear to Butler that Moo Young would not knowingly agree to a meeting with Maharaj. Accordingly, in order to trick Moo Young into meeting with Maharaj, a plan was devised whereby Butler would tell Moo Young, who was engaged in importing and exporting goods, that two individuals from the Bahamas

(Eddie Dames and Prince Ellis) would be in Miami and that they were interested in purchasing goods for their catering business. Butler arranged for the meeting to be held on October 16, 1986, in Dames' room at the Dupont Plaza Hotel in Miami. He never informed Moo Young that Maharaj would be at the meeting.

Maharaj and Butler met at the Dupont on the morning of October 16. Butler gave Dames the keys to his rental car and instructed Dames that he would meet Dames in the lobby at around noon or 1:00 p.m.—which would allow sufficient time to use Dames' room for the 11:00 a.m. meeting with Moo Young. When Derrick Moo Young arrived at the Dupont Plaza Hotel for the meeting, Butler was surprised to see that Moo Young had unexpectedly brought along his son, twenty-three-year-old Duane Moo Young.

As the Moo Youngs entered Dupont Plaza Hotel room 1215, Maharaj emerged from behind the door carrying a pillow in his left hand and a gun in his gloved right hand. Soon thereafter, an argument ensued, and Maharaj shot Derrick Moo Young in the leg. Maharaj then instructed Butler to tie up Duane and Derrick Moo Young. Before he could do so, Derrick Moo Young lunged at Maharaj, who again shot Derrick Moo Young, hitting him three or four more times. Maharaj then turned his attention to Duane Moo Young, who Butler had loosely tied to a chair with the cord from an immersion heater. While Maharaj was talking to Duane Moo Young, Derrick Moo Young managed to open the door to the hallway and attempted to crawl outside. Once he noticed the escape attempt, Maharaj shot Derrick Moo Young still again and dragged him back inside the room by his ankles.

Butler testified that Maharaj then went back to interrogating Duane Moo Young, attempting to verify what the Moo Youngs had done with the money allegedly extorted from Maharaj's relatives in Trinidad. Soon thereafter, a person identifying himself as a hotel security guard shouted from outside the room that he noticed blood in the hall and inquired whether everyone was all right. According to Butler, Maharaj moved towards the door and responded that everything was all right. After several minutes of silence, Maharaj opened the door, poked his head out into the hall and appeared to tell someone that everything was all right. After Maharaj re-entered the room, Duane Moo Young unsuccessfully lunged at Maharaj in an attempt to gain control of the gun. Maharaj continued to interrogate Duane Moo Young, this time on the top floor of the two-level hotel suite.

Butler, who remained on the lower floor, testified that he then heard a single shot from above, after which Maharaj came downstairs alone, and they both left the room. Maharaj and Butler took the elevator to the ground floor and retrieved Maharaj's car from the parking lot. They drove around the block. Butler voiced his opinion that they needed to wait at the hotel for Dames to return. Maharaj agreed, and they parked in front of the hotel for approximately three hours until Dames returned.

While parked in front of the hotel, Maharaj told Butler that he was just as guilty for what happened in the room as Maharaj was, because Butler had arranged the

meeting and been present during the killings. Maharaj promised Butler that he would take care of him, stating that he would give Butler a job with the *Caribbean Times,* provide a down payment for Butler's house, and give him a car.

When Dames finally arrived at the Dupont, Butler exited the car, retrieved his car keys from Dames, and left the scene. Later that day, Maharaj contacted Butler and told him he wanted to meet at a Denny's restaurant near the Miami Airport so they could coordinate their stories. Butler subsequently met up with Dames and Ellis, who had given statements to police investigators. Dames and Ellis convinced Butler to contact the police. Butler then called the lead investigator on the case, Miami Police Detective John Buhrmaster, and explained what had happened in the hotel room. Butler brought Buhrmaster to the Denny's, where Maharaj was arrested.

The State presented other witnesses at trial who testified as to motive and prior acts by Maharaj that were consistent with the murders at the Dupont Plaza Hotel. For example, Tino Geddes, a journalist at the *Caribbean Echo,* testified that Maharaj had purchased camouflage clothing and exotic weapons and had twice attempted to ambush Eslee Carberry. Furthermore, Geddes said that on one occasion, Maharaj met him at the Dupont Plaza Hotel, with a handgun, and asked Geddes to call Derrick Moo Young and Eslee Carberry and lure them to the hotel. Although Geddes called both, neither came.

The State also presented corroborating testimonial and physical evidence. Loretta Molaskey, a maid at the Dupont Plaza Hotel, testified that she thoroughly cleaned the room where the murders occurred (suite 1215) on the morning of October 16, 1986, and that it appeared as if nobody had slept in the room the night before. She said that at around 12:15 p.m., her boss summoned her to room 1215 where he saw blood on the hallway carpet outside the door. While there, she noticed that the room was double-locked from the inside, preventing her from opening it with the master key, and that there was no "Do Not Disturb" sign on the exterior of the door. Some five to ten minutes later, Molaskey was contacted by hotel security and again asked to return to room 1215. She did, discovering that the door was no longer double-locked and there was a "Do Not Disturb" sign hanging on the exterior doorknob. At the request of the security guard, she opened the door with the master key and discovered the bodies of Derrick and Duane Moo Young.

Other hotel employees testified similarly. Miguel Sueiras, Ms. Molaskey's boss, testified that when he summoned Molaskey to open the door to room 1215, there was blood on the outside carpet, the door was double-locked, and there was no "Do Not Disturb" sign hanging on the doorknob. Jorge Aparicio, a security guard at the Dupont, testified that he too noticed blood outside room 1215, and when he asked whether everyone inside was all right, someone inside answered that everything was fine. He also noticed that there was no "Do Not Disturb" sign on the door at that time.

The State also presented a fingerprint expert who testified that Maharaj's fingerprints were found in approximately twelve places in room 1215, including on the "Do Not Disturb" sign that was found on the exterior doorknob when the room

was opened, on the exterior portion of the entrance door, on the interior bathroom door and doorframe, on the top of the bureau, on a soda can found on the bureau, on the telephone and television, on the bottom of a glass tabletop, on a piece of paper left in an ashtray, on two newspapers, and on the torn plastic packages for the immersion cords.

A firearms expert testified that, based on multiple projectiles and fragments recovered from the hotel room and Derrick Moo Young's body, eight bullets were fired from a Smith & Wesson model 39, nine-millimeter semiautomatic pistol with a serial number less than 270000. Richard Bellrose, a city of Miramar police officer, testified that he sold a Smith & Wesson model 39 pistol, serial number A235464, to his supervising lieutenant in 1986, who in turn sold the gun to Krishna Maharaj. Gregory Jansen, a City of Plantation police officer, testified that Krishna Maharaj was stopped for a traffic infraction on July 26, 1986, some three months before the murders, and that he found a Smith & Wesson model 39, nine-millimeter handgun, bearing serial number A235464, in the trunk of Maharaj's car. Finally, Sylvia Ramos, a crime scene technician with the City of Miami Police Department, testified that Derrick Moo Young had black gunpowder on the upper-right shoulder area of his shirt, a finding consistent with having been shot at very close range.

Maharaj v. Sec'y for Dep't of Corr., 432 F.3d 1292, 1299-1302 (11th Cir. 2005).

## THE 1997 RULE 3.850 PROCEEDINGS

As noted above, Petitioner succeeded in obtaining relief in the 1997 Rule 3.850 Proceedings only as to the penalty phase and not as to the guilt phase.  As to the latter, the Florida Supreme Court directed that an evidentiary hearing be held to resolve whether, *inter alia,* "material was improperly withheld by the prosecutor."  Maharaj, 684 So. 2d at 728.  The evidentiary hearing mandated by the Florida Supreme Court was held from September 8, 1997 to September 15, 1997.  See Order on Rule 3.850 Petition for Postconviction Relief, dated October 26, 1997 [D.E. 39-4 at 7].  In addition to submitting documentary evidence, Petitioner called the following ten witnesses: "Manelo Stravos; Eric Hendon, the former trial attorney; Paul Ridge, the former Chief prosecutor; John Kastrenakes, the former co-prosecutor; David Rivero, a Miami Police officer; Ron Petrillo, the former private investigator; John Buhrmaster, a Miami Police Officer (lead homicide detective); Douglas Scott; Christina Nagel; and Mr. Brenton Ver Ploeg, P.A., an attorney."  Id.

Based on its thorough examination of the evidence presented and consideration of its cumulative effect, the court found no *Brady* violation as to any of Petitioner's *Brady* sub-claims. Id. at 12-18.

Petitioner was similarly unsuccessful in obtaining Section 2254 relief in this Court and the Eleventh Circuit. See Maharaj v. Sec'y for Dep't of Corr., Case No. 02-22240-CV-PCH (S.D. Fla. Aug. 31, 2004), *aff'd* 432 F.3d 1292 (11th Cir. 2005). As summarized in the district court's opinion, Petitioner's most significant *Brady* claims were that the government failed to disclose to him: "(1) a transcript of Neville Butler's statement during a polygraph examination conducted by the State, (2) the contents of the Moo Youngs' briefcase, including their passports, and (3) information concerning the Moo Youngs' life insurance policy." See Maharaj, Case No. 02-22240-CV-PCH [D.E. 53 at 17]. The district court "agree[d] with the Florida courts that there was no constitutional violation through any alleged withholding, either individually or cumulatively, of these items . . . ." Id. at 22. The district court similarly agreed with the Florida Supreme Court that no constitutional violations occurred with respect to Petitioner's various other *Brady* claims, which were related to the following items: non-disclosure of Adam Hosein having left a message for Eddie Dames in Room 1215 sometime around the day of the murders; failure to turn over notes indicating that Petitioner had invoked his rights to an attorney and to silence during questioning by Detective Buhrmaster; failure to turn over an anonymous file memo that reflected poorly on the character of Eslee Carberry, a trial witness; failure to notify Petitioner that two other people named Maharaj owned Smith & Wesson guns; Detective Buhrmaster's not having turned over certain *Brady* material to the defense based on a letter authored by an investigator for the William Penn Life Insurance Company ("William Penn Insurance"); and suppression of evidence regarding Petitioner's gun being stolen by the Florida Highway Patrol prior to the murders. Id. at 22-25. Finally, the district court found that the Florida courts were reasonable in finding that any *Brady* violation due to failure to disclose these documents, either individually or cumulatively, would not

have affected the outcome of the trial.  Id. at 25.

The Eleventh Circuit conducted an extensive review of Petitioner's three most significant *Brady* claims, relating to Neville Butler's polygraph examination, the Moo Youngs' briefcase and their life insurance policy.  See Maharaj, 432 F.3d at 1310-17.   The Eleventh Circuit

> readily conclude[d] that there is no reasonable probability, had all of the items been disclosed to the defense, the result of the proceedings would have been any different. There was ample evidence of motive, and significant physical evidence tying Petitioner to the room where the murders occurred. The State's eyewitness, Neville Butler, never wavered as to the most important part of his testimony, describing Maharaj's brutal attacks on the Moo Youngs, and that testimony was corroborated by physical and ballistic evidence. None of the alleged *Brady* items calls into question that portion of Butler's testimony, and none refutes any of the physical evidence. Moreover, Neville Butler was significantly impeached by Petitioner's trial counsel, who extracted numerous admissions from Butler concerning the lies he told at various points throughout this case. Again, the Florida courts' disposition of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

Id. at 1317.  Thus, on federal habeas review, no error was found with respect to the *Brady* claims presented in the 1997 Rule 3.850 Proceedings.

### THE EVIDENTIARY HEARING IN THE 2012 RULE 3.850 PROCEEDINGS

The 2012 Rule 3.850 Proceedings also involved an evidentiary hearing (hereafter, "Evidentiary Hearing – 2012 Rule 3.850 Proceedings").  See 2012 Rule 3.850 Order [D.E. 38-3 at 4]; Transcript of Evidentiary Hearing (hereafter, "Transcript") [D.E. 38-4 through 38-7].  The following witnesses testified at the evidentiary hearing: Henry Cuervo; John Brown; Brenton Ver Ploeg; Michael Flynn; Prince Ellis; Baruch Vega; John Kastrenakes; and Sergeant Altare Williams.  See Transcript [D.E. 38-4 through 38-7].  Following is a summary of the witnesses' testimony.

### A.  *Henry Cuervo*

1. Henry Cuervo ("Agent Cuervo") was a retired Drug Enforcement Administration ("DEA") agent and supervisor who worked in Miami from 1986-87 to 2002.  During that period,

the majority of his cases involved the Medellin Cartel and he developed extensive knowledge of how the Colombian drug cartels operated in South Florida.  He testified as an expert in the operation of Colombian and related drug cartels in South Florida in the 1980's and how law enforcement would go about evaluating the clues in investigating potential involvement of cartel members in crime.

2.      According to Agent Cuervo, the drug trade involved the laundering of money through banks or other financial institutions.

3.      Agent Cuervo listed the most prominent members of the Medellin Cartel in the 1980's as Pablo Escobar, the Ochoa Brothers, Jose Gonzalo Rodriguez Gacha and Carlos Lehder.

4.      Agent Cuervo testified that the following circumstances would have raised red flags to him: the location of the Moo Young murders at the Dupont Plaza Hotel in downtown Miami and a Colombian individual staying at the hotel room next door to where the murders occurred.

5.      Agent Cuervo also found the following red flags in the statement of that individual, Jaime Vallejo Mejia ("Mr. Mejia"), to the police: that he had recently come from Aruba, a country used by drug traffickers to launder their money; that he claimed to be in insurance sales and in the import and export business; and that he was from Pereira, a city in Antioquia, Colombia where the Medellin cartel operated.

6.      Agent Cuervo reviewed an indictment from the Western District of Oklahoma dated September 3, 1987, which charged Mr. Mejia with money laundering.  Because the indictment included dates going back to May 27, 1985, Agent Cuervo opined that the DEA's investigation of Mr. Mejia conducted in Oklahoma must have gone back to 1985 and maybe even earlier.

7.      According to Agent Cuervo, if he had been investigating Mr. Mejia and learned of a DEA investigation, he would have contacted federal counterparts to see what they knew of him, as well as reach out to the Colombian national police to obtain additional information.

8.      Agent Cuervo also reviewed a memorandum from an employee of the Florida Department of Business Regulation, who had apparently reached out to DEA Agent Kimberly Abernathy ("Agent Abernathy").

9.      Agent Cuervo testified that he had also reached out to Agent Abernathy, who told him that, as part of the 1983-84 Operation Greenback in South Florida, the DEA had been looking into Mr. Mejia.

10.     Agent Cuervo testified that, if he had been investigating an individual who had been identified as a potential money launderer and had been indicted for it, he would have sought out his tax filings and banking records in relation to his import and export business, by issuing subpoenas if necessary.

11.     Agent Cuervo then reviewed a 1986 balance sheet for Mr. Mejia's leather import and export business, which showed a loss of approximately $40,000.00.

12.     Agent Cuervo also reviewed an October 15, 1986 bank statement for Mr. Mejia's leather import and export business, which showed a balance of just under $500 million.  After reviewing additional bank records, Agent Cuervo opined that they raised a red flag indicative of potential money laundering.

13.     Agent Cuervo also opined that Mr. Mejia's having posted a cash bond of $600,000 when he was arrested would have raised a red flag that this was an individual who was going to flee the country.  Agent Cuervo added that the large amount of the cash bond was indicative of money laundering or involvement in a criminal organization laundering drug proceeds.

14.     Based on the foregoing documentation and his discussion with Agent Abernathy, Agent Cuervo expressed no doubt that Mr. Mejia was a member of a Colombian narcotics conspiracy.

15.     Agent Cuervo further testified that, during his time with the DEA in South Florida, he worked with local law enforcement at the Miami Police Department and other municipalities. This collaboration involved deputizing local officers and sharing information with those who were trustworthy.  One such trusted officer in Agent Cuervo's opinion was Al Singleton, a Metro-Dade homicide detective in the 1980's.

16.     Agent Cuervo opined that following up on Mr. Mejia's potential association with the Colombian cartels after he was deported would involve contacting DEA offices in either Bogota or Barranquilla and seeking to obtain business registration documents from Colombia.

17.     Agent Cuervo reviewed a Chamber of Commerce document from a Colombian company by the name of Proquim Industrial Limitada, which was in the business of importing chemicals to Colombia.  According to Agent Cuervo, such a company would raise a red flag regarding Mr. Mejia and what he did after being deported back to Colombia.

18.     With regard to Pablo Escobar, Agent Cuervo testified that the rule was that people could not steal from him; and that there was zero tolerance for such conduct.

19.     Agent Cuervo also reviewed financial records of Derrick Moo Young, which, in his opinion, were indicative of money laundering or fraud.

20.     Agent Cuervo testified that an individual by the name of Manuel Guillermo Zuluaga Salazar aka "Cuchilla" was a hit man for Pablo Escobar.  According to Agent Cuervo, Cuchilla was killed by a revenge organization called "Los Pepes" composed of persons who had been persecuted by Pablo Escobar.

21.     Agent Cuervo identified Cuchilla's Colombian identification and a legal document reflecting the seizure of properties belonging to Cuchilla for his involvement in narcotrafficking. An additional document from the city of Rionegro showed that the property had been purchased on May 7, 1987.

22.     Agent Cuervo described Jorge Maya and his brothers (hereafter, "Maya Brothers") as representatives of Pablo Escobar in South Florida, who made sure that drugs and laundered money were accounted for and who served as payors for services to Pablo Escobar.  An indictment returned in the Southern District of Florida charged the Maya Brothers with laundering $2.5 billion.  Agent Cuervo had no doubt that Jorge Maya, who was never arrested and lived in Colombia, was associated with the Colombian narcotics cartel.  Only one of the Maya Brothers, Sigifredo, was arrested and convicted in the United States; and another Maya Brother, Luis, passed away.

23.     According to Agent Cuervo, Jorge Maya was Cuchilla's handler whenever the latter traveled to the United States; and he assisted Cuchilla with whatever Cuchilla had come to do, including providing him with funds.  Agent Cuervo also testified that, if Pablo Escobar had wanted someone to carry out something for him in the southern part of the United States, he would have given instructions to Jorge and Luis Maya.  Agent Cuervo further opined that, if Cuchilla had been involved in the murder of the Moo Youngs, Jorge Maya would have known about that.

24.     According to Agent Cuervo, Jhon Jairo Velasquez aka "Popeye" was another hit man for Pablo Escobar and part of his inner circle.  Agent Cuervo believed that Popeye had been recently released from jail in Colombia, that he was subject to various threats due to his cooperation with Colombian authorities, and that his life was in danger.

25.     Agent Cuervo described Nigel Bowe as an attorney in the Bahamas who assisted the cartels in laundering money, and who was ultimately charged and convicted.  If Agent Cuervo saw a report that corporations belonging to the Moo Youngs were registered at Nigel Bowe's office in the Bahamas, that would raise a red flag for him to look into more of what they were doing, particularly given the role of the Bahamas in the drug trade of the 1980's.

26. If Agent Cuervo learned that Eddie Dames ("Mr. Dames"), the registrant for Room 1215 at the Dupont Plaza where the Moo Youngs were murdered, was a traffic controller in the Bahamas and was involved in drugs, this would also raise a red flag because corrupt traffic controllers were part of the drug smuggling enterprise. According to Agent Cuervo, the Shower Posse in Jamaica was a criminal organization involved in moving guns and drugs. If Agent Cuervo learned that a witness in the Maharaj case was linked to the Shower Posse, this would also raise a red flag for him that he was looking at a criminal organization.

27. According to Agent Cuervo, all the information presented to him on the stand consisted of leads that could have been followed and pursued further as to what they all meant and what had occurred.

28. On cross-examination, Agent Cuervo acknowledged that, in his 30-some years with the DEA, he never received any reports from any confidential informants or other DEA agents about either Mr. Mejia or the Moo Youngs. Agent Cuervo also acknowledged that he had never investigated the Moo Youngs or heard their names during his DEA career.

29. Agent Cuervo also acknowledged that, in his direct examination, he had not been asked to identify a photograph of any of the persons he had been discussing; and that much of the information that was presented came from Petitioner's counsel.

30. In preparing for his testimony, Agent Cuervo was not provided with any information regarding the handgun used in the murder of the Moo Youngs, or any ballistics reports, or the autopsy reports, or the placement of the wounds, or the testimony of eyewitnesses, or the location of Petitioner's fingerprints inside Room 1215. Agent Cuervo acknowledged that the MAC 10 would be one of the weapons of choice for cartel members.

31. Agent Cuervo had some limited information regarding the contentious nature of the relationship between Petitioner and the Moo Youngs but did not review the newspaper articles in

which they disparaged each other.  Agent Cuervo didn't know that Petitioner and the Moo Youngs had been neighbors or that Duane Moo Young referred to his killer as "Uncle."

32.    Agent Cuervo first learned of the Moo Young murders four or five months prior to his deposition and the case was never in his radar while he was a DEA agent, notwithstanding the practice of sharing information with deputized local law enforcement.

33.    Despite being familiar with and recognizing from a group photograph several cartel figures, Agent Cuervo did not recall having ever heard of Mr. Mejia until Petitioner's counsel brought him up.

34.    Agent Cuervo acknowledged that, at his deposition, he testified that if he had been the investigator in the Moo Young murders he would have "squeezed" Mr. Mejia because he was a Colombian who spoke English, which would have made him "golden" to the drug cartel.  But Agent Cuervo acknowledged that he was also a Colombian who spoke English.

35.    Agent Cuervo had no information regarding how many guests were checked into the Dupont Plaza at the time of the murders, or how many were Colombian, or how many had businesses at the hotel.

36.    Agent Cuervo had never seen a photo of Mr. Mejia, other than one shown to him, which Petitioner's counsel claimed was Mr. Mejia's photo.  Additionally, Agent Cuervo had no information regarding Mr. Mejia's sentence or that he had been permitted to travel by the federal government and ultimately placed on probation.  Agent Cuervo thought this indicated that the case against Mr. Mejia was not that strong.

37.    Agent Cuervo acknowledged that, in his investigations, he never encountered a case of a defendant being framed by the police and the cartel, as Petitioner claims is his case.

38.    Agent Cuervo also acknowledged that, although a major part of crimes in South Florida were attributable to drug trafficking in the 1980's; there were also numerous non-related

home burglaries, strong-arm robberies, domestic violence cases, and murders by former friends, lovers or family members.

39.     With regard to Petitioner's case, Agent Cuervo acknowledged that he did not know the details of the police investigation or their follow up, and that he never looked at the police reports or the trial transcript.  Agent Cuervo further acknowledged that his role was not to tell the court that Petitioner did not kill the Moo Youngs or that the Moo Youngs were money launderers.

40.     When asked by the court, "Why are you here?" Agent Cuervo answered, "Basically to paint the picture of how the Colombian cartels worked and operated in South Florida in the '80's."  See Transcript [D.E. 38-4 at 104].

41.     On re-direct examination, Agent Cuervo testified that, if he learned that the eyewitness to the Moo Young murders was associated with drugs, that would raise a red flag for him.  And if he learned that the eyewitness had failed a polygraph exam, that would taint the individual as a witness.

42.     When asked to compare a conflict between Petitioner and the Moo Youngs versus one between Pablo Escobar and someone who had taken money from him, Agent Cuervo repeated that Pablo Escobar did not tolerate such conduct at all, that he would not allow anyone to do that. When asked by the court why, if that was the case, would Pablo Escobar not publicize that he was the person who had the Moo Youngs killed rather than someone else being framed for the murders, Agent Cuervo responded that word of the killing by Pablo Escobar would spread internally. According to Agent Cuervo the thing Pablo Escobar was most afraid of in life was getting extradited to the United States.

43.     Agent Cuervo expressed no doubt that, given Agent Abernathy's investigation of Mr. Mejia, there were all sorts of documents somewhere in the federal government regarding Mr. Mejia.

44.     Although distinguishing between the Metro Dade and the Miami Police Departments, Agent Cuervo acknowledged that he would have equally shared information with personnel from both police departments, if appropriate.

45.     Agent Cuervo believed that, if someone had put a little bit of pressure or maybe a bit of investigation on Mr. Mejia, they would have found out that he was a drug dealer; so, in Agent Cuervo's opinion, the three-page interview of Mr. Mejia did not get to the truth about him.

46.     Based on the materials he reviewed, Agent Cuervo opined that there were significant leads towards the conclusion that Jorge Maya, Baruch Vega and Popeye were involved in the Moo Young murders.  Agent Cuervo also opined that there was significant evidence that the Moo Youngs were money launderers.

47.     Agent Cuervo was subsequently recalled to testify about a telephone call he had received the previous day from Popeye.  See Transcript [D.E. 38-6 at 55-60].  According to Agent Cuervo, Popeye confirmed that he had written a statement in prison to clear his conscience, in which he stated that it was Pablo Escobar and his people who had killed the Moo Youngs.  Agent Cuervo added that Popeye had expressed fear for his life and had offered that, if the threat passed, he would be willing to do a deposition via Skype.[3]

48.     On recall cross-examination, Agent Cuervo reported that Popeye, who had been released from prison, said he was a religious person who had changed his way.

**B.     John Brown**

49.     John Brown ("Mr. Brown") testified under a pseudonym.  He claimed to have been

---

[3] Popeye's statement was admitted as Petitioner's Exhibit 503 in a handwritten Spanish version and a typewritten English translation [D.E. 38-3 at 14-23].  In his written statement, Popeye claimed: that, as a member of the Cartel, he knew about the Moo Young assassinations in Miami at the time they occurred; that he remembered the name Moo Young because he always thought of it as the mooing of a cow; that Pablo Escobar told him directly that they had stolen his money and that of his partners and that they therefore "had to die;" that the person in charge of the assassinations was Cuchilla, who worked for the Cartel as a paid assassin; and that Cuchilla had coordinated the murders of the Moo Youngs.  Id. at 22-23.

a pilot for Pablo Escobar and the Medellin cartel, along with the Cali Cartel, the North Coast Cartel

of Colombia, from 1985 to 1990.  Mr. Brown admitted that, in this role, he was a member of the

conspiracy to import narcotics into the United States.

50.     Mr. Brown first met Pablo Escobar in late 1986 at his ranch, "Los Napoles."

51.     At that time, Mr. Brown had been making so many successful trips into the United

States that Pablo Escobar wanted to meet him.  The meeting took place in the evening next to the

pool in front of the main house at Los Napoles.

52.     During the conversation, Pablo Escobar talked about various people he wanted to

have killed in the United States, including Max Mermelstein and Barry Seals.  The import of the

conversation to Mr. Brown was that, if one stole from or lied about Pablo Escobar, the penalty was

death.

53.     With regard to Barry Seals, Pablo Escobar said that Seals had lied about him and

had informed on him, so Pablo Escobar "clipped Little Bird's wings."  See Transcript [D.E. 38-4

at 145].

54.     Later, Pablo Escobar asked Mr. Brown where he was living at the time, to which

Mr. Brown responded that he was living at the old Holiday Inn on the Miami River.  In that

conversation, Pablo Escobar "said something about the – the Chinos.  And he said the one Chino

has stole from him. Know stole from him."  Id. at 146.

55.     Mr. Brown further testified as follows:

> Q. And did he indicate what happened to him?
> A. He said that he had killed him.
> Q. And whereabouts did he say that he --
> A. Across from the hotel that I was staying in.
> Q. And to you, what hotel was that that he was talking about?
> A. Well, there were several hotels over there, but the major hotel that was straight
> across from there was the Dupont.

Id.

56.     According to Mr. Brown, Mr. Mejia was a money launderer for the cartel, who was called "El Enano Peligroso," or dangerous dwarf.  Mr. Brown came to know Mr. Mejia from several encounters at Pablo Escobar's ranch.

57.     Mr. Brown had heard the nickname Cuchilla, the Blade, referencing a "sicario" or killer.

58.     With regard to Popeye, Mr. Brown testified that he was one of Pablo Escobar's main people who handled a lot of bombings and murders for Pablo Escobar along with Jhonny Acosta.

59.     According to Mr. Brown, who claimed to have known Pablo Escobar quite well over a five-year period, Pablo Escobar was most afraid of being extradited to the United States.

60.     Mr. Brown had never previously testified in a case for the defense, and was not keen to be testifying, but was doing so because, in his words, the state "got the wrong guy."  Id. at 148.

61.     On cross examination, Mr. Brown acknowledged that, at his deposition, the words "Moo Young" never came out of his mouth and he explained that he did not know their names, that Pablo Escobar only said, "Los Chinos."  Additionally, Mr. Brown never said to anybody that Pablo Escobar had told him that Cuchilla had killed the Moo Youngs at the Dupont because no one had ever told him so.

62.     Mr. Brown's memory of his conversation with Pablo Escobar was jogged by Gary McDaniel ("Mr. McDaniel"), a defense investigator, twenty-eight years after the encounter, while Mr. Brown in prison.  Mr. McDaniel asked Mr. Brown if he knew anything about the Dupont murders and Mr. Brown told him the story he had just provided in court.

63.     Mr. Brown acknowledged that, in January 2013, he recounted the story as Pablo Escobar referring to "El Chino." But in May 2014, Mr. Brown changed the reference to "Los

Chinos," attributing the change to his poor Spanish.  Mr. Brown also acknowledged that Pablo Escobar never said the words "Dupont Plaza."  Therefore, the statement that Pablo Escobar told Mr. Brown that he killed the Moo Youngs in the Dupont Plaza is not a true statement.

64.    When Mr. Brown initially told Mr. McDaniel that he had spoken to Pablo Escobar in January or February of 1986, that was not true.  Rather, if Mr. Brown spoke to Pablo Escobar at all it was either the end of December 1986 or early January 1987.  Also, when talking about the killing, Pablo Escobar did not say whether it had already occurred.

65.    Mr. Brown acknowledged that he did not know the identity of the Moo Youngs, had never seen their photographs or heard their names, or even knew the identity of the shooters or the date of the crime.

66.    Also, Mr. Brown only learned the exact location of the murders from Mr. McDaniel.  He only knew what Pablo Escobar told him, that they had occurred across the hotel where he was living.  Mr. Brown also testified that his hotel may have been a Sheraton or a Holiday Inn, but that it was on the Miami River, at the corner of Brickell Avenue.  When asked about the Hyatt hotel, Mr. Brown acknowledged that it was also on the Miami River, but contended that the Hyatt was not across from the hotel where he was living.

67.    Mr. Brown also acknowledged that, when Mr. McDaniel asked him about Mr. Mejia, he was not sure if Mr. McDaniel was referring to Jaime or Jairo, so he asked Mr. McDaniel, "Which Mejia?"  See Transcript [D.E. 38-5 at 5-6].

68.    Mr. Brown acknowledged that, throughout his career, he had the opportunity to reveal the facts he was testifying about to lawyers, cops, judges and prosecutors, but did not do so.  Mr. Brown claimed he had given enough information to authorities and testified in fifteen trials and that was enough.

69.     Mr. Brown had no knowledge of who the murder victims were in Petitioner's case. He pieced together his conversation with Pablo Escobar with the name of the Moo Youngs provided by Mr. McDaniel and surmised the location of the murders being the Dupont Plaza.

70.     Mr. McDaniel asked Mr. Brown about "El Chino" who Mr. Brown knew to be a killer or sicario; but here he was talking about "El Chino" or "Los Chinos" as the victim or victims. Mr. Brown acknowledged that the reference to "Los Chinos" could be to two individuals or to a dozen individuals, Mr. Brown did not know which.

### C.     Brenton Ver Ploeg

71.     Brenton Ver Ploeg ("Mr. Ver Ploeg") was an attorney in private practice who became involved in civil litigation matters arising from the deaths of the Moo Youngs.  At the time, Mr. Ver Ploeg represented William Penn Insurance, which had issued "key man" life insurance coverage for both of the Moo Youngs.  According to Mr. Ver Ploeg, under this type of insurance, the decedent's corporation, rather than family members, is the beneficiary of the life insurance policy.

72.     Mr. Ver Ploeg was charged with investigating any potential reasons for disallowing payment on the Moo Youngs' life insurance policy after William Penn Insurance had initially denied the beneficiaries' claims.  The matter was litigated in the federal court for the Southern District of Florida.

73.     Mr. Ver Ploeg gathered a considerable number of records in the course of his investigation, but he had no involvement in the state criminal case against Petitioner.

74.     Mr. Ver Ploeg initially considered pursuing denial of the claims based on suspicions of drug trafficking and money laundering and misrepresentation of income level; but he found it would be easier to pursue an alternative path, namely, that there was no insurable interest in the

lives of the Moo Youngs because their company, DMY, was not a legitimate business enterprise. Ultimately, the case was confidentially settled for a modest sum.

75.     In reviewing the materials from the insurance case file, Mr. Ver Ploeg was able to determine that some public records had been obtained from the City of Miami Police Department. To the best of Mr. Ver Ploeg's recollection, there were a total of 15 to 20 bankers' boxes full of documents gathered for the case.

76.     The documents gathered by Mr. Ver Ploeg included materials related to financial dealings on the part of the Moo Youngs and their company, DMY.  The materials were both domestic and from other countries, such as Panama.

77.     During the period of time from the homicides in 1986 to Petitioner's trial in 1987 on through appeal, Mr. Ver Ploeg was not contacted by any lawyer or investigator working for Petitioner.

78.     However, in the late 1990's Petitioner's counsel did reach out to Mr. Ver Ploeg in connection with testifying in the 1997 Rule 3.850 Proceedings.  At that time, Mr. Ver Ploeg provided to counsel access to his case documents that were being stored at the Iron Mountain document retention center.

79.     Sometime in 2013, Mr. Ver Ploeg was again contacted by Petitioner's counsel to conduct a renewed document review.  At that time, Mr. Ver Ploeg realized that the volume of documents from the case was close to double what had been provided to Petitioner's counsel in the late 1990's.  This time, there were approximately 20 or 25 bankers' boxes.

80.     Mr. Ver Ploeg testified about a number of documents from his case file, but he could not identify which ones had been provided in the first go-round and which in the second one.

81.     The following subjects were referenced in the documents reviewed by Mr. Ver Ploeg on the stand: Cargil, a company in which the Moo Youngs were involved, which had

significant dollar volume transactions; an individual by the name of Adam Hosein; transactions involving precious gems; an international oil company; the balance sheet for a company named Kris International Canada, Inc.; Equifax reports; and the name Roger Stefan ("Mr. Stefan").

82.     Mr. Ver Ploeg testified that he had hired Mr. Stefan directly from the state attorney's office and assigned him to work on the William Penn Insurance/Moo Young case.  Mr. Ver Ploeg was not aware of any contacts between Mr. Stefan and the state attorney's office or the City of Miami Police Department regarding the records from the William Penn Insurance/Moo Young case.

83.     Mt. Ver Ploeg had no reason to dispute Petitioner's counsel's assertion that all of the documents he reviewed on the stand were first seen during the 2013 document review.

84.     On cross-examination, Mr. Ver Ploeg testified that he had seen no evidence of the Moo Youngs having been investigated, charged or arrested for any crimes.

85.     Mr. Ver Ploeg confirmed that, in looking at the current batch of 25 bankers' boxes, he could not say what documents had been provided in the first round versus the second round, but he noted that, in terms of volume, the two rounds were quite different.

86.     Mr. Ver Ploeg also testified that he had learned very little about the relationship between Petitioner and the Moo Youngs.  He did know that there were a number of corporations that they shared, some of which used their initials as their names, such as KDM.  He also knew that Petitioner lived next door to Derrick Moo Young and that they had been friends and business partners for many years.

87.     On re-direct examination, Mr. Ver Ploeg testified that, in the 1980's, he had no specialized training in money laundering or the criminal aspects of tax fraud or tax evasion. Nevertheless, concerns about these matters immediately rose from his review of the Moo Young

documents; and, due to the complexity of working the case from that angle, he chose the insurable interest route.

### D.    *Michael Flynn*

88.    Michael Flynn ("Mr. Flynn") served as a police officer with the City of Miami for twenty-three years.  At the time of his testimony, Mr. Flynn was incarcerated at the Northwest Florida Reception Center.

89.    Mr. Flynn knew about Petitioner's case in 1986, but he did not think much of it until he heard more about it while in prison.

90.    There, he met another inmate by the name of Brian Doyle ("Mr. Doyle"), who had served as deputy press secretary for the Department of Homeland Security.  Mr. Doyle told Mr. Flynn that he had been at the Martin Correctional Institution with Petitioner.  Mr. Flynn also learned about Petitioner from his roommate, Perry Gargaines.

91.    When Mr. Doyle mentioned that Petitioner was involved in a homicide at the Dupont Plaza, Mr. Flynn remembered Petitioner's case.  Mr. Flynn also remembered being told back then by Pete Romero ("Mr. Romero") that Petitioner was innocent, that he had been "hooked up" for the homicide, and that he thought a guy by the name of Oscar Cuni, who was a drug dealer, was behind it.  See Transcript [D.E. 38-5 at 80-81].[4]  Mr. Flynn had mistakenly thought that Mr. Romero was one of the homicide detectives, but he found out that Mr. Romero was neither in homicide nor a detective at the time of the Moo Young murders.

92.    When Mr. Doyle asked Mr. Flynn who he thought the shooters might be, Mr. Flynn opined, based on mere speculation, that it might have been a hit team used by Oscar Cuni, composed of two individuals named "Tata" and "Chino."  Id. at 82.

---

[4]  According to Mr. Flynn, the term "hooked-up" was loosely used among police to mean that they "were going to put somebody in who didn't deserve to be put in."  Id. at 81.

93.     During his tenure at the Miami Police Department, Mr. Flynn worked on violent crimes associated with narcotics and he did liaison work with the FBI, whereby information was shared between the police and federal law enforcement.

94.     When Petitioner's counsel and Mr. Flynn first met in 2011, they talked about police corruption in the City of Miami.  According to Mr. Flynn, there were certain elements of the police force that were involved with drug dealers, the biggest example being the Miami River Cops case.

95.     Mr. Flynn testified that, when he was a police officer, he worked with Oscar Cuni, who would pay officers such as himself to do security on drug shipments.  Mr. Flynn added that Oscar Cuni discussed with him issues where police officers would help cover up crimes.  Mr. Flynn provided Petitioner's counsel with a list of unsolved homicides for which he believed Oscar Cuni was responsible.

96.     Mr. Flynn recalled a particular homicide in Liberty City in the late 1990's, at which he was the first officer on the scene and found five people gagged, with their hands tied behind their backs, and shot in the back of their heads.  One of the victims, who was still alive, gurgled the words "Chi Chi Chino, something to that effect." Id. at 96.

97.     On cross-examination, Mr. Flynn acknowledged that Mr. Romero had passed away.  Per a stipulation from Petitioner's counsel, the date of Mr. Romero's passing was August 24, 2012.

98.     Mr. Flynn claimed that he had told the truth at a prehearing deposition, but he acknowledged that an earlier declaration he provided to Petitioner's counsel was not entirely true.

99.     Although Mr. Flynn stated in his declaration that he had been to the Moo Young crime scene, that was not true.  Also, Mr. Flynn did not work extensively with the FBI, as stated in his declaration.  Also, he never heard anyone use the word "framed" with regard to Petitioner, making that portion of his declaration untrue.  Finally, the declaration was purportedly signed under oath, but no one administered an oath to him.

100.     Mr. Flynn also acknowledged that he had not drafted or dictated the various versions of his declaration that had been signed by him.

101.     When the court asked him what was true in his declarations, Mr. Flynn responded that it was what Mr. Romero told him about Petitioner.  When the court asked him about signing his declaration even though it was not entirely true, Mr. Flynn responded he assumed it would all be cleared up eventually.

102.     After visiting with Mr. Flynn, Petitioner's counsel went to see and wrote a letter to the Boston U.S. Attorney on Mr. Flynn's behalf.  Mr. Flynn did not disagree with Petitioner's counsel undertaking this effort.  After Petitioner's counsel told him that Petitioner had been set up and the cartels were involved, Mr. Flynn believed that Petitioner's counsel was hoping he would say something that would benefit Petitioner's case.

103.     Based on his review of Mr. Romero's personnel file, Mr. Flynn acknowledged that the latter had only served as a patrol officer and was never in homicide.

104.     Mr. Flynn acknowledged testifying at his deposition that he did not think much about Mr. Romero's brief words to him and then they just faded away.  Mr. Flynn only decided to speak about it when he met Mr. Doyle, who then connected him with Petitioner's counsel.  Also, Mr. Flynn acknowledged that Mr. Romero's words did not include the terms "framed" or "innocent."

105.     In response to the court's question about what Mr. Romero actually said to him, Mr. Flynn responded:

> Like I said earlier, Your Honor, what I remember was Pete Romero told me Maharaj was going [to] get hooked up for this and C[uni], he believed that C[uni] was behind it.  That's what he told me.  And when I heard that C[uni] was behind it, for that day, for that moment, I really thought that C[uni] was behind that incident because I was even wondering why he would ask me about it.  Though he knows I know C[uni], nevertheless, I gave it a lot of thought on that day and I really thought that C[uni] was behind that homicide.

Id. at 116.

106.    When asked again by the court, "You don't know anything about the case," Mr. Flynn replied, "Nothing."

107.    Mr. Flynn had no physical evidence to support what he claimed Mr. Romero told him; and he did not know if Mr. Romero's claim was actually true.  Mr. Flynn also acknowledged that he had sought post-conviction relief and had never brought out the conversation with Mr. Romero in an effort to reduce his sentence.

108.    On re-direct examination, Mr. Flynn testified that he had met with Petitioner's counsel in August 2011 and signed his declaration in August and September 2012; and that Mr. Romero was alive at the time.

109.    Mr. Flynn also testified again that the lingo "hooked-up" was used loosely to mean framed.

### E.    *Prince Ellis*

110.    Prince Ellis ("Mr. Ellis") is a resident of Nassau, Bahamas, who testified at Petitioner's trial.

111.    At the time of his testimony in the 2012 Rule 3.850 Proceedings, Mr. Ellis had been the senior vice president and general manager of a hotel in Paradise Island for fourteen years.

112.    In 1986, Mr. Ellis had a business relationship with Mr. Dames, involving a catering service for a nightclub.  On October 15, 1986, the day before the Moo Young murders, Mr. Ellis came to Miami on a business trip from the Bahamas aboard a Bahamasair flight.  At that time, he had been traveling to Miami pretty often to buy supplies for the catering business.

113.    Upon his arrival in Miami, Mr. Ellis called the Dupont Plaza Hotel in an effort to reach Mr. Dames at his hotel room.  After several unanswered calls, Mr. Ellis asked successively

to be provided with Mr. Dames' room number, to be given a room next to his, and to be put on the same floor as he, but all of these requests were denied.  Ultimately, Mr. Ellis was given Room 526, for which he paid $29 in cash for one night, to October 16, 1986.

114.    According to Mr. Ellis, Mr. Dames "was not aware that I was coming to Miami and I wanted to surprise him and then we were to go and look for some equipment for our disco. . . [f]or the catering business, the partnership."  Id. at 131.  So, after checking into his room, Mr. Ellis again repeatedly tried to reach Mr. Dames' room, calling around 7:00 p.m., 9:00 p.m., 12:00 midnight, 2:00 a.m. and 3:00 a.m.  Mr. Ellis then called the hotel manager and advised him that he was concerned that Mr. Dames did not answer his repeated calls.

115.    Mr. Ellis then slept for a couple or hours and went downstairs around 9:00 a.m., at which time he tried reaching Mr. Dames again.  Mr. Ellis then went for breakfast at the Hyatt Hotel across the street, returning to the Dupont Plaza around 10:00 a.m.  Mr. Ellis tried reaching Mr. Dames' room once again from the hotel front desk without success.

116.    At that point, Mr. Dames walked into the hotel with some other folks.  Mr. Ellis was happy to see Mr. Dames and Mr. Dames was surprised to see Mr. Ellis, although Mr. Dames knew that Mr. Ellis often traveled to Miami on business.

117.    After some conversation, Mr. Dames introduced Mr. Ellis to his companions, two either Hispanic or White gentlemen who could have been Colombians, Americans, Cubans, or from any place, but not Bahamian.  According to Mr. Ellis, there was also a Black gentleman, Neville Butler ("Mr. Butler"), who Mr. Ellis could not remember if he had met before.  One of the two Hispanic or White gentlemen was relatively short and the other one was about 5'10" and well built.

33

118.    Mr. Dames asked Mr. Ellis to wait for him because "he [was] going to take some fellows up to the room" and then he wanted Mr. Ellis "to take him to Ace Music Studio." Id. at 135.  The two Hispanic or White gentlemen then left the hotel lobby area with Mr. Dames.

119.    Mr. Ellis had come to Miami to buy meat at Rosa Brothers for a wedding, but he agreed to go to Ace Music Studio to look at music equipment, such as sound systems, and buy some for their expanded business that would include a banquet hall and a nightclub.

120.    When Mr. Dames returned, Mr. Ellis drove to Ace Music Studio in his rental car with Mr. Dames.  They spent a couple of hours looking around and it appeared to Mr. Ellis that they were just buying time and didn't purchase anything before returning to the Dupont Plaza after approximately three and a half hours.  By then, it was sometime in the afternoon.

121.    Mr. Ellis thought maybe Mr. Dames had a girl in his room because he suggested calling from the reception area before going up.  After their conversation about calling the room, they were approached by police flashing a badge and somebody saying homicide.

122.    Mr. Ellis was thinking it was drug enforcement agents because he had a pretty good idea of what Mr. Dames was into.  According to Mr. Ellis, "I know a drug dealer when I see one or I know a drug dealer when I have a conversation with them." Id. at 140-41.  Mr. Ellis thought Mr. Dames might be involved in drugs, because he smoked pot and was not discrete in purchasing it, even though he had a government position working at the control tower of the Bahamas government's international airport.

123.    Mr. Ellis recounted that, one time, he was invited by Mr. Dames to go for a joyride to Abaco on a cigarette boat and, after parking the boat on the beach, Mr. Dames returned with kilos of cocaine.  Mr. Ellis believed this occurred before the Dupont Plaza encounter.

124.     After talking to them, the police took Mr. Dames and Mr. Ellis to the police station for about two hours.  Mr. Ellis was questioned and gave a statement to the police.[5]

125.     When Mr. Ellis and Mr. Dames were both finished with the police, they were picked up by Mr. Butler, who Mr. Ellis had heard of from Mr. Dames and thought he might have met once before but could not remember for certain.  Mr. Ellis thought that Mr. Butler was Mr. Dames' associate.

126.     When he got in the car, Mr. Ellis noticed that Mr. Butler was slung back in the car seat, like he was hiding, that his shirt was torn and had blood on it, and that the band on his wristwatch was broken.  Mr. Ellis testified, "I was very concerned as to what went on.  And then after knowing the question that I was asked, then [Mr. Butler] said to [Mr. Dames] that they just went crazy and started shooting and it was bullet all over the place and I think there was some remark about the money or two suitcases of money.  I'm not too clear on that."  Id. at 148.

127.     Mr. Ellis further testified that the three of them went to a Sizzlers restaurant and that, while Mr. Butler went to make some phone calls, he advised Mr. Dames to contact the policeman who had given him his card at the police station and tell him what had happened; otherwise, they would all get in trouble.  Mr. Ellis also suggested the Mr. Butler get cleaned up before they went to talk to the police, which he did.

128.     In response to the question, "Did you know about any Neville Butler relationship with Eddie Dames and drugs," Mr. Ellis responded, "Somewhat."  Id. at 152.

129.     After Mr. Dames and Mr. Butler accepted Mr. Ellis' suggestion that they call the police, two officers came to the Sizzlers restaurant's parking lot, where they met with Messrs.

---

[5]  The police asked Mr. Ellis and Mr. Dames not to leave town and paid for them to stay overnight at the Hyatt Hotel.

Ellis, Dames and Butler.  At some point, Mr. Butler said, "[T]hey are down at the Denny's restaurant by the airport."  See Transcript [D.E. 38-6 at 1].   Mr. Ellis did not know at the time who "they" were, but later learned it from the police.

130.    Mr. Ellis and Mr. Dames then left the Sizzlers restaurant, while Mr. Butler left with the police officers.  On their way to the Hyatt Hotel, Mr. Dames stopped to buy marijuana from someone who happened to be an undercover police officer, but who let them go after speaking with the officer who had interrogated Mr. Dames and Mr. Ellis at the police station.

131.    After Mr. Ellis returned to the Bahamas, he was contacted by a prosecutor from the State Attorney's Office for the purpose of taking his deposition, which took place on February 21, 1987.  Although Mr. Dames told him not to answer the prosecutors' questions or even speak with them, Mr. Ellis rejected that advice.  Mr. Ellis had learned that Mr. Dames had been transferred out of his job at the airport in the Bahamas under suspicion of drug dealing and their business relationship ended.

132.    Mr. Ellis never saw or heard Petitioner's name mentioned while he was at the Dupont Plaza in October 1986 and first learned from the prosecutors that Petitioner had been charged with the murders that took place there.

133.    During his deposition, Mr. Ellis was asked the following about Mr. Dames:

Q.    Do you know whether or not Eddie has been involved in any drug-related ventures?
A.    Do I know?
Q.    Yes.
A.    Definitely?
Q.    Yes
A.    No.

Id. at 11.

134.    However, Mr. Ellis claimed that he had told the prosecutors that he believed Mr. Butler was involved with Mr. Dames and drugs.  Mr. Ellis also claimed to have told this to the

police when he was interrogated in Miami.

135.    Mr. Ellis testified that he had heard the name Adam Hosein from Mr. Dames and Mr. Butler and from the police officers.  Mr. Ellis appeared to recall that one of the two persons who came to the Dupont Plaza the morning of October 16, 1987 was Hosein, based on a recollection that he was called "Hardman Hosein" by Mr. Dames.  Id. at 13-14.

136.    Mr. Ellis recalled asking Mr. Dames what had happened at the Dupont Plaza when Mr. Butler was not present, if it was a drug deal gone sour, and Mr. Dames responding no, that "[i]t was something to do with some black male and some newspaper to do," but Mr. Ellis "didn't buy it."  Id. at 14.

137.    On cross-examination, Mr. Ellis claimed that he did not recall having testified at Petitioner's trial, even after being shown a copy of the trial transcript.[6]

138.    Mr. Ellis did recall his deposition that took place in Nassau at a hotel on the Cable Beach Strip in 1987.  He also acknowledged that his memory of the events that occurred at the time of the Moo Young murders was better when he gave a police statement that same day than at the time of his testimony.

139.    When asked about apparent inconsistencies between his 1986 police statement and his testimony, Mr. Ellis responded, "Some things I could remember, some things I cannot, some questions I was asked and I answered to the best of my knowledge.  I was also asked 27 years ago -- I must have been approached about ten times about this case.  When asked a question, sometimes I answer based on what information they asked for and to the best of my knowledge that I could remember."  Id. at 28.  Mr. Ellis clarified that the ten times when he was approached, it was by people on behalf of Petitioner and news agencies from London and Palm Beach.

---

[6]  Although Mr. Ellis also claimed that Mr. Dames had not appeared for deposition, he was shown the transcript of Mr. Dames' deposition.

140.    In his October 16, 1986 sworn statement to the police, Mr. Ellis stated that he had met Mr. Dames about a quarter to 10:00 at the Dupont Plaza Hotel lobby; that a black gentleman by the name of "Rupert or something," who claimed to drive Mr. Dames around, was with Mr. Dames; that he had never met Rupert before; and that Rupert may have had a goatee or a mustache. The sworn statement did not mention any two other men.  Id. at 29-30.[7]

141.    In his 1987 deposition, Mr. Ellis testified that Mr. Dames had walked into the Dupont Plaza Hotel lobby around 10:00 am, or shortly before, with a slim black guy, in his late 30's or early 40's, who had a low haircut and maybe a goatee, and who Mr. Dames introduced as Neville who drove him around when he came to Miami.  In response to the question, "Did he introduce you to anybody else," Mr. Ellis responded, "No."  Id. at 40-41.  Mr. Ellis acknowledged that his memory about these events was better in 1987 than at the time of his testimony.

142.    At Petitioner's trial, Mr. Ellis testified that he had returned to the Dupont Plaza Hotel at 9:30 or quarter to 10:00, at which time he saw Mr. Dames and another gentleman; who Mr. Dames introduced as Neville Butler.

143.    At the end of his cross-examination, after being quizzed on other aspects of his police statement and deposition testimony, Mr. Ellis stated, "I'm not sure about anything."  Id. at 46.

144.    On re-direct examination, Mr. Ellis acknowledged that in 1986 he had told the police about Mr. Butler and the way he looked.  With regard to his police statement, Mr. Ellis claimed that the police asked him questions and he "just answered the questions.  So many things happened.  So many bits and pieces are not in sequence."  Id. at 48.

---

[7]  The sworn statement was admitted as State Exhibit 9.  Id. at 31.

### F.     Baruch Vega

145.     Baruch Vega ("Mr. Vega") testified that he had a Ph.D. in engineering and had gone to law school for international law but had become a fashion photographer for the past thirty years.

146.     While attending college in Colombia, he was recruited through a professor to work for the CIA in South America and, later, in the United States, where he was also introduced to the DEA and other government agencies.

147.     Mr. Vega moved to South Florida in 1978 and married the owner of the Mutiny Hotel in Miami, which became a venue for drug traffickers.

148.     In the mid-1980's, Mr. Vega was working with a federal task force by the name of Centac-26, that consisted of personnel from Miami and Miami-Dade police, as well as the DEA and the FBI.

149.     Mr. Vega claimed to have met Mr. Mejia in connection with an offer to purchase Mr. Vega's house.  According to Mr. Vega, Mr. Mejia was highly involved in money laundering and was a sophisticated multi-millionaire who used to handle the money for various drug cartels.

150.     Mr. Vega originally knew Derrick Moo Young not by his name but as "Chino Mau." Id. at 73.  Mr. Vega learned about him after a problem with some money orders he provided to Mr. Mejia as part of the offer to purchase Mr. Vega's house, which turned out to be counterfeit.

151.     Mr. Vega eventually made the connection between the name "El Chino Mau" and Derrick Moo Young when the FBI put together the names, nicknames and pictures of individuals.

152.     According to Mr. Vega, Mr. Mejia utilized "Chino Mau" as a provider of banking instruments in exchange for cash.

153.     Although Mr. Vega claimed to have met Derrick Moo Young in the past, Mr. Vega could not recognize him from a passport photo, saying "it could be any Chinese." Id. at 74.

154.    Mr. Vega testified that, sometime after the 1986 Moo Young murders, Mr. Mejia stated at a meeting, "We have to kill this bastard SOB for being a crook." Id. at 75.[8]

155.    Mr. Vega testified that: he knew Cuchilla to be one of the hitmen for Pablo Escobar; he also knew Jhon Jairo Vasquez Velasquez to be another of the hitmen for Pablo Escobar; and Jorge Maya was another of the workers in Pablo Escobar's group, who was based in Miami. According to Mr. Vega, all of these individuals were seriously involved in narcotics.

156.    Mr. Vega testified that he worked in South Florida from 1978 to 2000, and that, during that time, he would report to his supervisory agents all the time.  Mr. Vega stated that he was confident he reported what he knew at the time and that the investigation on Mr. Mejia and "El Chino Mau" was very advanced then. Mr. Vega also claimed to have known the names Tino Guedes and Adam Hosein to have come up in the same circumstances.

157.    On cross-examination, Mr. Vega repeated what he claimed that Mr. Mejia had said to him in 1986 as, "We have to kill this son of a bitch crook, Chinese crock [sic]." Id. at 79.

158.    Mr. Vega acknowledged that, when he had been previously asked by state counsel about this conversation he responded "that I hear they say something, but I did not say specifically that. . . . because I did not remember at that point." Id.

159.    Mr. Vega admitted that the specific words to which he testified at his deposition were told to him by an individual named Alvaro Sudaca two days after speaking with state counsel. Specifically, Mr. Vega testified at his deposition: "They say that since Chino Mau have taken money from them, possibly one of the guys kill them.  Again, nobody mentioned specifically to who or how, nothing.  I wouldn't pay attention to that." Id. at 80.  Mr. Vega also testified at his deposition that Mr. Mejia had said, "Finally, he was killed." Id.

_____

[8]  This was Mr. Vega's English translation of the following Spanish words purportedly used by Mr. Mejia: "Tuvimos que matar a este Chine per puta por franposo." Id.

160.    On the stand, Mr. Vega was asked, "So what you told me was that Mr. Mejia said, Finally, they were killed?" to which Mr. Vega answered, "Absolutely correct." Id.

161.    Mr. Vega acknowledged that he was involved in a book and a movie, that he was seeking quite a lot of publicity, that he was quite public in complaining about corruption in Colombia and the United States, that he was no longer living the large life he once had, and that he was comfortable appearing on videos, posting on blogs, and talking to reporters.

162.    Mr. Vega also acknowledged that he knew almost nothing about Petitioner's case until five or six months before his deposition, and that his memory was jogged by a conversation with a reporter named David Adams ("Mr. Adams") who wrote a flattering article about Mr. Vega's life for a magazine.

163.    In the past, Mr. Vega had only reported his encounters with Mr. Mejia. He knew there was a killing but did not know anyone had been arrested. When Mr. Adams told Mr. Vega someone had been arrested and it was a death penalty case, Mr. Vega only thought of the murder of one person.

164.    Mr. Vega admitted that he only knew the name "El Chino Mau," and that the FBI's posting of pictures on the wall identified "El Chino Mau" to him as Derrick Moo Young. However, Mr. Vega could not identify Derrick Moo Young from his picture the night before his deposition.

165.    Prior to his deposition, Mr. Vega was also shown a picture of Mr. Mejia but did not recognize him either.

166.    Mr. Vega also admitted that he never saw: any documents with the name Derrick Moo Young; any transaction between Mr. Mejia and Derrick Moo Young; or Derrick Moo Young do anything that Mr. Vega was claiming he had done.

167.    Mr. Vega further admitted that all the things he had testified about were things he had heard from other people; that he was not accusing Tino Geddes of any crime; and that he did

not know the facts of the murder of Derrick Moo Young.

168.     On re-direct examination, Mr. Vega claimed that the identification picture he had been previously shown was "a bad picture of an Oriental person" that he could not recognize. Id. at 88.

### G.     John Kastrenakes

169.     At the time of his testimony, Mr. Kastrenakes served as a Circuit Court Judge in Palm Beach County, Florida.

170.     In October 1986, Mr. Kastrenakes was an Assistant State Attorney at the Miami-Dade State Attorney's Office.  He was asked to work on Petitioner's case by the lead prosecutor, Paul Ridge ("Mr. Ridge").  Although they divided their workload, the two prosecutors worked together on the overall strategy of the case.

171.     In complying with his responsibilities to provide discovery to the defense, Mr. Kastrenakes served on Petitioner's trial counsel a list of names of witnesses, witness statements, police reports, and hotel and telephone records.

172.     Mr. Kastrenakes confirmed that Mr. Ellis had been called as a witness at trial, and had been deposed at a hotel in Cable Beach, Nassau, Bahamas.

173.     Mr. Dames was also deposed after Mr. Ellis at the same location.  Neither Mr. Kastrenakes nor Mr. Ridge told Mr. Ellis that Mr. Dames had refused to appear for his deposition.

174.     Mr. Ellis never told Mr. Kastrenakes that Mr. Dames had been involved in drugs or drug trafficking; he never disclosed a trip he had taken with Mr. Dames to Abaco Island; he never claimed that Mr. Dames and Mr. Butler were involved with drugs; and he never mentioned the name Adam Hosein or Hardman.

175.     At Mr. Ellis' deposition, Petitioner's defense counsel, Eric Hendon ("Mr. Hendon") asked a question that appeared to be out of the blue, as to whether Mr. Ellis had any information

about Mr. Dames being involved in drug trafficking, which Mr. Ellis answered in the negative. Mr. Hendon later told the prosecutors that he had heard a rumor about Mr. Dames, who was employed as an air traffic controller by the government of the Bahamas, being involved in narcotics.

176.    According to Mr. Kastrenakes, Mr. Dames testified at this deposition that, in the car leaving the police station, Mr. Butler had used a derogatory term to describe what turned out to be Petitioner and "said that that person went crazy," referring to one person, not two people. Id. at 98.

177.    Mr. Kastrenakes further testified that Mr. Dames was not called as a witness at Petitioner's trial because his testimony would have been duplicative of Mr. Ellis' testimony.

178.    Mr. Kastrenakes also testified that Mr. Ellis never told him that, when he saw Mr. Dames in the lobby of the Dupont Plaza Hotel, the latter was with two Hispanic, Caucasian men. Rather, Mr. Ellis said that Mr. Dames was with a Bahamian individual, a Black man who was introduced as Neville, who Mr. Ellis had never met before.  Mr. Kastrenakes concluded that it was Mr. Butler and Mr. Butler said that he was the person with Mr. Dames.

179.    On cross-examination, Mr. Kastrenakes testified that, from the prosecution of Petitioner's case, he knew that Mr. Mejia was the person who had the room directly across from Room 1215 at the Dupont Plaza Hotel.  Mr. Mejia was not a trial witness, so Mr. Kastrenakes did not focus on him.  Mr. Kastrenakes knew that he had been interviewed by the police and that he had given a statement.  That was all Mr. Kastrenakes knew about Mr. Mejia.

180.    Mr. Kastrenakes had no recollection of any investigation of Mr. Mejia, such as a background check.  If that had been conducted, it would have been disclosable as part of the prosecution's discovery obligations.

181.    In 1986, 1987, Mr. Kastrenakes was aware that the City of Miami Police

Department had access to databases to do background investigations of named witnesses, but not to the extent that the federal government had.

182.    Mr. Kastrenakes explained that he did not focus on Mr. Mejia because he had cooperated with law enforcement by giving a statement to the police and the evidence that had been developed against Petitioner was, in the prosecution's view overwhelming at that point in time.  Therefore, there was no reason to be chasing other individuals who, from everyone's understanding, had nothing to do with the Moo Youngs homicide.

183.    With regard to Petitioner, Mr. Kastrenakes acknowledged that he answered questions but said that he gave information that turned out to be completely false, such as not having been inside Room 1215 or inside the hotel and never having owned a handgun.  Further, Petitioner only acknowledged ownership of a handgun at the penalty phase of his trial.

184.    When asked whether he was convinced that Petitioner was properly convicted of the case against him that Mr. Kastrenakes prosecuted, Mr. Kastrenakes responded, "Absolutely. Otherwise I wouldn't be testifying here for the State of Florida, period."  Id.  at 119.

185.    With regard to law enforcement not having looked to see if anybody else might possibly have been involved in the Moo Youngs homicide, Mr. Kastrenakes responded that, based on the evidence that had been gathered against Petitioner, it would have been "a waste of time to look elsewhere."  Id. at 119-20.

186.    Mr. Kastrenakes did not recall Mr. Hendon having raised a theory with the prosecution team about Mr. Mejia being the Colombian associated with the murders.

187.    Mr. Kastrenakes also explained that, in Petitioner's case, there was never any evidence that caused the prosecution team to have any doubt that Petitioner was completely involved in the Moo Young murders.  Based on that, the prosecution "didn't look elsewhere."  Id. at 123.

188.    Mr. Kastrenakes acknowledged that there was no investigation conducted into whether Derrick Moo Young was involved in fraud, but he added that the newspaper articles against him were offered at trial.

189.    According to Mr. Kastrenakes, the prosecution team did not become aware that the Moo Youngs had obtained a significant insurance policy until after the trial, so there was no disclosure of this information to the defense.  Mr. Kastrenakes also found out about litigation over the insurance policy after the trial.  Mr. Kastrenakes saw Mr. Stefan, who was then an attorney in private practice, watching some of the proceedings.  When Mr. Kastrenakes asked Mr. Stefan why he was there, Mr. Stefan responded that there was litigation over the validity of the insurance policy.

190.    Mr. Kastrenakes testified that, if he had learned that the insurance company was proceeding on a theory that Derrick Moo Young was involved in a criminal business through his company, he would have disclosed that information to the defense; however, that was never disclosed to the prosecution by Mr. Stefan or the Moo Young family.

191.    Mr. Kastrenakes' understanding of the Moo Youngs' business was that it involved import/export.  He did not obtain their tax returns, but if he had they would have been disclosed to the defense.

192.    With regard to Mr. Butler, Mr. Kastrenakes acknowledged that he was an important witness in the case.

193.    The prosecution team did not disclose to the defense any drug-related background of Mr. Butler because they were not aware of any.  However, they did disclose what Mr. Butler had "said and retracted and said" in connection with his polygraph issues.  Id. at 137.

194.    With regard to Mr. Dames, the only drug information came from the defense through the question asked at Mr. Ellis' deposition.  The prosecution's knowledge of Mr. Dames

was that he was an air traffic controller, an entertainer, and an import/exporter, who wanted to open a disco and traveled frequently between Miami and the Bahamas.  In the prosecution's view, Mr. Dames was not an important witness.

195.    Mr. Kastrenakes acknowledged that there was no inquiry at Mr. Dames' deposition as to any criminal law background.  He was an employee of the government of the Bahamas as an air traffic controller and there was no reason to believe that he was a drug trafficker. Further, there was no investigation of the rumors about Mr. Dames that Mr. Hendon alluded to at Mr. Ellis' deposition; and there was no further follow up of Mr. Dames, who was not called as a witness at trial.

196.    Mr. Kastrenakes further testified that he never knew about Mr. Mejia having been federally indicted a short time prior to Petitioner's trial for money laundering activity occurring in South Florida during 1986 and 1987, since neither the prosecution team nor law enforcement conducted any follow-up investigation or criminal history check of Mr. Mejia.  If Mr. Kastrenakes had received this information, he would have disclosed it to the defense.  But Mr. Mejia was not being called as a witness, so there was no investigation done of him.

197.    Mr. Kastrenakes further testified that, after Petitioner was indicted, there was no inquiry as to whether anyone other than Petitioner was involved in the Moo Young murders.  The investigation into someone else was limited to Mr. Butler's potential complicity in the murders because his initial version of the events, that he had been kidnapped, did not make sense.

### H.    *Excerpt of video of BBC documentary about Popeye played in open court*[9]

198.    "Jhon Jairo Velasquez, known as Popeye, is now nearing the end of his sentence at Combita maximum security prison.  Krishna Maharaj is a name he's never heard of, but he does

---

[9]  See Transcript [D.E. 38-7 at 8-9].

recall who killed the Moo Youngs.

199.   "An assassin known as Cuchilla, the Blade.  Cuchilla was Pablo Escobar's most professional assassin.  Because killing an American on American soil is terribly delicate.  You have to be a professional killer.  Later on, Cuchilla became much more famous because he killed the Moos.

200.   We don't speak English, but it's very easy to say Moo.  We always heard that the Moos were killed because they were stealing money from Pablo Escobar.  Cuchilla, the assassin, was later murdered himself.  It's believed he was (unintelligible)."

I.   *Sergeant Altare Williams*

201.   Sergeant Altare Williams ("Sergeant Williams") testified that he worked as a supervisor in the homicide unit of the Miami Police Department.

202.   He presented evidence from Petitioner's case consisting of a burgundy calendar that was collected from the Dupont Plaza Hotel in 1986.[10]

## THE 2012 RULE 3.850 ORDER

The Honorable William L. Thomas ("Judge Thomas"), who presided over Petitioner's 2012 Rule 3.850 Proceedings, summarized the *Brady* claims as follows:

> Mr. Maharaj basically advances three Brady claims.  First, he alleges that the State failed to disclose the indictment of Jaime Vallejos Mejia.  Mr. Mejia was indicted in the Federal District Court in Oklahoma for money laundering in September, 1987.  This was approximately five weeks prior to the start of Maharaj's trial.  Mr. Mejia was arraigned on the federal indictment in December, 1987.  Mr. Mejia pled guilty to the federal indictment and received a probation sentence in 1988.  Second Mr. Maharaj alleges that DEA special agent Kimberly Abernathy made a statement in a memorandum document with the Department of Business Regulation that Mr. Mejia was arrested on the federal indictment of laundering money on behalf of Colombian drug smugglers.  Finally, Mr. Maharaj alleges the testimony of Mr. Vega (as detailed below) was in the constructive possession of the State because Mr. Vega was a government informant who had information about Mr. Mejia and the Moo Youngs.

---

[10]  The calendar was admitted into evidence.

<u>See</u> 2012 Rule 3.850 Order [D.E. 38-3 at 3].  Judge Thomas found as follows:

> Upon review of these claims, this Court must conclude the alleged undisclosed evidence reasonably considered within the context of the entire record, does not undermine confidence in the verdict.  Additionally, based upon the record evidence considered by the Court, Mr. Maharaj failed to satisfy his burden to demonstrate that the State willfully or inadvertently suppressed favorable material evidence. There is no evidence in this record to even suggest the State had any knowledge of the claimed Brady evidence.  This fact is absolutely fatal to Mr. Maharaj receiving relief from this Court based upon a *Brady* claim.  Finally, this court rejects any suggestion that the claimed *Brady* evidence was in the constructive possession of the State.  This Court is confident that the jury verdict would have been the same and Mr. Maharaj's newly discovered evidence claim based upon *Brady* must be denied.

<u>Id.</u>  Judge Thomas' decision was affirmed by the Third District Court of Appeal in a *per curiam* opinion.  <u>Maharaj v. State</u>, No 3D15-321 (Fla. 3d DCA July 13, 2016) [D.E. 38-9 at 78-79].

## THE *BRADY* CLAIMS PRESENTED IN THE PETITION

In his Supplement to Petition, Petitioner divides the predicates for his *Brady* claims into two parts.  In the first part, which relates to the 2012 Rule 3.850 Proceedings, Petitioner contends that the following matters were suppressed by the prosecution and provide predicates for alleged *Brady* violations:

1. Information regarding Mr. Mejia arising from: his Oklahoma indictment in 1987; Florida Department of Business Regulation documents; the Proquim LTDA company; Mr. Mejia's full history, including connections with Pablo Escobar and other drug cartel members; Mr. Brown's and Agent Cuervo's testimony; Mr. Maya's statement;[11] and Popeye's statement.[12]

2. Information from Mr. Vega's testimony.[13]

3. Materials obtained by William Penn Insurance in connection with the dispute over payment on the Moo Youngs' life insurance policy regarding: Cargil International (Panama); the 2014 Moo Young tax lien; the Jadusingh narcotics trafficking in Jamaica.

---

[11]  Mr. Maya's statement, proffered as Exhibit 501, was excluded [D.E. 38-3 at 62-65].

[12]  Petitioner lists additional matters that are not part of the record of the 2012 Rule 3.850 Proceedings, which the undersigned does not consider.  <u>See</u> Order Re: Evidentiary Hearing [D.E. 124 at 7].

[13]  Petitioner also lists additional matters here that are not part of the record of the 2012 Rule 3.850 Proceedings, which the undersigned does not consider.  <u>See</u> Order Re: Evidentiary Hearing [D.E. 124 at 7].

4.  Information from Mr. Ellis' testimony.

5.  Information from Mr. Flynn's testimony.

See Supplement to Petition [D.E. 16 at 7-15].

As the second part of the predicates for his Brady claims, Petitioner presents additional matters from the 1997 Rule 3.850 Proceedings.  Petitioner argues that this second part must be aggregated with the first part, relying on Kyles v. Whitley, 514 U.S. 419 (1995).  In Kyles, the United States Supreme Court stressed that the definition of materiality "in terms of suppressed evidence [must be] considered collectively, not item by item."  Id. at 436.  Accordingly, the Supreme Court described its materiality analysis as follows: "We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately and at the end of the discussion . . . ."  Id. at 436 n.10.  The additional matters presented by Petitioner from the 1997 Rule 3.850 Proceedings that he contends were suppressed by the prosecution and provide predicates for alleged *Brady* violations are:

1.  The Moo Youngs' life insurance policy purchased from William Penn Insurance shortly before their death.

2.  Materials from the Moo Young briefcase found at the crime scene.

3.  Materials obtained by William Penn Insurance in connection with the dispute over payment on the Moo Youngs' life insurance policy.

4.  Detective Buhrmaster's notes of his interview with Petitioner.

5.  Detective Buhrmaster's statement to William Penn Insurance investigator.

6.  References to Mr. Butler in the evidence before the grand jury

7.  Mr. Butler's polygraph examination.

8.  Additional information regarding Mr. Butler.

9.  Information regarding Adam Hosein.

10. Information regarding Cargil International (Bahamas).

11. Information regarding Mr. Dames.

12. Information regarding Eslee Carberry and the Caribbean Echo.

13. Additional information regarding Eslee Carberry.

14. Information regarding Tino Geddes

Id. at 15-37.

## DISCUSSION

As noted above, Section 2254 provides that an application for a writ of habeas corpus with respect to a claim adjudicated on the merits by a state court may only be granted if the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct[;]" and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

In his Petition, Maharaj presents a lengthy narration of his view of the facts that were adduced at trial and in the 1997 Rule 3.850 Proceedings and 2012 Rule 3.850 Proceedings.  See Petition [D.E. 1 at 11-205].[14]  Petitioner then challenges Judge Thomas' factual determinations as unreasonable in light of the evidence presented in the 2012 Rule 3.850 Proceedings, arguing that Judge Thomas "did not deem there to be relevant facts to

---

[14]   Petitioner includes frequent commentaries in this narration.  Id.  Petitioner also seeks to incorporate materials beyond this narration that are not part of the state court record, id. at 205-14, and that the undersigned does not consider.  See Order Re: Evidentiary Hearing [D.E. 124 at 7].

apply to the legal issues, due to a fundamental misunderstanding of the law of evidence."

Id. at 222.   Specifically, Petitioner challenges Judge Thomas' determination that Mr.

Vega's testimony was "fraught with inadmissible hearsay."   See 2012 Rule 83.850 Order

[D.E. 38-3 at 7].   According to Petitioner, the entirety of Mr. Vega's testimony was

admissible as co-conspirator statements to a confidential informant.   See Petition [D.E. 1

at 228 n.219].   In making this argument, Petitioner is not actually challenging Judge

Thomas' factual findings with regard to Petitioner's *Brady* claims.   Rather, he is

challenging Judge Thomas' application of Florida's evidentiary rules to Mr. Vega's

testimony.   In this regard, Petitioner's argument is misguided since federal habeas review

only encompasses whether "the state habeas court decision is 'contrary to' clearly

established United States Supreme Court precedent."   Hall, 310 F.3d at 690.[15]

Petitioner proceeds to argue that Judge Thomas' decision was contrary to, and an

unreasonable application of, clearly established federal law in three respects, in that Judge

Thomas:

> (1) "did not even mention the clearest *Brady* material in the case in the context of the issue";
>
> (2) "did not say what standard he was using for imputing knowledge from a state agent to the prosecution, but whatever standard he used was wrong";
>
> (3) "did not aggregate the *Brady* material from the 1997 hearing with the material in 2014".

See Petition [D.E. 1 at 245-48].   The undersigned addresses each of these contentions in

turn.

---

[15]   Petitioner makes similar arguments with respect to statements by Mr. Brown, Mr. Maya and Popeye. See Petition [D.E. 1 at 228-29].   Petitioner also argues that various statements would be admissible as statements against penal interest and as a matter of due process.   Id. at 234-42.   These arguments are equally misguided in light of the limited scope of federal habeas review.   Hall, 310 F.3d at 690.

**1.   *The contention that Judge Thomas did not mention the "clearest" Brady material.***

According to Petitioner, "it is not at all clear that [Judge Thomas] realized that all of Baruch

Vega's testimony was *Brady* . . . " because Mr. "Vega was reporting to CENTAC, the joint state-

federal narcotics task force . . . ."  See Petition [D.E. 1 at 245].

The first prong of a *Brady* violation is "that the Government possessed evidence favorable

to the defense."  Moon v. Head, 285 F.3d 1301, 1308 (11th Cir. 2002).   In this regard, "the

individual prosecutor has a duty to learn of any favorable evidence known to the others acting on

the government's behalf in the case, including the police."  Kyles, 514 U.S. at 437.  In Moon, the

Eleventh Circuit stated:

> This court's predecessor, the Fifth Circuit, held that there was no per se rule to
> determine whether information possessed by one government entity should be
> imputed to another, but rather, required "a case-by-case analysis of the extent of
> interaction and cooperation between the two governments."

Moon, 285 F.3d at 1309 (quoting United States v. Antone, 603 F.2d 566, 570 (5th Cir. 1979)).  As

noted by the Moon court,

> In *Antone,* the court found that information possessed by state investigators should
> be imputed to the federal prosecutor only because "the two governments, state and
> federal, pooled their investigative energies [to prosecute the defendants]." *Id.* at
> 569. There, a joint investigative task force composed of FBI agents and state
> investigators was formed to solve the murder of a state police officer. *See id.* at 568.
> Joint meetings were held, tasks were divided, and state officers were "important
> witnesses in the federal prosecution." *Id.* at 569. Thus, the court found that the state
> investigators essentially "functioned as agents of the federal government under the
> principles of agency law." *Id.* at 570.

Moon, 285 F.3d at 1309.  Finding no such level of collaboration and no indicia of agency, the

Eleventh Circuit refused to impute to the Georgia prosecutor information that had been obtained

by a Tennessee investigator who, at most, was utilized by the Georgia prosecutor "to provide

background information to the Georgia courts."  Id. at 1310; see also Smith v. Secretary, Case No.

06-10545, at 8 (11th Cir. Dec. 27, 2006) (finding no *Brady* violation where it was "not shown that

the state prosecutor in th[e] case had authority over anyone with knowledge" of the allegedly suppressed evidence).[16]

Petitioner's attempt here to impute the contents of Mr. Vega's testimony to the prosecution on the sole basis that Mr. Vega was reporting to CENTAC similarly fails.  There is no connection between CENTAC and Petitioner's prosecution by the State of Florida, much less any indicia of collaboration or agency.  Thus, Petitioner has failed to establish the first prong of a *Brady* violation with respect to Mr. Vega's testimony, namely, that the prosecution "possessed evidence favorable to the defense."  Moon, 285 F.3d at 1308; Smith, Case No. 06-10545, at 8.

Petitioner also contends that Judge Thomas did not "mention anywhere in his order the Oklahoma indictment against Jaime Vallejo Mejia, and the additional material that Mr. Maharaj discovered in the files of the Florida Department of Business Regulation . . . ."  See Petition [D.E. 1 at 245].  However, it is clear from the 2012 Rule 3.850 Order, *supra*, that Judge Thomas did address both of these matters.  See 2012 Rule 3.850 Order [D.E. 38-3 at 3].

### 2. *The contention that Judge Thomas did not articulate the standard for imputing knowledge from a state agent to the prosecution, and that he used the wrong standard.*

Petitioner argues that Mr. Mejia's federal indictment "was clearly available to the state agents," given the existence of a memorandum from an employee of the Florida Department of Business Regulation, who had apparently reached out to DEA Abernathy, as testified by Agent Cuervo.  See Petition [D.E. 1 at 247].

As noted above, Mr. Kastrenakes testified that Mr. Mejia was not a trial witness, so Mr. Kastrenakes did not focus on him.  Moreover, Mr. Kastrenakes had no recollection of any investigation of Mr. Mejia, such as a background check.  If that had been conducted, it would have

---

[16]  Available at https://www.ca11.uscourts.gov/search-unpublished-opinions.

been disclosable as part of the prosecution's discovery obligations.  Mr. Kastrenakes further testified that he never knew about Mr. Mejia having been federally indicted a short time prior to Petitioner's trial for money laundering activity occurring in South Florida during 1986 and 1987, since neither the prosecution team nor law enforcement conducted any follow-up investigation or criminal history check of Mr. Mejia.  If Mr. Kastrenakes had received this information, he would have disclosed it to the defense.  But Mr. Mejia was not being called as a witness, so there was no investigation done of him.  Mr. Kastrenakes also explained that, in Petitioner's case, there was never any evidence that caused the prosecution team to have any doubt that Petitioner was completely involved in the Moo Young murders.  Based on that, the prosecution "didn't look elsewhere."[17]

"A prosecutor has no duty to undertake a fishing expedition in other jurisdictions . . . ." United States v. Meros, 866 F.2d 1304, 1309 (11th Cir. 1989).  Given Mr. Kastrenakes' explanation of the prosecution's view of the case, and the decision not to call Mr. Mejia as a witness, Petitioner's arguments about the potential fruits of further investigation of Mr. Mejia fall outside the scope of the prosecution's *Brady* obligations, as a fishing expedition.  Id.[18]

### 3.   The contention that Judge Thomas did not aggregate Brady material from the two state post-conviction proceedings.

This contention is belied by Judge Thomas' own words at the close of the Evidentiary Hearing - 2012 Rule 3.850 Proceedings:  "I do really need to sit down and read the – really go through the trial transcript in conjunction with what I just heard . . . [a]nd the 1997 transcript.  I did have a chance to review the order.  I just haven't read the transcripts as it relates to that.  And so that's obviously going to take me a little longer th[a]n ten days . . . [a]nd so I want to get my

---

[17] See Mr. Kastrenakes' testimony at the Evidentiary Hearing in the 2012 Rule 3.850 Proceedings, *supra.*
[18] Although addressed by Petitioner in this section, his imputation argument with regard to Mr. Vega's testimony was fully addressed above.

own facts by reading the -- reading it myself."  <u>See</u> Transcript [D.E. 38-7 at 90-91].  Moreover, in articulating the basis for his opinion, Judge Thomas confirmed his thorough review of the record when he referenced "the alleged undisclosed evidence reasonably considered within the context of the entire record . . . ."  <u>See</u> 2012 Rule 3.850 Order [D.E. 38-3 at 3].  Therefore, the undersigned finds no merit in this contention.

With regard to the materiality prong of the *Brady* claims, this touches on the question of whether, in the absence of the allegedly suppressed materials, Petitioner "received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  <u>Kyles</u>, 514 U.S. at 434.  In this regard, Judge Thomas expressed confidence "that the jury verdict would have been the same . . . ."  <u>See</u> 2012 Rule 3.850 Order [D.E. 38-3 at 3].  Moreover, as noted by Judge Thomas, at trial there was "ample evidence implicating Mr. Maharaj in the murder(s)."  <u>Id.</u> at 10-12 (recounting some of the evidence adduced at trial); <u>see</u> <u>also</u> <u>Maharaj</u>, 432 F.3d at 1299-1302 (summarizing the trial evidence), *supra.*  The AEDPA precludes "second-guess[ing] the reasonable decisions of state courts."  <u>Renico</u>, 559 U.S. at 779.  Therefore, the materiality prong of the *Brady* claims is not met.

Having addressed Petitioner's arguments, the undersigned concludes that Petitioner has not demonstrated that the state court's decision on the *Brady* issue "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding"; or that it "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d).

## <u>RECOMMENDATION</u>

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that Maharaj's Petition be DENIED.  The undersigned further RECOMMENDS that a certificate of appealability issue.

Pursuant to Local Magistrate Judge Rule 4(b), and the Court's Order [D.E. 126] the parties have **<u>seven days</u>** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Jose E. Martinez, United States District Judge.  Failure to file timely objections may bar the parties from attacking the factual findings contained herein on appeal.  <u>See</u> <u>Resolution Tr. Corp. v. Hallmark Builders, Inc.</u>, 996 F.2d 1144, 1149 (11th Cir. 1993).  Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."  <u>See</u> 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this 11th day of September, 2020.

_____
ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE


cc:     United States District Judge Jose E. Martinez
        Counsel of Record