UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case Number:  17-21965-CIV-MARTINEZ-OTAZO-REYES**

KRISHNA MAHARAJ,
        Petitioner,

vs.

JULIE JONES, et al.,
        Respondents.

_____/

## ORDER ON REPORT AND RECOMMENDATION

THIS CAUSE is before the Court upon the Report and Recommendation ("R&R") of Magistrate Judge Otazo-Reyes, recommending that Petitioner's § 2254 habeas corpus petition be denied. [ECF No. 127]. Section 636(b)(1) of the Federal Magistrate Act requires a *de novo* review of those parts of the R&R to which an objection is made. 28 U.S.C. § 636(b)(1); *United States v. Raddatz*, 447 U.S. 667, 673 (1980).

Having conducted a *de novo* review of the entire record, including the issues presented in Petitioner's Objections, [ECF No. 128], Magistrate Judge Otazo-Reyes's R&R is affirmed and adopted. The state court's disposition of Petitioner's claims was neither contrary to nor an unreasonable application of clearly established federal law; nor was its decision based on an unreasonable determination of the facts in light of the evidence. The new evidence provided by Petitioner is insufficient to overcome this finding.

### I.    Background

This case has garnered over thirty years of litigation. The facts of this case have been laid out at length during the course of those thirty years—at both the state and federal level. At issue in the instant Petition is whether Petitioner's newly discovered evidence—cumulated with the facts

raised in his previous habeas claims—is sufficient to warrant relief under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").

On October 21, 1987, Petitioner Krishna Maharaj was convicted of two counts of first-degree murder, two counts of kidnaping, and the unlawful possession of a firearm. The convictions arose from the shooting deaths of Derrick and Duane Moo Young, who were found at the Dupont Plaza Hotel in Miami, Florida on October 16, 1986. According to the testimony presented at trial, Maharaj owned and operated the *Caribbean Times*, a newspaper that catered to the West Indian Community. The *Caribbean Echo*, another local newspaper, was owned by Eslee Carberry. Maharaj approached Carberry to pitch a story about how his neighbor Derrick Moo Young had stolen money from him. After providing Carberry documents that purported to corroborate his accusations, Maharaj paid the *Caribbean Echo* a $400 "sponsorship fee" to publish the article.

After the article was published, Derrick Moo Young presented the *Caribbean Echo* with his version of the story, pointing to an ongoing civil lawsuit Moo Young had filed against Maharaj. Subsequently, the *Caribbean Echo* published a series of articles describing Maharaj's alleged involvement in an illegal scam to take millions of dollars out of Trinidad. Maharaj, however, claimed that Moo Young was committing fraud and extortion against him and his family, including the alleged extortion of $160,000 from Maharaj's relatives in Trinidad.

Neville Butler, the State's primary trial witness, was previously employed by the *Echo* before writing several articles for the *Caribbean Times* under various pennames. Butler testified at trial that Maharaj informed him that Carberry and Moo Young were attempting to extort money from Maharaj's relatives in Trinidad in exchange for suppressing additional unflattering stories. Butler further testified that Maharaj asked him to lure Derrick Moo Young to a meeting in order to (1) extract a confession from Moo Young that he was actually behind the extortion and bribery;

2

(2) require Moo Young to write two checks to repay him for the fraud; and (3) cause Butler to go to a bank with the checks and certify them, after which Maharaj would allow Moo Young to leave.

The meeting was set for October 16, 1986, under the pretext that Moo Young, who was involved in the import/export business, would be meeting with Eddie Dames and Prince Ellis of the Bahamas to discuss the purchase of goods for their catering business. Butler arranged for the meeting to be held in Dames's room at the Dupont Plaza Hotel. Moo Young was never informed that Maharaj would be in attendance.

When Derrick Moo Young arrived at the Dupont, he had unexpectedly brought his twenty-three-year-old son, Duane Moo Young. When the Moo Youngs entered the room, Maharaj emerged from behind the door with a gun in his right hand and a pillow in his left. An argument ensued, and Maharaj shot Derrick Moo Young in the leg. Butler testified that Maharaj then instructed him to tie the Moo Youngs up, but before he could do so, Derrick Moo Young lunged at Maharaj, who again shot the elder Moo Young three or four more times. Maharaj then turned his attention toward Duane Moo Young, who was loosely tied to a chair with a cord from an immersion heater. While Maharaj questioned Duane about the money, Derrick Moo Young managed to open the door to the hallway and attempted to crawl outside. Maharaj shot Derrick Moo Young again and dragged him back inside the room by his ankles.

 Maharaj took Duane Moo Young upstairs for further questioning, attempting to verify what the Moo Youngs had done with the money allegedly extorted from Maharaj's relatives in Trinidad. Soon thereafter, a hotel security guard shouted from outside the room that he noticed blood in the hallway and inquired whether everyone was alright. Maharaj apparently moved toward the door and verified that things were fine. After several minutes, Maharaj poked his head into the hallway and appeared to tell someone that everyone was fine. After Maharaj returned

upstairs to question Duane once more, Butler testified that he heard a single gunshot. Maharaj then came downstairs alone and they both left room 1215.

Butler testified that he and Maharaj waited in the car in front of the hotel for three hours for Dames's return. Maharaj promised Butler that, in exchange for his silence, he would provide Butler a job at the *Caribbean Times*, a down payment for Butler's home, and a car. Once Dames arrived, Butler exited the vehicle and left the scene. Later that day, Maharaj contacted Butler and asked to meet at a Denny's restaurant near the Miami Airport to coordinate their stories. Butler testified that before meeting with Maharaj, he met with Dames and Ellis and told them what happened. Dames and Ellis had already given statements to police investigators and encouraged Butler to contact the police. Butler then called the lead investigator, Miami Police Detective John Buhrmaster, and explained what had transpired. Butler and Buhrmaster arrived at the Denny's together, where Maharaj was arrested for the murders.

The State presented other witnesses who testified at trial to Maharaj's motive and prior acts that were consistent with the murders at the Dupont Plaza Hotel. For example, Tino Geddes, a journalist at the *Caribbean Echo*, and Carberry, testified about Maharaj's payment to Carberry to publish unfavorable articles about Derrick Moo Young. Geddes also testified that Maharaj had previously met Geddes at the Dupont Plaza Hotel with a handgun and asked Geddes to lure Carberry and Derrick Moo Young to the hotel. According to Geddes, Maharaj purchased exotic weapons and had attempted to harm Carberry on several occasions.

Additionally, the State presented corroborating physical evidence and testimony from hotel staff as to the blood outside of room 1215, the "Do Not Disturb" sign that was later found with Maharaj's fingerprints on it, and the eleven additional fingerprints found inside the room that matched Maharaj's. The State also presented evidence linking Maharaj to a Smith & Wesson

model 39, nine-millimeter pistol—the type of gun a firearms expert testified was used in the Moo Young murders.

The jury found Maharaj guilty on all counts. His convictions were affirmed, and he was denied state post-conviction relief on the guilt phase of his case.[1] Maharaj then petitioned for federal habeas relief and was again denied in both the district court and the Eleventh Circuit Court of Appeals. *See Maharaj*, *v. Sec'y for Dep't of Corrs.*, 432 F.3d 1292 (11th Cir. 2005).

As relevant to Maharaj's instant successive petition, Judge Huck found in a lengthy and comprehensive order that Maharaj's *Brady* claims were insufficient to warrant habeas relief. *See Maharaj v. Moore*, No. 02-22240-HUCK/TURNOFF, ECF No. 54 (S.D. Fla. Aug. 31, 2004). The alleged *Brady* evidence at issue before Judge Huck included: (1) a transcript of Neville Butler's statements during a polygraph examination conducted by the State; (2) the contents of the Moo Youngs' briefcase, including their passports; and (3) information concerning the Moo Youngs' life insurance policies. *Id.* at 17. Though Judge Huck noted that the evidence produced may have afforded Maharaj "perhaps a better developed theory of defense," he nonetheless found that Maharaj did not "provide[] sufficient evidence… to undermine the verdict of the jury." *Id.* at 6. Judge Huck further found that Maharaj could not establish a constitutional violation under *Brady* to form the basis for relief under the AEDPA. *Id.* at 6, 17–25.

This finding was upheld by the Eleventh Circuit. As to the transcript of Butler's polygraph examination, the Eleventh Circuit agreed that the Florida Supreme Court's analysis, under both *Brady* and *Giglio*, was neither contrary to nor an unreasonable application of clearly established federal law. Noting that Butler was thoroughly and vigorously cross-examined about the

---

[1] Maharaj's death sentence was overturned and he was subsequently sentenced to life in prison.

inconsistencies in his accounts of the murders, and that Maharaj's counsel indeed elicited testimony from Butler that he had lied under oath, the panel found that "even if Maharaj had established that Butler's testimony was false (which he did not), the falsehood was not material." *Maharaj*, 432 F.3d at 1314. As such, the Butler polygraph was insufficient to support a *Brady* claim.

Regarding Maharaj's second piece of evidence—the contents of the Moo Youngs' briefcase—the Eleventh Circuit deemed such evidence insufficient to support a *Brady* violation for two reasons: (1) "the briefcase and its documents were not suppressed by the State because Petitioner knew of their existence and had the power to compel their return from the Moo Young family by subpoena," and (2) "the information was not material." *Id.* at 1315. Accordingly, the Court found that the Florida Supreme Court's conclusions regarding the briefcase was neither contrary to nor an unreasonable application of clearly established federal law. *Id.*

The Court similarly rejected Maharaj's reliance on the Moo Youngs' life insurance policies as the basis for his *Brady* claims, agreeing with the Florida Supreme Court that the policies were not exculpatory nor would the disclosure of the policies "have put the case in so different a light as to undermine confidence in the verdict." *Id.* at 1316–17. The Court emphasized that Maharaj's arguments that the life insurance policies indicated shady dealings on behalf of the Moo Youngs were "even more speculative than his argument concerning the other contents of the briefcase." *Id.* Viewing the evidence cumulatively, the Eleventh Circuit determined that "there [was] no reasonable probability, had all of the items been disclosed to the defense, the result of the proceedings would have been any different." *Id.* at 1317.

In 2012, Maharaj filed a second motion for post-conviction relief pursuant to Rule 3.850, which was denied at the trial level and affirmed on appeal. *See* ECF No. 38, Ex. 1–9; *Maharaj v.*

*State*, No. 3D15-321 (Fla. 3d DCA July 31, 2016). Maharaj's *Brady* claims were specifically dismissed by the state court judge as unavailing. *See* Order Def.'s Mot. Post-Conviction Relief, No. F86-030610 (Fla. Cir. Ct. Jan. 5, 2015), ECF No. 38-3 ("2012 Rule 3.850 Order").

Maharaj advanced three *Brady* claims. *Id*. First, he alleged that the State failed to disclose the indictment of Jaime Vallejo Mejia, the man staying in the room across the hall from the murder scene who had alleged ties to the cartel. *Id*. Mejia was indicted for money laundering in the Western District of Oklahoma approximately five weeks prior to Maharaj's trial. *Id*. Second, Maharaj alleged that "DEA special agent Kimberly Abernathy made a statement in a memorandum document with the Department of Business Regulation that Mr. Mejia was arrested on the federal indictment for laundering money on behalf of Colombian drug smugglers." *Id*. Finally, Maharaj alleged that the testimony of Baruch Vega, a former CIA informant, was in the constructive possession of the State and was therefore withheld in violation of *Brady*. *Id*. In all, Maharaj—as he does today—purports that this allegedly withheld evidence supports his innocence based on the theory that Mejia conducted the murders on behalf of Pablo Escobar and the Colombian cartel.

The state court disagreed, holding not only that Maharaj "failed to meet his burden to demonstrate that the State willfully or inadvertently suppressed favorable material evidence," but that even if such evidence had been disclosed, "the jury verdict would have been the same." *Id*.

Before denying relief, the trial court also conducted an evidentiary hearing on Maharaj's claims of newly discovered evidence based upon witness testimony that Escobar and the Colombian cartel were responsible for the murders.

The evidence presented at the hearing included: (1) testimony and documentation from Brenton Ver Ploeg, an attorney representing the life insurance company in a lawsuit filed by the

Moo Young family; (2) testimony from Jorge Maya that the Moo Young murders were actually ordered by Pablo Escobar and carried out by Manuel Guillermo Zuluaga Salazar; (3) a two-minute television interview of Jhon Jairo Velasquez Vasquez conducted by BBC; (4) testimony from Baruch Vega, a former CIA informant, who testified about his relationship with Jaime Vallejo Mejia; (5) testimony from John Brown, a former pilot for the cartel; (6) testimony from Michael Flynn, whose claim that the Miami Police Department framed Maharaj was found to be "one of the most obvious self-serving endeavors [the state court had] seen in ten years on the Circuit Court bench"; (7) testimony from Prince Ellis; (8) testimony from Henry Cuervo, who testified as an expert in investigating Colombian drug cartels in South Florida in the 1980s; and (9) additional miscellaneous evidence related to other witnesses and the Moo Youngs. *Id*.

The state court, having "fully considered all the newly discovered evidence which would be admissible," ultimately found that the new evidence presented at the hearing was insufficient "to give rise to a reasonable doubt as to Mr. Maharaj's guilt." *Id*. The court specifically took issue with the "inherent credibility concerns and admissibility issues surrounding the newly discovered evidence…." *Id*. Accordingly, despite finding certain testimony presented at the hearing probative, the state court denied relief. This decision was upheld on appeal.

Pursuant to the AEDPA, Maharaj sought leave from the Eleventh Circuit to file the instant successive federal habeas petition. *In re Maharaj*, No. 17-10452-F (11th Cir. Mar. 18, 2017), ECF No. 63-1 at 5 ("11th COA Order Permitting Successive Petition"). The Eleventh Circuit panel granted Maharaj's application with respect to certain *Brady* claims. *Id*.

## II.   **Eleventh Circuit Scope of Successive Petition**

In his application to the Eleventh Circuit, Maharaj sought permission to raise seven distinct claims in a second or successive petition:

> (1) he is actually innocent; (2) the government suppressed favorable evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (3) the government knowingly presented perjured testimony at trial, in violation of *Giglio v. United States*, 405 U.S. 150 (1972); (4) his trial counsel was ineffective; (5) he was intentionally framed by law enforcement officers; (6) his post-conviction counsel was ineffective; and (7) cumulative error in his prosecution violated his fundamental rights.

*Id*. at 2.[2] The Eleventh Circuit, however, only granted leave as to "Claims 2(c)–(f),"—i.e., Maharaj's *Brady* claims. *Id.* at 2–3 ("Because we conclude that Mr. Maharaj has made a *prima facie* showing that his subclaims 2(c) through (f) satisfy § 2244(b)(2)(B), we grant his request for authorization to file a second or successive habeas petition in the district court.").

In Claims 2(c)–(f), Maharaj "alleges that the State suppressed materials or information from five individuals who could testify that a cartel hit man actually committed the murders." *Id*. at 3. Specifically, the alleged *Brady* evidence includes (1) testimony from John Brown; (2) a statement from Jorge Maya, an "enforcer" for the cartel, that Escobar in fact ordered the murders; (3) an affidavit from Jhon Jairo Velasquez Vasquez to the same effect; and (4) testimony from an additional witness insisting on anonymity who portends to provide additional evidence that the cartel carried out the hit and not Maharaj. *Id.* at 4–5.

Accordingly, this Court's review is limited to the foregoing claims—which, as it pertains to Maharaj's Petition, is listed as "Ground One: Violations of Brady v. Maryland." *See* ECF No. 29; *see also In re Hill*, 715 F.3d 284, 296 (11th Cir. 2013). Therefore, as recommended in the R&R, Grounds Two through Four of the Petition will not be addressed for lack of jurisdiction. *See* ECF No. 127 at 5.

---

[2] The Court noted that although Maharaj indicated in his application that he wished to raise a single claim, his proposed habeas petition actually set forth seven claims. *See* 11th COA Order Permitting Successive Petition, ECF No. 63-1 at 2 n.1.

9

With this in mind, the Court must also dispel Petitioner's notion—or insistence, rather—that the Eleventh Circuit's permission to file a second or successive petition constitutes a finding that no reasonable jurist could find Petitioner guilty—i.e., that its permission amounts to a declaration of Petitioner's innocence. This is not so.

> For example, the Eleventh Circuit stated:
>
> Mr. Maharaj has sufficiently alleged a *Brady* violation: he learned in 2014 that Mejia—an individual who resided in close proximity to the murder scene and who apparently was involved with the cartel—was under criminal investigation of the Moo Young murders, a fact that the prosecution or the police knew but did not disclose.

11th COA Order Permitting Successive Petition, ECF No. 63-1 at 5.  This statement, however, merely means that Maharaj has made a threshold showing; it is not a finding that a *Brady* violation indeed occurred. The Eleventh Circuit highlighted this point, stating "'[a]s usual nothing about our ruling here binds the district court, which must decide every aspect of the case fresh, or in the legal vernacular, *de novo*.'" *Id.* at 6 (quoting *In re Chance*, 831 F.3d 335, 1338 (11th Cir. 2016)). This includes—as the Eleventh Circuit clarified—"the merits" of Maharaj's *Brady* claims. *Id.* at 7.

Now that the boundaries of this Court's review are set, the Court will do so.

### III.    <u>AEDPA Standard</u>

The AEDPA circumscribed a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

In reviewing the decisions of the Florida Supreme Court, the Court is governed by the terms of AEDPA, which provide that the Court may grant a § 2254 writ of habeas corpus only if (1) the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) the state

decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

The phrase "clearly established Federal law," as used in § 2254(d)(1), "encompasses only the holdings of the Supreme Court of the United States." *Maharaj*, 432 F.3d at 1308. A state court decision is ***contrary to*** clearly established federal law if either "(1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001) (emphasis added). An "***unreasonable application***" of clearly established federal law may occur if the state court "identifies the correct legal rule from Supreme Court case law but unreasonably applies this rule to the facts of the petitioner's case." *Id.* (emphasis added).

Differing slightly from its (d)(1) counterpart, § 2254(d)(2) provides an additional basis for relief where the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "A state court's determination of the facts, however, is entitled to substantial deference." *Maharaj*, 432 F.3d at 1309; *see* 28 U.S.C. § 2254(e)(1) (noting that "a determination of a factual issue made by a State court shall be presumed to be correct" and the habeas "applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

Indeed, "[w]hen reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 575 U.S. 312, 316 (2015). In sum, "AEDPA erects a formidable barrier to federal habeas relief or prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 1 (2013).

11

**IV.**   ***Brady* Standard**

As discussed above, Petitioner's claims are limited by the Eleventh Circuit's Order permitting a second or successive petition to the alleged *Brady* violations enunciated in his subclaims 2(c)–(f)—here, "Ground One." [ECF No. 29].

*Brady* violations are defined as "the suppression by the prosecution of evidence favorable to an accused…when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The duty to disclose, however, is applicable even in the absence of a request by the defendant and includes both exculpatory evidence and impeachment material. *See Strickler v. Greene*, 527 U.S. 263, 280 (1999).

There are four elements required to establish a *Brady* violation: (1) the State possessed evidence favorable[3] to the defense; (2) the defendant did not possess the evidence and could not obtain it with any reasonable diligence; (3) the prosecution suppressed the evidence, either willfully or inadvertently; and (4) a reasonable probability exists that the outcome of the proceeding would have been different had the evidence been disclosed to the defense—i.e., the evidence was "material". *See Moon v. Head*, 285 F.3d 1301, 1308 (11th Cir. 2002).

In sum:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995) (internal quotation marks and citations omitted).

---

[3] Evidence is considered favorable to the accused if it is either exculpatory or because it is impeaching. *See Strickler*, 527 U.S. at 281–82.

## V.    <u>Analysis</u>

With these principles in mind, the Court reviews the merits of Petitioner's *Brady* claims. Today, Maharaj presents new evidence that he alleges establishes both his innocence and the factual predicate for a *Brady* violation when viewed together with the evidence previously rejected. As discussed, the new evidence includes (1) testimony from John Brown; (2) a statement from Jorge Maya, an "enforcer" for the cartel, that Escobar in fact ordered the murders; (3) an affidavit from Jhon Jairo Velasquez Vasquez to the same effect; and (4) testimony from an additional witness insisting on anonymity who portends to provide additional evidence that the cartel carried out the hit and not Maharaj. *See* 11th COA Order Permitting Successive Petition at 4–5. Like its predecessors, the Court notes at the outset that, upon review of the Petition and the evidence set forth therein, were this case to be tried again today, Maharaj would undoubtedly have a stronger theory of defense to present to the jury. This, however, is insufficient to warrant relief under the AEDPA. Maharaj can neither show that this evidence constitutes *Brady* material nor can he establish that, had the evidence been disclosed, the result of his trial would have been different.

### A.  *Actual Innocence Issue*

"The guilt or innocence determination in state criminal trials is 'a decisive and portentous event.'" *Herrera v. Collins*, 506 U.S. 390, 401 (1993) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977)). Accordingly, the Supreme Court has determined that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id.* at 400. "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Id.*

As such, despite his contentions to the contrary and despite the capacious amount of allegedly exculpatory evidence presented in the Petition, Maharaj is only entitled to habeas relief if he can establish that a *Brady* violation occurred. The Court finds that he cannot.

B. *The Prosecution Team Did Not Possess or Suppress the Alleged Brady Material*

The state court held that Maharaj "failed to satisfy his burden to demonstrate that the State willfully or inadvertently suppressed" the alleged *Brady* material. *See* 2012 Rule 3.850 Order, ECF No. 38-3 at 3. The state court specifically found that "there is no evidence in this record to even suggest the State had any knowledge of the claimed *Brady* evidence," and likewise "reject[ed] any suggestion that the claimed *Brady* evidence was in the constructive possession of the State." *Id.* This finding is neither contrary to nor an unreasonable application of clearly established federal law. Nor was it an unreasonable determination of the facts in light of the evidence.

There are two pieces of material that could be argued to have been in the possession of the prosecution—the indictment of Jaime Vallejo Mejia that occurred approximately five weeks prior to Maharaj's trial, and testimony from Baruch Vega, who was an informant for the CIA at the time of the murders. The testimony from John Brown, Jorge Maya, Jhon Jairo Velasquez Vasquez, and anonymous Witness "A" could not be construed to be in the prosecution's possession— constructively or otherwise. Like much of the additional evidence presented in this case, this evidence could bolster Maharaj's materiality argument in that it tends to reinforce his assertion that his trial would have turned out differently. Maharaj may have had significantly more evidence to strengthen his theory of defense that a Colombian man carried out the murders on behalf of the cartel. Nonetheless, without any ***possessed and suppressed evidence*** to bootstrap this testimony to, the testimony is insufficient on its own to assert a *Brady* violation.

"*Brady* and its progeny apply only to evidence possessed by the prosecution team, which includes both investigative and prosecutorial personnel," as well as "anyone over whom [the prosecutor] has authority." *Kelley v. Sec. for Dep't of Corr.*, 377 F.3d 1317, 1354 (11th Cir. 2004); *Moon*, 285 F.3d at 1309. "[T]he prosecution team generally is considered a unitary entity, and favorable information possessed by the police but unknown to the prosecutor is nonetheless subject to the *Brady* test." *Breedlove v. Moore*, 279 F.3d 952, 961 (11th Cir. 2002). The Eleventh Circuit has made clear, however, that "[k]knowledge of information that state investigators obtain is not imputed for *Brady* purposes to federal investigators who conduct a separate investigation when the separate investigative teams do not collaborate extensively." *United States v. Naranjo*, 634 F.3d 1198, 1212 (11th Cir. 2011); *see also Moon*, 285 F.3d at 1310 (holding that knowledge obtained by investigators in one state is not imputed to investigators that conduct a separate investigation in another state).

1. Indictment of Jaime Vallejo Mejia

As previously mentioned, Jaime Vallejo Mejia was a Colombian man staying in the room across from room 1215 in the Dupont Plaza hotel at the time of the murders. On September 3, 1987—some five weeks before Maharaj's trial and almost a year after the murders—Mejia was indicted in the United States District Court for the Western District of Oklahoma for money laundering. *See* ECF No. 47-3 at 6. It is Maharaj's contention that Mejia was engaged in currency crimes on behalf of the Colombian cartel and was either the murderer himself or was otherwise involved in the double homicide. Maharaj argues that the State knew of or should have been aware of Mejia's federal indictment in Oklahoma, and that the prosecutorial team either willingly failed to disclose this information or failed to conduct a sufficient investigation of Mejia. This theory is the gist of Maharaj's claim.

In support of such claim, Maharaj offers the testimony of Agent Henry Cuervo, who was a retired Drug Enforcement Administration ("DEA") agent working in Miami from about 1986 to 2002. The R&R outlines Agent Cuervo's testimony at length, but in sum, Agent Cuervo opined as an expert that certain characteristics of Mejia, including the fact that he was from Antioquia, Colombia, had recently traveled from Aruba, and claimed to be in insurance sales, all should have raised red flags to the investigative team at the time of the murders. Agent Cuervo also testified that based on the indictment, Mejia was likely being investigated by the DEA as early as 1985 and potentially earlier. Agent Cuervo had also reached out to DEA Agent Kimberly Abernathy, who informed him that the DEA had been investigating Mejia as part of the 1983–84 Operation Greenback in South Florida. In all, Agent Cuervo testified as to the numerous leads that could have—and in his opinion, should have—been pursued.

Maharaj also presented a memorandum from the Florida Department of Business Regulations, indicating that an agent for the department was able to determine that Mejia—who was then applying for a liquor license—was being looked into by the DEA. This document is also offered to "illustrat[e] how Det[ective] Buhrmaster would have easily found this" information had he performed an adequate investigation. *See* ECF No. 128 at 3.

2.  Testimony from Baruch Vega

Baruch Vega worked as an informant for the CIA in South America and the United States, where he was also introduced to the DEA and other government agencies. Vega's testimony is also outlined at length in the R&R but is summarized as follows.

In the mid-1980's, Vega worked with a federal task force known as CENTAC-26, consisting of personnel from Miami and Miami-Dade police, the DEA, and the FBI. Vega testified

that he reported to his supervisory agents consistently from 1978 to 2000, and that he was confident he reported what he knew at the time of the murders. Vega acknowledged that he had a friendship with Mejia and knew Mejia to be highly involved in money laundering for various cartels. Vega testified that Mejia used an individual known as "El Chino Mau" to launder money and that Mejia stated to him that the cartel "needed to kill this son of a bitch crook, Chinese crock [sic]" for stealing from Pablo Escobar. Vega asserts that he reported this admission to his handlers who were allegedly conducting a "very advanced" investigation. According to Vega, he knew "El Chino Mau" to be Derrick Moo Young. He also testified, however, that he knew only of the name "El Chino Mau" and that the FBI's posting of pictures on the wall identified "El Chino Mau" to him as Derrick Moo Young. Indeed, though asserting that he had met Moo Young in the past, Vega was unable to identify him in a picture the night before his deposition.

The state court considered Vega's testimony both "very interesting" and "probative." *See* 2012 Rule 3.850 Order, ECF No. 38-3 at 6–7. Nonetheless, the court found that his testimony was "profoundly weakened by his inability to identify a photograph of Mr. Mejia or Derrick Moo Young," was "fraught with inadmissible hearsay[,] and [was] woefully insufficient to establish a reasonable probability of acquittal on retrial." *Id.* at 7. Accordingly, the materiality of Vega's testimony was considered "questionable." *Id.*

3.  Insufficient Evidence to Impute to Prosecutorial Team

The state court's determination that Maharaj did not meet his burden to impute this evidence to the prosecutorial team is not unreasonable.

John Kastrenakes, former Circuit Court Judge in Palm Beach County, Florida, and one of two Assistant State Attorneys assigned to the case, testified that the prosecution was aware of

Mejia's presence across from room 1215 at the time of the murders. He knew Mejia had been interviewed by the police and had given a statement. Mejia, however, was not a trial witness, so the prosecution had not focused on him. Kastrenakes further testified that he was never aware of Mejia having been federally indicted a short time prior to Petitioner's trial, as neither the prosecution team nor law enforcement conducted any follow-up investigation of Mejia.

Maharaj's defense counsel testified at the 1997 evidentiary hearing that he was aware that room across the hall from the murder scene was occupied by Mejia, and confirmed that the prosecution had disclosed his name and the available information about him. *See* ECF No. 71-1 at 115. The defense received Mejia's 1986 statement to Detective Buhrmaster and had its own investigator look into Mejia. The State also gave the defense Mejia's overseas address and phone number.

There is no indication of collaboration between the State's prosecution team in Florida and federal investigators in Western Oklahoma. *See Moon*, 285 F.3d at 1310 (holding that knowledge obtained by investigators in one state is not imputed to investigators that conduct a separate investigation in another state). Maharaj cannot establish that the prosecution team in his case knew of Mejia's wrongdoings in another state; what he contends, however, is that the prosecution should have known.

Maharaj specifically asserts that had Detective Buhrmaster actually checked Mejia with "all agencies" as he contended at trial, the indictment, information from the Florida Department of Business Regulations, and Vega's intel to CENTAC-26 would have come up in his investigation.

In hindsight and all other things aside, this may have been true.[4] Nonetheless, the prosecution "has no duty to undertake a fishing expedition in other jurisdictions…." *See Meros*, 866 F.2d 1304, 1309. Mr. Kastrenakes explained why the prosecution did not focus its resources on Mejia— namely, he was cooperative and was not being called as a trial witness, and the evidence against Maharaj was overwhelming. Indeed, Maharaj's own private investigation of Mejia was fruitless at the time of trial.

Nor does the record reflect a connection between CENTAC-26 and the state prosecution. Therefore, even if Vega's testimony that he reported Mejia's admission to his handlers is true, there is no indication that the team prosecuting Maharaj had access to or knowledge of such.

In sum, much of the evidence proffered by Maharaj makes a strong case that the investigation was not up to par. In fact, that is precisely what Agent Cuervo opined. But even if this were true—a contention made doubtful by the overwhelming record evidence implicating Maharaj in the murders—it is insufficient to establish the first and third *Brady* prongs. The prosecution could not have suppressed information it was not aware of.[5]

### C. *Cumulative Impact of the Evidence*

Before the Court moves on to the final *Brady* prong of materiality, it must address Maharaj's assertions that both the state court and Magistrate Judge Otazo-Reyes failed to analyze

---

[4] Though, again, the Court highlights that Mejia was not indicted in Oklahoma until almost a year after the murders took place. This statement should not be construed to agree with Maharaj's contention that this information would have come up in an investigation but merely states that it may have.

[5] At the very least, the Court finds that the state court's determination of this issue was not contrary to or an unreasonable application of clearly established federal law. Nor was it an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)–(2).

his claims cumulatively. That is, that both decisions fail to include the evidence set forth in Maharaj's 1997 *Brady* claims.

The Supreme Court has made clear that a *Brady* materiality determination must consider the aggregate effect of all the suppressed evidence. *See Kyles*, 514 U.S. at 436, 441. "That does not mean, however, that an individual assessment of each piece of suppressed evidence is somehow inappropriate." *Maharaj*, 432 F.3d at 1310. A court can evaluate the cumulative effect only by first examining each piece of material standing alone. *See Kyles*, 514 U.S. at 436 n.10 (noting that "[w]e evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately and at the end of the discussion…."); *see also Kelley*, 377 F.3d at 1335, 1369.

Maharaj's objections to this point are unavailing. Not only does the Court agree with the R&R's determination that the state court analyzed the alleged *Brady* materials in the aggregate, Maharaj's arguments regarding their cumulative effect are misplaced. For example, Maharaj continues to argue that cumulatively, the documents contained within the briefcase paired with this newly discovered evidence demonstrates a clear *Brady* violation. *See* ECF No. 128 at 11–12. This is not so. As found by the Eleventh Circuit, the documents within the briefcase were not *Brady* material at all, in that they were available to Maharaj at the time of trial. *Maharaj*, 432 F.3d at 1314–15. The Eleventh Circuit similarly found that evidence regarding the Moo Youngs' insurance policies was not *Brady* material because it was not exculpatory. *Id.* at 1317–18. Finally, the Eleventh Circuit found that the Florida Supreme Court's finding that Neville Butler's polygraph test was not suppressed was neither contrary to nor an unreasonable application of clearly established law. *Id.* Therefore, even cumulatively, this evidence cannot serve as the basis of a *Brady* violation.

So, while the Court must address the cumulative effect of all of the ***suppressed evidence*** to properly analyze the materiality prong of Maharaj's *Brady* claims, those items found to not constitute *Brady* material—whether it be because the evidence was not suppressed or because it is not exculpatory—are not relevant to the materiality analysis under *Kyles*. *See* 514 U.S. at 436, 441. In short, if an item was not suppressed, it does not matter if it is material in this context. *Brady* requires all four prongs to be met. The Court agrees that, in the aggregate, Maharaj's materiality argument is strengthened by the evidence he has set forth. However, the Court also agrees with the state court's conclusion that the evidence discussed above was not suppressed by the prosecution team. Therefore, even analyzed in the aggregate, Maharaj's evidence is insufficient to assert a *Brady* claim.

D. *Materiality*

The discussion could end here. The Court, however, would be remiss to forego a discussion of the final prong of *Brady*—materiality. Evidence is material where a reasonable probability exists that the outcome of the proceeding would have been different had the evidence been disclosed to the defense. *See Moon*, 285 F.3d at 1308.

As previously stated, had Maharaj had at his disposal at trial the evidence he now contends asserts a Brady claim, he undoubtedly would have had a stronger theory of defense. This does not signify, however, that the outcome of his trial would have been different. Maharaj's Colombian cartel theory was proffered at trial. Mejia's federal indictment in Oklahoma—though seeming to be more than a coincidence—is too attenuated to overcome the evidence at trial and the jury's determination that Maharaj committed the murders. As discussed, there was ample evidence of Maharaj's involvement, including twelve matching fingerprints, a known relationship between Maharaj and the victims, a motive, a link to Maharaj and the murder weapon, and an eyewitness.

Mejia's federal indictment may have arguably tied him to the cartel, but it does not necessarily tie him to the murders. And, given the high deference due under the AEDPA, the state court's determination that the evidence presented does not undermine the jury's verdict should be upheld.

## VI.    Certificate of Appealability

A Certificate of Appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right," and it must indicate the issue on which the petitioner made such a showing. 28 U.S.C. § 2253(c)(2), (3); *see also* ECF No. 114 at 3. Where the district court has denied a motion to vacate in whole or in part on procedural grounds, a movant must show that reasonable jurists could debate: (1) whether the motion states a valid claim for the denial of a constitutional right, and (2) whether the district court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). A Certificate of Appealability "must specify what constitutional issue jurists of reason would find debatable. Even when a prisoner seeks to appeal a procedural error, the certificate must specify the underlying constitutional issue." *Spencer v. United States*, 773 F.3d 1132, 1138 (11th Cir. 2014) (*en banc*).

The Court finds that reasonable jurists could debate whether Maharaj has set forth a *Brady* claim to warrant habeas relief. Specifically, the Court certifies the following questions:

(1) Whether the Mejia indictment and/or the information from Baruch Vega could be imputed to the prosecution for purposes of establishing possession and suppression by the prosecution under *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

(2) If so, whether this information would have changed the outcome of the verdict in light of the deference to be afforded under the AEDPA.

## VII.    <u>Conclusion</u>

To be clear, of the litany of habeas petitions before this Court, the facts of this case give the undersigned pause. Unfortunately, pause is insufficient to overcome the highly deferential standard set forth by the AEDPA. *See Woods*, 575 U.S. at 316. Because Maharaj has failed to overcome this "formidable barrier," his Petition must be denied. *Burt*, 571 U.S. at 1.

Accordingly, after careful consideration, it is hereby:

**ORDERED AND ADJUDGED** that

1.     United States Magistrate Judge Otazo-Reyes's Report and Recommendation, [ECF No. 127], is **AFFIRMED and ADOPTED**.

2.     Petitioner's Petition for Habeas Corpus, [ECF No. 29], is **DENIED**. As set forth above, a Certificate of Appealability is **GRANTED** and **SHALL ISSUE**.

3.     This case is **CLOSED**, and all pending motions are **DENIED AS MOOT**.

DONE AND ORDERED in Chambers at Miami, Florida, this 30th day of November 2020.

JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
All Counsel of Record
Magistrate Judge Otazo-Reyes